# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **NAVY SEALS 1-26,** et al., <br><br>       Plaintiffs, <br><br>   v. <br><br> **JOSEPH R. BIDEN, JR.**, in his official capacity as President of the United States, et al., <br><br>       Defendants. | Case No. 4:21-cv-01236-O |

## OFFICIAL CAPACITY DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.       The COVID-19 Pandemic.................................................................................3

    II.     Department of Defense COVID-19 Vaccine Directive .................................................3

    III.    The Navy's Implementation of DoD's Vaccine Directive ...........................................5

        A.     Navy Policies Applicable to All Navy Service Members.......................................5

        B.     Navy Special Warfare Community..............................................................6

        C.     Navy Policies Applicable to Members of the Navy Special Warfare Community..7

    IV.    Procedural History ........................................................................................8

LEGAL STANDARDS ............................................................................................... 9

ARGUMENT ............................................................................................................ 10

    I.       Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.............................10

        A.     The Court Lacks Jurisdiction to Enter Relief Against the President. ...................10

        B.     Plaintiffs Have Not Exhausted Military Remedies. ...............................................11

        C.     Plaintiffs' Claims Pertaining to Their Duty Assignments, Deployment, and Medical Qualifications Are Non-Justiciable.........................................................15

        D.     Plaintiffs' First Amendment and RFRA Claims Are Unlikely to Succeed. ..........19

    II.     Plaintiffs Do Not Face Irreparable Harm....................................................................30

    III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction. ..........35

    IV.    Any Relief Should Be Narrowly Tailored. .................................................................40

CONCLUSION.......................................................................................................... 40

i

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision Inc. v. Jones*,
  722 F.3d 711 (5th Cir. 2013) ................................................................ 20

*303 Creating LLC v. Elenis*,
  6 F.4th 1160 (10th Cir. 2021) ............................................................... 28

*Ali v. Stephens*,
  822 F.3d 776 (5th Cir. 2016) ................................................................ 24

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
  878 F.2d 806 (5th Cir. 1989) ................................................................. 9

*Anderson v. Jackson*,
  556 F.3d 351 (5th Cir. 2009) ................................................................. 9

*Antonellis v. United States*,
  723 F.3d 1328 (Fed. Cir. 2013)............................................................. 17

*Bois v. Marsh*,
  801 F.2d 462 (D.C. Cir. 1986) ......................................................... 33, 39

*Bowen v. Roy*,
  476 U.S. 693 (1986).............................................................................. 30

*Brown v. Smith*,
  24 Cal. App. 5th 1135 (2018) ............................................................... 22

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008)............................................................... 30

*BST Holdings, LLC v. Occupational Health & Safety Administration*,
  17 F.4th 604 (5th Cir. 2021) ........................................................... 34, 35

*Burson v. Freeman*,
  504 U.S. 191 (1992)............................................................................... 22

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)......................................................................... 20, 22

*Bynum v. FMC Corp.*,
  770 F.2d 556 (5th Cir. 1985) ............................................................... 12

ii

*Chacon v. Granata,*
    515 F.2d 922 (5th Cir. 1975) ............................................................ 32

*Chappell v. Wallace,*
    462 U.S. 296 (1983).......................................................... 15, 18, 39

*Chilcott v. Orr,*
    747 F.2d 29 (1st Cir. 1984)........................................................ 33, 39

*Church v. Biden,*
    2021 WL 5179215 (D.D.C. Nov. 8, 2021) ................................. *passim*

*Connecticut v. Massachusetts,*
    282 U.S. 660 (1931)..................................................................... 20

*Contech Casting, LLC v. ZF Steering Sys., LLC,*
    931 F. Supp. 2d 809 (E.D. Mich. 2013)........................................ 31

*Cutter v. Wilkinson,*
    544 U.S. 722 (2005)..................................................................... 21

*D.J. v. Mercer Cnty. Bd. of Educ.,*
    No. 13-0237, 2013 WL 6152363 (W.Va. Nov. 22, 2013) .............. 22

*Daniels Health Scis., LLC v. Vascular Health Scis., LLC,*
    710 F.3d 579 (5th Cir. 2013) ....................................................... 30

*Diraffael v. Cal. Mil. Dep't,*
    2011 WL 13274364 (C.D. Cal. Mar. 21, 2011)............................. 15

*Doe v. Austin,*
    2021 WL 5816632 (N.D. Fla. Nov. 12, 2021)................................. 2

*Does 1-6 v. Mills,*
    16 F.4th 20 (1st Cir. 2021)............................................................. 2

*Employment Division, Department of Human Resources of Oregon v. Smith,*
    494 U.S. 872 (1990)..................................................................... 29

*Farmer v. Mabus,*
    940 F.2d 921 (5th Cir. 1991) ....................................................... 10

*F.F. on behalf of Y.F. v. New York,*
    65 Misc. 3d 616 (N.Y. Sup. Ct. 2019) .......................................... 22

*Florida v. HHS,*
    2021 WL 5768796 (11th Cir. Dec. 6, 2021) ............................................................... 40

*Foley v. Biden,*
    No. 4:21-cv-01098-O (N.D. Tex. Oct. 6, 2021) ....................................................... 10

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .................................................................................................... 11

*Garland v. N.Y.C. Fire Dep't,*
    2021 WL 5771687 (E.D.N.Y. Dec. 6, 2021) ...................................................... 32, 38

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ............................................................................................... 40

*Gilligan v. Morgan,*
    413 U.S. 1 (1973) .......................................................................................................... 9

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) .............................................................................................. 21, 29

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) .................................................................................................... 20

*Grutter v. Bollinger,*
    539 U.S. 306 (2003) .................................................................................................... 21

*Guerra v. Scruggs,*
    942 F.2d 270 (4th Cir. 1991) ........................................................................... 17, 33, 39

*Guitard v. Sec'y of Navy,*
    967 F.2d 737 (2d Cir. 1992) ....................................................................................... 33

*Hall v. McHugh,*
    2010 WL 596499 n.4 (S.D. Ga. Feb. 17, 2010) ......................................................... 34

*Harkness v. Sec'y of Navy,*
    858 F.3d 437 (6th Cir. 2017) .......................................................................... 16, 17, 38

*Hartikka v. United States,*
    754 F.2d 1516 (9th Cir. 1985) .................................................................................... 33

*Hodges v. Callaway,*
    499 F.2d 417 (5th Cir. 1974) .......................................................................... 13, 14, 15

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) .......................................................................... 30, 32

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................................ 30

*Johnson v. Reed*,
    609 F.2d 784 (5th Cir. 1980) ................................................................................ 16

*Kane v. De Blasio*,
    --- F.4th ---, 2021 WL 5549404 (2d Cir. Nov. 28, 2021) ..................................... 28

*Lawrence v. McCarthy*,
    344 F.3d 467 (5th Cir. 2003) ................................................................................ 15

*Layman v. Harvey*,
    2007 WL 430678 (M.D. Fla. Feb. 5, 2007) .......................................................... 18

*Lebron v. Rumsfeld*,
    670 F.3d 540 (4th Cir. 2012) ................................................................................ 21

*Love v. State Dep't of Educ.*,
    29 Cal. App. 5th 980 (2018) ................................................................................. 22

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994).............................................................................................. 40

*Maier v. Orr*,
    754 F.2d 973 (Fed. Cir. 1985).............................................................................. 18

*Mass. Correction Officers Federated Union v. Baker*,
    2021 WL 4822154 (D. Mass. Oct. 15, 2021)................................................... 38, 39

*Mazares v. Dep't of Navy*,
    302 F.3d 1382 (Fed. Cir. 2002)........................................................................ 10, 18

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)................................................................................................ 9

*McCurdy v. Zuckert*,
    359 F.2d 491 (5th Cir. 1966) ........................................................................... 33, 35

*Meister v. Tex. Adjutant General's Dep't*,
    233 F.3d 332 (5th Cir. 2000) ........................................................................... 12, 16

*Mier v. Owens*,
    57 F.3d 747 (9th Cir. 1995) ........................................................................ 16

*Miller v. United States*,
    42 F.3d 297 (5th Cir. 1995) ........................................................................ 18

*Mindes v. Seaman*,
    453 F.2d 197 (5th Cir. 1971) .......................................................... 12, 16, 18

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
    760 F.2d 618 (5th Cir. 1985) ........................................................................ 9

*Navy SEAL 1 v. Biden*,
    2021 WL 5448970 (M.D. Fla. Nov. 22, 2021) .................................... 2, 11

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) .............................................................. 11

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
    833 F.2d 583 (5th Cir. 1987)................................................................12

*Nianga v. Wolfe*,
    435 F. Supp. 3d 739 (N.D. Tex. 2020) .................................................. 10

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................................ 30, 35

*Orloff v. Willoughby*,
    345 U.S. 83 (1953)........................................................................ 16, 30, 39

*Pelekai v. Hawaii*,
    2021 WL 4944804 (D. Haw. Oct. 22, 2021) .......................................... 32

*Pullins v. West*,
    3 F.3d 56 (table), No. 93-3355, 1994 WL 447268 (7th Cir. Aug. 19, 1994)........................... 14

*Reaves v. Ainsworth*,
    219 U.S. 296 (1911)................................................................................ 18

*Reinhard v. Johnson*,
    209 F. Supp. 3d 207 (D.D.C. 2016)................................................. 33, 39

*Robert v. Austin*,
    No. 1:21-cv-02228-RM (D. Colo. Sept. 1, 2021) .................................... 2

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
   141 S. Ct. 63 (2020) ............................................................................ 21, 40

*Rostker v. Goldberg*,
   453 U.S. 57 (1981) ..................................................................................... 10

*Rydie v. Biden*,
   2021 WL 5416545 (D. Md. Nov. 19, 2021) ............................................. 40

*Sampson v. Murray*,
   415 U.S. 61 (1974) ..................................................................................... 30

*Schlanger v. United States*,
   586 F.2d 667 (9th Cir. 1978) ..................................................................... 17

*Sebra v. Neville*,
   801 F.2d 1135 (9th Cir. 1986) ................................................................... 18

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) ................................................................................... 34

*Shaw v. Austin*,
   2021 WL 1840397 (D.D.C. May 1, 2021) ..................................... *passim*

*Sims v. Fox*,
   505 F.2d 857 (5th Cir. 1974) ..................................................................... 35

*Smith v. Biden*,
   2021 WL 5195688 (D.N.J. Nov. 8, 2021) ................................................ 11

*Solorio v. United States*,
   483 U.S. 435 (1987) ................................................................................... 10

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................... 11

*Standage v. Braithwaite*,
   526 F. Supp. 3d 56 (D. Md. 2021) ............................................................ 15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ..................................................................................... 3

*Texas v. Biden*,
   10 F.4th 538 (5th Cir. 2021) ..................................................................... 31

*Texas v. United States,*
  523 U.S. 296 (1998) .................................................................................... 13

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) .................................................................................... 13

*Tigges v. Northam,*
  473 F. Supp. 3d 559 (E.D. Va. 2020) ......................................................... 40

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ........................................................................ 29, 40

*U.S. ex rel. New v. Perry,*
  1996 WL 420175 (D.D.C. Jan. 16, 1996) ................................................... 34

*U.S. Postal Serv. v. Gregory,*
  534 U.S. 1 (2001) ................................................................................ 20, 23

*United States v. Kisala,*
  64 M.J. 50 (C.A.A.F. 2006) ........................................................................ 14

*United States v. O'Brien,*
  391 U.S. 367 (1968) .................................................................................... 21

*United States v. Shearer,*
  473 U.S. 52 (1985) ...................................................................................... 18

*Valdez v. Grisham,*
  2021 WL 4145746, at *8 (D.N.M. Sept. 13, 2021) ..................................... 28

*Vaughan v. Ky. Army Nat'l Guard,*
  2013 WL 211075 (E.D. Ky. Jan. 18, 2013) ................................................. 15

*Voge v. United States,*
  844 F.2d 776 (Fed. Cir. 1988) .................................................................... 16

*Volk v. United States,*
  111 Fed. Cl. 313 (2013) .............................................................................. 33

*Von Hoffburg v. Alexander,*
  615 F.2d 633 (5th Cir. 1980) ................................................................ 10, 13

*Walker v. United States,*
  93-cv-2728, 1994 U.S. Dist. LEXIS 16550, (E.D. La. Nov. 15, 1994) .................... 14

*Walker v. United States*,
    1998 WL 637360 (E.D. La. Sept. 16, 1998), *aff'd*, 184 F.3d 816 (5th Cir. 1999) .................. 35

*Waters v. Schlesinger*,
    366 F. Supp. 460 (N.D. Tex. 1973) ........................................................................... 34

*Wenger v. Monroe*,
    282 F.3d 1068 (9th Cir. 2002) ................................................................................. 17

*We the Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ............................................................................... 28, 29

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ............................................................................ 30, 39

*Wickham v. Hall*,
    706 F.2d 713 (5th Cir. 1983) ................................................................................... 15

*Wiggins v. Sec'y of Army*,
    751 F. Supp. 1238 (W.D. Tex. 1990) ....................................................................... 34

*Wilburn v. Dalton*,
    832 F. Supp. 943 (E.D. Pa. 1993) ........................................................................... 33

*Williams v. Brown*,
    2021 WL 4894264 (D. Or. Oct. 19, 2021) ............................................................... 32

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ............................................................................................... 22

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ........................................................................................ 9, 30, 36

*Yellowbear v. Lampert*,
    741 F.3d 48 (10th Cir. 2014) .................................................................................. 24

**Statutes**

5 U.S.C. §§ 701–06 ...................................................................................................... 8

10 U.S.C. § 1552 ......................................................................................................... 33

42 U.S.C. § 2000bb ...................................................................................................... 8

**Other Authorities**

Catherine Bozio, et al., *Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19–Like Illness with Infection-Induced or mRNA Vaccine-Induced SARS-CoV-2 Immunity — Nine States, January–September 2021*, posted on CDC, Morbidity and Mortality Weekly Report (MMWR) (Oct. 29, 2021), https://perma.cc/R4HU-82YF........ 27, 28

CDC, *COVID Data Tracker*, https://perma.cc/8DFY-VW8C ...................................................... 3

CDC, *Delta Variant*, https://perma.cc/4RW6-7SGB ...................................................... 3

CDC, *Frequently Asked Questions about COVID-19 Vaccination* (updated Nov. 5, 2021), https://perma.cc/S3BT-257B ..................................................................................... 27

HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R ..................................................................................... 3

*How COVID-19 Spreads*, https://perma.cc/4ZBC-8WYQ ............................................................. 3

Stanley Lemon, et al., *Protecting Our Forces: Improving Vaccine Acquisition and Availability in the US Military*, National Academies Press, 2002, https://perma.cc/E545-TQ9G............................................................................... 3, 4

## INTRODUCTION

In warfare, disease has traditionally accounted for more service member deaths than battlefield injuries. In 1777, General Washington instituted the first program to inoculate the troops, and a mandatory vaccination program for members of the American military has existed ever since. The current Department of Defense ("DoD") immunization program requires that all service members obtain nine immunizations, and an additional eight may be required depending on circumstances like deployment and duty assignment.

Plaintiffs—35 service members, all serving in the Naval Special Warfare community— seek an order enjoining the addition of the COVID-19 vaccination to the list of inoculations required of all members of the Navy. They also seek an order requiring the Navy to maintain them in their special warfare billets and deem them worldwide deployable for combat missions. Plaintiffs claim to have religious objections to the COVID-19 vaccination and seek to have this Court order the Navy to allow them to take other "safety measures like mask-wearing, physical distancing, sick leave, and teleworking" while performing special warfare missions. Pls.' Mem. 6, ECF No. 16. Their extraordinary request is contrary to both law and common sense.

Multiple jurisdictional obstacles preclude a finding that Plaintiffs are likely to succeed on their claims. Plaintiffs' claims are not ripe and are not justiciable because the military processes are ongoing, and Plaintiffs have not exhausted their military remedies. Even if Plaintiffs had exhausted, their claims regarding duty assignments and deployability would not be justiciable.

On the merits, Plaintiffs' claims fare no better. Plaintiffs' core contention that the Navy will not consider their requests for religious accommodations is inaccurate; the Navy's vaccine requirement expressly allows for a religious accommodation, and thus satisfies the requirements of the Religious Freedom Restoration Act ("RFRA"). Even if there were some basis to address

these claims before the Navy has had a chance to consider Plaintiffs' religious-accommodation requests, the military context would require a higher deferential approach to the Navy's judgment that vaccines are necessary.  The Navy's interests in protecting the health and mission of the naval forces is indisputably compelling.  And Plaintiffs' proffered less-restrictive alternatives, such as teleworking and physical distancing, cannot be taken seriously as feasible options when conducing special warfare missions; they also do not satisfy the military's compelling interests nearly as effectively as immunization.  The military has a critical national security interest in deploying only the fittest service members on these highly sensitive missions.  Special operations missions require an elite team that can deploy at a moment's notice anywhere in the world, and an unexpected absence caused by illness can seriously undermine a special operations team's ability to accomplish its mission.

The remaining factors also weigh heavily against the entry of any injunctive relief. Plaintiffs cannot show that they face irreparable harm or that the balance of equities tilts in their favor.  Vaccine requirements are critical to reducing infectious disease morbidity and mortality in the armed forces where service members—particularly those serving in the special warfare community—must routinely operate in close quarters.   Even if applied to just Plaintiffs, an injunction would degrade military readiness, undermine the efforts to combat the deadly coronavirus, and harm national security.

Four other courts have already denied similar motions by service members for preliminary injunctions and temporary restraining orders.  *See Church v. Biden*, 2021 WL 5179215 (D.D.C. Nov. 8, 2021); *Doe v. Austin,* 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021); *Navy SEAL 1 v. Biden*, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021); Order, *Robert v. Austin*, No. 1:21-cv-02228-RM (D. Colo. Sept. 1, 2021), ECF No. 12.  The Court should likewise deny Plaintiffs' motion.

## BACKGROUND

### I.    The COVID-19 Pandemic

The virus SARS-CoV-2 causes a disease known as COVID-19 that "spreads when an infected person breathes out droplets and very small particles that contain the virus."  Centers for Disease Control and Prevention ("CDC"), *How COVID-19 Spreads*, https://perma.cc/4ZBC-8WYQ.[1]  In January 2020, the then-Secretary of HHS declared a public health emergency because of COVID-19.  HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R.

In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 case[s] and hospitalization rates," driven by the Delta variant.  *See* CDC, *Delta Variant*, https://perma.cc/4RW6-7SGB.  Community transmission rates remain high in 43 states and substantial in six other states.  *See* CDC, *COVID Data Tracker*,  https://perma.cc/8DFY-VW8C.  And daily case rates are once again increasing.  *Id*.  To date, more than 49,000,000 Americans have been infected, and more than 790,000 Americans have died from COVID-19.  *Id.*  In DoD alone, "there have been 256,552 cases" of COVID-19 in service members, "of which 2,298 have required hospitalizations and led to 80 deaths."  Ex. 12 (Decl. of Scott Stanley) ¶ 3 (App263).  Of those 80 service members, all but one were unvaccinated.  *Id.*  Moreover, many "otherwise healthy Service members have developed 'long-haul' COVID-19, potentially impacting their long-term ability to perform their missions."  Ex. 18 (Decl. of Tonya Rans, M.D.) ¶ 9 (App350–51).

### II.    Department of Defense COVID-19 Vaccine Directive

The U.S. military instituted its first immunization program in 1777 when General Washington directed the inoculation of the Continental Army for smallpox.  Stanley Lemon, et al.,

---

[1] The Court may take judicial notice of factual information available on government websites.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

*Protecting Our Forces: Improving Vaccine Acquisition and Availability in the US Military*, National Academies Press, 2002, *available at* https://perma.cc/E545-TQ9G.   Deaths due to infectious diseases outnumbered those due to direct combat injuries until World War II, when vaccines became widespread.  *Id.* at 3.   More recently, disease accounted for nearly 70% of U.S. Army hospital admissions during the Persian Gulf War.  *Id.* at 10, Table 1-1.   Military-mandated vaccines have played a key role in reducing infectious disease morbidity and mortality among military personnel.  *Id.* (highlighting the historical use of vaccines in armed conflict).  For decades, the military has implemented a variety of enduring or situational inoculation measures to maintain the readiness of the force.  *See* Ex. 5 (Congressional Research Report Defense Health Primer: Military Vaccinations) (App071–72).

 DoD's current immunization program is governed by DoD Instruction ("DoDI") 6205.02. Nine vaccines are required for all service members, including the annual influenza vaccine, while eight others are required when certain elevated risk factors are present.  *See* Ex. 4 (Navy Bureau of Medicine and Surgery Instruction ("BUMEDINST") 6230.15B), Table D-1 (App063).   In general, DoD aligns its immunization requirements and eligibility determinations for service members with recommendations from the CDC's Advisory Committee on Immunization Practices.  Ex. 3 (DoDI 6205.02) at 3 (App009).   The Services have separately issued regulatory guidance for the administration of vaccines to service members, including processes to seek medical and religious exemptions.  *See* Ex. 4, Chapter 2-6 (App040–41).

On August 9, 2021, Secretary of Defense Lloyd Austin, noting the impact COVID-19 rates have on military readiness, announced that he would add the COVID-19 vaccine to the list of vaccines required for all service members by the earlier of mid-September or upon approval by the Food and Drug Administration ("FDA").  *See* Ex. 1 (Mem. for all Defense Employees (Aug. 9,

2021)) (App002).  On August 24, 2021, after FDA announced the approval of the Pfizer COVID-19 vaccine, Secretary Austin directed the Secretaries of the Military Departments to immediately vaccinate all members of the armed forces under DoD authority who were not already fully vaccinated.  *See* Ex. 2 (Mem. For Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors (Aug. 24, 2021)) (App004–05).

## III.    The Navy's Implementation of DoD's Vaccine Directive

### A.    Navy Policies Applicable to All Navy Service Members

Shortly after the Secretary of Defense issued the vaccine directive, the Navy issued guidance for implementing the Secretary's directive. Ex. 6 (ALNAV 062/21) (App075–76).  Upon determining that COVID-19 "adversely impacts [the Navy's] force readiness and mission execution," the Secretary of the Navy directed active-duty service members to be fully vaccinated within 90 days (*i.e.*, by November 28, 2021).  *Id.* ¶¶ 2, 4 (App075).

As with other vaccine requirements, the Navy's implementation guidance establishes a process to seek medical and religious exemptions.  *See* Ex. 7 (NAVADMIN 190/21) ¶ 3.d. (App079).  The Navy has an appeal process available to service members seeking religious exemptions if their initial requests are denied. Ex. 17 (Decl. of William Merz) ¶ 14 (App308–11). A service member who refuses vaccination without an approved exemption may be subject to discipline or adverse administrative action.  *See, e.g.*, Ex. 6 ¶ 5 (App075).  But adverse action will not be taken against a service member with a pending exemption request.  Ex. 8 (NAVADMIN 225/21) ¶ 3.c (App084); Ex. 16 (Decl. of Mery-Angela Sanabria Katson) ¶ 3 (App294); Ex. 17 ¶¶ 10 n.9, 14 n.13 (App306, App310).  On October 13, 2021, the Navy issued NAVADMIN 225/21, designating the Chief of Naval Personnel as the COVID Consolidated Disposition Authority—the centralized authority to initiate separation procedures for sailors who refuse the COVID-19 vaccination and do not have a pending exemption request.  Ex. 8 ¶ 5 (App084–85).  The same

NAVADMIN designated the Vice Chief of Naval Operations—the second highest uniformed officer in the Navy—as the Navy authority to initiate court-martial and non-judicial punishment for sailors refusing the COVID-19 vaccination without an exemption. *Id.* These disciplinary authorities are thus withheld from lower-level commanders.

On November 15, 2021, the Chief of Naval Personnel issued further guidance to commanders pertaining for service members refusing the COVID-19 vaccination. *See* Ex. 9 (NAVADMIN 256/21) (App089–96). This guidance provides that the "least favorable characterization of service for Navy service members refusing the vaccine, without extenuating circumstances, will be GENERAL (under honorable conditions)." *Id.* ¶ 2.a. (App090). However, "Navy service members who are not vaccinated, regardless of exemption status, may be temporarily reassigned with concurrence of the first flag officer in the administrative chain of command based on operational readiness and mission requirements." *Id.* Plaintiffs seek to have this Court enjoin NAVADMIN 225/21 and NAVADMIN 256/21, both of which apply to the entire Navy. *See* Pls.' Proposed Order ¶ 2, ECF No. 15-1.

### B.  Navy Special Warfare Community

The Naval Special Warfare ("NSW") community consists of Navy SEALs and NSW combat support personnel, such as Special Warfare Combatant Craft Crewmen ("SWCC"), Explosive Ordinance Disposal personnel, and Navy Divers. Ex. 15 (Decl. of Christopher Brown) ¶ 3 (App282–83). Navy SEALs and Special Warfare Combatant Craft Crewmen comprise the "special operations forces." *Id.* ¶ 3 (App282). NSW service members conduct some of the military's most critical and sensitive missions, such as small-scale offensive actions, special reconnaissance, countering weapons of mass destruction, counterterrorism, counterinsurgency, and hostage rescue and recovery. *Id.* ¶¶ 3, 14 (App282–83, App289); *see also* Navy SEAL, *available at* https://www.navy.com/seals (last visited Dec. 9, 2021). These missions often occur

in diplomatically sensitive or hostile environments that lack medical facilities, and may necessitate clandestine action, often working with or through host-nation, underground, and/or guerilla forces. Ex. 15 ¶ 14 (App289).   NSW service members conducting these missions routinely engage in "high-risk operations," such as parachuting, high-speed boat and unconventional vehicle operation, weapons operation, demolitions employment, and SCUBA diving.   Ex. 14 (Decl. of Lanny Littlejohn) ¶ 4 (quoting MANMED § 15-105(1)) (App276).   And they conduct these operations in small, tight-knit units operating in close proximity.   *Id.* ¶ 5 (App276–77); Ex. 15 ¶ 14 (App289).

### C.     Navy Policies Applicable to Members of the Navy Special Warfare Community

Service members in the NSW community are subject to DoD and Department of the Navy policies, as well as policies governing members of the NSW community, which are referred to as "Trident Orders."   Ex. 15 ¶ 5 n.3 (App283).   Following the issuance of the DoD and Department of the Navy vaccine directives, Trident Order #12 was issued to provide NSW personnel a consolidated reference to several policies relevant to the mandatory vaccination requirement, and to implement specific timelines for personnel to comply with the requirement.   *See* Ex. 10 (Trident Order #12) (App099); Ex. 15 ¶ 5 (App283–84).   Trident Order #12 did not change the process for seeking exemptions from the Navy's vaccine directive; NSW service members' exemption requests for either medical or administrative (including religious) reasons are adjudicated in accordance with the applicable Navy policy.   *See* Ex. 10 (App099); Ex. 15 ¶ 6 (App284).

Trident Order #12 also reminded special forces personnel of a pre-existing policy relating to medical disqualification of special operations personnel refusing to receive recommended vaccines based on their personal or religious beliefs.   Ex. 10 (App099); Ex. 15 ¶ 7 (citing Ex. 11 (MANMED § 15-105(4)(n)(9)) (App284)).   Because of the critical nature of the missions, the physical demands of their activities, and the likely lack of medical facilities while deployed, Navy

SEALs and Special Warfare Combatant Craft Crewmen are subject to stringent medical requirements. Ex. 14 ¶ 4 (App274–75). If members cannot meet these requirements, they are medically disqualified from service so as not to endanger their lives, the lives of other service members in their unit, and the mission. *Id.* ¶ 7 (App277–78). Accordingly, Trident Order #12 advised special operations forces personnel that they were required to seek a waiver from medical requirements under the Navy's Manual of the Medical Department ("MANMED") § 15-105, in addition to any medical or administrative exemption request from the COVID-19 vaccine requirement. *Id.* ¶ 9 (App278). This provision was included in Trident Order #12 to ensure that all special operations personnel understood the unique medical requirements applicable to them, as these requirements were not addressed in ALNAV 062/21 or NAVADMIN 190/21. *See id.*

## IV.    Procedural History

On November 9, 2021, 35 members of the U.S. Navy, all currently proceeding under pseudonyms, filed their complaint challenging the DoD COVID-19 vaccine directive and Navy policies implementing the DoD directive under RFRA, 42 U.S.C. § 2000bb (Counts 1–2), the First Amendment (Counts 3–4), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06 (Counts 5–8). Compl. ¶¶ 100–257, ECF No. 1. Plaintiffs sued the President and DoD, as well as the Secretary of Defense and Secretary of the Navy in both their official and individual capacities. *Id.* ¶¶ 22–25. Plaintiffs seek a nationwide injunction against the President and the military that would prevent implementation of DoD's and Navy's COVID-19 vaccination policies; a declaratory judgment that the vaccination policies violate RFRA, the First Amendment, and the APA; actual damages for purported violations of RFRA; and nominal damages against the Secretary of Defense and Secretary of the Navy in their individual capacities. *Id.* at 36–37.

On November 24, 2021, Plaintiffs filed their motion for a preliminary injunction against Defendants in their official capacities. Pls.' Mem., ECF No. 16. The motion addresses only RFRA

and First Amendment claims. *See generally* Pls.' Mem.  Plaintiffs seek to enjoin: (1) Defendants' purported "across-the-board denial of religious accommodation requests for COVID-19 vaccination," "differential treatment of accommodation requests for the COVID-19 vaccination for secular reasons and accommodation requests for religious reasons," and "retributive or negative action against servicemembers who make or have made religious accommodation requests"; (2) the application of four Navy policies concerning COVID-19 vaccine requirements to Plaintiffs; and (3) Defendants from taking any discipline or adverse employment action against Plaintiffs. *See* Pls.' Mem. 2–3; Pls.' Proposed Order.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). ("Injunctive relief is an extraordinary and drastic remedy[ ] and should only be granted when the movant has clearly carried the burden of persuasion.").  Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs' failure to demonstrate any of the factors is sufficient to deny injunctive relief, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule[,]" *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

Additionally, judicial review of claims involving the "complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force[,]" *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), is highly constrained. *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981)

(Because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy.); *Farmer v. Mabus*, 940 F.2d 921, 923 (5th Cir. 1991) ("We are keenly aware that judicial intrusion into military matters is to be most cautiously and charily approached.").  Such deference extends to constitutional claims and military decisions about the health and welfare of the troops.  *See Solorio v. United States*, 483 U.S. 435, 448 (1987); *Mazares v. Dep't of Navy*, 302 F.3d 1382, 1385 (Fed. Cir. 2002).

## ARGUMENT

## I.       **Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.**

The Court lacks jurisdiction over this case for several reasons, and the lack of jurisdiction forecloses any finding of substantial likelihood of success on the merits.  *See Nianga v. Wolfe*, 435 F. Supp. 3d 739, 743 (N.D. Tex. 2020).  As an initial matter, the Court may not enter the requested relief against the President, and Plaintiffs have no standing to bring suit against him.  Next, Plaintiffs' challenge to the DoD and Navy vaccine directives is not justiciable because Plaintiffs have not shown that they have completed the process for requesting exemptions or exhausted their intra-military remedies before filing suit—a long-standing prerequisite for jurisdiction over military claims in this Circuit.  *See Von Hoffburg v. Alexander*, 615 F.2d 633 (5th Cir. 1980).  Further, their claims pertaining to their military duty assignments and worldwide deployability determinations are not reviewable.  Even if Plaintiffs could establish jurisdiction, they cannot show they are likely to succeed on the merits of any of their claims, which rest on factual and legal misconceptions about the President's, DoD's, and the Navy's policies and decisions.

## A.       **The Court Lacks Jurisdiction to Enter Relief Against the President.**

As this Court recently recognized, neither declaratory nor injunctive relief is proper against the President in his official capacity.  *See* Order at 3, *Foley v. Biden*, No. 4:21-cv-01098-O (N.D. Tex. Oct. 6, 2021), ECF No. 18.  Indeed, "[w]ith regard to the President, courts do not have

jurisdiction to enjoin him and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." (quotation marks omitted)); *Navy SEAL 1*, 2021 WL 5448970, at *2 (finding that "[n]o injunctive or declaratory relief can issue against the President," including for RFRA claims); *Smith v. Biden*, 2021 WL 5195688, at *5 (D.N.J. Nov. 8, 2021) (similar).   In addition, Plaintiffs lack standing to bring suit against the President, as the vaccine directives that apply to them were issued by DoD and the Navy, not the President.   Therefore, Plaintiffs cannot establish an injury caused by the President, nor can they establish that any such injury could be redressed by this Court.   *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).   Accordingly, the President should be dismissed from this case and no injunction should be entered against him.

### B.   Plaintiffs Have Not Exhausted Military Remedies.

Plaintiffs are 35 service members from the Navy Special Warfare Community.   They claim to object to the DoD and Navy COVID-19 vaccination requirement based on their sincerely held religious beliefs.   Pls.' Mem. 1.   All but two Plaintiffs have submitted religious accommodation requests to the Navy seeking to avoid the COVID-19 vaccination requirement and instead to fulfill any special warfare missions they may be assigned using "safety measures like mask-wearing, physical distancing, sick leave, and teleworking."   *Id.* at 6; *see also* Ex. 16 ¶ 4 (App295) (noting Navy SEAL 22 and SWCC 3 have not submitted religious accommodation requests).   No Plaintiff claims to have been formally disciplined or had discharge procedures initiated against them. Plaintiffs seek to have this Court order the Navy to grant them a religious exemption to the COVID-19 vaccination requirement before the Navy has fully adjudicated their request.   Further, they ask this Court to intrude into the management of the military by forcing the Navy to consider

Plaintiffs medically qualified for continued service in a special warfare unit, eligible for combat missions, and world-wide deployable. *See, e.g.*, Pls.' Mem. 25–27.

Plaintiffs cite no case that has ever granted such extraordinary relief in the military context, and in fact, they provide no authority supporting the reviewability of military decisions. Nevertheless, "[i]t has long been recognized that interference by civilian courts with military authority inevitably raises both questions about judicial competency in this area and separation of powers concerns." *Bynum v. FMC Corp.*, 770 F.2d 556, 562–63 (5th Cir. 1985). Here, each of Plaintiffs' claims is non-justiciable. It may be that *if* the Navy rejects one or more Plaintiffs' requests for accommodations—which is entirely speculative at this point—they may be able to pursue certain claims, such as challenges to a discharge decision resulting from a failure to comply with the vaccination requirement, at that point (although even then, the Navy's decision would receive significant deference given the military context). But, as Plaintiffs' claims are not ripe, it is far too soon to say if that will be the case. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987) ("[A] case is not ripe if further factual development is required."). And other claims, such as their request to continue serving in a special warfare unit or be deemed worldwide deployable, are decisions of military judgment and will likely never be fit for judicial review.

This Circuit decides the justiciability of claims requiring review of "internal military affairs" using the test articulated in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971); *Meister v. Tex. Adjutant General's Dep't*, 233 F.3d 332, 339 (5th Cir. 2000). In *Mindes*, the Fifth Circuit held that courts "should not review internal military affairs in the absence of (a) an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations, and (b) exhaustion of available intraservice corrective

measures." 453 F.2d at 201. If a plaintiff satisfies both of those two prerequisites, courts must weigh four factors, discussed in Part I.C, to determine if the case is reviewable.

Plaintiffs' claims fail this first step of the *Mindes* test. Although Plaintiffs allege a violation of constitutional and statutory rights, it cannot seriously be disputed that they have not exhausted their intra-military remedies. Until they do, Plaintiffs "will find the doors of the federal courthouse closed pending exhaustion of available administrative remedies." *Von Hoffburg*, 615 F.2d at 637–38 (citing *Hodges v. Callaway*, 499 F.2d 417, 420 (5th Cir. 1974)). "The strict application of the exhaustion doctrine in military discharge cases serves to maintain the balance between military authority and the power of federal courts." *Id.* All but two Plaintiffs have submitted a religious exemption request, but they concede that only some of those requests have been decided at the initial level, and none have completed the available appeals process. Ex. 16 ¶ 4 (App295) (noting the status of Plaintiffs' religious accommodation requests); Pls.' Mem. 2. Plaintiffs who have not submitted an exemption request or declined to appeal an initial denial of such a request obviously have not exhausted their intra-military remedies. *Id.* ¶¶ 4.a, 4.c (App295).

Moreover, Plaintiffs who still have a religious exemption request pending do not even have a cognizable injury, *id.* ¶¶ 4.a, 4.c (App295), because any harm from receiving the vaccine or facing adverse action rests "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581 (1985)). If the military grants the requests, the service members will be exempted from the vaccination requirement, and while they wait for a determination, they are not subject to any disciplinary action or discharge proceedings. Ex. 17 ¶¶ 10 n.9, 14 n.13 (App306, App310).

Even if the Navy's appellate authority ultimately denies Plaintiffs' religious exemption

requests, they refuse to comply and face adverse action—a series of hypothetical, future events—the Navy has further administrative procedures that offer many opportunities for them to present their arguments and for the Navy to respond. *See* Ex. 17 ¶¶ 14–22 (App308–20). Anyone subject to discipline can challenge the lawfulness of the vaccination requirement in those proceedings. *See United States v. Kisala*, 64 M.J. 50 (C.A.A.F. 2006); *see also* Ex. 17 ¶ 20 n.19 (App318). Should Plaintiffs face discharge for non-compliance with the directive, they may present their arguments before the Navy discharge authority. Ex. 17 ¶¶ 17–19 (App312–16). This process takes several months, and service members with more than six years of military service receive a formal administrative hearing over which a panel of no fewer than three senior service members preside. *Id*. If a service member is discharged, he or she can appeal to the Navy Discharge Review Board and Board for Correction of Naval Records ("BCNR"). *See* Ex. 17 ¶ 22 (App319–20). For adverse action less than discharge, the Navy has additional procedures that can provide relief. *Id.*

Plaintiffs argue that these military procedures would be futile to pursue. Pls.' Mem 2 ("These interim adverse actions foreshadow the predetermined outcome of Plaintiffs' requests."). But "the exhaustion doctrine rests on legitimate and important policy objectives governing the proper balance between military authority and the power of federal courts." *Walker v. United States*, 93-cv-2728, 1994 U.S. Dist. LEXIS 16550, at *4–6 (E.D. La. Nov. 15, 1994). The fact that Plaintiffs may not anticipate a favorable outcome does not render the remedies futile. *Hodges,* 499 F.2d at 423 ("[T]he administrative remedy available to grievants like [the plaintiffs] may offer cold comfort and small consolation, [but] it is beyond [this Court's] authority to permit the exceptions to the exhaustion doctrine to swallow the rule."); *Pullins v. West*, 3 F.3d 56 (table), No. 93-3355, 1994 WL 447268, at *3 (7th Cir. Aug. 19, 1994) (stating that "the fact that [a plaintiff] may have no faith in it, evidently because of his anticipation that his grievance will be rejected, is

not sufficient to render the procedure itself futile"); *Shaw v. Austin*, 2021 WL 1840397, at \*10 (D.D.C. May 1, 2021) ("Despite Plaintiff's skepticism about the show-cause process, the Court cannot so easily dismiss the possibility that he will have a fair opportunity to make his case to a Board of Inquiry."); *cf. Chappell v. Wallace,* 462 U.S. 296, 303 (1983) (recognizing that service member complaints of a deprivation of constitutional rights can be addressed "within the framework of [] intramilitary administrative procedure").

In any event, the exhaustion requirement also serves the important purpose of allowing the military to apply its "specialized expertise" in the first instance. *Lawrence v. McCarthy*, 344 F.3d 467, 470 (5th Cir. 2003). As another Court recently found in a nearly identical context, review of Plaintiffs' claims without first allowing the military's internal administrative process to conclude would "infringe on the military's expertise and interest in handling its own personnel matters." *Church*, 2021 WL 5179215, at \*11. Accordingly, until those military procedures are exhausted, Plaintiffs cannot seek relief in this Court. *Wickham v. Hall,* 706 F.2d 713, 715 (5th Cir. 1983); *Hodges*, 499 F.2d 417; *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 93–94 (D. Md. 2021); *Diraffael v. Cal. Mil. Dep't*, 2011 WL 13274364, at \*3 (C.D. Cal. Mar. 21, 2011); *Vaughan v. Ky. Army Nat'l Guard*, 2013 WL 211075, at \*6 (E.D. Ky. Jan. 18, 2013).

### C.   Plaintiffs' Claims Pertaining to Their Duty Assignments, Deployment, and Medical Qualifications Are Non-Justiciable.

Even if Plaintiffs had exhausted their intra-military remedies, their claims regarding their duty assignments, deployment, and medical fitness for duty are not justiciable under *Mindes*. If the first step of *Mindes* is satisfied, a court then must weigh the following four factors to determine whether a claim regarding internal military affairs is justiciable:

1. The nature and strength of the plaintiff's challenge to the military determination;
2. The potential injury to the plaintiff if review is refused;
3. The type and degree of anticipated interference with the military function; and
4. The extent to which the exercise of military expertise or discretion is involved.

*Mindes*, 453 F.2d at 201–02; *Meister*, 233 F.3d at 339.  This second step of the *Mindes* analysis "requires the court to balance the sufficiency of the complaint's allegations against the policies contravening review."  *Johnson v. Reed*, 609 F.2d 784, 788–89 (5th Cir. 1980).

As explained above, the traditional deference afforded to the military requires that courts treat certain challenges to military personnel decisions as non-justiciable, even where a constitutional claim is raised.  *See, e.g.*, *Orloff v. Willoughby*, 345 U.S. 83, 93–94 (1953); *Meister*, 233 F.3d at 341; *Harkness v. Sec'y of Navy*, 858 F.3d 437, 443–45 (6th Cir. 2017); *Mier v. Owens*, 57 F.3d 747, 749–50 (9th Cir. 1995); *see also Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988) (noting that there are "thousands of . . . routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with").  These types of "internal military decisions" are unreviewable under *Mindes*.  *See Meister*, 233 F.3d at 341.  For example, in *Harkness*, a former Navy chaplain alleged that he was denied various promotions and duty assignments in violation of the First Amendment.  858 F.3d at 443.  The Sixth Circuit explained that "courts are generally reluctant to review claims involving military duty assignments," noting that "[s]everal justifications for this rule exist: lack of expertise, deference to the unique role of the military in our constitutional structure, and the practical difficulties that would arise if every military duty assignment was open to judicial review."  *Id.*

The first *Mindes* factor—the strength of Plaintiffs' claims—weighs against judicial review.  As discussed in greater detail below in Part I.D, the constitutional and statutory claims raised by Plaintiffs are unpersuasive because the military can reasonably require its service members to be vaccinated against an additional disease, particularly in the midst of a deadly pandemic, while not running afoul of religious rights.  Further, the Navy can certainly consider service members'

COVID-19 vaccination status when determining their duty assignment as it does for several other mandatory vaccines.  Ex. 5 Table D-1 (App062) (showing vaccines required on a situational basis depending on deployment and duty assignment).

The second *Mindes* factor also weighs against judicial review under these circumstances. As discussed below in Part II, Plaintiffs face no imminent risk of harm.  *Cf. Guerra v. Scruggs*, 942 F.2d 270, 279 (4th Cir. 1991) (finding lack of irreparable harm showing determinative of second *Mindes* factor, where a less than honorable discharge was at stake).  If less than honorable discharges do not warrant judicial interference in military personnel decisions, a change of duty assignment or deployability status is also not the sort of harm justifying judicial review.  *See Harkness*, 858 F.3d at 444 ("the harm inflicted by the denial of a routine duty assignment is negligible") (quoting *Schlanger v. United States*, 586 F.2d 667, 671–72 (9th Cir. 1978)).  Here, Plaintiffs' claimed harms from not receiving their preferred assignments or deployments or from medical disqualification for certain assignments are not the types of harm justifying judicial interference in internal military personnel decisions.

The third and fourth *Mindes* factors, "[t]he extent of interference with military functions" and "[t]he extent to which military discretion or expertise is involved," are often considered together.  *Wenger v. Monroe*, 282 F.3d 1068, 1075 (9th Cir. 2002).  Both weigh sharply in favor of the Government here.  As the Sixth Circuit explained, "[d]uty assignments lie at the heart of military expertise and discretion" and "[s]ubjecting every such assignment to judicial review would have a deleterious effect on the military's performance of its vital operations and would impede its overall preparedness."  *Harkness*, 858 F.3d at 444–45; *see also Antonellis v. United States*, 723 F.3d 1328, 1336 (Fed. Cir. 2013) ("Courts are in no position to determine the 'best qualified Officer' or the 'best match' for a particular billet.").  The Fifth Circuit has also recognized

that "[s]uits in which commanding officers would have to stand prepared to convince a civilian court of the wisdom of a wide range of military and disciplinary decisions are an improper interference by the judiciary in the management of the armed forces." *Miller v. United States*, 42 F.3d 297, 303 (5th Cir. 1995) (citing *United States v. Shearer*, 473 U.S. 52, 58 (1985)). Rather, "'[c]omplex, subtle, and professional decisions as to the composition, training, . . . and control of a military force are essentially professional military judgments.'" *Id.* (citing *Chappell*, 462 U.S. at 302); *see also Sebra v. Neville*, 801 F.2d 1135 (9th Cir. 1986) (declining to review military transfer decision).

This is no less true when medical fitness determinations are at stake. In *Mindes* itself, the Fifth Circuit noted that the Supreme Court had been unwilling to venture into this area of military expertise, such as when the Court was asked to analyze "medical records" and an individual's "fitness as an officer." *See Mindes* 453 F.2d at 200 (citing *Reaves v. Ainsworth*, 219 U.S. 296 (1911), for proposition that Court refused to review plaintiff's medical records and determination of fitness as an officer); *see also Maier v. Orr*, 754 F.2d 973, 984 (Fed. Cir. 1985) (responsibility for determining physical fitness of service persons is that of the armed forces, not of the judiciary); *Layman v. Harvey*, 2007 WL 430678, *10–11 (M.D. Fla. Feb. 5, 2007) (declining to review hardship and fitness determination); *see also Mazares*, 302 F.3d at 1385 ("The military has broad authority and discretion in dealing with its personnel, both military and civilian, including the protection of their health.").

Plaintiffs' claims regarding their duty assignments or medical disqualification involve military judgments about an individual's fitness for specific military positions. The Court is not well-situated to evaluate whether unvaccinated Plaintiffs are worldwide deployable in light of close working conditions, the need to coordinate with foreign militaries, the size of ships and

18

aircraft they typically work in, the threat to their units from potential outbreaks, the difficulties of conducting a medical evacuation in theater, and the effect on military readiness of such decisions. *See, e.g.*, Ex. 14 ¶¶ 5, 8 (App276–78); Ex. 15 ¶¶ 14–16 (App289–91) (describing duties and threats to units from COVID).  Plaintiffs prefer the military to rely on "safety measures like mask-wearing, physical distancing, sick leave, and teleworking," in lieu of medical disqualification or re-assignment.  Pls.' Mem. 6.  But as discussed in greater detail below in Parts I.D and III, the military's judgment is that such mitigation measures are not adequate to protect the force.  The Court should not attempt to second-guess those determinations and risk placing unvaccinated individuals in a position to undermine the military readiness of their units.  Under *Mindes,* these decisions are not subject to judicial review.

### D.     Plaintiffs' First Amendment and RFRA Claims Are Unlikely to Succeed.

Plaintiffs' facial challenges to the Navy's COVID-19 vaccination requirement under the First Amendment and RFRA are without merit.  The vaccine requirement complies with RFRA because the requirement will only apply to service members requesting a religious exemption if the Navy makes an individualized determination—particularized to the demands of the service member's unit—that denial of that request furthers a compelling military interest and that there is no less restrictive means of accommodating the request.  *See* Ex. 17 ¶ 14 (App308–11).

Plaintiffs claim, without evidentiary support, that although they have sought a religious exemption, the military has "made clear that none is forthcoming."  Pls.' Mem. 15.  Plaintiffs provide no evidence that the military's process to consider religious exemptions is a sham.  *See* Ex. 17 ¶ 14 (App308–11).  Each religious exemption request is individually reviewed by a commander in the service member's chain of command for an individualized assessment of the command's interest in the service member's immunization against COVID-19 and whether less restrictive alternatives to immunization feasibly serve those interests.  *Id*.  Plaintiffs provide no

basis to assume that their commander will not take that duty seriously. They likewise fail to provide "clear and convincing evidence" to overcome the "'presumption of regularity that attaches to the actions of Government agencies.'" *10 Ring Precision Inc. v. Jones*, 722 F.3d 711, 725 n.79 (5th Cir. 2013) (quoting *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001)). And an injunction "will not be granted against something merely feared as liable to occur at some indefinite time in the future." *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931).

To the extent Plaintiffs raise as-applied challenges, by claiming that the military has wrongfully denied a religious exemption request in their particular cases (or might deny one in the future), that type of individualized challenge to military regulations cannot be brought until that regulation is applied in a manner that is judicially reviewable (such as a service member's discharge), and the service member has exhausted all intra-military remedies. *See* Parts I.B., I.C. Moreover, the required inquiry under RFRA focuses on the "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006)). Such an inquiry here is impossible to conduct until the Navy has the opportunity to present a complete administrative record to the Court for judicial review.

Even if their claims were justiciable, and Plaintiffs had exhausted their intra-military remedies, and there were an administrative record for the Court to review, their as-applied RFRA claims would likely still fail because the Government has a compelling interest in ensuring a military fit for service, and vaccination requirements are the least restrictive means to further that interest. Plaintiffs argue that the military does not have a compelling interest in mandating that Navy Special Warfare units be immunized against a disease that has killed nearly 800,000

Americans and caused severe illness in millions more.  Pls.' Mem. 17–19.  But that position is untenable.  The Navy has several compelling interests in immunizing service members against COVID-19 infections.  First, the Supreme Court has held that "[s]temming the spread of COVID–19 is unquestionably a compelling interest."  *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  Ensuring that service members are immunized against COVID-19 certainly stems its spread in the Armed Forces.

Second, the Navy has a vital interest in maximizing the effectiveness of Naval Special Warfare operations against U.S. enemies and minimizing the risk of error in these critical operations.  The Government's interest in "maximum efficiency" of Navy SEAL special operations and ensuring their maximum capacity "of easily and quickly responding to continually changing circumstances" is paramount.  *Cf. United States v. O'Brien*, 391 U.S. 367, 381 (1968). The Navy cannot accept any Naval Special Warfare operating conditions that place its success in combat against enemies of the United States at risk of failure.

"[W]hen evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest."  *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986).  RFRA must be applied "with particular sensitivity to security concerns."  *See Cutter v. Wilkinson*, 544 U.S. 722, 723 (2005) (describing similar statute). "[C]ontext matters."  *Id*. (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)); *see also Lebron v. Rumsfeld,* 670 F.3d 540, 557–58 (4th Cir. 2012) (denying RFRA claim against the military and noting that "[c]ourts have long been reluctant to interpret statutes in ways that allow litigants to interfere with the mission of our nation's military, preferring that Congress explicitly authorize suits that implicate the command decisions of . . . our national defense").

Plaintiffs argue in the abstract that there can be no circumstances where requiring vaccinations could be the least restrictive means of serving a compelling interest. Here again, numerous courts have found, in non-military settings, that preventing infectious diseases through vaccines was the least restrictive means. *See Does 1-6 v. Mills*, 16 F.4th 20, 32–33 (1st Cir. 2021); *F.F. on behalf of Y.F. v. New York*, 65 Misc. 3d 616, 633 (N.Y. Sup. Ct. 2019); *Brown v. Smith*, 24 Cal. App. 5th 1135, 1145 (2018); *Love v. State Dep't of Educ.*, 29 Cal. App. 5th 980, 996 (2018); *see also Hobby Lobby*, 573 U.S. at 733 ("Other coverage requirements, such as immunizations, may be supported by different interests (for example, the need to combat the spread of infectious diseases) and may involve different arguments about the least restrictive means of providing them."); *D.J. v. Mercer Cnty. Bd. of Educ.*, No. 13-0237, 2013 WL 6152363, at *4 (W.Va. Nov. 22, 2013). Plaintiffs contend that "a 100% vaccination rate is [not] a magic bullet against COVID-19 infections, as vaccinated individuals can contract and transmit the virus." Pls.' Mem. 19–20. But strict scrutiny requires that a rule be "narrowly tailored, not that it be 'perfectly tailored.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (addressing First Amendment free speech claim) (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992)). And unvaccinated individuals have 5.8 times the risk of testing positive for COVID-19 and greater than 14 times the risk of dying from COVID-19. Ex. 12 ¶ 18 (App268). Accordingly, each unvaccinated service member exponentially increases the rate of transmission in the Navy.

In any event, Plaintiffs focus entirely on whether their failure to immunize "will make or break Defendants' ability to combat the virus within the Navy[,]" Pls.' Mem. 20, not on the Government's compelling interest in minimizing the risk that a service member will experience illness or need to quarantine during deployment on a special warfare operation, thereby frustrating the Navy's success on critical missions. Indeed, Plaintiffs describe their role as "conduct[ing]

special operation missions . . . aimed at eliminating high-level enemy targets, anti-guerrilla warfare, or intelligence-gathering behind enemy lines." *Id.* at 3. And symptoms of even mild cases of COVID-19 will affect military readiness and hamper the effectiveness of these most-critical missions. *See* Ex. 18 ¶¶ 7–10 (App348–51). Considering the small size of special operations units, each member's health is critical to mission success. *See* Ex. 14 ¶ 5 (App276). In short, the military has a critical national security interest in deploying only service members with the least risk of contracting illness on the type of critical warfare missions reserved for the Navy Seals. Moreover, other nations have required COVID-19 immunization as a condition of entry; a service member's failure to be immunized may mean that the service member cannot take part in certain missions or training exercises with partner nations. *See* Ex. 12 ¶¶ 10–11 (App266).

Plaintiffs' suggested alternatives to immunization come nowhere close to serving this compelling interest. For example, Plaintiffs suggest that they can telework, Pls.' Mem. 6, but "anti-guerrilla warfare" and "intelligence-gathering behind enemy lines," *id.* at 3, obviously are not amenable to telework, Ex. 15 ¶ 14 (App289). Plaintiffs also assert that they can wear a mask, Pls.' Mem. 6, but the military has determined that masking will not prevent COVID-19 illness during critical special operations in the same manner as immunization, and that mask wearing is not "mission appropriate for select missions," as when, for example, service members may be forced to share closed-circuit diving rebreathers, Ex. 15 ¶ 14 (App289). And Plaintiffs make no effort to explain how "physical distancing," Pls.' Mem. 6, is a plausible opinion in many special operations mission settings, like helicopters, let alone how an ill but physically distant Navy Seal is as capable at mission success as a healthy one. Indeed, the military has experienced multiple COVID-19 outbreaks while adhering to mandatory masking and distancing rules. Ex. 12 ¶¶ 8–9 (App265–66); *see Does 1-6*, 16 F.4th at 33 (noting same was true of Maine).

Plaintiffs also claim that the immunization requirement for deployment on Navy SEAL special operation missions is underinclusive because DoD has "already granted several medical exemptions for the COVID-19 vaccination with no accompanying detriment to those service members, who remain fully deployable," Pls.' Mem. 20, and because "there is no reason that Plaintiffs are permanently non-deployable" when those in clinical trials or who received a medical exemption are not, *id*. at 27. But "a government can rebut a claim that its policy is underinclusive 'by showing that it hasn't acted in a logically inconsistent way—by (say) identifying a qualitative or quantitative difference between the particular religious exemption requested and other . . . exemptions already tolerated." *Ali v. Stephens*, 822 F.3d 776, 787 (5th Cir. 2016) (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 61 (10th Cir. 2014)). And the quantitative difference between requested medical exemptions and religious exemptions is expansive. Whereas there are only seven permanent medical exemptions for all Navy and Reserve personnel from the COVID-19 immunization duty, Ex. 13 (Decl. of Jeremy Biehn) ¶ 3 (App272), there are more than three thousand pending requests for a religious exemption from the COVID-19 vaccination requirement. *See* Ex. 16 ¶ 3 (App294). The implications for the Navy's compelling interests would be far greater were it to grant all similarly situated religious exemptions, as compared with the seven medical cases. In any event, there is no evidence that any of those seven individuals is assigned to the type of special operations missions to which Plaintiffs demand the Court order their deployment. Indeed, all permanent medical exemption requests for the personnel falling under NSWC authority have been denied. Ex. 14 ¶ 10 (App278–79). Similarly, Plaintiffs' comparison to clinical trials is unavailing. *See* Pls. Mem. 20. Any exemption granted for a service member participating in a COVID-19 vaccine trial would be temporary in nature, while a service member's religious convictions are presumably permanent, and there is no evidence that any service member in the

Navy—much less in the NSW community—is presently participating in such trials.  Ex. 13 ¶ 4 (App272).[2]

Plaintiffs argue that it is too late for the Navy to add COVID-19 to the list of mandatory immunizations.  Pls.' Mem. 21–22.  But the U.S. military has no deadline for taking actions that maximize mission effectiveness and force readiness.  And even if the timing needed justification, the Secretary of Defense ordered COVID-19 immunization in light of the rising infection rates due to the Delta variant and one day after the first COVID-19 vaccine "received full licensure from the [FDA]."  Ex. 2 (App004); Ex. 6 ¶ 3 (App075); Ex. 18 (App351–52).  It is reasonable for the military to await FDA approval, as that process "provides additional confidence and comfort in the safety of the most effective tool we have in our arsenal against this threat."  Ex. 6 ¶ 3 (App075).

Plaintiffs also argue that accommodating natural immunity is a less restrictive means because the Navy's regulations "recognize acquired immunity as a substitute for vaccination," Defendants "cannot justify imposing the vaccinate mandate on the Plaintiffs who have natural immunity from COVID-19."  Pls.' Mem. 22.  But this argument is based on a misreading of the applicable regulations, and is unavailing.

The Navy's Bureau of Medicine and Surgery Instruction ("BUMEDINST") 6230.15B, titled "Immunizations and Chemoprophylaxis for the Prevention of Infectious Diseases," applies to all the Military Services and provides requirements for the military's vaccination program.  *See*

---

[2] Plaintiffs argue that it is too late for the Navy to advance any compelling interest by adding COVID-19 to the list of mandatory immunizations.  Pls.' Mem. 21–22.  But the U.S. military has no deadline for taking actions that maximize mission effectiveness and force readiness.  And even if the timing needed justification, the Secretary of Defense ordered COVID-19 immunization in light of the rising infection rates due to the Delta variant and one day after the first COVID-19 vaccine "received full licensure from the [FDA]."  Ex. 2 (App004); Ex. 6 ¶ 3 (App075); Ex. 18 (App351–52).  It is perfectly reasonable for the military to await FDA approval, as that process "provides additional confidence and comfort in the safety of the most effective tool we have in our arsenal against this threat."  Ex. 6 ¶ 3 (App075).

Ex. 4 (App029–69).  Pursuant to BUMEDINST 6230.15B, service members may seek a medical exemption from an immunization requirement.  *See id.* ¶ 2-6a (App040).  The DoD directive and the Navy's implementation guidance do not eliminate the procedures for service members to obtain a medical exemption; rather, they incorporate them.  Ex. 2 (vaccination requirement "subject to any identified contraindications and any administrative or other exemptions established in Military Department policy") (App004); *see also* Ex. 8 (App083) (allowing service members to pursue exemptions in BUMEDINST 6230.15B).

Plaintiffs contend that BUMEDINST 6230.15B presumptively exempts from vaccination service members whom the military knows have a previously documented infection with the disease for which the vaccination is being ordered.  Pls.' Mem. 22–23.  That is not correct.  The regulation makes clear that the decision to grant a medical exemption from an immunization requirement is made by a health care provider on a case-by-case basis, taking into consideration an individual's health and the nature of the immunization.  Ex. 4 ¶ 2-6a (App040) ("Health care providers will determine a medical exemption based on the health of the vaccine candidate and the nature of the immunization under consideration.").  BUMEDINST 6230.15B provides "[g]eneral examples of medical exemptions," which include, among other things, "[e]vidence of immunity based on serologic tests, documented infection, or similar circumstances."  *Id.* ¶ 2-6a(1)(b) (App040).  The regulation cautions, however, that "serologic or other tests can be used to identify pre-existing immunity from prior infections" only "[f]or *some* vaccine-preventable diseases."  *Id.* ¶ 2-1.g (App037) (emphasis added).  Therefore, service members with previous infections or positive serology are not automatically exempt from full vaccination requirements.  Ex. 17 ¶¶ 6, 9 (App302–03, App305); Ex. 18 ¶ 19 (App361) ("The presence of antibodies is not the same thing as being immune.").  There is no automatic exemption based on prior infection because "natural

infection for some diseases, in some cases, can result in longstanding immunity (e.g., measles)," whereas other diseases, such as "Influenza, Respiratory Syncytial Virus, Malaria, Whooping cough, and rotavirus," "do not mount long-standing immunity."  Ex. 18 ¶¶ 22–23 (App362–63). Thus, while a service member who had the measles may be granted an exemption from the requirement to get the measles vaccine based on his prior infection, a service member who previously had the flu may not be granted an exemption from the requirement to get the influenza vaccine on that basis.  *See id.*  Plaintiffs' interpretation of BUMEDINST 6230.15B as requiring a presumptive exemption to a vaccine requirement on the basis of prior infection is thus meritless.

In addition, relying on CDC guidance, DoD has determined that there are insufficient data concerning "natural immunity" against COVID-19, both as to the length of time antibodies stay in the body following infection and the level of antibodies necessary to indicate that an individual is protected from infection.  For these reasons, the military has determined that "a medical exemption based on the history of COVID-19 disease or serology results does not meet 'evidence of immunity,'" and that the "presence of antibodies" does not make an individual immune.  Ex. 18 ¶ 19 (App360–61).  The CDC's recommendation that individuals who have previously been infected get vaccinated is based on, among other things, a study that "showed that unvaccinated people who already had COVID-19 are more than 2 times as likely than fully vaccinated people to get COVID-19 again."  CDC, *Frequently Asked Questions about COVID-19 Vaccination* (updated Nov. 5, 2021), https://perma.cc/S3BT-257B.  Another CDC study conducted made similar findings and concluded that "[a]ll eligible persons should be vaccinated against COVID-19 as soon as possible, including unvaccinated persons previously infected with SARS-CoV-2."  Catherine Bozio, et al., *Laboratory-Confirmed COVID-19 Among Adults Hospitalized with COVID-19–Like Illness with Infection-Induced or mRNA Vaccine-Induced SARS-CoV-2 Immunity — Nine States, January–*

*September 2021*, posted on CDC, Morbidity and Mortality Weekly Report (MMWR) (Oct. 29, 2021), https://perma.cc/R4HU-82YF; *see also* Ex. 18 ¶¶ 20–21 (App361–62). Accordingly, DoD's and the Navy's determination that prior infection does not render a service member automatically exempt from the vaccination requirement is grounded in the CDC's medical guidance and has a well-founded, reasoned basis. *See Valdez v. Grisham*, 2021 WL 4145746, at *8 (D.N.M. Sept. 13, 2021) (rejecting the plaintiffs' argument that it was irrational for the government to "fail[] to take into account that 'Covid-recovered individuals have equal to or better immunity response than vaccinated individuals'"), *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021).

Plaintiffs further claim that the immunization requirement triggers strict scrutiny under the Constitution. Pls.' Mem. 23–25. That contention is meritless. Because Plaintiffs cannot show a likelihood of success under RFRA, which already incorporates strict scrutiny, they cannot succeed on any constitutional claim. Moreover, even assuming the military context was not relevant here, the immunization policies Plaintiffs challenge are not subject to strict scrutiny under the Free Exercise Clause because they are neutral and generally applicable. To be sure, the policy provides for a medical exemption, but "an exemption is not individualized simply because it contains express exceptions for objectively defined categories of persons." *Kane v. De Blasio*, --- F.4th ---, 2021 WL 5549404, at *7 (2d Cir. Nov. 28, 2021) (quoting *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 288 (2d Cir. 2021)); *see also* (*303 Creating LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021) (same). "Rather, there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct," *Kane*, 2021 WL 5549403, at *7, a showing Plaintiffs do not make here. Vaccinating a service member "who is known or expected to be injured by the vaccine would harm her health" *see We The Patriots USA*,

17 F.4th at 285, undermining the very interests justifying the Navy's vaccination program.  Nor can Plaintiffs point to the existence of the religious exemption itself as a basis for invoking strict scrutiny.  Pls.' Mem. 23–24.  If that were so, the existence of RFRA review itself would mean no federal law would ever be covered by *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990).

In any event, "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society."  *Goldman*, 475 U.S. at 507.  Plaintiffs "cite no authority for [their] proposition that the more free-ranging inquiry [they] propose[] is appropriate in the national security and foreign affairs context."  *Trump v. Hawaii,* 138 S. Ct. 2392, 2420 n.5 (2018).  It is no surprise that Plaintiffs cite no case in which a court reviewed a military policy under strict scrutiny because "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'"  *Trump*, 138 S. Ct. at 2419 (citation omitted).  "'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [judicial] inquiry into matters of . . . national security is highly constrained."  *Id*. at 2419–20 (citation omitted).  At most, the vaccine mandate is subject to rational basis scrutiny, *see id*., which is easily satisfied given the compelling interests it furthers, *see supra* at 22.

Again, the challenged policy here exempts religious objectors unless a commanding officer recommends, and senior military authority agrees, that denying the exemption is narrowly tailored to a compelling military interest.  Ex. 17 ¶ 14 (App308–11).  So denials will only occur when, under the policy, a service member's commander "demonstrate[s] a compelling reason for denying the requested exemption."  *Bowen v. Roy*, 476 U.S. 693, 708 (1986).  The military is best situated

to assess whether a specific unvaccinated individual puts the military mission at risk, or whether feasible, less restrictive alternatives are available. *See Orloff*, 345 U.S. at 94 ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in in judicial matters.").  After all, "the Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion . . . are well beyond the competence of judges." *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring).

## II.   Plaintiffs Do Not Face Irreparable Harm.

Plaintiffs must show that, in the absence of an injunction, they are "likely to suffer irreparable harm." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted).  It is not enough simply to "show[ ] some possibility of irreparable injury." *Nken v. Holder*, 556 U.S. 418, 434–35 (2009); *see also Winter*, 555 U.S. at 22 (explaining that issuing a preliminary injunction "based only on a possibility of irreparable harm" would be "inconsistent" with treating a preliminary injunction as an "extraordinary remedy"). "Speculative injury is not sufficient" to "make a clear showing of irreparable harm." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).  Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

"In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  Conversely, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  And "[i]n the context of 'military personnel decisions, . . . courts have held that the showing of irreparable harm must be *especially strong* before an injunction is

warranted, given the national security interests weighing against judicial intervention in military affairs." *Church*, 2021 WL 5179215, at *17 (citation omitted).  Plaintiffs make no such showing.

Plaintiffs' principal argument is that they have suffered an irreparable injury from the loss of their "First Amendment freedoms" and "RFRA rights."  Pls.' Mem. 27–28.  But, as shown above, Plaintiffs have suffered no loss of First Amendment freedoms or RFRA rights warranting injunctive relief at this stage, because ten Plaintiffs filed for religious exemptions to the vaccine directive, and none of those exemption requests have been finally adjudicated.  Ex. 16 ¶¶ 3, 4 (App294–95).  Plaintiffs have not been, and will not be, directed to get vaccinated while those requests are pending.  Ex. 8 ¶ 3.e.(4) (App079).

Plaintiffs claim that "[e]ach has a sincere religious objection to receiving a COVID-19 vaccination, Pls.' Mem. 1, but two Plaintiffs did not submit religious exemption requests and 23 Plaintiffs have not yet or did not go through the Navy's appeal process after their requests were denied. Ex. 16 ¶ 4 & Ex. A (App295, App297).  Those Plaintiffs cannot establish irreparable harm, as they could seek an exemption or file an appeal, and the exemption request might be granted. *See Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (finding that the "self-inflicted nature" of asserted harm "severely undermines" a claim for equitable relief); *Contech Casting, LLC v. ZF Steering Sys., LLC*, 931 F. Supp. 2d 809, 818 (E.D. Mich. 2013) ("[I]rreparable harm will not be found where alternatives already available to the plaintiff make an injunction unnecessary.").

Plaintiffs also argue they will suffer from irreparable harm from the "threat[]" of "court-martial proceedings or involuntary separation."  Pls.' Mem. 29.  But, as Plaintiffs themselves acknowledge by the use of the word "threat[]," *id.*, it is speculative that they will be discharged from the military or court-martialed for non-compliance with the vaccine directive.  This speculation is two-fold.  First, no such action would occur while Plaintiffs' exemption requests are

pending.  Ex. 16 ¶ 3 (App294); Ex. 17 ¶¶ 10 n.9, 14 n.13 (App306, App310); *see also Church*, 2021 WL 5179215, at *16 (finding no irreparable harm when service members' exemption requests were pending); *Williams v. Brown*, 2021 WL 4894264, at *10 (D. Or. Oct. 19, 2021) (finding same in the civilian context); *Garland v. N.Y.C. Fire Dep't*, 2021 WL 5771687, at *9 (E.D.N.Y. Dec. 6, 2021) (same).  And if their exemption requests are granted, Plaintiffs will not face any adverse consequences from the vaccine directive.  *See Pelekai v. Hawaii*, 2021 WL 4944804, at *1 (D. Haw. Oct. 22, 2021) (finding no injury when exemption requests were granted).

Second, if Plaintiffs' exemption requests are denied, all appeals are exhausted, and they still refuse to take the vaccine, they may be subject to a "range of administrative and disciplinary actions."  Ex. 6 ¶ 5 (App075).  Such administrative and disciplinary actions may, but would not necessarily, include a court-martial proceeding.  *See id.*  And although service members who do not comply with the vaccine directive will be processed for administrative separation, this process does not automatically result in a member's separation from service.  Ex. 17 ¶ 15 n.14 (App311).  Indeed, certain administrative and disciplinary proceedings, such as processing a service member for separation, can take months and even up to a year to conclude and may not result in a member's separation.  *Id.* ¶¶ 15 n.14, 19 (App311, App315–16).  Such actions are not imminent, and Plaintiffs' speculation that they may face administrative or disciplinary proceedings in the future cannot establish irreparable harm.  *Holland Am. Ins. Co.*, 777 F.2d at 997; *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."); *Shaw*, 2021 WL 1840397, at *10 (speculative that sailor faces harm where administrative procedures incomplete).

In addition to being speculative, separation from service is not irreparable, nor is being rendered non-deployable and ineligible for promotions and travel.  *See* Pls.' Mem. 28.  The BCNR

may correct any military record when it is necessary to correct an error or remove an injustice, including ordering retroactive back pay and retroactive promotion.  10 U.S.C. § 1552; Ex. 17 ¶ 22 (App319–20).  And courts have consistently found that military administrative and disciplinary actions, including separation and a less than honorable discharge, are not irreparable injuries because the service member could later be reinstated and provided back pay if he or she prevailed on his or her claim.  *See, e.g.*, *McCurdy v. Zuckert*, 359 F.2d 491, 493 (5th Cir. 1966) (finding that separation from service with "a general discharge" is not "irreparable"); *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985); *Chilcott v. Orr*, 747 F.2d 29, 34 (1st Cir. 1984); *Guitard v. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992); *Guerra*, 942 F.2d at 274; *Shaw*, 2021 WL 1840397, at *10; *Reinhard v. Johnson*, 209 F. Supp. 3d 207, 220 (D.D.C. 2016); *Wilburn v. Dalton*, 832 F. Supp. 943, 948 (E.D. Pa. 1993).  Indeed, another court recently found that an adverse action such as "military discharge or a delayed promotion" that service members may face as a result of non-compliance with the DoD COVID-19 vaccine directive "is not irreparable."  *Church*, 2021 WL 5179215, at *17 (citing *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986)).

Plaintiffs also argue that they suffer irreparable harm from the loss of the "NEC device pin."  Pls.' Mem. 28–29.  Again, that is not correct.  Although a service member may not reapply for Navy Enlisted Classification or the associated trident pin, proceedings before the BCNR may result in the restoration of NEC status and the associated insignia (*e.g.*, the trident pin), *see* 10 U.S.C. § 1552; Ex. 17 ¶ 22 (App319–20); *see also Volk v. United States*, 111 Fed. Cl. 313, 317, 322–23 (2013) (describing BCNR review of the loss of NEC and the pin).  Thus, loss of the NEC device pin, even if it occurred as a result of the vaccine mandate, would not be irreparable.

Subjecting a service member to court-martial proceedings also does not constitute an irreparable injury.  Notably, the Supreme Court in *Schlesinger v. Councilman* reversed an

injunction that prevented the military from proceeding with an impending court martial, finding that the "inconvenience of having to defend against a single criminal prosecution cannot be considered irreparable."  420 U.S. 738, 755 (1975) (cleaned up); *see also, e.g.*, *Wiggins v. Sec'y of Army*, 751 F. Supp. 1238, 1241 (W.D. Tex. 1990) (finding no irreparable harm from facing arrest and possible imprisonment by avoiding deployment based on moral beliefs as a conscientious objector), *aff'd*, 946 F.2d 892 (5th Cir. 1991).  Courts have followed this principle even when a plaintiff alleges constitutional claims.  *See, e.g.*, *Waters v. Schlesinger*, 366 F. Supp. 460, 462 (N.D. Tex. 1973); *Hall v. McHugh*, 2010 WL 596499, at *2 n.4 (S.D. Ga. Feb. 17, 2010); *U.S. ex rel. New v. Perry*, 1996 WL 420175, at *1 (D.D.C. Jan. 16, 1996).

Plaintiffs' argument that administrative and disciplinary consequences for non-compliance with the vaccine directive constitute irreparable harm is based on *BST Holdings, LLC v. Occupational Health & Safety Administration*, 17 F.4th 604 (5th Cir. 2021).  *See* Pls.' Mem. 28–29.  But Plaintiffs' reliance on *BST Holdings* is misplaced, as the OSHA requirement at issue in that case applies to civilian employers, not service members.  What the Fifth Circuit saw as businesses' "nonrecoverable compliance costs"—the "business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, [and] the diversion of resources necessitated by the Mandate"—and the imposition of "financial penalties" for non-compliance, *BST Holdings*, 17 F.4th at 618, are not analogous to the potential consequences service members may face for non-compliance with the military's vaccine directive, because, as shown above, those consequences are reparable.

Plaintiffs also argue that, like the employees in *BST Holdings*, they face a "choice between their job(s) and their jab(s)."  Pls.' Mem. 28 (quoting *BST Holdings*, 17 F.4th at 618).  But they face no such choice while their exemption requests are pending.  *See* Ex. 17 ¶¶ 10 n.9, 14 n.13

(App306, App310).  And although the court in *BST Holdings* found that the OSHA rule "threatens to substantially burden the liberty interests" of private individuals choosing between their job or taking a COVID-19 vaccine, *BST Holdings*, 17 F.4th at 618, the Fifth Circuit has recognized that service members' liberty interests are implicated only if the member is subject to a stigmatizing discharge, *see Sims v. Fox*, 505 F.2d 857, 862–64 (5th Cir. 1974); *Walker v. United States*, 1998 WL 637360, at *10 n.29 (E.D. La. Sept. 16, 1998), *aff'd*, 184 F.3d 816 (5th Cir. 1999).  Service members who are processed for discharge for failure to comply with the COVID-19 vaccine directives will be processed with a General (Under Honorable Conditions) discharge.  Ex. 17 ¶¶ 17–18 (App312–15).  As the Fifth Circuit has recognized, "a general discharge" from service is not the type of stigmatizing discharge that is irreparable.  *McCurdy*, 359 F.2d at 493–94.

### III.    The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party."  *Nken*, 556 U.S. at 435.  These factors tilt decisively against granting a preliminary injunction here.

Although Plaintiffs request that the Court enter a nationwide injunction to prevent the Navy from implementing its COVID-19 vaccine directive, *see* Pls.' Proposed Order ¶ 2, Plaintiffs fail to discuss how such an injunction would affect the public interest, *see* Pls.' Mem. 29–30.  In any event, a nationwide injunction against the Navy's requirements would seriously and adversely impact the public interest and the national security of the United States.  The Secretary of Defense "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people."  Ex. 2 (further stating that "[t]o defend this Nation, we need a healthy and ready Force").  The Secretary made this decision after consulting with "medical experts and military leadership," *id.*, including the "Chairman of the Joint Chiefs of Staff, the Secretaries of

the Military Departments, [and] the Service Chiefs," and considering the rise in infection rates due to the Delta variant, Ex. 1. The Secretary of the Navy likewise found that COVID-19 "adversely impacts" "force readiness and mission execution" and that "[v]accination is the most effective tool we have to prevent widespread manifestation of COVID-19 in [the] force." *See* Ex. 6 ¶¶ 2, 3 (App075). The Court must "give great deference" to the "professional military judgments" of these leaders when it comes to what is needed to ensure military readiness. *See Winter*, 555 U.S. at 24–25; *see also Church*, 2021 WL 5179215, at *18 (deferring to the judgment of military leaders concerning the importance of vaccination for military readiness).

These professional military judgments are supported by the evidence showing COVID-19's harmful impact on the military. *See Church*, 2021 WL 5179215, at *18 (stating the Secretary of Defense's decision to require vaccination is "supported by a lengthy record replete with data demonstrating the necessity of a general vaccine mandate"). Since the onset of the COVID-19 pandemic, hundreds of thousands of service members have been infected, thousands have been hospitalized, and dozens have died. Ex. 12 ¶ 3 (App263). All but one of the service members who have died were unvaccinated. *Id.* COVID-19 has "impacted exercises, deployments, redeployments, and other global force management activities," *id.* ¶ 6 (App264) (including rendering one of the Navy's eleven aircraft carriers non-operational because of an outbreak, *id.* ¶ 8 (App265)); caused the cancellation of "19 major training events, many of which involved preparedness and readiness training with our foreign partners," *id.* ¶ 9 (App265–66); and "required significant operational oversight" by the most senior military leaders, *id.* ¶ 4 (App263). Further, vaccination requirements of other nations restrict the ability of unvaccinated service members to participate in joint training exercises, which are "vital to the preservation of national security and the protection of our foreign interests." *Id.* ¶¶ 10–11 (App266). In addition, because health care

providers have had to care for COVID-19 patients, certain service members have not been able to "address non-emergency conditions and undergo routine medical and health assessments that are required under military directives to maintain medical readiness." *Id.* ¶¶ 13–14 (App267).

Vaccinations have promoted readiness by reducing the risk of infections, hospitalizations, and deaths of service members, reducing the number of service members required to quarantine, and permitting the military to return to higher levels of occupancy in DoD facilities and hold in-person training. *Id.* ¶ 14 (App267). Vaccinations also permit service members to engage in joint training exercises with other countries that have vaccine requirements. Ex. 15 ¶ 16 (App291).

Even an injunction of the Navy directives limited solely to the 35 Plaintiffs would harm the national defense and the public interest. Service members in the Navy Special Warfare community conduct some of the military's most sensitive missions, such as small-scale offensive action (*e.g.*, the Osama bin Laden mission), counterterrorism, and hostage rescue and recovery. Ex. 15 ¶¶ 3, 14 (App282–83, App289); *see also* Navy SEAL, *available at* https://www.navy.com/seals (last visited Dec. 9, 2021). If they are unvaccinated, Plaintiffs could get infected with COVID-19, become seriously ill, and face hospitalization and death—all of which would affect the readiness of their unit to conduct these missions. Ex. 18 ¶¶ 7–9 (App348–51). This concern is particularly acute for the NSW community, as service members "operate in small units," for instance in teams of two or four, such that "the incapacitation of one member can significantly degrade the effectiveness of the unit and may ultimately compromise the mission." Ex. 14 ¶ 5 (App276–77). And if a NSW service member is unvaccinated, is permitted to deploy, and gets seriously ill with COVID-19 in a hostile area, a medical evacuation may risk the lives of other service members or may ultimately not be possible, thus endangering the member's life and affecting the unit's mission. *Id.* ¶¶ 5, 9 (App276–78); Ex. 15 ¶¶ 15–16 (App290–91). Given the

types of sensitive missions conducted by NSW service members, any compromise to those missions could have a direct impact on the national defense.

Even if service members suffer a mild case of COVID-19, they could experience the effects of "long COVID," which can cause various ailments, such as fatigue, functional mobility impairments, and respiratory abnormalities for months after infection. Ex. 18 ¶¶ 8–9 (App349–51). In fact, several members of the NSW community have had long COVID. Ex. 14 ¶ 8 (App278). Because Navy Special Warfare members "'routinely engage in high-risk operations including parachuting, high-angle activities, high-speed boat and unconventional vehicle operation, weapons operation, demolitions employment, and waterborne activities,'" they are subject to "stringent medical requirements." *Id.* ¶ 4 (App275–76) (quoting MANMED § 15-105(1)). A NSW service member who experiences the effects of long COVID may be medically disqualified from service, thus degrading the readiness of the member's unit. *See id.* ¶ 7 (App277–78) (quoting MANMED § 15-105(1)). Relatedly, the public interest favors allowing military leaders, not Plaintiffs, to decide who is medically qualified to perform their duty assignments and deploy. *See Harkness*, 858 F.3d at 443.

Unvaccinated service members also could spread the coronavirus to others, which is of particular concern for the military, given that these service members work in close quarters and in operational settings. Ex. 18 ¶ 9 (App350–51); Ex. 12 ¶ 8 (App265); *see Garland*, 2021 WL 5771687, at *9 (noting the city's "significant interest" in preventing the spread of COVID-19 among firefighters who work in "close proximity" with each other "while on duty [and] in their fire stations"); *Mass. Correction Officers Federated Union v. Baker*, 2021 WL 4822154, at *8 (D. Mass. Oct. 15, 2021) (noting the public interest in preventing the spread of COVID-19 in "congregate facilities"). For example, Navy SEALs may travel with their unit on boats that are

not even six feet across or on helicopters where they are sitting shoulder-to-shoulder.  Ex. 15 ¶ 14 (App289).  Additionally, NSW personnel may have to "share closed-circuit diving rebreathers, where COVID-19 could imperil one another because members are forced to share breathing devices, and literally inhale one another's exhalation." *Id.*  Thus, even as it relates solely to the Plaintiffs, enjoining the Navy's vaccine directive would significantly impact military readiness.

Plaintiffs also request that the Court enjoin the Government from taking any adverse employment action or discipline for non-compliance with the DoD directive.  *See* Pls.' Proposed Order ¶¶ 3(c), 4.  But the military has authority to handle matters of good order and discipline without interference from the Judiciary.  *Chappell*, 462 U.S. at 300–01; *Bois*, 801 F.2d at 467–68. The Navy has specific processes that must be followed prior to implementation of any discipline or adverse employment action, *see* Ex. 8 (App083–87); Ex. 17 ¶¶ 15–21 (App311–19), and the Navy's "interest in good order and discipline is best served by adjudicating each refusal [to comply with the vaccine directive] on a case-by-case basis," Ex. 17 ¶ 23 (App320–21).  An injunction prohibiting the military from initiating or completing those processes "would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities."  *Orloff*, 345 U.S. at 95; *cf. White*, 862 F.2d at 1212 (stating that *Sampson* "explicitly mandates that courts must consider the disruptive effect on the administrative process of the federal government of granting preliminary injunctions in government-employment-related cases").  Such an injunction would be contrary to the public interest.  *See Chilcott*, 747 F.2d at 33 (noting the "strong judicial policy against interfering with the internal affairs of the armed forces"); *see also Reinhard*, 209 F. Supp. 3d at 221; *Guerra*, 942 F.2d at 275; *Shaw*, 2021 WL 1840397, at *10.

More generally, enjoining the DoD directive would harm the public interest in slowing the spread of COVID-19 among millions of service members and the members of the public with

whom they interact.  In recognition of the Government's "compelling interest" in "[s]temming the spread of COVID-19," *Cuomo*, 141 S. Ct. at 67, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction.  *Tigges v. Northam*, 473 F. Supp. 3d 559, 574 (E.D. Va. 2020); *see also, e.g.*, *Church*, 2021 WL 5179215, at *18–19; *Florida v. HHS*, 2021 WL 5768796, at *17 (11th Cir. Dec. 6, 2021); *Rydie v. Biden*, 2021 WL 5416545, at *5–6 (D. Md. Nov. 19, 2021).

Plaintiffs argue that there is a public interest in ensuring that their constitutional and statutory rights are not violated.  Pls.' Mem. 29–30.  But as shown above, the Government is not violating those rights.  And in any event, the balance of interests weighs heavily against the entry of preliminary injunctive relief in light of the harms that would result to the national defense, to the health of service members, and more broadly to the public health of the United States.

## IV.   Any Relief Should Be Narrowly Tailored.

If the Court were to disagree with Defendants' arguments, relief should be no broader than necessary.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring). Thus, any relief should benefit only Plaintiffs.

## CONCLUSION

Accordingly, Plaintiffs' motion for a preliminary injunction should be denied.

Dated:  December 10, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

Respectfully submitted,

/s/ *Courtney D. Enlow*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW (NC Bar No. 46578)
LIAM HOLLAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 10, 2021, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

/s/Courtney D. Enlow
COURTNEY D. ENLOW (NC Bar No. 46578)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov