UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>                  Plaintiffs,<br><br>          v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>                  Defendants. | Case No. 4:21-cv-01236-O |

**APPENDIX IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL STAY PENDING APPEAL**

| Ex. | Description | Bates Number(s) |
|---|---|---|
| 1 | Diana Stancy Correll, "Omicron Isn't Significantly Impacting Navy Operations, Admiral Says," *Navy Times* (Jan. 27, 2022). | 0001-0005 |
| 2 | NAVADMIN 07/22, "U.S. Navy COVID-19 Standardized Operational Guidance 5.0" (Jan. 15, 2022). | 0006-0012 |
| 3 | Declaration of U.S. Navy Special Warfare Combatant Craft Crewman 4. | 0013-0017 |

Respectfully submitted this 31st day of January, 2022.

KELLY J. SHACKELFORD
  Texas Bar No. 18070950
JEFFREY C. MATEER
  Texas Bar No. 13185320
HIRAM S. SASSER, III
  Texas Bar No. 24039157
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
JUSTIN BUTTERFIELD
  Texas Bar No. 24062642
Danielle A. Runyan *
  New Jersey Bar No. 027232004
Holly M. Randall *
  Oklahoma Bar No. 34763
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
jbutterfield@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org

JORDAN E. PRATT
  Florida Bar No. 100958*  **
FIRST LIBERTY INSTITUTE
227 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (972) 941-4444
jpratt@firstliberty.org

*Admitted pro hac vice.
** Not yet admitted to the D.C. Bar, but admitted to practice law in Florida. Practicing law in D.C. pursuant to D.C. Court of Appeals Rule 49(c)(8) under the supervision of an attorney admitted to the D.C. Bar.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER
  Texas Bar No. 24103325
ANDREW B. STEPHENS
  Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
Tel.: (512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

*Attorneys for Plaintiffs*

Sections  Pay & Benefits   Flashpoints   Pentagon & Congress   Off Duty   Education and Transition   Military Honor   Veterans   Subscribe Now

Your Navy

# Omicron isn't significantly impacting Navy operations, admiral says

By **Diana Stancy Correll**

Jan 27, 02:56 PM



The littoral combat ship Billings steams through the Atlantic Ocean on Dec 16, 2021. (MC3 Aaron Lau/Navy)

The U.S. Navy hasn't witnessed any significant operational impacts stemming from the omicron variant of COVID-19 — despite outbreaks like the one on the littoral combat ship Milwaukee last month, according to Navy leaders.

Pls.' Opp. Mot. Partial Stay Pending Appeal App. 0002

"We've had all variants on our ships, including omicron," Vice Adm. William Merz, deputy chief of naval operations for operations, plans and strategy, told reporters Wednesday. "We have taken advantage of our operational flexibility to evaluate and ensure our approach has remained effective, and we all continue to learn and adjust."

Omicron has a quick turn around and isn't causing severe illness in sailors, Merz said.

"So, it's coming and going all the time, very small numbers, and really no operational impact," Merz said. "And the teams are just very, very attuned to watching their indications and reacting to it."

The Milwaukee [deployed to U.S. 4th Fleet in December](), but was sidelined later that month at Naval Station Guantanamo Bay, Cuba due to the virus outbreak. The whole crew, just over 100 sailors, was fully vaccinated, and those infected only "exhibited mild or no symptoms," according to the Navy. [The ship got back to sea Jan. 4]().

Several other ships have also had omicron cases, Merz said, but he declined to say which ones. The Navy keeps track of cases that are "almost statistically insignificant" cases, he noted, and these episodes have provided the Navy an opportunity to examine its mitigation tactics.

For example, the Navy updated its COVID-19 guidance to sailors on Jan. 15 to align with the Centers for Disease Control and Prevention's latest instruction, slashing the isolation period for those who test positive. That means that sailors who test positive now must isolate for five days or until symptoms have cleared, depending on which is longer. Following isolation, sailors will then wear a mask for an additional five days.

"No exit testing is required and, absent symptoms, prior positives should not be PCR tested for 90 days," the naval administrative message said.

Those who exhibit symptoms will be tested, and those who've been exposed to a sailor with COVID-19 but are asymptomatic will test two to five days later if testing is available. The guidance says those exposed but asymptomatic must wear a mask for 10 days and test if symptoms develop.

Ad

In that guidance, the Navy reiterated that sailors should receive the COVID-19 booster shot, and Rear Adm. Bruce Gillingham, surgeon general of the Navy, told reporters the service hasn't experienced resistance from sailors about getting that third shot.

The COVID-19 booster shot is still under emergency-use authorization from the Food and Drug Administration, and therefore not mandatory for sailors. However, Merz and Gillingham said they expect it to become mandatory once the booster shots receive FDA approval.

"Because all studies are converging on the need for a vaccine booster to ensure enduring protection, it has essentially become the next-shot in a series and will likely become mandatory in the near future," the NAVADMIN said. "There is no shortage of vaccine booster doses for those eligible."

A total of 5,035 active component and 2,960 Ready Reserve sailors remain unvaccinated, according to figures the Navy released Jan. 26. The service has approved 10 permanent medical exemptions, 259 temporary medical exemptions, and 59 administrative exemptions for active duty sailors, along with seven temporary medical exemptions and 24 administrative exemptions for Navy Reserve sailors.

Pls.' Opp. Mot. Partial Stay Pending Appeal App. 0004

No religious exemptions have been approved, although more than 4,000 active duty and Navy Reserve sailors have submitted such requests.

Additionally, the [Navy has booted 45 sailors](#) from the service for refusing the mandatory COVID-19 vaccine. That includes 23 active duty sailors and 22 entry level separations, meaning the sailors were still completing initial training periods within their first 180 days of active duty at the time of separation.

According to Merz, it's significantly less expensive to separate a sailor than to conduct a medical evacuation due to a COVID-19 outbreak. There have been no medical evacuations for sailors since the Navy reached 100 percent vaccination among its operational units, Merz said.

Those who have a waiver or are seeking a COVID-19 vaccine exemption are transferred to a shore tour to ensure sailors in operational units are fully vaccinated.

At least 17 sailors have died due to complications from COVID-19.

Share:     

### More In Your Navy ›

Get News Alerts

**Navy says the leaked images of the F-35 crash into the South China Sea are real**
The carrier has verified that the video of the F-35C as it approached and the photos of it after it fell in the sea were taken aboard the ship.


**Did McDonalds just release a Marine Corps Burger?**
The Air, Land and Sea will be sold for a limited time beginning Jan. 31.


**Military families 'exhausted' two months into water crisis in Hawaii**
Residents of the affected communities are weighed down by the uncertainty of when they'll be able to return to their homes and how safe their homes will be, their long-term health concerns and just the daily grind.


**LCS Little Rock temporarily lost power during sea trials, returned to Mayport**
USS Little Rock lost power and returned to port during its post-maintenance sea trials, two years after a similar incident involving its combining gear forced it to end its maiden deployment.


**Coast Guard to suspend search for migrants off Florida**

# Exhibit 2

```
UNCLASSIFIED//
ROUTINE
R 152351Z JAN 22 MID600051441248U
FM CNO WASHINGTON DC
TO NAVADMIN
INFO SECNAV WASHINGTON DC
CNO WASHINGTON DC
BT
UNCLAS

NAVADMIN 07/22

MSGID/NAVADMIN/CNO WASHINGTON DC/CNO/JAN//

SUBJ/U.S. NAVY COVID-19 STANDARDIZED OPERATIONAL GUIDANCE 5.0//

REF/A/NAVADMIN/OPNAV/021344ZJUN21//
REF/B/NAVADMIN/OPNAV/042044ZMAY21//
REF/C/NAVADMIN/OPNAV/221712ZDEC21//
REF/D/MEMO/OSD/30DEC2021//
REF/E/DOC/SECDEF/24AUG2021//
REF/F/ALNAV/SECNAV/302126ZAUG21//
REF/G/NAVADMIN/CNO/311913ZAUG21//
REF/H/NAVADMIN/OPNAV/241805ZNOV21//
REF/I/DOC/NMCPHC/27DEC2021//
REF/J/DOC/NMCPHC/14MAY2021//
REF/K/DOC/NMCPHC/19MAR2021//
REF/L/MEMO/OSD/20DEC2021//
REF/M/NAVADMIN/OPNAV/301952ZAPR21//
REF/N/MEMO/OSD/10JAN2022//
REF/O/NAVADMIN/OPNAV/041827ZAUG21//
REF/P/NAVADMIN/OPNAV/231718ZAUG21//

NARR/REF A IS NAVADMIN 110/21, U.S. NAVY COVID-19 STANDING GUIDANCE UPDATE 1.
REF B IS NAVADMIN 088/21, SARS-COV-2 VACCINATION AND REPORTING POLICY.
REF C IS NAVADMIN 289/21, GUIDANCE ENCOURAGING COVID-19 VACCINE BOOSTER.
REF D IS USD P&R FORCE HEALTH PROTECTION (FHP) SUPPLEMENT 15 REVISION 3 DOD
GUIDANCE FOR CORONAVIRUS DISEASE 2019 LABORATORY TESTING SERVICES AVAILABLE
AT https://www.defense.gov/Spotlights/Coronavirus-DOD-Response//Latest-DOD-
Guidance/.
REF E IS THE SECRETARY OF DEFENSE MEMO MANDATING CORONAVIRUS DISEASE 2019
VACCINATION FOR DEPARTMENT OF DEFENSE SERVICE MEMBERS.
REF F IS ALNAV 062/21, 2021-2022 DEPARTMENT OF THE NAVY MANDATORY COVID-19
VACCINATION POLICY.
REF G IS NAVADMIN 190/21, 2021-2022 NAVY MANDATORY COVID-19 VACCINATION AND
REPORTING POLICY.
REF H IS NAVADMIN 268/21, REQUIRED COVID-19 TESTING FOR UNVACCINATED SERVICE
MEMBERS.
REF I IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER COVID-19 OMICRON VARIANT
AND BOOSTER EFFECTIVENESS.
REF J IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER U.S. NAVY FORCE HEALTH
PROTECTION WITH CONSIDERATIONS FOR VACCINE EFFICACY.
REF K IS NAVY AND MARINE CORPS PUBLIC HEALTH CENTER DOCUMENT ASSESSING REAL
COVID-19 RISK.
REF L IS USD P&R FORCE HEALTH PROTECTION (FHP) SUPPLEMENT 23 REVISION 3 DOD
GUIDANCE FOR CORONAVIRUS DISEASE 2019 VACCINATION ATTESTATION, SCREENING,
TESTING, AND VACCINATION VERIFICATION AVAILABLE
AThttps://www.defense.gov/Spotlights/Coronavirus-DOD-Response//Latest-DOD-
Guidance/.
REF M IS NAVADMIN 086/21, UPDATED GUIDANCE TO COMMANDERS ON ADJUSTING HEALTH
PROTECTION CONDITIONS AND BASE SERVICES DURING COVID-19 PANDEMIC (CORRECTED
COPY).
REF N IS USD P&R FORCE HEALTH PROTECTION (FHP) SUPPLEMENT 20 REVISION 1 DOD
GUIDANCE FOR PERSONNEL TRAVELING DURING THE CORONAVIRUS DISEASE 2019 PANDEMIC
```

Pls.' Opp. Mot. Partial Stay Pending Appeal App. 0007

```
AVAILABLE AT https://www.defense.gov/Spotlights/Coronavirus-DOD-
Response//Latest-DOD-Guidance/.
REF O IS NAVADMIN 165/21, SOVEREIGN IMMUNITY POLICY.
REF P IS NAVADMIN 180/21, UPDATE TO COVID-19 REPORTING REQUIREMENTS.

POC/OPNAV/CAPT STEVEN TARR III, (703) 614-9250//EMAIL:
STEVEN.TARR1.MIL(AT)US.NAVY.MIL

RMKS/ 1.  Purpose.  This NAVADMIN provides updated COVID-19 standardized
operational guidance and cancels and replaces references (A) and (B).  As a
result of our unblinking focus on personnel safety, our sailors and civilians
have proven resilient to the COVID-19 global pandemic. Vaccinations, vaccine
boosters, command engagement, and personal accountability continue to form
the foundation of our success.  Although Commanding Officers hold ultimate
responsibility for the health and welfare of their crews, in the case of a
persistent pandemic every member of every command must take personal
ownership and responsibility of the promulgated measures required to keep
COVID-19 in check.

2.  Applicability.  This guidance applies to all service members (active duty
and ready reserve) who are members of, or support, operational units as
defined by the applicable Navy Component Commander (NCC) per paragraph
4.e below.  Non-operational forces, civilian employees and contractor
personnel should follow the latest Department of Defense (DOD) Force Health
Protection, Center for Disease Control (CDC) and state/local area
guidance.  Additionally, host nation and/or higher-echelon Commanders
guidance may apply.

3.  Evolving Guidance.  The fight against COVID-19 has been dynamic.  Both
the data and the response to the data continue to evolve and the CDC is the
authority for COVID-19 measures for the general population.  The CDC
does not provide Navy-specific guidance.  The Navy Surgeon General is the
authority for Navy COVID-19 measures and advises the CNO on how best to apply
CDC guidance across the spectrum of Navy operating environments.
To date, the Navy has met or exceeded CDC guidance and continues to
experience a much lower incidence of adverse effects than the general
population.  Accordingly, and except as noted below in this NAVADMIN,
evolving CDC guidance related to virus behavior should first be evaluated
by the Navy Surgeon General prior to Fleet implementation. Questions
regarding applicable COVID-19 measures may be directed to the point of
contact (POC) listed above.

4.  Definitions.  All CDC definitions regarding COVID-19 apply and are kept
current on the CDC website:  https://www.cdc.gov/.
The following additional Navy definitions are provided:
4.a.  Immunized / Vaccinated:  Interchangeable terms for an individual who
has completed a primary vaccine series as defined in reference (C).  Term
applies two weeks after the final dose is received.  During the time period
from initial dose until two weeks after the final dose, an individual is
considered partially immunized/vaccinated.
4.b.  Vaccine Booster:  The vaccine booster is a time-based reinforcement of
the initial vaccine in order to prevent decreasing immunity.  A vaccine
booster is authorized greater than 5 months after a Pfizer/BioNTech or a
Moderna mRNA two-dose vaccine series, and greater than 2 months after a
Johnson and Johnson single-dose vaccine. Booster guidance is subject to
change and the most up to date information is available on the CDC website.
4.c.  High-risk personnel:  Those individuals designated by a medical
provider who meet CDC criteria for increased risk of severe
illness.  Qualifying conditions are included on the CDC website.
4.d.  Commander:  For the purposes of this NAVADMIN, the term Commander
includes Commanding Officers, Officers-in-Charge, Masters, and Aircraft
Commanders.
4.e.  Operational and non-operational forces:  For the purposes of this
NAVADMIN, operational forces and non-operational forces are defined by the
applicable NCC.  For operational forces, this might include deployed forces,
```

forces in sustainment, or other operational elements that the NCC determines
to fall within the intent and context of this NAVADMIN.
4.f.  Restriction of movement (ROM):  DOD term for limiting personal
interaction to reduce risk to a broader population.  Personnel executing
directed ROM remain in a duty status and will not be charged leave.
ROM-sequester is the Navy term for preemptive ROM in order to reduce risk of
infection in advance of movement.
4.g.  Health protection measures (HPM):  Comprehensive term for mitigation
measures that reduce the spread of COVID-19.  This includes physical
distancing, wearing of masks, and enhanced environmental
cleaning.  Recommended HPMs are included on the CDC website.
4.h. Viral test:  For the purposes of this NAVADMIN, and unless specifically
stated otherwise, a COVID test is defined as receiving a test that measures
antigen produced by the body's immune response (antigen test) or a test that
detects the actual presence of the virus (Polymerase Chain Reaction (PCR)
test).
4.i.  Close contact:  A person who was less than 6 feet away from another,
infected person (laboratory-confirmed or a clinical diagnosis) for a
cumulative total of 15 minutes or more over a 24-hour period (for example,
three individual 5-minute exposures for a total of 15 minutes).

5.   COVID-19 infected personnel and close contacts.
5.a.   Actions for personnel suspected of being infected.
5.a.1.  Symptomatic.  Test immediately those individuals exhibiting COVID-19
symptoms.  If symptomatic and positive, isolate the individual per paragraph
5.a.3. and identify close contacts per reference (D); if symptomatic and
negative, consult a medical provider prior to returning to work.
5.a.2.  Close contacts.  Asymptomatic close contacts should be tested 2-5
days after exposure, if testing is available (see paragraph 6).  Close
contacts may remain on duty but must wear a mask for 10 days. If symptoms
develop, test per paragraph 5.a.1.
5.a.3.  Isolation.  Isolate individuals who test positive for 5 days or until
symptoms are clearing, whichever is longer, including 24 hours with no
fever and without fever-reducing medication (day 0 is date of positive test
or symptom onset, whichever occurred first).  Isolation may be conducted
either ashore or afloat. Once released, individuals will wear a mask for an
additional 5 days (minimum 10 days total).  No exit testing is required and,
absent symptoms, prior positives should not be PCR tested for 90 days (per
paragraph 6.c).,
5.b.  Actions for unvaccinated personnel.
5.b.1.  Per references (E), (F) and (G), all operational Navy units are
assumed to be 100 percent vaccinated. Unvaccinated uniformed personnel should
only include those with an approved waiver, those awaiting waiver
disposition, or those processing for separation.  With the exception of
separation orders, unvaccinated personnel will not execute orders until the
COVID-19 Consolidated Disposition Authority (CCDA) has completed disposition
of their case.

6.   COVID-19 Testing.
6.a.  Testing Priority.  Personnel exhibiting COVID like symptoms are the
highest priority for testing. If testing asymptomatic close contacts per
paragraph 5.a.2. stresses testing supplies, or if operations preclude testing
(e.g., small, remote teams or depleted supplies), Commanders are authorized
to forego testing of asymptomatic close contacts.
6.b.  Testing of unvaccinated personnel.  Unvaccinated personnel shall follow
the testing requirements of reference (H) and paragraph 6.c. below.
6.c.  Testing of individuals previously infected with COVID-19.  Individuals
previously infected with COVID-19 may be asymptomatic and continue to test
positive by PCR for up to 90 days from date of initial diagnosis due to the
presence of persistent non-infectious viral fragments.  Therefore, prior
COVID positives are exempt from testing protocols for 90 days from the
earlier of symptom onset or first positive test (90-day rule).
Individuals exhibiting new or persistent symptoms during the 90-days
following infection should be evaluated by a medical provider.
6.d.  Surveillance / ship-wide testing.  Surveillance or ship-wide testing is

neither required nor recommended and has previously generated large numbers
of unmanageable persistent positives.
6.e.  Test procurement.  To ensure uninterrupted operations, and as feasible,
Commands will coordinate with their supporting supply activities to obtain
testing supplies 60 days in advance of need.

7.   Requirements for Operational units.
7.a.  Vaccine booster.  To promote maximum protection, NCCs should continue
the campaign for COVID-19 vaccine boosters.  Because all studies are
converging on the need for a vaccine booster to ensure enduring protection,
it has essentially become the next-shot in a series and will likely become
mandatory in the near future.  There is no shortage of vaccine booster doses
for those eligible.
7.b.  Medical screening.  Medical screening will include newly reporting
personnel and a command-wide monthly data review and assessment, as directed
by the applicable NCC.  An additional pre-deployment screening will be
completed within 7 days of deployment.  Medical screening shall be conducted
by medical providers and reported to the unit Commander to assist in
assessing risk and mitigations.  Screening will include, at a minimum, a
review of vaccination and vaccine booster status, an assessment of COVID-19
exposure history (those under the 90-day rule), and a review and assessment
of those with underlying risk factors (high-risk determination).
Unvaccinated Navy personnel shall not be assigned to operational units.
7.c.  Military Sealift Command (MSC).  MSC shall medically screen Civil
Service Mariners and contract personnel for deployment on MSC vessels in
accordance with existing MSC Quality Management System processes and
procedures. Unvaccinated personnel should not be assigned to operational
units, with exceptions approved and mitigated by Commander, MSC.
7.d.  Vaccinated High-risk personnel.  The decision to operate and deploy
with vaccinated high-risk personnel rests with the Commander, as advised by
medical providers, who must report intentions to their immediate superior in
command (ISIC).  High-risk personnel shall be PCR viral tested within 3 days
of embarking.
7.e.  Pre-deployment ROM-sequester.  Vaccinated individuals should not
normally be required to ROM- sequester ahead of planned operations.  In rare
circumstances, the applicable NCC may direct a ROM-sequester in response,
for example, to unanticipated virus behavior or in response to Geographic
Combatant Commander (GCC) and/or host nation requirements.  Foreign clearance
guidance is available at https://www.fcg.pentagon.mil/.
7.f.  Underway HPM.  As a result of demonstrated vaccine effectiveness, a
100% vaccinated operational force and a healthy demographic, serious illness
or death resulting from COVID-19 for vaccinated individuals is statistically
very unlikely, and modeling contained in references (I), (J), and (K)
indicates this will continue in the context of current variants.  However,
the increasing contagious nature of evolving variants can result in
unmanageable numbers of even mild symptomatic positives that may pose general
health and operational unit risk, i.e. risk to force (RTF) or risk to mission
(RTM), regardless of symptom severity. The following HPM, at a minimum, is
required:
7.f.1.  Medical screening as outlined above in paragraph 7.b.
7.f.2.  Wearing masks for the first 10 days (analogous with paragraph 5
requirements) after leaving port if more than 25% of the total crew meets the
requirements for, but has not yet received, the vaccine booster.
At Commanders discretion, masks may be removed if there is no evidence of
COVID infection for 10 days (no positive symptomatic and no isolations).  At
the onset of COVID on board, and if still greater than 25% have not received
the vaccine booster, return to wearing masks until there is no longer
evidence of COVID.  Although all vaccinated personnel have demonstrated
protection against serious illness or death, this percentage indicates
decreasing immunity and the potential for increasing numbers of symptomatic
individuals requiring isolation.
7.f.3.  Educate and reinforce self-monitoring for symptoms and prompt
reporting.
7.f.4.  Educate and reinforce frequent handwashing and social distancing,
when applicable.

Pls.' Opp. Mot. Partial Stay Pending Appeal App. 0010

7.f.5.  Aggressively isolate COVID-19 positive individuals per paragraph 5 above.
7.f.6.  Ensure adequate ventilation in spaces routinely manned.
7.f.7.  Educate and reinforce focused cleaning efforts on high-touch surfaces, at least daily or more frequently, depending upon usage (e.g., tables, hatch latches, ladderwells, phones, watch console keyboards and buttons, toilets, faucets, sinks, etc.).  Although remote, there is evidence of surface spread of COVID-19 and other viruses with similar symptoms.
7.g.  Considerations for adding or relaxing HPM. NCCs and Commanders should consider for any unit the operational impact resulting from the number of sailors in isolation, either ashore or afloat, regardless of percentage of immunized personnel, boosted personnel, or severity of symptoms.  Commanders may elevate HPM at any time and retain the latitude to temporarily apply alternate HPM in lieu of isolation to support safe operations.  An example might be a rapid spread that compels a Commander to utilize asymptomatic or mildly symptomatic positives to manage watch-bill impact while recovering others in isolation, applying additional alternate measures as needed to minimize spread. The following should be considered before adjusting HPM:
7.g.1.  Overall number of individuals in isolation and trend. The general rule of thumb for a COVID outbreak trending in a favorable direction is that the number of those exiting isolation matches (flattening curve) or exceeds (lowering curve) those entering isolation, combined with the assessment that the total number of symptomatic individuals is manageable and improving, and watch-bill (operational) impact is manageable and improving.
7.g.2.  Proximity of a units access to shore and afloat Medical Treatment Facilities (MTF) within a medically relevant timeline, balanced with paragraph
7.f HPM and onboard trend.  Rule of thumb is within 1-week of an MTF for 100 percent vaccinated crew with a manageable COVID-positive case load; moving to a more restrictive, 72 hours or less, if a growing or concerning case load; or, moving to a less restrictive, beyond 1-week, if a small or no case load.
7.h.  Port visits.  Liberty is an important mission and should be pursued within the context of this NAVADMIN. Geographic NCCs (GNCC) will set conditions for foreign port off-base liberty in coordination with country teams and local authorities, taking into account host country requirements, vaccination and booster status, sovereign immunity per paragraph 8 below, COVID-19 prevalence and mission requirements.
7.i.  Aircraft operations.  On a case-by-case basis, aircrews and aircraft maintainers may be exempt from this guidance in order to meet emergent operational or NATOPS currency requirements. Exemptions and mitigation plans must be approved by the Squadron Commander.  For aviation units embarked on surface ships, mitigation plans will be coordinated with the ships health protection plan and approved by the ships Commanding Officer.
7.j.  Post-deployment.  Personnel returning to homeports from deployment shall follow CDC and U.S. Department of State travel and testing requirements. If return travel includes foreign countries, personnel shall adhere to the requirements of those countries as well.  Updated travel information is on the following website:
https://travel.state.gov/content/travel.html.
7.k.  Visitors embarking underway vessels and Navy aircraft.  All visitors are required to be vaccinated in accordance with reference (L), and, if eligible, have received a vaccine booster. Masks will be worn during transit; and for ships, 10 days once onboard.

8.  Sovereign immunity.
8.a.  It is U.S. Government policy to protect the sovereign immunity of warships, naval auxiliaries, and aircraft, including protecting crew information to the maximum extent possible. Within the context of COVID-19, host nations may request or require crew or ship information exceeding that authorized by U.S. policy or international law.  NCCs will ensure appropriate training and guidance on protecting U.S. sovereign immunity and the protection of health information as part of OPSEC/personal security.
8.b.  GNCCs should determine in advance those host nations that may challenge our sovereign immunity and, as able, avoid them.  See reference (O) for

```
additional guidance.  In all cases, GNCCs shall authorize the minimum
information necessary in order to meet operational requirements.  The
Navy Declaration of Health (NAVMED 6210/3) is the only authorized form for
providing health information to foreign officials.  If required by the host
nation, and with GNCCs concurrence, Commanders at their discretion may
include on the NAVMED 6210/3 that their unit is 100% vaccinated, those
disembarking will have tested negative within the required timeframe, and
those disembarking have received a vaccine booster.
8.c.  Exception to Policy (ETP).  On a case-by-case basis, and to support
operations, OPNAV may grant an exception to policy (ETP) in deference to the
varying impacts of COVID-19. Any action that may constitute or require a
waiver of sovereign immunity must be coordinated by the applicable GNCC with
OPNAV N3N5 for ETP approval no later than 5 days ahead of need.
To avoid precedence beyond COVID-19, any ETP will be messaged to the host
nation as explicitly linked to the pandemic.  Requests shall include
justification for port selection; host nation mitigation and testing
requirements; alternate port options; impact to mission if the request
is denied; medical, legal, collection and privacy risk; and feedback from
country team coordination.
Notifications and requests may be sent via record message traffic, email to
the POC provided above, or both.
8.d.  Guidance for Commanders.  Per the direction of their GNCCs, Commanders
shall comply with domestic and foreign quarantine regulations for port entry
and document compliance on NAVMED 6210/3.  Absent GNCC approval in advance,
Commanders will not submit to host nation COVID-19 testing nor provide
individual or collective medical data, copies of health records, nor any
supplementary or locally demanded health forms, and shall not grant access
to ship or crew health records or allow the same to be searched or inspected
by host nations.  If circumstances compel a Commander to acquiesce to
additional host nation requirements without obtaining an ETP or GNCC
concurrence (e.g., personnel emergency, weather avoidance), report the event
and circumstances to OPNAV N3N5 via the chain of command as soon as
practicable.

9.  Reporting procedures.  Reporting procedures are amended as follows and
will be incorporated in the next revision of reference (P).  OPREP-3 Navy
Blue messages for COVID cases that do not result in death, request for
assistance, or operational impact may instead be reported via SharePoint.  If
unable to report via SharePoint, a single daily OPREP-3 Navy Unit SITREP
summarizing all COVID cases onboard is required.  SharePoint information is
used to produce daily reports to Senior Navy and DoD Leadership.

10.  Released by VADM W. R. Merz, Deputy Chief of Naval Operations for
Operations, Plans and Strategy, OPNAV N3/N5.//

BT
#0001
NNNN
UNCLASSIFIED//
```

# Exhibit 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **U.S. NAVY SEALs 1-3**, on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>    Plaintiffs,<br><br>  v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>    Defendants. | Case No. 4:21-cv-01236-O |

## DECLARATION OF U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMAN 4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury as follows:

1. I am over the age of eighteen and am competent to make this declaration.

2. I have served in the Navy for 10 years.

3. I reviewed the declarations submitted in support of the Defendants' motion to stay pending appeal and I submit this declaration in response.

4. Many of the Plaintiffs are not currently at deployable commands.

5. All 35 Plaintiffs, including those of us at deployable commands, are not subject to overnight deployment. Only Tier 1 elements or members of certain task forces (which no Plaintiff

is a member of), are that quickly deployable. Even in those situations, those individuals have a certain idea of when they may be asked to deploy.

6. The idea that any of the 35 of us could be asked to leave on such short notice is far-fetched, except for during total all-out war.

7. We are stationed at teams that operate on a 24-month cycle, which is broken up into four six-month cycles. This allows us to build our lives around the timeframe for deployments and gives us ample opportunity to prepare.

8. With respect to our integration with Fleet assets while on deployment, while Naval Special Warfare (NSW) does sometimes call upon outside support, that is not done frequently. For large-scale exercises, civilian contractors are often involved.

9. Also, the use of these forces generally entails minimal close contact—in other words, there is no need to board the vessel, and if so, it is only for short durations. If boarding is required on surface assets (i.e. large fleet ships), we are given a designated space for our personnel, equipment and we keep to ourselves because of the general nature of NSW work and the corresponding clearance level associated with the missions (i.e. Secret/Top Secret level). As a result, the vast majority of active-duty members and personnel on board the Fleet either do not hold the required clearance and/or do not have the need to know that we are there. Moreover, other personnel would not be allowed in our occupied spaces.

10. We generally have no need for NSW personnel to mingle through compartments of the ship. The only two spaces that would be closely shared, if any, would be the galley and the gym. But we generally pack our own gyms and it's not uncommon for us to work out of what we call a fly-away kit (a ISU full of workout equipment only for our use). If that were a concern, it would be easy enough to work with the ship to have certain times for certain individuals and

mitigate any risk or concerns of cross-pollination. As the newest NAVADMIN (07/22) recognizes, there will be COVID-19 outbreaks on ships regardless of vaccination, so NSW would likely take these measures anyway.

11. Additionally, aside from eating, masks can be worn by everyone on ships as they have been over the last couple years.

12. To the extent the image that is portrayed is that we are constantly onboard fleet assets, and that when we are onboard we mingle throughout their space, that is not consistent with my personal experience. When we are onboard we are generally left alone and more often than not, the ship is briefed by senior leadership to leave us to our business and pretend we are not there.

13. While attached to my current team, I stood up a Troop that deployed during the early stages of the pandemic, as I discussed in the declaration I filed in December.

14. We deployed to the Middle East. Our Unit Level Training began when COVID-19 first hit the United States. There were no treatments or vaccines at the time, nor much information about the virus, its transmissibility, or its effects. Through the measures of symptomatic testing, masking when appropriate, and social distancing, we were able to complete all phases of training over 12 months.

15. For three weeks before we left, we did blanket testing so that if anyone was positive, they had time to quarantine for 14 days before departure.

16. Our training included multiple Inter-Fleet Operations and large-scale military exercises with various kinds of fleet assets that were focused on a real-world operation that my Troop was set to conduct on deployment. We were able to conduct all rehearsals without any hiccups or setbacks from COVID-19 before a vaccine was mandated or even available.

17. My Troop then went on to conduct a successful multi-theater deployment with almost 50% of the members unvaccinated. Again, COVID posed no threat or setbacks to our ability to be combat-ready and effective, even though the variant circulating at that time was much more serious than the current variant.

18. From my personal experience, as well as my experience having completed my entire 24-month deployment cycle during the worst of the COVID-19 pandemic, I do not believe there would be increased operational risk by the 35 Plaintiffs in this lawsuit being unvaccinated.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on January 31, 2022.

*/s/ Special Warfare Combatant Craft Crewman 4*
Special Warfare Combatant Craft Crewman 4
