## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

---

**NAVY SEALS 1-3,** et al.,

                Plaintiffs,

     v.

**LLOYD AUSTIN, III**, in his official capacity as
Secretary of Defense, *et al.*,

                Defendants.

Case No. 4:21-cv-01236-O

---

## DEFENDANTS' REPLY BRIEF APPENDIX IN SUPPORT
## OF THEIR MOTION FOR A PARTIAL STAY PENDING APPEAL

### Table of Appendix

| Bates Stamps | Description |
|---|---|
| App001–App014 | Declaration of Captain Christopher D. Brown |
| App015–App038 | Department of Defense Instruction 1332.45 |

Dated: February 2, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Andrew E. Carmichael*
ANDREW E. CARMICHAEL (VA Bar. No. 76578)
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
LIAM C. HOLLAND
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3346
Fax: (202) 616-8470
Email: Andrew.e.carmichael@usdoj.gov

*Counsel for Defendants*

# Exhibit 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

**U.S. NAVY SEALs 1-26;**
**U.S. NAVY SPECIAL WARFARE**
**COMBATANT CRAFT CREWMEN 1-5;**
**U.S. NAVY EXPLOSIVE ORDNANCE**
**DISPOSAL TECHNICIAN 1; and**
**U.S. NAVY DIVERS 1-3,**
                                    Plaintiffs,

v.                                                                 Case No. 4:21-CV-01236-O

**LLOYD J. AUSTIN, III,**
in his official capacity as
United States Secretary of Defense; **UNITED**
**STATES DEPARTMENT OF DEFENSE;**
**CARLOS DEL TORO,** in
his official capacity as United States
Secretary of the Navy,
                                    Defendants.

### SUPPLEMENTAL DECLARATION OF CHRISTOPHER D. BROWN

I, Christopher D. Brown, hereby state and declare as follows:

1.     I am a Captain in the United States Navy, currently serving as the Chief of Staff

of U.S. Naval Special Warfare Command (NSWC), located in Coronado, California, whose

mission is to provide maritime special operations forces (SOF) to conduct full spectrum

operations, unilaterally or with partners, to support national objectives. I make this declaration in

my official capacity, based upon my personal knowledge and upon information that has been

provided to me in the course of my official duties.

2.     I have served as a commissioned naval officer for the past 27.5 years.  In that

time, I have deployed nine times and served at every level of command.  I have been assigned to

my current position since September 24, 2021.  Prior to my current assignment, I served as the

1

Commander of Naval Special Warfare Group ONE; Commander of Joint Task Force Indo-Pacific, Director of Operations at Special Operations Command-Central; Commanding Officer of SEAL Team ONE; Commander of Special Operations Task Force-Iraq; Commander of U.S. Central Command Crisis Response Element; and Deputy Commander of Joint Special Operations Task Force-Philippines.  As part of my duties currently, I am responsible for supervising and coordinating the work of the staff of NSWC, which exercises administrative control over subordinate Naval Special Warfare commands and units worldwide.

### NSCW Efforts to Comply with Preliminary Injunction *and* Protective Order

3.      On the evening of Monday January 3, 2022, the Court issued a preliminary injunction (PI) pertaining to the 35 Plaintiffs in the above captioned case.  ECF 66.  NSWC was informed of the PI that evening and immediately began to take significant action to ensure compliance with the Court's injunction.[1]  First, I had my Force Judge Advocate (FJA)[2] begin coordination with Department of the Navy lawyers to ensure the PI was understood and to ensure that compliance efforts were in step with Departmental interpretation of the PI.  Next, I had my FJA and limited members of his legal staff begin researching the Naval Special Warfare (NSW) commands and chains-of-command that had plaintiffs assigned to them.  This research required our legal staff to execute non-disclosure agreements (NDAs) under the court's protective order on Tuesday January 4, 2022, and compile a list of the cognizant commands, officers-in-charge,

---

[1] Thirty-three of the Plaintiffs are in commands or units under the administrative control of NSWC.  Two of the Plaintiffs are currently at non-NSWC training commands.  I am informed that the command with administrative control over those two units, Naval Training and Education Command, has executed similar actions to comply with the protective order and preliminary injunction.

[2] The FJA is the senior Staff Judge Advocate (SJA) across the Naval Special Warfare enterprise.  SJAs are uniformed attorneys assigned to commands who provide a variety of legal services and advice to commanders and personnel.

App003

commanding officers, and commodores.[3]  On Wednesday January 5, 2022, at my regular weekly

Major Commander Sync meeting, I informed all NSW Commodores (or their attending Deputy

Commander or Chief Staff Officer (CSO) if the Commodore was unavailable)[4] of the PI to

ensure maximum level of attention and compliance at the major command level.  I informed

them that no adverse actions were to be taken against plaintiffs and noted that my legal staff was

identifying the reporting chains of each of the plaintiffs and would disseminate guidance through

their assigned Staff Judge Advocates (SJAs), as there was a protective order in the case and

NDAs needed to be executed before identities could be shared.  On the same day, my legal staff

completed their list of reporting chains for the plaintiffs and began informing servicing SJAs that

their Commodores had plaintiffs assigned to them or under one of their subordinates commands,

and distributing NDAs for signature by the respective Commodores, SJAs, and key personnel, as

required in the Commodore's judgment (based on a balancing test of the need to inform

personnel to comply with the PI while also limiting disclosure to the minimum needed to comply

with the protective order).  I also executed my NDA that day, so that I could understand the

situation, be postured to discuss matters with NSWC Commodores, and because I am responsible

for one Plaintiff who is assigned to NSWC.  Over the next few days, each Commodore discussed

the PI with their servicing SJA, and determined the personnel who needed to sign an NDA to

ensure compliance with the PI.  During this time, my Commodores and I each spoke to our

---

[3] NSWC is a U.S. Special Operations Command (USSOCOM) component and the Department of the Navy Echelon II command responsible for all NSW forces across the Navy.  It has seven major commands underneath it (known as Echelon III commands); each of which is commanded by an O-6 (Captain) Commodore.  Each Commodore, in turn, has numerous Echelon IV commands under them; each of which is commanded by an O-5 (Commander) Commanding Officer.  Many of these Echelon IV commands have subordinate detachments that are geographically separate from their parent command and run by Officers-in-Charge of the detachments.  Officers-in-Charge vary in rank, ranging from Chief Warrant Officer to Lieutenant Commander.

[4] The weekly Major Commander Sync meeting allows NSWC and its Major Commanders to discuss important issues at a regularly scheduled weekly meeting.  Commodores normally attend personally; however, when they are unavailable, their Deputy Commodore (second in command) or CSO (responsible for coordinating staff actions at the major commands and ostensibly third in command) attends.

3

servicing SJA to discuss compliance issues. As a general matter, our sense was that compliance with the PI could largely be effectuated through the Commodores themselves because any formal adverse actions for COVID-19 matters required routing through each Commodore; however, temporary reassignment presented more challenges. First, the temporary reassignment of personnel is the prerogative of a commander, based on military and mission requirements, long before any of the provisions concerning temporary reassignment of personnel were reiterated in NAVADMIN 225/21 or NAVADMIN 256/21.[5] This authority derives from U.S. Navy Regulations, and is at the discretion of commanders and commanding officers so that they may accomplish military requirements and balance risks to the mission and force. Second, even though these NAVADMINs did not refer to the assignment of duties, we suspected that the assignment of duties could be confused with temporary reassignment, even though the two are distinct. Because we wanted to get compliance right, over this same period (from 5 January 2022 to 13 January 2022) NSW attorneys coordinated with Department of the Navy attorneys to ensure NSW attorneys were postured to provide commands with clear and consistent guidance regarding each command's obligations to adhere to the PI.

4.  Ensuring compliance with both the Court's PI and the Court's protective order is of paramount importance to NSWC and its subordinate commands. Having said that, complying with the PI while also limiting disclosure of the identities of the Plaintiffs presents several challenges for commanders.[6] Pursuant to the terms of the protective order issued on December 6, 2022, NSWC carefully disclosed the Plaintiffs' identities to the minimum number of personnel

---

[5] Though assignment of duties is within a commander's prerogative, it is a responsibility delegated down to every supervisor. The day-to-day tasking of servicemembers is carried out by a variety of command personnel at every rank level. Temporary reassignment of personnel completely remains a decision of the Commanding Officer and Senior Enlisted Leader of a command.

[6] There are unvaccinated servicemembers within NSW that are not parties to this lawsuit. These servicemembers are still subject to precautionary measures (not intended to be punitive) and exclusion of plaintiffs from these measures is difficult without identification.

4

"actually engaged in the preparation of this litigation for trial or other proceedings herein" and who executed an NDA, Appendix A to the protective order. ECF 37 ¶ 2. For example, commodores, commanding officers, and other key staff executed NDAs and have discretion to have others execute NDAs to the extent it was necessary to comply with the PI. While clearly understanding the requirement to comply with the PI, commanders were also cautious in disclosing the identities of these plaintiffs to only the required personnel. Many of these units are small and disclosing the identities to too many personnel could undermine the purpose of the protective order. Furthermore, many of the actions referenced in the Plaintiffs' motion are controlled by commands outside the authority of NSWC. For example, eligibility to take an advancement exam or advance in rank are managed by discrete offices administering those issues Navy-wide.[7] To avoid any interim action by lower-level personnel across the Navy enterprise that could be perceived to be adverse would require disclosure of the Plaintiffs' identities to dozens, if not hundreds, of servicemembers in a variety of ranks across various commands in the NSW and Navy Personnel enterprise.[8]

5.      One example of this tension between the protective order and PI relates to Navy SEAL 21's claim that he was initially informed that he would not be allowed to take the advancement exam for Chief Petty Officer. See Decl. of Navy SEAL 21 ¶ 7, ECF 97. In support of this allegation Navy SEAL 21 submits an email from his command's career counselor who is a Petty Officer First Class—the same rank as Navy SEAL 21, and a command member who was

---

[7] A Navy advancement exam is a prerequisite to promotion for enlisted servicemembers seeking promotion to E-5, E-6 and E-7. It is a Navy-wide requirement and the exam is carried out by Navy Personnel Command.

[8] Navy SEAL 21 and SEAL 25 also mention being required to pick up trash as a part of their duties. I would note that it is common Navy practice for all servicemembers to pick up trash as a part of their duties. In fact, I regularly require the members of my staff to pick up trash around the spaces we are responsible for and do not view this as an adverse action. These duties are assigned irrespective of any desire to punish a sailor but rather as a productive use of their time when other duties are not pressing. Even as Chief of Staff, I continue to take out my own trash and pick up trash when my duties allow.

App006

not aware the PI applied to the Plaintiff. ECF 97 at 20. But to abide by the protective order NSWC did not inform each servicemember in Plaintiff's peer group of the lawsuit or the PI. However, it appears from the email chain that this issue was ultimately raised to the command level and Navy SEAL 21 was allowed to take the advancement exam even though a member of his peer group initially told him otherwise. Ultimately, there is a wide array of administrative policies and requirements implicated by the Plaintiffs' vaccination status. Some of these policies are either not covered by the PI or are managed by personnel outside the small number of personnel to whom disclosure of Plaintiffs' identities is appropriate pursuant to the protective order. This factor may have led to Plaintiffs' flawed perception that the preliminary injunction is being disregarded. Instead of widespread disclosure, we relied on the traditional operation of the Navy chain of command to serve as a bottleneck to ensure that no adverse action could be finalized against any of the Plaintiffs. All significant adverse actions that can be taken against a servicemember are either routed through their chain of command or provide the servicemember an opportunity to appeal through their chain of command.[9] My direction to NSWC subordinate commanders was to ensure that the injunction was enforced, and they stood ready to overrule any attempt to take an adverse action. For example, Navy SEAL 21 noted an administrative note on his Chief examination referring to his vaccine status. The inclusion of this note was carried out by lower ranking personnel who carry out the Navy-wide Chief's exam who were not privy to SEAL 21's identity as a Plaintiff in this lawsuit. The note itself, however, is not an adverse action. It refers to possible future adverse action, but this action would have to be routed through

---

[9] In addition, the Navy Regulations Article 1150 and Uniform Code of Military Justice Article 138 provide ample opportunity to any sailor to bring a concern about adverse action to their chain of command's attention. Once informed, each Plaintiff's commodore stood ready to ensure no adverse action be finalized.

6

SEAL 21's Commodore, who is aware of the injunction in this lawsuit and is poised to ensure no adverse action is taken on account of SEAL 21's religious accommodation request.

6.      The Court enjoined Defendants from taking any adverse action against Plaintiffs based on Plaintiffs' requests for religious accommodation; however, Plaintiffs appear to conflate sensible, medically sound risk mitigation measures applicable to all unvaccinated personnel – regardless of the reason for their being unvaccinated – with adverse administrative actions.  To my knowledge, the Navy has not taken any action that would typically be considered an adverse action (e.g., imposition of discipline, processing for administrative separation) or that constitutes adverse administrative action under governing Navy regulations against any Plaintiff.  There are, however, several medically recommended risk-mitigation measures in place for unvaccinated servicemembers.  These include limiting unvaccinated personnel from engaging in trainings where transmission risk is high as referenced by Navy SEALs 12, 13, and 25; additional travel clearance requirements as referenced by Navy SEAL 26; and COVID-19 testing requirements as referenced by Navy Diver 2.

7.      The PI prohibits the application of some risk mitigation measures in NAVADMIN 225/21 and NAVADMIN 256/21, which include among other provisions, prohibition on official travel for unvaccinated personnel.  NSWC commands and personnel, however, are subject to other risk mitigation requirements that have not been enjoined by the Court's order.  For example, the Deputy Secretary of Defense (DEPSECDEF) issued a memo on 24 September 2021 that requires unvaccinated servicemember travel to be limited to "mission critical travel" approved by Department of Defense (DoD) Component Heads.[10]  Commander,

---

[10] The DEPSECDEF Memo includes the following requirement: "Individuals who are not fully vaccinated or who decline to provide information about their vaccination status, are limited to mission-critical official travel, both domestic and international. 'Mission-critical' will be determined by the traveler's DoD or Office of the Secretary of

7

U.S. Special Operations Command (USSOCOM), a combatant commander, who reports directly to the Secretary of Defense and exercises Combatant Command Authority over NSWC,[11] implemented this requirement by requiring his personal approval on any waiver for unvaccinated SOF personnel to deploy or travel based on a determination that it is mission essential to military operations and outweighs the risks associated with the travel for unvaccinated personnel.[12] Neither the DEPSECDEF memo nor the SOCOM order were enjoined by the court; they do not constitute "adverse action" and thus must be followed by all personnel subject to USSOCOM authority. ECF 66 at 26.

       8.     To the extent some Plaintiffs believe they are not being treated consistent with *their understanding* of the terms of the PI, those Plaintiffs may not be properly elevating the issue to the appropriate members of their chain of command who have executed an NDA pursuant to the protective order and therefore are aware of the Court's PI. Furthermore, many non-adverse administrative actions were taken weeks or months prior to the issuance of the PI. Plaintiffs seem to confuse these prior administrative actions with the Navy "taking any adverse action against Plaintiffs" *after* the injunction was issued. ECF 66 at 26. In fact, once a Navy administrative action is taken, no Navy command will spontaneously re-open that decision unless a new request is made or some other circumstance requires re-evaluation. Our steadfast

---

Defense (OSD) Component head, who may delegate this authority in writing to his or her Principal Deputy (or equivalent) but no lower." DEPSECDEF Memo of 24 Sep 21.

[11] 10 U.S.C. 167; *see also* Joint Chiefs of Staff, *Doctrine for the Armed Forces of the United States,* JP 1 (Washington, DC: Joint Chiefs of Staff, 2017), V-2 – V-6, laying out the extent of the broad Combatant Command Authority, which includes "[n]ontransferable command authority, which cannot be delegated, of a combatant commander to perform those functions of command over assigned forces involving organizing and employing commands and forces; assigning tasks; designating objectives; and giving authoritative direction over all aspects of military operations, joint training, and logistics necessary to accomplish the missions assigned to the command."
[12] Fragmentary Order 33 to USSOCOM Operational Order for Coronavirus Disease (COVID-19) Oct. 6, 2021. An Operational Order is a tool utilized by Combatant Commands to push orders to subordinate commands. A Fragmentary Order is a mechanism that a Combatant Command regularly uses to modify previous Operational Orders.

App009

implementation of the injunction was focused on "preserv[ing] the status quo" and not on taking

new actions to reverse prior decisions. ECF 66 at 25. If Plaintiffs do not communicate their

concerns to their chains of command or request new actions to address their concerns, the chain

of command will be unaware and unable to address situations that Plaintiffs perceive as

inconsistent with the terms of the PI. In the cases of Navy SEAL 13's removal from a leadership

course, Navy SEAL 14's request to attend Officer Candidate School, and Navy SEAL 22's

transfer, final action was taken before the injunction was issued and no new request or other

driver was acted on by their commands. For Navy SEAL 26, who alleges his command denied

him treatment for traumatic brain injury (TBI), his Commanding Officer affirms there has never

been any intention to deny him treatment, rather administrative delays led to the treatment

facility booking additional patients ahead of him. The command is currently trying to get Navy

SEAL 26 treatment as soon as possible, which will require travel to be processed in accordance

with the aforementioned DEPSECDEF memo and USSOCOM order.

### Compelling Government Interest in Readiness

9.     The Plaintiffs' characterization of the compelling government interest in ensuring

NSW personnel are deployable is misguided. First, the claims that "[n]one of the Plaintiffs are in

a group that may be deployed with one day notice," and that "many of them are not in a

deployable command," fails to appreciate the dynamic nature of military operations and special

operations in particular. ECF 99 at 6. Though deployment cycles generally progress in a

planned, rotational fashion, military contingencies may necessitate the immediate deployment of

qualified personnel with little-to-no notice. Events requiring short-notice deployments occur

regularly and due to the nature of NSW work are inherently a matter of national security (i.e., in

response to unexpected or rapidly escalating security situation). In my 27.5 years of naval

9

service, I have personally witnessed several shifts in short-notice deployment requirements

across the NSW force in response to world events, including within the past year. The fact is

that our servicemembers currently serving in a training capacity may be called upon at any

moment to deploy for matters of the utmost urgency. In fact, when Operation Enduring Freedom

and Operation Iraqi Freedom were ongoing, there was a heavy strain on our NSW force and

during that period it was a regular occurrence to pull servicemembers directly from training

commands for immediate deployment. Furthermore, even when not deploying, several of the

Plaintiffs are instructors who have close contact with other NSW servicemembers in deploying

units, which directly increases the risk of COVID-19 infection to units preparing for deployment.

Moreover, Plaintiffs' characterization entirely ignores the fact that some of the Plaintiffs in this

litigation are currently in units that are preparing for deployments in the near future. The

mission of NSW requires constant readiness. Every servicemember unable to deploy has a direct

operational impact on that mission.

10.     In support of their position, the Plaintiffs rely on the opinion of SWCC 4, a

Special Warfare Combatant-Craft Crewman Petty Officer First Class with 10 years of experience

in the Navy. SWCC 4's experience, aside from training commands, includes two assignments at

Special Boat Teams (SBTs) in Virginia and Mississippi. Although SWCC 4's service in support

of the SBTs' missions is valued, his awareness of the broader issues around NSW readiness and

the deployment requirements for NSW (and SOCOM, more broadly) lacks perspective and

accuracy. A First-Class Petty Officer in NSW is asked to carry a heavy burden and sacrifice as a

part of operations. But they are also shielded from many of the operational and strategic

considerations so that they can focus on tactical mission accomplishment. I have served in the

Navy for 27.5 years, deployed 9 times, and held command at every level. I have deployed early,

App011

seen deployments extended, and experienced rapid acceleration of operational timelines. With this experience, I always emphasize the need for ongoing medical readiness in all of my commands. In addition, though SWCC 4 may not have personally experienced it, every day, someone in the NSW force is onboard Navy ships, submarines, and aircraft, in close contact with the crew and sharing heavily trafficked spaces to include the gym, dining facilities, and workspaces. In fact, it is common for NSW personnel to embark on submarines, where every space is shared and close contact is inevitable. It is simply untrue to say that NSW personnel are segregated from ship's company when they travel onboard a Navy vessel in a way that would prevent COVID-19 transmission. These underway periods can last weeks and involve sharing close quarters for extended periods. Any increase in the likelihood of transmitting a respiratory disease in these conditions can have immediate mission impact to NSW and the Navy overall.

11. Finally, the Plaintiffs continue to suggest that, based on their prior successful deployments during the pandemic, there is no compelling need that they be vaccinated against COVID-19. The fact that members of the NSW community have continued to accomplish their missions despite the challenges presented by COVID-19 is a testament to the character and fortitude of our personnel, including the Plaintiffs. However, the Plaintiffs fail to appreciate the fact that successful execution of their missions does not mean that COVID-19 had no impact on other missions, their fellow servicemembers, or the military readiness of the NSW force as a whole. Contrary to these assertions, COVID-19 had an immense impact on the entire force and our continued mission accomplishment in the face of COVID-19 took a toll across our force. During the height of COVID-19, we had to conduct 30-day Restrictions on Movement (ROM) periods for our personnel before they could deploy. ROM periods remain an ongoing COVID mitigation measure and extend the time our servicemembers are away from their family, reduces

11

their time in the fight, increases fiscal costs, and undercuts their training cycles. Further, we execute ROM periods when NSW assets embarked on ships, transit national boundaries, operate with partner forces, or have close contact with infected personnel. Every one of these ROM periods exponentially increases the burden on our force for the same mission accomplishment that was possible before COVID-19. Further, though these impacts have lessened over time, they still exist today. ROM requirements continue to extend normal turnover timeframes from 2-3 days to 18 or more. The NSW mission includes operating in the most delicate international environments, and we cannot afford to unnecessarily alienate our partner nations. Currently, many key partner nations have COVID-19 related entry requirements that would preclude or complicate unvaccinated servicemembers entering their country and restrict unvaccinated personnel from joint operations with their forces. For example, "the Government of Kuwait stated that unvaccinated non-Kuwaiti residents over the age of 16 may not travel to Kuwait."[13] NSW commanders of unvaccinated servicemembers regularly have to leave these personnel off of missions because of ship embarkation or country clearance requirements, reducing their operational capabilities; As a Joint Task Force Commander, I personally had to manage risk by restricting unvaccinated personnel from missions. Accordingly, NSW continues to carry out risk mitigation measures for unvaccinated servicemembers that include some of the very same actions that Plaintiffs have complained about in their motion. This includes regular testing, additional verification steps for travel, and verifying medical facilities are prepared to treat unvaccinated individuals before sending them.

---

[13] https://kw.usembassy.gov/covid-19-information/. Austria (https://www.austria.info/en/service-and-facts/coronavirus-information/entry-regulations), Indonesia (https://kemlu.go.id/losangeles/en/news/11727/update-indonesia-travel-restrictions), Turkmenistan (https://tm.usembassy.gov/covid-19-information/), and Ecuador (https://ec.usembassy.gov/covid-19-information-ecu-2/) all have similar restrictions.

App013

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of February, 2022.

CHRISTOPHER D. BROWN

Captain, U.S. Navy

13

# Exhibit 2



# DoD Instruction 1332.45

# Retention Determinations for Non-Deployable Service Members

---

| | |
|---|---|
| **Originating Component:** | Office of the Under Secretary of Defense for Personnel and Readiness |
| **Effective:** | July 30, 2018 |
| **Change 1 Effective:** | April 27, 2021 |
| **Releasability:** | Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/. |
| **Incorporates and Cancels:** | Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "DoD Retention Policy for Non-Deployable Service Members," February 14, 2018 |
| **Approved by:** | Robert L. Wilkie, Under Secretary of Defense for Personnel and Readiness |
| **Change 1 Approved by:** | Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness |

---

**Purpose:**  In accordance with the authority in DoD Directive 5124.02, this issuance:

- Establishes policy, assigns responsibilities, and provides direction for retention determinations for non-deployable Service members.

- Provides guidance and instructions for reporting deployability data for the Total Force.

App016

DoDI 1332.45, July 30, 2018
Change 1, April 27, 2021

# TABLE OF CONTENTS

SECTION 1:  GENERAL ISSUANCE INFORMATION .................................................................. 4
  1.1.  Applicability. ........................................................................................................... 4
  1.2.  Policy. ...................................................................................................................... 4
  1.3.  Information Collections. .......................................................................................... 4
  1.4.  Summary of Change 1. ............................................................................................ 4
SECTION 2:  RESPONSIBILITIES ......................................................................................... 6
  2.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ...................... 6
  2.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA))...... 6
  2.3.  Assistant Secretary of Defense for Health Affairs.................................................... 6
  2.4.  Secretaries of the Military Departments. ................................................................. 6
SECTION 3:  PROCEDURES .................................................................................................. 8
  3.1.  Tracking. .................................................................................................................. 8
  3.2.  Reporting.................................................................................................................. 8
  3.3.  Deployable with Limitations. .................................................................................. 9
  3.4.  Training and Transient. ............................................................................................ 9
    a.  Initial Entry Training.............................................................................................. 9
    b.  Cadets and Midshipman......................................................................................... 10
    c.  All Other Training.................................................................................................. 10
    d.  Transient. ............................................................................................................... 10
  3.5.  Temporary Non-Deployable Categories. ................................................................. 10
    a.  Medical. ................................................................................................................. 10
    b.  Legal. ..................................................................................................................... 11
    c.  Administrative........................................................................................................ 11
  3.6.  Permanent Non-Deployable Categories. ................................................................. 13
    a.  Medical. ................................................................................................................. 13
    b.  Administrative........................................................................................................ 13
    c.  Approved for Retention.......................................................................................... 14
  3.7.  IMR Deficits. ........................................................................................................... 14
    a.  Overdue PHA. ........................................................................................................ 14
    b.  Dental Readiness (Dental Class 3)......................................................................... 14
    c.  Overdue Dental Screening (Dental Class 4). ......................................................... 14
    d.  Additional IMR Categories.................................................................................... 15
  3.8.  Prioritization of Service Members by Category. ..................................................... 15
    a.  Deployed. ............................................................................................................... 15
    b.  Deployable with Limitations. ................................................................................. 15
    c.  Approved for Retention.......................................................................................... 15
    d.  Permanent Non-Deployable. .................................................................................. 15
    e.  Training and Transient. .......................................................................................... 16
    f.  Temporary Non-Deployable. ................................................................................. 16
    g.  IMR Deficits. ......................................................................................................... 16
SECTION 4:  RETENTION DETERMINATION .......................................................................... 18
  4.1.  Retention Authority for Non-Deployable Service Members. ................................... 18

4.2.  Retention Determination. ............................................................................................. 18
4.3.  Special Categories. ....................................................................................................... 19
SECTION 5:  AUTHORITIES FOR SEPARATIONS AND RETIREMENTS ............................................. 20
GLOSSARY ........................................................................................................................................ 21
G.1.  Acronyms. ...................................................................................................................... 21
G.2.  Definitions. ..................................................................................................................... 21
REFERENCES .................................................................................................................................... 23

DoDI 1332.45, July 30, 2018
Change 1, April 27, 2021

# SECTION 1: GENERAL ISSUANCE INFORMATION

## 1.1. APPLICABILITY.

This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

## 1.2. POLICY.

It is DoD policy that:

a.  To maximize the lethality and readiness of the joint force, all Service members are expected to be deployable.

b.  Service members who are considered non-deployable for more than 12 consecutive months will be evaluated for:

(1)  A retention determination by their respective Military Departments.

(2)  As appropriate, referral into the Disability Evaluation System (DES) in accordance with DoD Instruction (DoDI) 1332.18 or initiation of processing for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30.  This policy on retention determinations for non-deployable Service members does not supersede the policies and processes concerning referral to the DES or the initiation of administrative separation proceedings found in these issuances.

c.  Implementation for this policy is October 1, 2018.

## 1.3. INFORMATION COLLECTIONS.

The Monthly Non-deployable Report, referred to in Paragraph 3.2. of this issuance, has been assigned report control symbol DD-P&R(M)2671 in accordance with the procedures in Volume 1 of DoD Manual 8910.01.  The expiration date of this collection is listed in the DoD Information Collections Website at https://www.esd.whs.mil/Directives/collections_int/.

## 1.4. SUMMARY OF CHANGE 1.

The changes to this issuance:

a.  Reflect updates to reporting tracking procedures (Paragraph 3.1. of this issuance) and timelines (Paragraph 3.2. of this issuance).

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

b.  Provide additional clarity for reporting temporary non-deployable categories (Paragraph 3.5. of this issuance) and individual medical readiness (IMR) deficits (Paragraph 3.7. of this issuance).

c.  Update the formatting according to new issuance template guidelines.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 2:  RESPONSIBILITIES

## 2.1.  UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R) establishes and oversees policy on retention determinations for non-deployable Service members.

## 2.2.  ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA):

    a.  Develops policy on the retention of non-deployable Service members.

    b.  Monitors the implementation of this guidance.

    c.  Tracks the number of non-deployable Service members and those non-deployable Service members retained in military service and the justification for such retention, in accordance with Section 3 of this issuance.

## 2.3.  ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Health Affairs:

    a.  Develops policy recommendations to the USD(P&R) for uniform retention medical standards in coordination with the Secretaries of the Military Departments.

    b.  Provides oversight of related medical policies and programs.

## 2.4.  SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

    a.  Will:

        (1)  Determine the deployability status of Service members.

        (2)  Make retention determinations consistent with this issuance for Service members who have been non-deployable for more than 12 consecutive months.

        (3)  Submit monthly reports identifying the number of non-deployable Service members for all components within their Departments to the Office of the USD(P&R) in accordance with Paragraph 3.2. of this issuance.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(4)  Monitor compliance with requirements established in DoDI 6025.19 to ensure required evaluations, assessments, and other medically related actions are accomplished to improve individual and overall unit readiness.

b.  May:

(1)  Retain in service those Service members whose period of non-deployability exceeds the 12 consecutive month limit in Paragraph 1.2. of this issuance if determined to be in the best interest of the Military Service.

(2)  Delegate the authority in Paragraph 2.4.(b)(1) of this issuance to retain in service those Service members whose period of non-deployability exceeds the 12 consecutive month limit.  Such a delegation must be in writing, and may only be made to Presidentially Appointed, Senate-Confirmed officials; Senior Executive Service members; or general/flag officers serving at the Military Department or Service headquarters.

(3)  Initiate administrative separation processing, or referral to the DES, as appropriate, prior to a non-deployable Service member being in a non-deployable status for 12 months when the Military Service determines there is a reasonable expectation that the reason will not be resolved and the Service member will not become deployable.

# SECTION 3: PROCEDURES

## 3.1. TRACKING.

a.  The Military Departments will monitor and track the number of Service members by Military Service that are:

(1)  Non-deployable in accordance with the categories established in Paragraphs 3.5. and 3.6. of this issuance.

(2)  Deployable with limitations in accordance with Paragraph 3.3. of this issuance.

(3)  Deployable but have IMR deficits in accordance with Paragraph 3.7. of this issuance.

(4)  In training or in a transient status in accordance with the category defined in Paragraph 3.4. of this issuance.

b.  To ensure accurate and consistent accounting across the DoD, Military Services will account for Service members in only one category.

(1)  If a Service member can be accounted for in more than one category, the Service member will be counted only once and in the category with the highest priority listed in accordance with Paragraph 3.8. of this issuance.

(2)  This restriction does not apply to Service members who may also be counted as IMR deficits in accordance with Paragraph 3.7. of this issuance.  In addition to the categories listed in Paragraphs 3.3. through 3.6. of this issuance, Service members with IMR deficits will also be counted in accordance with Paragraph 3.8.g. of this issuance.

## 3.2. REPORTING.

a.  The Secretaries of the Military Departments will report to the ASD(M&RA) the number of non-deployable personnel (and other categories as provided in this section) for all Military Services, and their respective components, on a monthly basis.

(1)  The format for the Monthly Non-deployable Report can be found at https://prhome.defense.gov/M-RA/Inside-M-RA/MPP/OEPM/.

(2)  Reports are due **no later than** the 20th of each month with data current as of the last day of the previous month.  For example, the May Non-deployable Report is due by June 20th with non-deployable data as of May 31st.  Reports will be accepted earlier if available.

b.  The number of non-deployable Service members is reported by categories, either temporary or permanent, and grouped into medical, legal, or administrative sub-categories.  Each sub-category is further broken down to account for the specific reasons or conditions that make a Service member non-deployable.

c.  The number of Service members who are deployable with limitations, in accordance with Paragraph 3.3. of this issuance, will be categorized separately on the monthly report.  Such Service members are not to be counted in the non-deployable populations.

d.  The number of Service members who require urgent or emergent dental treatment for dental readiness (Dental Class 3), are overdue for annual dental screening (Dental Class 4), or are overdue for a Periodic Health Assessment (PHA) are reported as IMR Deficits in accordance with Paragraph 3.7. of this issuance.  Such Service members are not counted in the non-deployable populations.

e.  The number of Service members who are in a training or transient status are reported in one of the four categories listed in Paragraph 3.4. of this issuance.

## 3.3.  DEPLOYABLE WITH LIMITATIONS.

Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations.  This includes, but is not limited to, conditions referred to in DoDI 6490.07.

## 3.4.  TRAINING AND TRANSIENT.

The Training and Transient category provides a means to track the human resources necessary to maintain a healthy force, within current end strength constraints.  This category contains Service members who are not immediately ready for deployment and fall into one of the following four categories:

### a.  Initial Entry Training.

These Service members are:

(1)  Enlisted Service members at recruit training, initial skill training, and other proficiency or developmental training accomplished before moving to the member's first permanent duty assignment.  This includes all in-transit time commencing upon entry into active service, through completion of the final course of initial entry training that terminates enlisted trainee status.

(2)  Enlisted trainees who enter officer candidate school, officer training school, and Service academy preparatory school following enlistment on active duty.  These members will be considered:

(a)  Enlisted trainees from initial entry on active duty until commissioning.

(b)  Upon commissioning, officer accession students and will remain in the initial entry training category for any subsequent initial entry training, or until they begin travel to their first permanent duty assignment.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(3)  Officers at officer basic courses, and all initial skill and proficiency training taken before travel to the Service member's first permanent duty assignment.  This includes all in-transit time from entry on active duty until completion of the last initial entry course of instruction.

(4)  Reserve Component (RC) Service members (enlisted and officer) who enter the Ready Reserve and are awaiting initial entry training.

**b.  Cadets and Midshipman.**

These are individuals currently attending the U.S. Military Academy, the U.S. Air Force Academy, or the U.S. Naval Academy.  In accordance with Section 115 of Title 10, United States Code (U.S.C.), cadets and midshipman are counted in the active duty end strength for their respective Service, but by policy are non-deployable while attending school.

**c.  All Other Training.**

These are Service members who are attending training that is 20 weeks or more in length, and is conducted after their initial entry training.  Examples include Command and Staff Colleges, Senior Service College, the United States Army Sergeants Major Academy, medical residencies, and all other post-graduate professional education opportunities.

**d.  Transient.**

These are Service members who are not available for duty while executing permanent change of station orders at the time of the report.  This category does not include military personnel who are:

(1)  On temporary duty for training between permanent duty stations, or;

(2)  Moving between entry-level courses of instruction, specifically Service members who have departed from one duty station and are in transit but have not yet reported for duty at the next permanent duty station.

**3.5.  TEMPORARY NON-DEPLOYABLE CATEGORIES.**

**a.  Medical.**

Service members are considered temporarily non-deployable for one of three reasons:

(1)  Patient.

In accordance with DoDI 1120.11, Service members who are hospitalized and are projected to heal, recover, and return to full duty in less than 12 months are temporarily non-deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(2)  Medical Condition That Limits Full Duty.

Service members who have temporary profiles or are in limited duty status are counted as temporarily non-deployable.  Light duty will not be reported as non-deployable unless the duration exceeds 30 days, with discretion given to the medical officer to extend light duty status for up to 60 days, making light duty no longer than 90 days for conditions expected to recover or stabilize within that time.  Service members who are considered to be classified as light duty are considered deployable and expected to be able to deploy, at the local commander's discretion, despite the medical condition causing their light duty status.

(3)  Pregnancy (including post-partum).

Service members who are pregnant or in the post-partum phase are temporarily non-deployable.  The post-partum phase ranges from 6 to 12 months after childbirth for female Service members and is determined by individual Service policy.

**b.  Legal.**

Service members are considered temporarily non-deployable for one of two reasons:

(1)  Prisoner.

Service members convicted by civilian or military authorities and sentenced to confinement of more than 30 days, but for 6 months or less, are temporarily non-deployable. Service members confined for more than 6 months are not included in end strength numbers and will not be included in the monthly non-deployability report.

(2)  Legal Action.

Service members who are under arrest, confined 30 days or less, pending military or civil court action, under investigation, a material witness, on commander directed hold, pending non-judicial punishment action under Section 815 of Title 10, U.S.C., also known as Article 15 of the Uniformed Code of Military Justice (UCMJ), or pending discharge based on action under the UCMJ are temporarily non-deployable.

**c.  Administrative.**

These Service members are considered temporarily non-deployable for one of eight reasons:

(1)  Absent Without Leave or Unauthorized Absence.

Service members who are absent without leave, as defined in Section 886 of Title 10, U.S.C., also known as Article 86 of the UCMJ, will be considered as temporarily non-deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(2)  Family Care Plan.

In accordance with DoDI 1342.19, Service members required but failing to have a family care plan in place are temporarily non-deployable.

(3)  Adoption.

Service members who are single parents or one member of a dual military couple and are adopting a child are temporarily non-deployable.  They are non-deployable for at least 6 months after the child is placed in the home, or longer dependent on the administrative stabilization period prescribed by the jurisdiction in which the adoption occurred.

(4)  Service Member Under 18.

Service members who are not yet 18 years of age are temporarily non-deployable.  The Child Soldier Prevention Act of 2007 prohibits Service members under the age of 18 from taking part in hostilities as a member of governmental armed forces.

(5)  Humanitarian Assignment.

Service members assigned to a location to provide support to a family member are temporarily non-deployable.  These Service members typically receive 12 to 24 months stabilization by Military Service policy.

(6)  Service Discretion.

Military Services may designate Service members temporarily non-deployable when the previous categories do not apply.  Examples include:

(a)  Simultaneous Membership Program or Officer Candidate School.

(b)  Education stabilization; mobilization deferral for affiliation after release from Active Component.

(7)  Pending Administrative Separation.

Service members being processed for administrative separation are temporarily non-deployable.

(8)  Unsatisfactory Participants or Administrative Action Pending (RC Only).

Service members who are determined to be unsatisfactory participants (defined in DoDI 1215.13 as a Service member that has nine unexcused absences within a 12-month period or fail to perform prescribed periods of active duty for training), are considered temporarily non-deployable, after the 90 day recovery period has elapsed.  The Military Services will have no more than 90 days to recover the unsatisfactory participant before the unsatisfactory participant is counted as temporarily non-deployable.  The Military Services will determine when an RC

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

Service member who was classified as an unsatisfactory participant is considered recovered, and no longer counted as non-deployable.

## 3.6.  PERMANENT NON-DEPLOYABLE CATEGORIES.

### a.  Medical.

Service members are considered non-deployable for one of three reasons listed below.

#### (1)  Permanent Limited Duty.

Service members with a medical condition that permanently prevents deployment are non-deployable.  This includes Service members processed through the DES who are not deployable and were retained in the Military Service.  In accordance with Section 1214a of Title 10, U.S.C., Service members cannot be involuntarily administratively separated or denied reenlistment due to unsuitability based solely on the medical condition considered in the evaluation unless the request to separate the Service member is approved by the Secretary of Defense.  The Military Service may direct the Service member to reenter the DES process to be reconsidered for retirement or separation for disability.

#### (2)  Enrolled in DES.

In accordance with DoDI 1332.18, Service members currently enrolled in the DES process are non-deployable.  That includes those pending separation or retirement after receiving a "not fit for duty" determination through the DES.

#### (3)  Permanent Profile Non-duty Related Action Needed (RC).

Those RC Service members who have a permanent profile and are pending a decision on a line of duty determination are non-deployable.

### b.  Administrative.

These Service members are considered non-deployable for one of three reasons:

#### (1)  Sole Survivor, Surviving Family Member, or Deferred from Hostile Fire Zone.

Service members who acquired the status in accordance with DoDI 1315.15 are non-deployable.

#### (2)  Unable to Carry a Firearm.

Service members who are subject to the provisions of Section 922 of Title 18, U.S.C. are non-deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(3)  Conscientious Objector.

Service members who are granted restriction of military duties in accordance with DoDI 1300.06 are non-deployable.

**c.  Approved for Retention.**

This category accounts for Service members who are retained by the Military Department despite being in a non-deployable status for 12 months or longer.  Service members who the Military Departments retained in Service and are considered non-deployable for one of two reasons:

(1)  Combat Wounded.

These are Service members whose injuries were the result of hostile action, meet the criteria for awarding of the Purple Heart, and whose injuries were not the result of their own misconduct.

(2)  Other.

These are Service members who are not designated as combat wounded but are non-deployable and retained in the Military Service by the Secretary of the Military Department in accordance with Paragraph 2.4. of this issuance.


**3.7.  IMR DEFICITS.**

These IMR categories are not considered non-deployable conditions.  While Service members who do not have a current PHA (completed) or whose dental readiness assessment is classified as either Dental Class 3 or Dental Class 4 are not medically ready to deploy, they will not be reported in the non-deployable population.  Components are expected to immediately correct all IMR deficits to ensure Service members are medically ready to deploy.

**a.  Overdue PHA.**

These Service members are not compliant with the requirement to complete a PHA in accordance with DoDI 6025.19.

**b.  Dental Readiness (Dental Class 3).**

Service members who require urgent or emergent dental treatment.

**c.  Overdue Dental Screening (Dental Class 4).**

Service members who are not compliant with the requirement to complete a dental screening in accordance with DoDI 6025.19.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

### d.  Additional IMR Categories.

In addition to dental categories (Dental Classes 3 and 4) and PHAs, the Military Departments track three additional areas of IMR:  immunization status, medical readiness and laboratory studies, and individual medical equipment.  In accordance with DoDI 6025.19, Service members who are not current in these areas are considered partially-medically ready.

## 3.8.  PRIORITIZATION OF SERVICE MEMBERS BY CATEGORY.

This paragraph sets the prioritization for the grouping of Service members into categories to provide consistent reporting among the Military Departments, in accordance with Paragraph 3.1.b. of this issuance.  With the exception of Service members who may be accounted for in IMR deficits, in accordance with Paragraph 3.1.b.(2) of this issuance, Service members will be counted only once, in a single category; Service members who may fall into more than one category will be reported in the priorities established in this paragraph.  These categories are listed below in descending order of priority.

### a.  Deployed.

This category includes Service members who are currently deployed.  These Service members will not be counted in any other category (including deployable with limitations or approved for retention).

### b.  Deployable with Limitations.

### c.  Approved for Retention.

(1)  Combat wounded – Non-deployable but retained.

(2)  Other – Non-deployable but retained.

### d.  Permanent Non-Deployable.

(1)  Medical permanent limited duty.

(2)  Administrative.

(a)  Sole survivor, surviving family member, or deferred from hostile fire zone.

(b)  Unable to carry a firearm (e.g., Lautenberg Amendment).

(c)  Conscientious objector.

(d)  Ex-prisoner of war.

(3)  Medical Enrolled in DES.

(4)  Permanent profile non-duty related action needed (RC).

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

**e.  Training and Transient.**

    (1)  Initial entry training.

    (2)  Cadets or Midshipmen.

    (3)  All other training.

    (4)  Transient (permanent change of station).

**f.  Temporary Non-Deployable.**

    (1)  Medical.

        (a)  Patient (assigned to "Individuals Account").

        (b)  Medical condition that limits full duty.

        (c)  Pregnancy (including post-partum).

    (2)  Legal.

        (a)  Prisoner.

        (b)  Legal Action.

    (3)  Administrative.

        (a)  Absence without leave.

        (b)  Family Care Plan.

        (c)  Adoption.

        (d)  Service member under 18.

        (e)  Humanitarian assignment.

        (f)  Service Discretion.

        (g)  Pending Administrative Separation.

        (h)  Unsatisfactory participants or admin action pending (RC).

**g.  IMR Deficits.**

Service members with IMR deficits may be counted as both overdue PHA and as either Dental Class 3 or Dental Class 4.

    (1)  Overdue PHA.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

    (2)  Dental readiness (Dental Class 3).

    (3)  Overdue dental screening (Dental Class 4).

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 4: RETENTION DETERMINATION

## 4.1. RETENTION AUTHORITY FOR NON-DEPLOYABLE SERVICE MEMBERS.

In accordance with Paragraph 2.4. of this issuance, the Secretaries of the Military Departments have retention authority.

## 4.2. RETENTION DETERMINATION.

a. The Secretaries of the Military Departments may retain Service members who are non-deployable in excess of 12 consecutive months, on a case-by-case basis, if determined to be in the best interest of the Service, based on:

(1) The Service member's ability to perform appropriate military duties commensurate with his or her office, grade, rank, or skill.

(2) The likelihood that the Service member will resolve the condition or reason that is the underlying cause of his or her non-deployable status.

b. The Secretaries of the Military Departments may approve retention for Service members who are non-deployable in excess of 12 consecutive months for up to:

(1) The length of time remaining on a Service member's enlistment contract; or

(2) Three years for officers, including warrant officers, and those enlisted members serving on indefinite contracts.

(3) Upon expiration of the retention period, the Secretary of the Military Department concerned may renew retention for a Service member on a case-by-case basis for periods stated in this paragraph.

c. The Secretaries of the Military Departments may establish procedures for Service members who are or will be non-deployable for 12 months or longer due to an administrative reason to request retention consideration.

d. Approval of the retention for Service members who are non-deployable for 12 months or longer will only be made for individual Service members, not an entire cohort or skill set of Service members.

e. Except as required by DoDI 1332.18, the Secretaries of the Military Departments may request from the Secretary of Defense the authority to automatically exempt Service members serving in specified positions from the requirement for a retention determinations pursuant to Paragraph 2.4.b.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

f.  When appropriate, Service members not recommended for further retention will be considered for processing for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30, or referral for disability separation in accordance with DoDI 1332.18.

## 4.3.  SPECIAL CATEGORIES.

a.  Pregnant and post-partum Service members, as a group, are exempt from Paragraph 2.4.a., for pregnancy-related health conditions during pregnancy through the post-partum period.

b.  The Secretaries of the Military Departments have the authority to retain combat wounded Service members who have been evaluated through the DES and whose reason for non-deployability is a direct result of their combat wounds, if requested by the Service member.

(1)  Disapproval of retention for non-deployable combat wounded Service members, who wish to be retained and whose reason for non-deployability is a direct result of their combat wounds, may not be delegated.

(2)  Retention will be authorized in accordance with Paragraph 4.2.b.

c.  Unless found unfit for duty through the DES, Service members serving in specified positions approved by the Secretary of Defense pursuant to Paragraph 4.2.e. are exempt from requiring a retention determination based solely on being in a non-deployable status for 12 months or longer.  Upon reassignment, these Service members will again require a retention determination in accordance with Paragraph 4.2.a.

d.  Unless sooner discharged or retired under another provision of law, or discharged due to misconduct or sub-standard performance, the Secretaries of the Military Departments may retain those Service members who are, or will be, non-deployable for 12 months or longer due to administrative reasons and who have attained such years of creditable service so as to be within 3 years of qualifying for:

(1)  Regular retirement (or in the case of enlisted members of the Navy or Marine Corps, transfer to the Fleet Reserve or Fleet Marine Corps Reserve, as the case may be) pursuant to Sections 3911, 3914, 6323, 6330, 8911, or 8914 of Title 10, U.S.C.; or

(2)  Non-regular retirement (but for age) pursuant to Sections 12731 and 12735 of Title 10, U.S.C., if, in the case of RC members other than RC members within 3 years of qualifying for regular retirement, they have attained at least 17 years of qualifying creditable service as computed in accordance with Section 12732 of Title 10, U.S.C., and continue to attain qualifying creditable service as computed under Section 12732 of Title 10, U.S.C. to become eligible for non-regular retirement within the 3-year period.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 5:  AUTHORITIES FOR SEPARATIONS AND RETIREMENTS

5.1.  In accordance with Paragraph 1.2. of this issuance, a Service member who has been non-deployable for an administrative reason (not medical or legal) for more than 12 consecutive months, will be processed for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30.  Military Services should ensure expeditious administrative separation proceedings in accordance with Military Department and Military Service policies.

5.2.  A Service member who has been non-deployable due to a physical disability that makes him or her potentially unfit for the duties of his or her office, grade, rank, or rating for more than 12 consecutive months will be referred into the DES in accordance with DoDI 1332.18.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# GLOSSARY

## G.1.  ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| DES | Disability Evaluation System |
| DoDI | DoD instruction |
| IMR | individual medical readiness |
| PHA | periodic health assessment |
| RC | Reserve Component |
| UCMJ | Uniformed Code of Military Justice |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness. |

## G.2.  DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **active duty** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **active service** | Defined in Section 101(d)(3) of Title 10, U.S.C. |
| **active status** | Defined in Section 101(d)(4) of Title 10, U.S.C. |
| **combat wounded** | Service members whose injuries were the result of hostile action, who meet the criteria for awarding of the Purple Heart, and whose injuries were not the result of their own misconduct. |
| **deployable** | A Service member who does not have a Service-determined reason that precludes him or her from deployment. |

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

| TERM | DEFINITION |
|---|---|
| **deployment** | The movement of personnel into and out of an operational area or in support of operations.  Deployment encompasses all activities from origin or home station through destination, specifically including inter-theater, and intra-theater movement legs, staging, and holding areas. |
| **Military Departments** | The Departments of the Army, Navy, and Air Force. |
| **Military Service Headquarters** | Headquarters, United States Army; Headquarters, United States Navy; Headquarters, United States Air Force; and Headquarters, United States Marine Corps. |
| **Military Services** | The United States Army, the United States Navy, the United States Air Force, the United States Space Force, and the United States Marine Corps. |
| **military specialty** | A military occupational specialty in the Army and the Marine Corps; an Air Force specialty code in the Air Force; or a rating or Navy enlisted classification in the Navy. |
| **non-deployable** | A Service member who has a Service-determined reason that precludes him or her from deployment. |
| **permanently non-deployable** | A Service member who has a reason that precludes them from deployment, and there is a Service expectation that the reason will not be resolved and the Service member will never be deployable. |
| **profile** | A document used to communicate to commanders the individual medical restrictions for Soldiers and Airmen. |
| **Ready Reserve** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **reason code** | The term used to define non-deployable categories. |
| **separation** | A general term that includes discharge, release from active duty, release from custody and control of the Military Services, transfer to the Individual Ready Reserve, and similar changes in Active and Reserve status. |
| **temporarily non-deployable** | A Service member who has a reason or reasons that precludes him or her from deployment, and there is a Service expectation that the reason or reasons will be resolved and the Service member will be deployable. |

GLOSSARY

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# REFERENCES

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1120.11, "Programming and Accounting for Active Component (AC) Military Manpower," March 17, 2015

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy" May 5, 2015

DoD Instruction 1300.06, "Conscientious Objectors," July 12, 2017

DoD Instruction 1315.15, "Special Separation Policies for Survivorship," May 19, 2017

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1342.19, "Family Care Plans," May 7, 2010, as amended

DoD Instruction 6025.19, "Individual Medical Readiness (IMR)," June 9, 2014, as amended

DoD Instruction 6490.07. "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees" February 5, 2010

DoD Manual 8910.01, Volume 1, "DoD Information Collections Manual:  Procedures for DoD Internal Information Collections," June 30, 2014, as amended

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

The Child Soldier Prevention Act of 2007, 110th Congress, S.1175

United States Code, Title 10

United States Code, Title 18