## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **NAVY SEALS 1-3,** et al., <br><br> Plaintiffs, <br><br> v. <br><br> **LLOYD AUSTIN, III**, in his official capacity as Secretary of Defense, *et al.*, <br><br> Defendants. | Case No. 4:21-cv-01236-O |

## DEFENDANTS' APPENDIX IN SUPPORT OF THEIR
## OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### Table of Appendix

| Bates Stamps | Description |
|---|---|
| App001–App011 | Email Chain Between Counsel re: Meet and Confer |
| App012–App016 | Declaration of Elizabeth Galvez |
| App017–App053 | Declaration of Captain Mery-Angela Sanabria Katson, Feb. 15, 2022 |
| App054–App056 | Declaration of Captain Mery-Angela Sanabria Katson, Feb. 3, 2022 |
| App057–App023 | DoD Instruction 1332.45 |

Dated: February 15, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Cassandra Snyder*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE

COURTNEY D. ENLOW
LIAM C. HOLLAND
CATHERINE YANG
CASSANDRA M. SNYDER (DC Bar. No. 1671667)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2022, I electronically filed the foregoing document through the Court's ECF system, which automatically notifies counsel of record for each party.

*/s/ Cassandra Snyder*
CASSANDRA M. SNYDER
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov

# Exhibit 1

| From: | Carmichael, Andrew E. (CIV) |
|-------|------------------------------|
| To: | Andrew Stephens; Heather Hacker; Powell, Amy (CIV); Enlow, Courtney D. (CIV) |
| Cc: | David Hacker; Mike Berry; Justin Butterfield; Holly Randall; Avallone, Zachary A. (CIV); Robinson, Stuart J. (CIV); Holland, Liam C. (CIV) |
| Subject: | RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235 |
| Date: | Tuesday, January 25, 2022 3:05:00 PM |

Andrew,

Are you available to discuss on the phone tomorrow?  We are generally available between 11am and 2pm EST tomorrow.

We would like to discuss your class definition and in particular the subclass definition because at least one part—"who are now or will be assigned"—seems vague and undefinable.  I was hoping we could at least try to eliminate that as an issue by discussing if there is a more discernable class definition.

We would also like to discuss how you planned to address cases brought in other jurisdictions involving plaintiffs that would likely fall into your putative class definition.

Best regards,

Drew

Drew Carmichael
Senior Trial Counsel | United States Department of Justice
Civil Division | Federal Programs Branch
Tel: (202) 514-3346


**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Tuesday, January 25, 2022 12:11 PM
**To:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Drew,

We plan to file a motion for class certification today.  Could you please let me know if Defendants are opposed or unopposed.

Best regards,

Andrew


**Andrew B. Stephens**
Partner

| |
|---|

www.hackerstephens.com


This message contains information that may be confidential and privileged. Unless you are the intended recipient (or authorized to receive for the intended recipient), you may not use, copy, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by replying or by phone at (512) 399-3022 and delete the message.


**From:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>
**Sent:** Monday, January 24, 2022 10:53 AM
**To:** Heather Hacker <heather@hackerstephens.com>; Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Thanks.  Some attorneys from my office may join.  We can use this dial in:

1-877-465-7975
Pin 96446767#


**From:** Heather Hacker <heather@hackerstephens.com>
**Sent:** Monday, January 24, 2022 11:50 AM
**To:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Hi Drew,

Yes, that works. Is the number below the best number for you? Or if others are going to participate, do you have a dial-in that you want to use or do you want us to circulate ours?

Thanks,
Heather

---

**From:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>
**Sent:** Monday, January 24, 2022 10:34 AM
**To:** Heather Hacker <heather@hackerstephens.com>; Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Heather,

Happy to jump on a call.  Does 12pm EST work?

We are proposing that the Navy be allowed the authority to manage the employment conditions of Plaintiffs as necessary; short of involuntary administrative separation and formal discipline (*i.e* courts-martial/Article 15) for not receiving the COVID-19 vaccine.

For example, the Navy is seeking to preserve the freedom for its commanders to reassign Plaintiffs from their current billets and units, cancel orders (including PCS and training orders), and remove them from a deployable and medically qualified status due to their unvaccinated status during the pendency of the litigation.  Given the language on page 23-24 of the order as well as the fact that NAVADMIN 225/21 and NAVADMIN 256/21 are enjoined as to Plaintiffs we believe such actions are prohibited by the court's current order.

Best regards,

Drew

Drew Carmichael
Senior Trial Counsel | United States Department of Justice
Civil Division | Federal Programs Branch
Tel: (202) 514-3346

---

**From:** Heather Hacker <heather@hackerstephens.com>
**Sent:** Monday, January 24, 2022 9:58 AM

**To:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Drew,

I think we would benefit from some discussion on this. If we had an idea of what specifically you were proposing, it might be possible for us to enter into a stipulation or joint motion for clarification of the injunction. But we'd need a little more info first.

We're available to discuss today, let us know.

Heather

---

**From:** Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>
**Sent:** Friday, January 21, 2022 4:56 PM
**To:** Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Counsel,

We plan to seek a stay pending appeal of the Court's preliminary injunction order to the extent it precludes Defendants from making the assignment and reassignment decisions that the military deems appropriate, taking into account Plaintiffs' vaccination status, including with respect to deployment and training.

Could you please let us know your position on such a stay?  We plan to file on Monday so please let us know your position by 10am EST Monday.  Thank you and have a nice weekend.

Best regards,

Drew

Drew Carmichael
Senior Trial Counsel | United States Department of Justice

Civil Division | Federal Programs Branch
Tel: (202) 514-3346

---

**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Thursday, January 20, 2022 10:44 AM
**To:** Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV)
<Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin
Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael,
Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV)
<Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland,
Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Amy,

We are planning to file an amended complaint which is likely to change the scope of discovery. Once
we get the amended complaint on file we'll get you a draft 26(f) report.

Andrew


**Andrew B. Stephens**
Partner

[                                        ]

www.hackerstephens.com

This message contains information that may be confidential and privileged. Unless you are the intended recipient (or
authorized to receive for the intended recipient), you may not use, copy, or disclose to anyone the message or any
information contained in the message. If you have received the message in error, please advise the sender by replying or by
phone at (512) 399-3022 and delete the message.

---

**From:** Powell, Amy (CIV) <Amy.Powell@usdoj.gov>
**Sent:** Tuesday, January 18, 2022 5:35 PM
**To:** Andrew Stephens <andrew@hackerstephens.com>; Enlow, Courtney D. (CIV)
<Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin
Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael,
Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV)
<Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland,
Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Andrew:

I think the way we left it on the call was that Plaintiffs' counsel was going to take the first stab at a draft 26(f) report.  Have you been able to do that?  I'm working on some language for our "Defendants' Position" sections as needed, but we may be able to come to joint language on some items.

Amy

Amy Elizabeth Powell
Senior Trial Counsel, Federal Programs Branch
Civil Division, Department of Justice
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

---

**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Thursday, January 06, 2022 9:38 AM
**To:** Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Great, thanks Courtney. Dial-in info below:

Dial-In Number          833 548 0282 (US Toll Free)
Conference ID           381 300 9255
Participant Passcode    030527

**Andrew B. Stephens**
Partner

www.hackerstephens.com

This message contains information that may be confidential and privileged. Unless you are the intended recipient (or

authorized to receive for the intended recipient), you may not use, copy, or disclose to anyone else or any information contained in the message. If you have received the message in error, please advise the sender by replying or by phone at (512) 399-3022 and delete the message.

---

**From:** Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Sent:** Thursday, January 6, 2022 8:31 AM
**To:** Andrew Stephens <andrew@hackerstephens.com>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Good morning Andrew,

Yes, we are available on Monday at 10:00 EST/9:00 CST.  Can you send a dial-in?

Thanks,
Courtney


Courtney Enlow
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 12102
Washington, D.C. 20005
(202) 616-8467
courtney.d.enlow@usdoj.gov

---

**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Wednesday, January 05, 2022 2:52 PM
**To:** Powell, Amy (CIV) <Amy.Powell@usdoj.gov>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>

**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Amy,

By my calculation, January 10th is the deadline for the Rule 26 conference. We would propose 9am CST on Monday if that works for you.

Best regards,

Andrew

---

**From:** Powell, Amy (CIV) <Amy.Powell@usdoj.gov>
**Sent:** Tuesday, January 4, 2022 4:35 PM
**To:** Andrew Stephens <andrew@hackerstephens.com>; Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael, Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV) <Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Thanks, Andrew.  It has been a busy week here.  We tend to believe discovery and a rule 26 conference is likely to be premature at this point, although we would be happy to discuss that position at a convenient time.  Would early next week work?  Perhaps Monday morning?

Amy

Amy Elizabeth Powell
Senior Trial Counsel, Federal Programs Branch
Civil Division, Department of Justice
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

---

**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Tuesday, January 04, 2022 5:14 PM
**To:** Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Heather Hacker <heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael,

Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>;
Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV)
<Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** [EXTERNAL] RE: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Courtney,

Could you please let me know your availability Thursday or Friday for a Rule 26 conference?

Thanks,

Andrew

**Andrew B. Stephens**
Partner

www.hackerstephens.com

This message contains information that may be confidential and privileged. Unless you are the intended recipient (or
authorized to receive for the intended recipient), you may not use, copy, or disclose to anyone the message or any
information contained in the message. If you have received the message in error, please advise the sender by replying or by
phone at (512) 399-3022 and delete the message.

---

**From:** Andrew Stephens <andrew@hackerstephens.com>
**Sent:** Tuesday, January 4, 2022 5:48 AM
**To:** Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>; Heather Hacker
<heather@hackerstephens.com>
**Cc:** David Hacker <dhacker@firstliberty.org>; Mike Berry <mberry@firstliberty.org>; Justin
Butterfield <jbutterfield@firstliberty.org>; Holly Randall <hrandall@firstliberty.org>; Carmichael,
Andrew E. (CIV) <Andrew.E.Carmichael@usdoj.gov>; Powell, Amy (CIV) <Amy.Powell@usdoj.gov>;
Avallone, Zachary A. (CIV) <Zachary.A.Avallone@usdoj.gov>; Robinson, Stuart J. (CIV)
<Stuart.J.Robinson@usdoj.gov>; Holland, Liam C. (CIV) <Liam.C.Holland@usdoj.gov>
**Subject:** Re: Navy SEALs 1-26 v Biden, 4:21-cv-01235

Courtney,

Heather is on vacation but since the court ruled yesterday we should proceed with normal
deadlines. Also we would like to schedule a Rule 26 conference for this Thursday or Friday. Does
10am CST Thursday or Friday work for you all?

Andrew

**Andrew B. Stephens**
Partner

Hacker Stephens LLP

www.hackerstephens.com

This message contains information that may be confidential and privileged. Unless you are the intended recipient (or authorized to receive for the intended recipient), you may not use, copy, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by replying or by phone at (512) 399-3022 and delete the message.

---

**From:** Enlow, Courtney D. (CIV) <Courtney.D.Enlow@usdoj.gov>
**Sent:** Monday, January 3, 2022 2:12 PM
**To:** Heather Hacker
**Cc:** Andrew Stephens; David Hacker; Mike Berry; Justin Butterfield; Holly Randall; Carmichael, Andrew E. (CIV); Powell, Amy (CIV); Avallone, Zachary A. (CIV); Robinson, Stuart J. (CIV); Holland, Liam C. (CIV)
**Subject:** Navy SEALs 1-26 v Biden, 4:21-cv-01235

Good afternoon Heather,

I hope you had a pleasant holiday season and a happy new year.

I wanted to touch base about motion to dismiss briefing.  Our motion to dismiss is currently due Friday, January 14.  We think it would be a better use of the parties' time and resources to hold off on the motion to dismiss briefing until after the Court has ruled on plaintiffs' motion for a preliminary injunction.  We propose that we file our motion to dismiss three weeks after the Court rules on the motion for a preliminary injunction.  We would agree to plaintiffs taking additional time to file your response if desired.  Please let me know if you agree with this proposal, and I'll draft a motion.

Thanks,
Courtney


Courtney Enlow
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 12102
Washington, D.C. 20005
(202) 616-8467
courtney.d.enlow@usdoj.gov

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

---

**U.S. NAVY SEALs 1-26;**
**U.S. NAVY SPECIAL WARFARE**
**COMBATANT CRAFT CREWMEN 1-5;**
**U.S. NAVY EXPLOSIVE ORDNANCE**
**DISPOSAL TECHNICIAN 1; and**
**U.S. NAVY DIVERS 1-3,**
                     Plaintiffs,

v.

**JOSEPH R. BIDEN, JR.**, in his official
capacity as President of the United States of
America; **LLOYD J. AUSTIN, III**,
individually and in his official capacity as
United States Secretary of Defense; **UNITED**
**STATES DEPARTMENT OF DEFENSE;**
**CARLOS DEL TORO**, individually and in
his official capacity as United States
Secretary of the Navy,
                     Defendants.

---

Case No. 4:21-CV-01236-O

## DECLARATION OF ELIZABETH GALVEZ

I, Elizabeth Galvez, hereby state and declare as follows:

1.      I am the Assistant Chief of Staff for Manpower, Manning and Personnel (N1) at

Naval Special Warfare Command (NSWC).   I make this declaration in my official capacity,

based upon my personal knowledge and upon information that has been provided to me in the

course of my official duties.

2.      As the NSWC N1, I am responsible for executing manpower management and

personnel programs for the Naval Special Warfare (NSW) force.   As a part of these

responsibilities, I track the makeup of the NSW force and analyze the force structure to help

inform management personnel decisions.  I have served in this role since 2017.  Prior to my time

1

at NSWC, I worked as a contractor and government civilian on Navy personnel initiatives at various Navy Commands in the San Diego area. Before then, I served as a Human Resources Officer in the Navy, retiring as a Captain in 2012.

### The NSW Force and Naval Special Operations

3.      The "class" of individuals that "will be assigned" to NSW at some time in the future is indistinguishable from the Navy writ large. When a Navy SEAL or Special Warfare Combatant-Craft Crewmen (SWCC) conducts an operation downrange, they do so as a part of a large and diverse NSW force. This team requires skillsets from a range of military specialties. The Navy SEAL carrying out an operation does so using equipment provided for and maintained by logistics and maintenance personnel, based on intelligence collected and analyzed by intelligence and information warfare specialists, having been transported to the location by aviation and submarine experts, after being cared for by medical personnel, and only once a command staff directed and coordinated the action. Similar chains of support exist when SWCCs conduct operations. At every level, talented NSW personnel with diverse training histories from a variety of Navy backgrounds provide necessary support to the mission.

4.      Because of this, NSW is a diverse community that requires operational and military specialties far beyond Navy SEALs, Special Warfare Combatant Craft crewmen and Explosive Ordinance Disposal technicians. In fact, over 55% of NSW is made up of service members with ratings and designators[1] other than Navy SEAL, SWCC, Navy Diver, or EOD Technician. Of the officer community, there are 66 officer designators in the force and the enlisted community is similarly diverse with 95 different ratings.[2] The individuals who will be assigned to these roles are currently serving in units across the Navy. For example, there are

---

[1] Designators are the name for codes used by the Navy to categorize different officer occupational specialties.
[2] Ratings are the name used by the Navy to denote different enlisted occupational specialties, skills and abilities.

2

over 400 supply personnel at NSW commands (more than the number of EOD Technicians and

Navy Divers combined).  These supply experts came from ships, submarines, aviation units, and

staffs from units across the globe.  Similarly, there approximately 900 NSW personnel (more

than the number of SWCCs) who specialize in intelligence, information, and cryptographic

warfare areas.  These technicians come from communities that support carrier strike groups,

submarine groups, cyberwarfare assets, and every other operational asset in the Navy arsenal.

5.      Notably, Navy Divers and EOD Technicians are not NSWC managed ratings

Their role in the NSW mission is like those of the other support positions that enable SEAL and

SWCC operations.  NSWC only maintains overall responsibility for SEAL and SWCC operator

training and requirements regardless of whether currently assigned within the NSW force.  Navy

Divers and EOD Technicians support NSW missions in combat support (CS) or combat service

support (CSS) roles, similarly to the way other CS/CSS designators and ratings support the NSW

mission.

6.      Additionally, there is no universal special warfare application process for CS/CSS

officer or enlisted sailors who may be assigned to NSW billets in the future.  Most billets are

filled by Navy detailers outside the NSW community and NSWC does not control where they

come from.  Because of this, there is no way to cross-reference the list of those who have

requested religious accommodations against those in various stages of pre-NSW training or

application pipeline.  The servicemembers who "will be assigned" to NSW will come from every

corner of the service.

### The Potential Navy SEAL Population

7.      The "class" of individuals that "will be United States Navy SEALs" is impossible

to define and could include almost every sailor in the Navy, along with a large number of

3

App.015

intelligent and athletic civilians.   NSW has established a series of recruitment and accessions programs for the Navy SEAL force that recruits heavily from ROTC and Naval Academy programs, allows other Navy personnel to lateral transfer into SEAL training, and for civilians to join the Navy specifically to attend SEAL training.  To be clear, Navy SWCCs, EOD Technicians, and Navy Divers are not Navy SEALS, though they may apply to Navy SEAL accessions programs like any other sailor.

8.     Finally, for those who are in a training pipeline to become special operators or combatant craft crewmen, only around 25% of those candidates will complete the pipeline and be assigned to Naval Special Warfare units.  Thus, even the pool of special operator trainees is highly fluid and ever-changing.  Indeed, even for SEALs, there are several lateral transfer programs that are available to wide swaths of the Navy

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of February, 2022.

Mrs. Elizabeth Galvez
Assistant Chief of Staff for Manpower,
Manning and Personnel
Naval Special Warfare Command

4

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **U.S. NAVY SEALs 1-26;**<br>**U.S. NAVY SPECIAL WARFARE**<br>**COMBATANT CRAFT CREWMEN 1-5;**<br>**U.S. NAVY EXPLOSIVE ORDNANCE**<br>**DISPOSAL TECHNICIAN 1; and**<br>**U.S. NAVY DIVERS 1-3**,<br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>**JOSEPH R. BIDEN, JR.**, in his official<br>capacity as President of the United States of<br>America; **LLOYD J. AUSTIN, III**,<br>individually and in his official capacity as<br>United States Secretary of Defense; **UNITED**<br>**STATES DEPARTMENT OF DEFENSE**;<br>**CARLOS DEL TORO**, individually and in<br>his official capacity as United States<br>Secretary of the Navy,<br>　　　　　　　　　　Defendants. | Case No. 4:21-CV-01236-O |

## DECLARATION OF CAPTAIN MERY-ANGELA SANABRIA KATSON, U.S. NAVY

I, Captain Mery-Angela Sanabria Katson, U.S. Navy, hereby state and declare as follows:

      1.      I am a captain in the United States Navy, currently serving as the Branch Head,

Enlisted Plans and Policy (OPNAV N132), located in Arlington, Virginia.  I make this

declaration in my official capacity, based upon my personal knowledge and upon information

that has been provided to me in the course of my official duties.

      2.      The Navy requires immunizations for all Service members, based on its

compelling interest in preventing the spread of diseases to support mission accomplishment,

including military readiness and health and safety, at the individual, unit, and organizational

levels.  Navy policy also works to support a Service member's religious practices to the broadest

1

extent possible within the bounds of military readiness, unit cohesion, good order, discipline, health and safety. Navy policy concerning requests for the accommodation of religious practices generally, including immunizations, is outlined in Bureau of Naval Personnel Instruction ("BUPERSINST") 1730.11A (attached as Exhibit A to this declaration). Specific guidance related to immunization exemptions for religious beliefs is found in the Naval Military Personnel Manual ("MILPERSMAN"), Article 1730-020 (attached as Exhibit B to this declaration).

### Religious Accommodation Request Process Overview

3.       An active duty or reserve Navy Service member[1] seeking an exemption of immunization for religious reasons must initiate the request in in accordance with BUPERSINST 1730.11A, ¶ 5.e. The requirements include a written request via his or her commander stating the waiver sought, followed by an interview with a Navy chaplain. A template for the Service member's request is provided in BUPERSINST 1730.11A, enclosure (1). Navy commanders are required to ensure the applicant receives counseling related to the potential health and travel impacts they may incur as a consequence of their waiver, and the possibility that their waiver may be revoked in the event they are at imminent risk of disease. MILPERSMAN 1730-020 ¶ 6.[2] The required counseling is recorded using a standard "Administrative Remarks" form (i.e. NAVPERS 1070/613, commonly known as a "Page 13"), which documents that the Service member has been advised of potential consequences of the immunization waiver request. MILPERSMAN 1730-020 ¶ 4.c.

---

[1] "This instruction applies to all active and reserve members of the Navy, including applicants for entry into the Navy and Navy Reserve, as well as midshipmen at the U.S. Naval Academy (USNA) and in the Naval Reserve Officers Training Corps (NROTC), and officers and officer candidates in Navy officer accession program." BUPERSINST 1730.11A ¶ 3.a

[2] The authority to revoke approved an approved religious accommodation exemption from COVID-19 vaccination is withheld per NAVADMIN 225/21 ¶ 7.g.

App.019

4.      Action on a Service member's written request for accommodation must be handled in a timely manner.  Within the Navy, the approval authority for requests for immunization exemptions for religious beliefs is the Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (hereinafter DCNO N1).[3] BUPERSINST 1730.11A, ¶ 5.a.(4). Requests for religious accommodation forwarded from an O-6 commanding officer or immediate superior in command ("ISIC") to DCNO N1 for adjudication must be forwarded within seven days from the date the requestor submitted the request to his/her immediate commander.  Review and final action must be completed in accordance with Department of Defense Instruction ("DoDI") 1300.17, which provides that action on requests must generally be completed 30 to 60 days from receipt of the Service member's request. *See* DoDI 1300.17, ¶ 3.2.c., Table 1.  However, exceptions to those timelines are authorized in exceptional circumstances by DODI 1300.17, ¶ 3.2.c. and SECNAVINST 1730.11B, Ch-1, ¶ 5.c. No disciplinary or administrative action will be initiated while a request for an exemption for religious accommodations is pending. If a request for a religious accommodation for vaccination is denied, the Navy Service member may appeal the DCNO N1 decision to the Chief of Naval Operations (CNO).[4]  BUPERSINST 1730.11A, ¶ 5.f. Commanders routing requests to DCNO N1 must forward the matter within seven days from the date of the Service member's request, in accordance with BUPERSINST 1730.11A, ¶ 5.c.

### Evaluation of Religious Accommodation Requests

5.      Within the Navy, requests for religious accommodation are evaluated on a case-by-case basis using criteria outlined in paragraph 5 of BUPERSINST 1730.11A.  The instruction

---

[3] DCNO N1 is identified by the alternate designation of CNP (Chief of Naval Personnel) in MILPERSMAN 1730-020).  DCNO N1 and CNP interchangeable acronyms and refer to the same position and official. The current DCNO N1 is Vice Admiral John Nowell, Jr.

[4] The current CNO is Admiral Michael Gilday.

advises commanders that "[i]t is essential that [they] articulate the factual basis underlying any compelling government interest and that they articulate why a recommended denial or partial denial is the least restrictive means available to the commander to protect the compelling government interest over the individual request." *Id.* ¶ 5.a.(2).  A template for the commander's endorsement is found in BUPERSINST 1730.11A, enclosure (4).  The endorsement must also provide information required by MILPERSMAN 1730-020 ¶ 5, including: (1) the negative effect (if any) of the requested accommodation on the unit's military readiness, health, or safety; (2) the number of Service members in the command that have been granted a similar exemption; and (3) when recommending denial, a determination that the denial furthers a compelling government interest and there is no less restrictive means of furthering that interest.  MILPERSMAN 1730-020 ¶ 5. a.-b.  Navy commanders are directed to evaluate each request considering the following factors:

    a.  Applicable operational or regional policies,
    b.  Importance of the military policy, practice or duty in terms of mission accomplishment, including military readiness, unit cohesion, good order, discipline, health, or safety,
    c.  Importance of the practice to the requestor,
    d.  Cumulative impact of repeated accommodations of a similar nature; and
    e.  Alternate means to fulfill the request.

BUPERSINST ¶ 5.a.(1).

6.      If an applicant carries his or her burden of demonstrating that the requirement would result in a substantial burden on the applicant's exercise of his or her religion, Navy commanders will not deny or recommend denial of a religious accommodation unless the denial or partial denial furthers a compelling governmental interest and is the least restrictive means of furthering that compelling government interest.  *Id.* ¶ 5.a.(2).  Factors for commanders to consider include (but are not limited to) whether approving the accommodation would pose a

health or safety hazard, or otherwise impair mission accomplishment, good order, discipline, morale or unit cohesion. *Id.* While commanders are directed to consider the cumulative impact of accommodations of a similar nature, they are advised not to approve or deny requests to accommodate religious practices simply because similar requests were approved or denied. *Id.* ¶ 5.a.(1).

### Sincerely Held Religious Beliefs

7.      The Navy chaplain interview assesses the sincerity of the requestor's religious belief using a standard checklist found in BUPERSINST 1730.11A, enclosure (2). The interview checklist directs the chaplain to assess the requestor's sincerity using one or more of the following factors:

   a.   Requestor was credible (consistently keeps tenets, practices, etc.).
   b.   Requestor's demeanor and pattern of conduct are consistent with the request.
   c.   Requestor participates in activities associated with the belief(s).
   d.   Other persons supporting the claim are credible.
   e.   Request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim.

   *Id.*

A requestor is not required to provide responses to each of these factors in order to show a sincere religious belief, and chaplain may find the requestor's beliefs sincere based on any of the factors above. The chaplain does not assess the validity of the requestor's beliefs. The Navy chaplain is also directed to explore alternate means of accommodating the requestor's practice in the interview. *Id.* After the interview, the chaplain provides the requestor's commander a written summary of the Service member's request, the religious belief(s) upon which the request is made, and a "professional and objective opinion regarding the religious importance of the request to the member." BUPERSINST 1730.11A, enclosure (3). Finally, the chaplain provides the commander an assessment of the sincerity of the Service member's personal religious belief,

5

including any information provided during the interview.  *Id*.  A copy of this memorandum is provided to the requestor.  *Id*.

8.      The chaplain assessment is not itself a determination of the sincerity of the requestor's belief. While not questioning the validity of the beliefs, the approval and appeal authority (i.e. DCNO N1 and CNO, respectively) for the Navy will consider the chaplain's input and assess the sincerity of the religious belief on a case-by-case basis using the same criteria in BUPERSINST 1730.11A, enclosure (2).  The chaplain's conclusion of the sincerity of the requestor's religious beliefs is not binding on either the approval or appeal authority.

**<u>Substantial Burden</u>**

9.      Where there is a sincerely held religious belief, the Navy's approval and appeal authority (if applicable) determine if the requirement to be immunized imposes a substantial burden on an exercise of religion based upon that belief.  This is also a case-by-case determination.  Some exercises of religion may not be substantially burdened if the requester has demonstrated acquiescence to the purported burden in other portions of their life (e.g., receiving other vaccinations or using other products developed with aborted fetal cells).  Additionally, if the requester's sincerely held religious belief concerns objections to the mRNA vaccines, the requestor's belief may not be substantially burdened by receiving a different type of vaccine.

10.     Requests for religious exemption from the COVID-19 vaccine have been adjudicated exclusively based on the Navy's compelling governmental interests and the least restrictive means for furthering those interests. As such, the requestor's professed sincere religious beliefs and the asserted substantial burden to those beliefs are presumed, and neither have been scrutinized or challenged in the course of adjudicating COVID-19 religious accommodation requests.

**Compelling Government Interest**

11.    Where a mandatory vaccination policy substantially burdens a Service member's exercise of religion, the Navy must establish that the substantial burden is required in furtherance of a compelling Navy interest and is the least restrictive means of accomplishing that interest. The Navy has a compelling governmental interest in mission accomplishment at the individual, unit, and organizational levels, including such necessary elements of mission accomplishment as military readiness, unit cohesion, good order and discipline, and health and safety.

**Least Restrictive Means**

12.    The approval and appeal authority will consider whether there are less restrictive means to achieve the Navy's compelling government interest.  This is a case-by-case review that is highly dependent on the particular facts applicable to the individual requester.  Under some circumstances, the review of the least restrictive means available to achieve the Navy's compelling interest is so clear that this factor takes precedence over all other considerations.  As noted below, specific duty assignments and the requirement for Sailors to be immediately available to deploy in the event of military exigencies will result in less restrictive means not being feasible in most circumstances.  A religious accommodation will be approved if it does not adversely impact the Navy's compelling government interest in preventing the spread of diseases to support mission accomplishment, including military readiness, unit cohesion, good order and discipline, or health and safety, at the individual, unit, and organizational levels.

13.    Communicable diseases such as COVID-19 can interfere with the ability of Service members to accomplish the Navy's mission at the individual, unit, and organizational levels, decrease the overall health of the force, degrade military readiness, and place additional strain on already limited medical resources.  Spread of communicable diseases among Sailors

7

who live and work in confined quarters aboard ships, or in austere deployed environments with limited access to immediate medical care, or for those who live or work in close proximity to others in the shore establishment, has the potential to cause mission failure if one or more personnel become too sick to perform their jobs.  Logistical challenges and operational risk inherent in moving personnel to and from deployed ships and other deployed environments makes it difficult, if not impossible, to quickly or safely evacuate sick personnel and replace them with healthy personnel.  Navy ships have limited medical and long-term placement capabilities.  If even one Sailor infected with a communicable disease requires treatment beyond the capabilities of a ship's medical department, or if multiple Sailors must be placed in critical care, a decision will have to be made whether the ship may have to abandon its mission and transit to a location that offers more adequate treatment.  Transit time is not instantaneous and depends on factors such as ship location, current mission requirements, and port access or availability. That time variable creates additional health risk for infected Sailors and the potential for disease transmission to the remaining crew.  Finally, the spread of communicable diseases from U.S. Navy personnel to foreign or host-nation personnel would have a detrimental impact on U.S. foreign relations, especially if the illness was viewed as preventable.

14.    As the COVID-19 pandemic unfolded, the Navy was compelled to implement stringent restrictions across the force to protect the health of the force and ensure military readiness.  For all personnel, severe restrictions were imposed on travel (both official and unofficial), permanent change of station (PCS) transfers, and activities such as dining in restaurants or engaging in activities outside of military installations.  Sailors on deployment or preparing for deployment were ordered to quarantine within "bubbles" for two weeks before getting underway (this quarantine is referred to as Restriction of Movement ("ROM")).

Additionally, almost all quality of life port visits were prohibited, further exacerbating the mental and physical toll of the deployment.  Personnel at sea and ashore were ordered to adhere to health protection policies, to include requirements to sanitize workspaces, wash hands frequently, wear masks, and maintain 6-foot social distancing.

15.     The effectiveness of these measures is extremely limited on ships, where Sailors must live, work, eat, and sleep in close proximity to other Sailors.  On board a ship, Sailors must navigate narrow passageways that do not permit sufficient social distancing.  Ships have almost no windows, and fresh air circulation is intentionally limited, as ships are designed to be able to seal off compartments to protect against water intrusion or chemical, biological, or radiological weapons attacks.  Though Sailors work to keep their ships clean, safe transit up and down ladders and through watertight doors requires everyone to touch all of the same handrails and handles frequently.  Ships typically have limited space to quarantine Sailors from the rest of the crew, if such facilities exist at all. Frequent handwashing is not generally feasible because Sailors have to transit up and down ladders, using those shared handrails, to get between their workspaces and the restrooms ("heads") in which they can wash their hands.  Almost all enlisted berthing compartments feature three-foot by six-foot bunks ("racks") that are generally stacked three high with narrow passages between rows.  Enlisted berthing compartments have as few as 12 and as many 210 personnel sleeping in the same space.  Sailors in larger berthing compartments are typically never alone in the head when they use the facilities, shower, or brush their teeth, because the head is a shared space used by 200 or more personnel.

16.     Health protection measures are more feasible ashore, but the effectiveness is highly dependent on the type of work a Sailor does and the configuration of their workspace.  Additionally, even for shore-duty commands, COVID-19 restrictions impose a substantial and

unsustainable administrative cost.  Commands across the Navy Service have been obligated to

adopt telework policies, where feasible,[5] or implement staggered shift rotations to avoid possible

exposure of personnel.  For Sailors placed on ROM, commands are required to track and report

their status, as well as provide rooms, meals and essentials to Sailors in a ROM status.[6]

Restrictions on official travel limited training opportunities for Sailors, while restrictions on

unofficial travel limited, and in some instances precluded, personal leave for Sailors outside of

extremely circumscribed geographic areas.  Finally, Sailors' assignments typically alternate

between sea duty and shore duty; however, every Sailor must be deployable.  *See* OPNAVINST

1300.20, Deployability Assessment and Assignment Program (requiring administrative

separation processing or referral to the Disability Evaluation System for any Sailor who is

undeployable for 12 months or longer).  Sailors assigned to shore duty or the Navy Reserve need

to be ready to deploy at a moment's notice as military exigencies require.  Even a Sailor on shore

duty pending retirement can be called up to deploy if necessary to achieve mission requirements.

## Staffing Process

17.     Every day, military commanders make decisions, both operational and

administrative in nature, that are critical to our Nation's security. Commanders rely on their

experience and judgment, their planners, and their staff officers, in order to resolve a broad range

of simple, routine, and complex problems. Navy staff work is a dynamic process that requires

close cooperation and involvement between the commander and staff to ensure that time is used

efficiently and that the most effective process is implemented to meet the commander's guidance

---

[5] Telework is not an option for many Sailors, including those performing work using classified networks, those who work with specialized equipment, or for any work, training, or maintenance on military assets (e.g. ships, aircraft, submarines).

[6] The DoD even instituted a new pay entitlement, "Hardship Duty Pay – Restriction of Movement (HDP-ROM)," in order to compensate Service members for the hardship associated with being ordered to self-monitor in isolation (i.e., restriction of movement) somewhere other than at their home or a government-funded lodging facility, if such facilities were unavailable.

and intent. Staff work is often conducted in a resource and time-constrained environment, necessitating effective and flexible interaction during the process to ensure the commander is presented with all available information to make an informed decision in an efficient manner. Consequently, Standard Operating Procedures ("SOPs") are frequently used tools by military staff officers to implement efficient and uniform administrative procedures across a wide-range of military issues.

18.     I am aware Plaintiffs have provided the court with an unidentified Service member's complaint of wrongs under Article 138, which includes a SOP tailored to the staffing process for religious accommodation requests from the COVID-19 vaccine, and which the complainant alleges violates the Religious Freedom Restoration Act (RFRA) and DoD policy. See ECF 62, Ex. 1. In fact, the SOP was developed in order to efficiently process the unprecedented influx of religious accommodation requests related to the COVID-19 vaccine requirement.[7] The SOP outlines the following six-phase, 50-step process to ensure that all religious accommodation requests are complete in order to ensure they are fairly adjudicated:

a. Phase 0 (Steps 1-5) outlines the process from receipt of a RA request, confirmation of receipt, and the initial steps to create a local file for the request for processing.

b. Phase 1 (Steps 6-13) outlines the initial intake phase, during which the RA request is added to a spreadsheet for tracking purposes and evaluated to ensure all necessary documents are present.

---

[7] Based on a review of records available, only 66 requests for religious accommodation from any vaccine (excluding the COVID-19 vaccines) were received from 2015 to the present. By contrast, 4,175 religious accommodation requests from the COVID-19 vaccine have been received as of February 14, 2022.

c. Phase 2 (Steps 14-15) includes a step that renames the files to organize them, and includes the addition of a letter template. Specific information within the template is tailored to reflect the requestor's name and dates of related materials.

d. Phase 3 (Steps 16-29) describes the process by which the RA request is added to DON Tracker, the Navy's current task management system. Specific offices are tasked to provide a response within given deadlines, and the point of contact is able to monitor the responders' progress within the system. Once all responders have provided inputs, they are compiled and placed in a new folder to indicate the request is ready for review.

e. Phase 4 (Steps 30-44) compiles RA requests that are ready for processing into batches of 10 packages for review and adjudication. The packages are organized by priority and an action memo is added to provide the adjudication authority with an overview of the contents and recommended disposition. At Step 35, data related to the RA requests is input into a spreadsheet. Specifically, a summary of the member's request, the chaplain's assessment, a least restrictive means analysis, in addition to medical, legal, and professional recommendations, are provided. The compiled files are then forwarded to the processor's assigned reviewer, who is notified that the package is ready for review.

f. Phase 5 (Steps 45-47) outlines the process by which the request package is routed, first through OPNAV N13 for recommendation to DCNO N1, and then to DCNO N1 for review and adjudication. Step 46 provides that, "[o]nce a final decision has been made on the request, N1 will return the signed [response letter]." In the event changes are required to be made to the letter (e.g., to change the disposition, correct typos or other errors, request clarification or additional information, etc.) the document may be returned

to the processor to be further modified before be resubmitted to DCNO N1 for adjudication.

g. Phase 6 (Steps 48-50) describes the manner in which the adjudicated RA request is returned to the requestor via his or her chain of command.

19.    Significantly, the SOP does not dictate the manner in which the adjudicating authority, i.e., DCNO N1, assesses any particular RA request. The SOP is entirely devoted to the *administrative processing* of RA requests to promptly field new RA requests, efficiently compile the necessary information for DCNO N1 action, and return adjudicated requests to the Service member. Indeed, Steps 1-45 are solely concerned with actions below the level of DCNO N1, and Steps 46-50 describe the actions taken subsequent to DCNO N1's decision. All of the steps described in the SOP are performed by administrative clerks who do not provide any recommendation with respect to the request, nor do they have any decision-making authority. Finally, DCNO N1 does not refer to the SOP in the course of his review of RA requests, nor does the SOP provide any procedural guidance to such a review. Rather, the SOP ensures that DCNO N1 is provided with all necessary information and materials in order to evaluate each case separately, as required by DoD policy and RFRA.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of February, 2022.


Mery Angela Sanabria Katson
Captain, U.S. Navy

# Katson Declaration

# Exhibit A



**DEPARTMENT OF THE NAVY**
CHIEF OF NAVAL PERSONNEL
701 SOUTH COURTHOUSE ROAD
ARLINGTON VA 22204-2472

BUPERSINST 1730.11A
N13
16 Mar 2020

BUPERS INSTRUCTION 1730.11A

From:  Chief of Naval Personnel

Subj:  STANDARDS AND PROCEDURES GOVERNING THE ACCOMMODATION OF
RELIGIOUS PRACTICES

Ref:   (a) DoD Instruction 1300.17 of 10 February 2009
(b) SECNAVINST 1730.8B
(c) NAVPERS 15665I
(d) BUMEDINST 6230.15B

Encl:  (1) Sample Request for Waiver of Policy to Accommodate a Religious Practice
(Template)
(2) Chaplain Interview Checklist (Template)
(3) Chaplain Memorandum for the Record (Template)
(4) Religious Accommodation Approval or Endorsement (Template)

1.  <u>Purpose</u>.  To provide policy, guidance, procedures and responsibilities for the
accommodation of practices in support of sincerely held religious beliefs for Sailors and
prospective accessions, per references (a) and (b).  Reference (c) provides the Navy's manner of
wear policy for the most commonly requested waivers of uniform and grooming standards in
support of religious practices, as delineated in paragraph 5.

    a.  This revision updates policy, guidance and procedures for the accommodation of
practices in support of sincerely held religious beliefs.

    b.  This is a complete revision and should be reviewed in its entirety.

2.  <u>Cancellation</u>.  BUPERSINST 1730.11.

3.  <u>Scope and Applicability</u>

    a.  This instruction applies to all active and reserve members of the Navy, including
applicants for entry into the Navy and Navy Reserve, as well as midshipmen at the U.S. Naval
Academy (USNA) and in the Naval Reserve Officers Training Corps (NROTC), and officers and
officer candidates in Navy officer accession programs.  Nothing in this instruction precludes
disciplinary or administrative action for conduct that is proscribed by the Uniform Code of
Military Justice or supporting policies.

BUPERSINST 1730.11A
16 Mar 2020

b.  Conscientious Objectors.  Conscientious objections are not covered under this instruction. See DoD Instruction 1300.06 (Conscientious Objector) of 12 July 2017.

c.  Peyote Use.  Peyote use is not covered under this instruction.  See Assistant Secretary of Defense for Force Management Policy Memorandum of 25 April 1997, *Sacramental Use of Peyote by Native American Service Members*.

3.  Background.  This policy complies with references (a) and (b) and supports the Navy's culture of diversity, tolerance and inclusion.  In line with section 2000bb-1 of Title 42, United States Code, requests for religious accommodation from a military policy, practice or duty that substantially burdens a Sailor's exercise of religion may be denied only when the military policy, practice or duty furthers a compelling government interest and is the least restrictive means available of furthering that compelling government interest.  Religious liberty is more than freedom to worship.  It includes the freedom to integrate one's religion into every aspect of one's life.  When the policies or procedures of the Navy conflict with a Sailor's religious practices, the Navy works to support the Sailor's religious practices to the broadest extent possible within the bounds of military readiness, unit cohesion, good order, discipline, health and safety.  Many religious practices such as (but not limited to) religious observances and dietary practices do not need a request for waiver of policy and can be accommodated at the command level.

4.  Roles and Responsibilities

a.  Sailors.  Sailors seeking accommodation of a religious practice that requires a waiver of Navy policy ("requestors") must submit a request in writing to their commander, consistent with enclosure (1).  Prospective accessions seeking accommodation of a religious practice that requires a waiver of Navy policy ("requestors") should use the accession source chain of command, consistent with subparagraph 5b, enclosure (1) and Table 2.

(1) A requestor must comply with the applicable policy, practice, direction or duty from which he or she is requesting a religious accommodation until the request is adjudicated. Additionally, commanders and commanding officers ("commanders") may temporarily modify or suspend a religious accommodation, consistent with subparagraph 5g.

(2) A requestor with an approved religious accommodation must inform his or her chain of command of the approved accommodation upon checking in to a new command or changing duties.  A requestor must retain a copy of the approved accommodation and be able to produce it within five working days.

b.  Chaplains.  Command chaplains are responsible for advising and assisting commands with religious accommodation policy execution.  In line with SECNAVINST 1730.7E, chaplains, assisted by Religious Program Specialists, provide for and facilitate religious requirements of Sailors and authorized users and advise commanders on command religious program matters throughout the Department of the Navy (DON).

2

BUPERSINST 1730.11A
16 Mar 2020

(1) A Navy chaplain will conduct an administrative interview for each religious accommodation request that requires a waiver of policy.  Local chaplains should be used if available.  Chaplains may use any means available to ensure the interview takes place promptly, such as telephone or video conference.  The chaplain should use enclosure (2) during the interview and must produce a memorandum for the record consistent with enclosure (3).

(2) The chaplain will inform the Sailor or prospective accession that the interview is for the purpose of preparing a memorandum for the record and advising the command, and that the content of the interview is not privileged or confidential as defined in SECNAVINST 1730.9A and the Manual for Courts-Martial Military Rule of Evidence 503.

c.  Commanders and Commanding Officers (CO).  Commanders must process requests according to the timelines, routing and criteria set forth in this instruction.

(1) When forwarding a request for adjudication or appeal, commanders will use enclosure (4).

(2) Commanders must obtain the advice of a judge advocate and a chaplain prior to acting on a request that involves a waiver of Navy policy.

(3) Commanders will include a religious needs assessment upon check-in to the command in line with OPNAVINST 1730.1E to include identification of Sailors who may need previously-approved religious accommodation waivers reviewed.

d.  Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (CNO N1).  CNO N1 is responsible for overseeing this religious accommodation policy and will review and act on religious accommodation requests that require waiver of Department of Navy (DON) policy and are routed to CNO N1 for approval as indicated in Tables 1 and 2.

5.  Policy.  In accordance with Article 0820 of United States Navy Regulations, 1990, commanders will provide maximum opportunity for the free exercise of religion by members of the naval service.

a.  Standards-Based Approach.  The Navy has a compelling governmental interest in mission accomplishment at the individual, unit and organizational levels, including such necessary elements of mission accomplishment as military readiness, unit cohesion, good order, discipline, health and safety. The military is a specialized community within the United States, governed by a discipline separate from the rest of society.  All Navy personnel must expeditiously review and act on requests for religious accommodations.  Many religious practices do not require an exception to Navy policy and can be accommodated at the command level.  The term "religious practice" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

BUPERSINST 1730.11A
16 Mar 2020

(1) Each request for religious accommodation must be reviewed on a case-by-case basis, giving consideration to the full range of facts and circumstances relevant to the specific request. Requests to accommodate religious practices should not be approved or denied simply because similar requests were approved or denied.  The following factors should be considered:

(a)  applicable operational or regional policies,

(b)  importance of the military policy, practice or duty in terms of mission accomplishment, including military readiness, unit cohesion, good order, discipline, health, or safety,

(c)  importance of the practice to the requestor,

(d)  cumulative impact of repeated accommodations of a similar nature and

(e)  alternate means to fulfill the request.

(2) To comply with the intent of section 2000bb-1 of Title 42, U.S. Code, commanders and their staffs should remain objective in considering requests to accommodate religious practices.  Commanders will not deny or recommend denial of a religious accommodation unless the denial or partial denial furthers a compelling governmental interest and is the least restrictive means of furthering that compelling government interest.  It is essential that commanders articulate the factual basis underlying any compelling government interest and that they articulate why a recommended denial or partial denial is the least restrictive means available to the commander to protect the compelling government interest over the individual request. Factors to consider include (but are not limited to) whether approving the accommodation would:

(a)  pose a health or safety hazard (such as flammable materials or loose clothing that could become caught in a piece of equipment),

(b)  interfere with the wear or proper function of special or protective clothing or equipment (such as a respirator, protective helmet or communication gear) or

(c)  otherwise impair mission accomplishment, good order, discipline, morale or unit cohesion.

(3) Sometimes it is necessary for commanders to recommend an alternative manner by which the religious requirement may be met.  For example, there may be options and resources not known to the member at the time of his or her request that might be known to the commander.  Those alternatives should be discussed and offered to the member to determine if they might satisfy some or all of the member's religious requirement.  Where appropriate, the chaplain memorandum may discuss alternative means available to address the requested accommodation.

4

BUPERSINST 1730.11A
16 Mar 2020

(4) Religious practices and corresponding approval authorities are listed in Table 1. Many religious practices, such as (but not limited to) religious observances and dietary practices do not need a request for waiver of policy and can be accommodated at the command level. Other religious accommodations may be approved by the first O-6 in the chain of command, whether the requestor's CO or Immediate Superior in Command (ISIC).  Per reference (a), exceptions to Table 1 are not permitted without CNO N1 approval.

| Type of Religious Practice | Authority |
|---|---|
| Religious observances per subparagraph 5d(1) | CO |
| Dietary practices per subparagraph 5d(2) | CO |
| Neat, conservative head covering in line with subparagraph 5d(4)(a), which requires waiver of uniform regulation provisions in reference (c) | Approvals authorized at O-6 CO/ISIC level.  O-6 CO/ISIC send recommendation for **disapproval** directly to CNO N1 |
| Unshorn hair on men in line with subparagraph 5d(4)(b), which requires waiver of uniform regulation provisions in reference (c) | O6 CO/ISIC send recommendation directly to CNO N1 |
| Beard, which requires waiver of requirement for male Sailors to be clean shaven found in reference (c), in line with subparagraph 5d(4)(c) | O6 CO/ISIC send recommendation directly to CNO N1 |
| Uniform, grooming or religious apparel waivers not authorized at the CO or O-6 CO/ISIC level in line with reference (c) | O-6 CO/ISIC send recommendation directly to CNO N1 |
| Immunizations per subparagraph 5d(3) | O-6 CO/ISIC send recommendation directly to CNO N1 |
| All other types of religious practices that require a waiver of Navy policy to support | O-6 CO/ISIC send recommendation directly to CNO N1 |

Table 1.  Authorities and Religious Practices

Note 1:  Pre-accession authority examples are listed below in subparagraph 5b.

5

BUPERSINST 1730.11A
16 Mar 2020

   b.  <u>Accessions</u>

     (1) Navy accession sources, Navy Recruiting Command, Naval Service Training Command, USNA and U.S. Navy Bureau of Medicine and Surgery (BUMED), are the designated chains of command for pre-accession requests in line with Table 2.  Accession source headquarters are responsible for ensuring active and reserve enlisted and officer accessions are informed of uniform and grooming standards and policies, as well as procedures for seeking religious accommodations.  Accession source headquarters must document this opportunity in writing and ensure all accession requests for religious accommodation are adjudicated prior to entering service.  The following language should be used to document the applicant understanding of the Navy's religious accommodation policy:

       "I understand that Department of the Navy policy is to accommodate religious practices whenever possible, unless doing so would have an adverse impact on mission accomplishment, including military readiness, unit cohesion, good order, discipline or health and safety.

       I understand accommodation of my religious practices cannot be guaranteed at all times.  I understand that determination of military necessity rests entirely with my Navy chain of command, and that I will be expected to comply with the Navy's policy, practice or duty from which I am requesting accommodation unless and until approved by the designated authority.

       I do NOT desire to request support for specific religious practices at this time

       _____
       (Applicant Signature)

       I DO desire to request support for the following religious practice(s):

       _____
       (Type of Request)

       _____
       (Applicant Signature)

       Applicants requesting religious accommodation may not enlist or commission until they receive a final response in writing.  Accession commands must immediately process the request in line with BUPERSINST 1730.11A (Standards and Procedures Governing the Accommodation of Religious Practices).

       _____
       (Typed or Printed Name and Signature of Witnessing Recruiting Representative)"

6

App.037

BUPERSINST 1730.11A
16 Mar 2020

(2)  Additionally, prospective accessions must be given the opportunity to route a religious accommodation request prior to departure for a Military Entrance Processing Station. Many pre-accession religious practices such as (but not limited to) religious observances and dietary practices do not need a request for waiver of policy and can be accommodated at the command level.  Certain requests for religious accommodation may be approved by local commanders as listed in Table 2, below. Per reference (a), exceptions to this table are not permitted without CNO N1 approval.

| Type of Religious Practice | Process | Notes |
|---|---|---|
| Religious observances | Route to RTC/OTCN CO for approval | RTC/OTCN CO send recommendation for disapproval directly to CNO N1 |
| Dietary practices | Route to RTC/OTCN CO for approval | RTC/OTCN CO send recommendation for disapproval directly to CNO N1 |
| Religious head covering during RTC/OTCN | RTC/OTCN CO may approve religious head covering during religious ceremonies/services only | If religious head covering during religious ceremonies/services only is not acceptable by applicant, then send to CNO N1 |
| Unshorn hair on men in line with subparagraph 5d(4)(b), which requires waiver of uniform regulation provisions in reference (c) | RTC/OTCN CO send recommendation directly to CNO N1 | |
| Any request for beards during RTC/OTCN | RTC/OTCN CO send recommendation directly to CNO N1 | |
| Uniform, grooming or religious apparel accommodation that do not require waiver of DON policy | Route to RTC/OTCN CO for approval | Disapproval recommendations must be routed to CNO N1 |
| Immunizations | RTC/OTCN CO may approve use of any available alternative vaccinations | If no alternative vaccines are available, then send recommendation directly to CNO N1 |
| All other requests that require a waiver of Navy policy | Route to CNO N1 | |

7

BUPERSINST 1730.11A
16 Mar 2020

Table 2.  Authorities and Religious Practices for Pre-Accession and Recruit Training

    c.  Timelines.  For waivers of policy requiring adjudication at the commander or O-6 CO/ISIC level, final review and written notification to the requestor will be completed no later than 7 days from the date the requestor submitted the request to his or her immediate commander.  Extensions for good cause may be granted by the Director, Military Personnel, Plans and Policy (OPNAV N13).  Examples of good cause for an extension include operational necessity or lack of immediate access to a judge advocate or chaplain.  All religious accommodation cases forwarded from an O-6 CO/ISIC or RTC/OTCN to CNO N1 for adjudication must be forwarded within 7 days from the date the requestor submitted the request to his/her immediate commander, and will be expeditiously adjudicated in line with references (a) and (b).  To ensure timely and consistent adjudication of all requests, active and reserve Sailors will not submit a request for a religious accommodation that would require a waiver of Navy policy if they are expected to execute permanent change of station orders within 90 days.  Written notification should be given to the requestor within 5 days upon any decision, modification, suspension or revocation of a waiver of policy.

    d.  Religious Practice Type

        (1) Observances of Worship and Holy Days.  Worship practices, holy days and Sabbath or similar religious observance requests will be accommodated except by necessity, consistent with mission accomplishment, U.S. Navy Regulations, and Navy Military Personnel Manual (MILPERSMAN) article 1731-010.  These requests do not normally require a waiver of policy.

        (2) Dietary Practices.  Commanders should support religious dietary observances to the fullest extent possible.  Commanders normally support religious dietary observances through a standard core menu that supports many religious dietary requirements or by issuing Meals Ready to Eat, Religious.  In certain circumstances, commanders may consider other alternative solutions.

        (3) Immunizations.  The Navy requires immunizations for all Sailors, based on its compelling interest in mission accomplishment, including military readiness, unit cohesion, good order, discipline, health and safety.  Local commanders should make a reasonable effort to acquire alternative vaccinations, when available, that meet both religious needs of Sailors and the Navy's immunization requirements as determined by BUMED.  Refer to MILPERSMAN 1730-020 as needed.  Medical waivers of immunization requirements not associated with religious belief will continue to be adjudicated by the health care provider as addressed in reference (d).

        (4) Uniform and Grooming.  Pursuant to subparagraph 5a above, to determine whether a religious accommodation might interfere with the accomplishment of the unit or individual mission(s), a commander should consider such factors as the safe and effective operation of weapons, work center equipment and machinery, as well as wear of protective clothing or equipment.  Commanders should also state in the endorsement or approval how the religious accommodation may need to be modified in operational, non-operational or training environments.

BUPERSINST 1730.11A
16 Mar 2020

(a) Head Coverings. As delineated in Table 1, religious accommodations for Sailors on all duty types to wear neat and conservative religious head coverings such as (but not limited to) a hijab, turban, kufi, kippah or yarmulke may be authorized at the O-6 CO/ISIC level based upon the operational environment and in line with reference (c). Except in the case of safety or protective headgear required by a Sailor's duties, position or assignment, Sailors granted a religious accommodation for head coverings are not required to wear military headgear in addition to their religious head covering if such military headgear would violate their sincerely held religious beliefs.

(b) Unshorn/Long Hair. As delineated in Table 1, waivers of Navy policy for male Sailors on all duty types to wear unshorn/long hair must be sent to CNO N1 for decision.

(c) Beards. As delineated in Table 1, waivers of Navy policy for Sailors on all duty types to wear a beard must be sent to CNO N1 for decision. Approved unshorn beards must be worn in a neat and conservative manner. When a Sailor is authorized to wear a beard of greater than 2 inches in length, the beard must be rolled, tied and/or otherwise groomed to achieve a length not to exceed 2 inches when measured from the bottom of the chin.

(5) Deoxyribonucleic Acid (DNA) Specimen Sampling. Waiver requests from participation in DNA specimen collection should be forwarded to CNO N1 for final adjudication. BUMED will be consulted prior to final adjudication.

(6) Other Religious Accommodation Requests. All other religious accommodation requests requiring a policy waiver not specified under this section will be routed to CNO N1 via OPNAV N13 for adjudication.

e. Routing. For those requests that require a waiver of policy:

(1) A requestor seeking a waiver of Navy policy must submit a request in writing through his or her commander using the template at enclosure (1). The requestor must state the waiver sought and may elaborate on the sincerely-held religious beliefs or circumstances motivating the request.

(2) Every requestor seeking religious accommodation requiring a waiver of Navy policy must interview with a Navy chaplain. The chaplain will assess whether the requestor's religious beliefs appear sincerely-held, and will forward an evaluation to the commander using the templates provided in enclosures (2) and (3).

(3) Commanders will take appropriate action on requests to stay within the timelines in subparagraph 5(c). Requests forwarded by a commander to the O-6 CO/ISIC or to CNO N1 must include enclosures (1) through (4). There are no additional requirements.

(4) A copy of all waivers of uniform or grooming policy authorized at the O-6 CO/ISIC level must be forwarded via e-mail to OPNAV N13 for record keeping purposes at

ALTN_Navy_Religious_Accommodations@navy.mil.  Requests forwarded from the O-6 CO/ISIC level to CNO N1 for adjudication must also be sent to that email address.  Forwarding waiver requests to OPNAV N13 via mail is highly discouraged and can potentially delay a decision for a Sailor.

(5)  For commands that do not have regular Navy/Marine Corps Intranet email accounts (e.g., overseas, sea duty or joint commands), email OPNAV N13 at ALTN_Navy_Religious_Accommodations@navy.mil first before sending attachments.

(6)  If the request contains Personally Identifiable Information (PII), the request must be labelled and encrypted appropriately.

(7)  A requestor who reports directly to another U.S. military service must route religious accommodation requests to the authority specified in the policies of that military service.  Sailors assigned to a Joint command will route requests to their respective Navy Element Commander for approval or recommendation to CNO N1 as delineated in Table 1.  In all circumstances Sailors will adhere to the provisions set forth in subparagraph 4a.

(8)  Questions from commands and requesters concerning religious accommodation requests may be referred to ALTN_Navy_Religious_Accommodations@navy.mil.

f.  Appeals

(1)  Appeals of command-level adjudication will be forwarded to the commander's O-6 CO/ISIC for adjudication.  Appeals of O-6 CO/ISIC level adjudication will be forwarded to CNO N1 for adjudication within 15 days from the date the requestor submits the appeal.  Appeals of CNO N1 adjudication will be forwarded to the Chief of Naval Operations (CNO) for final adjudication, unless other direction is provided in reference (a) or (b).

(2)  When a religious accommodation request is denied, the requestor may renew the request upon a change in physical, operational or geographical environment, or at any time in which there is a change to pertinent policy.

g.  Approval Duration, Withdrawal and Suspension.  Religious accommodations are subject to review, suspension or revocation, in whole or in part, any time there is a change in the circumstances upon which the initial religious accommodation was based (e.g., new duty assignment, temporary duty or other material change in circumstances).  However, an approved religious accommodation remains in effect until the commander or future commander notifies the Sailor or candidate in writing that a compelling government interest requires suspension or revocation of the accommodation.  The written notification must include the nature of the changed circumstances and specify the reason for the revocation and the length of the suspension.

BUPERSINST 1730.11A
16 Mar 2020

(1)  The authority to temporarily suspend a previously approved religious accommodation resides with the Sailor's CO, while the authority to permanently revoke a previously approved religious accommodation remains with CNO N1.  A commander may suspend or initiate revocation of an approved religious accommodation only upon a determination that a compelling government interest requires such suspension or revocation and that no less restrictive means of furthering that compelling government interest are available.  The decision to suspend or initiate revocation of an approved religious accommodation must be informed by the factors enumerated in this instruction.

(2)  A commander may require immediate compliance with suspension of a religious accommodation only if necessary due to an imminent threat to health or safety.  In any case in which there is no imminent threat, the Sailor or candidate must be given five business days to submit an appeal using the process described in subparagraph 5f(1).  The religious accommodation will remain in effect until the appeal process is completed.  When necessary, a Sailor may be assigned to temporary additional duty orders to protect him or her from circumstances that are incompatible with the religious accommodation while the appeal is being adjudicated.

(3)  When there is a change in military duties or requirements, a commander may suspend a previously approved religious accommodation if the suspension furthers a compelling government interest and is the least restrictive means available to further that interest.  For example, a Sailor with a grooming waiver authorizing him to wear a beard may be required to shave the beard to deploy to an area in which there is a high risk that the Sailor will have to don a gasmask.  When the conditions that required the suspension are no longer present, the Sailor may resume the religious practice per the original waiver.  There is no requirement for a Sailor to resubmit a request for a religious accommodation that has been suspended.

6.  Records Management

a.  Records created as a result of this instruction, regardless of format or media, must be maintained and dispositioned for the standard subject identification codes (SSIC) 1000 through 13000 series per the records disposition schedules located on the Department of the Navy/Assistant for Administration (DON/AA), Directives and Records Management Division (DRMD) portal page at https://portal.secnav.navy.mil/orgs/DUSNM/DONAA/DRM/Records-and-Information-Management/Approved%20Record%20Schedules/Forms/AllItems.aspx.

b.  For questions concerning the management of records related to this instruction or the records disposition schedules, please contact your local records manager or the DON/AA DRMD program office.

7.  Review and Effective Date.  Per OPNAVINST 5215.17A, OPNAV N13 will review this instruction annually on the anniversary of its issuance date to ensure applicability, currency and consistency with Federal, Department of Defense, SECNAV and Navy policy and statutory authority using OPNAV 5215/40 Review of Instruction.  This instruction will be in effect for 5 years unless revised or cancelled in the interim, and will be reissued by the 5-year anniversary

11

BUPERSINST 1730.11A
16 Mar 2020

date if it is still required, unless it meets one of the exceptions in OPNAVINST 5215.17A, paragraph 9. Otherwise, if the instruction is no longer required, it will be processed for cancellation following the guidance in OPNAV Manual 5215.1 of May 2016.

JOHN B. NOWELL, JR
Deputy Chief of Naval Operations
(Manpower, Personnel, Training,
and Education)

Releasability and distribution:
This instruction is cleared for public release and is available electronically only via BUPERS/NAVPERSCOM Web site, https://www.public.navy.mil/bupers-npc/reference/Pages/default.aspx

12

BUPERSINST 1730.11A
16 Mar 2020


SAMPLE REQUEST FOR WAIVER OF POLICY TO ACCOMMODATE A RELIGIOUS
PRACTICE (TEMPLATE)

(Date)


From:  Rate or rank, as applicable, full name, branch and type of service as applicable
To:    Appropriate authority per Table 1 or Table 2 (i.e., O-6 CO/ISIC or CNO N1)
Via:   Appropriate authority per Table 1 or Table 2 (i.e., CO, O-6 CO/ISIC)

Subj:  REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

Ref:   (a) DoD Instruction 1300.17 of 10 February 2009
       (b) SECNAVINST 1730.8
       (c) BUPERSINST 1730.11
       (d) Other references as needed

Encl:  (1) Photograph or graphic (as needed to show the neat and conservative color, manner of
wear, etc.)
       (2) Optional enclosures (e.g., religious leader endorsement or research in applicable area)


1.  Pursuant to references (a) through (c), I hereby request religious accommodation from Navy
policy (use reference as needed) to ___(describe the specific practice(s)) _____ due to my
religious belief that _____(paraphrase religious basis of the request)__.


2.  My request is based on my religious belief that_____ (provide a detailed explanation
here as desired)_____ and reference enclosure (1) or (2) as needed/desired.


3.  (Required statement) I certify that I understand that any approved or partially approved
waiver may not be appropriate for future duty to which I may be assigned, including operational,
non-operational or training command(s), and may be suspended or withdrawn in accordance with
reference (c).


_____
(Signature)

BUPERSINST 1730.11A
16 Mar 2020

## CHAPLAIN INTERVIEW CHECKLIST TEMPLATE

| Requestor: | Interview Date: |
|---|---|
| Name: | Chaplain Interviewer: |
| Phone: | Phone: |
| Email: | E-mail: |
| Command: | Chaplain's Command: |

| Interview Preliminaries | | | |
|---|---|---|---|
| Yes | No | N/A | |
| | | | Chaplain reviewed policy and doctrine on religious accommodation and the policy for which the requestor is seeking accommodation. |
| | | | Applicant was notified that the interview is not confidential and will be used to advise the command. |
| | | | Chaplain explained to the applicant that confidential support can be received from another chaplain. |
| | | | Applicant has been granted a waiver for this practice previously. |
| | | | Applicant's Page 2 (NAVPERS 1070/602) reflects the belief cited in the application. |

| Type of Waiver Requested | | | |
|---|---|---|---|
| Yes | No | N/A | |
| | | | Uniform standards |
| | | | Grooming standards |
| | | | Immunization requirements |
| | | | DNA sampling |
| | | | Other (Please describe): |

| Interview | | | |
|---|---|---|---|
| Yes | No | N/A | |
| | | | Requestor's religious beliefs seemed honestly and sincerely held using one or more of the following factors: |
| | | | 1.  Requestor was credible (consistently keeps tenets, practices, etc.). |
| | | | 2.  Requestor's demeanor and pattern of conduct are consistent with the request. |
| | | | 3.  Requestor participates in activities associated with the belief(s). |
| | | | 4.  Other persons supporting the claim are credible. |
| | | | 5.  Request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim. |
| | | | Alternate means of accommodating the practice were explored in the interview. |

| Process Checklist | | | |
|---|---|---|---|
| Yes | No | N/A | |
| | | | Chaplain has prepared a memorandum documenting the interview. |
| | | | Chaplain reviewed memorandum with applicant and provided a copy. |
| | | | Chaplain submitted the memorandum and this document to the commanding officer via chain of command. |
| | | | Chaplain referred applicant to command to process request. |

BUPERSINST 1730.11A
16 Mar 2020

<u>CHAPLAIN MEMORANDUM FOR THE RECORD (TEMPLATE)</u>

From:   [Chaplain's rank and name], CHC, USN
To:       [Commanding Officer of requestor]

Subj:   REQUEST FOR A WAIVER OF POLICY TO ACCOMMODATE PRACTICE
           BASED ON RELIGIOUS BELIEF ICO [REQUESTOR'S RANK, NAME]

Ref:     (a) SECNAVINST 1730.8
           (b) SECNAVINST 1730.9

1.  (Requestor's rank and name) has submitted a request for accommodation of a religious
practice per reference (a).  Per BUPERSINST 1730.11A, I interviewed the requestor on (date).  I
explained that this interview would not be a confidential communication as defined by reference
(b) and informed the requestor that referral for confidential chaplain support was available.

2.  Nature of the request.  (Provide a narrative summary of the request for religious
accommodation and whether or not the requestor has previously had this or any other related
request approved or denied)

3.  Basis.  (Identify the religious beliefs on which the accommodation request is based and
provide a professional and objective opinion regarding the religious importance of the request to
the member.  Include the requestor's religion as listed on NAVPERS 1070/602 (Page 2).

4.  Alternate Means.  (Indicate alternate means of meeting the request)

5.  Sincerity.  (Assess the sincerity of the requestor. The memorandum should focus on the
sincerity of the member's personal religious beliefs, including the information provided during
the interview.)

6.  My contact information is (telephone number and e-mail address).


                                                    [Signature]


Copy to:
(Rank and name of requestor)

BUPERSINST 1730.11A
XX Mar 2020

<u>RELIGIOUS ACCOMMODATION APPROVAL OR ENDORSEMENT (TEMPLATE)</u>

(Date)

From:  Appropriate authority per Table 1 or Table 2
To:      Appropriate authority per Table 1 or Table 2
Via:     As applicable with appropriate authority per Table 1 or Table 2

Subj:  APPROVAL (or) APPROVAL/DISAPPROVAL RECOMMENDATION ICO (INSERT
          NAME HERE) RELIGIOUS ACCOMMODATION

Ref:    (a) DoD Instruction 1300.17
          (b) SECNAVINST 1730.8
          (c) BUPERSINST 1730.11A
          (d) Other references as needed including regional or operational policy

Encl:   (1) Sailor/accession request of DD MMM YY
          (2) Chaplain Memorandum and Interview Checklist
          (3) Other enclosures as needed (e.g., operational or regional policy)

1.  Per references (a) through (c)/(d), I am approving this request or I am forwarding this request
recommending approval/disapproval in full or in part during the following environments (as
applicable to the command):

    a.  Operational recommendation:

    b.  Non-operational recommendation:

    c.  Training environment recommendation:

2.  The following information was considered or is provided for consideration as applicable
(articulate the factual basis underlying any compelling government interest and why the denial or
partial denial is the least restrictive means available to protect the compelling government
interest over the individual request):

    a.  The importance of the military policy, practice or duty from which religious
accommodation is sought in terms of mission accomplishment, including:

      (1) Military readiness:

      (2) Unit cohesion:

      (3) Good order and discipline:

      (4) Health and safety:

BUPERSINST 1730.11A
XX Mar 2020

  b.   The religious importance of the practice to the requestor.

  c.   The cumulative impact of repeated accommodations of religious practices of a similar nature.

  d.  Alternate means available to accommodate the practice in whole or in part.

3.  Other pertinent issues or information associated with this request.

4.  My point of contact (POC) for this matter is _____ (insert POC here) who can be reached at _____(insert e-mail and telephone number  here).

5.  This approval/recommendation will be emailed to OPNAV N131 for review/decision within the timelines in reference (c).  Otherwise, Commander should provide the timeline/waiver of timeline here as applicable.


                                    _____
                                    (Signature)

Copy to:
OPNAV N131
Operational Commander(s),
Requestor, etc.

# Katson Declaration

# Exhibit B

# MILPERSMAN 1730-020

## IMMUNIZATION EXEMPTIONS FOR RELIGIOUS BELIEFS

| Responsible Office | OPNAV (N131) | Phone:          DSN<br>COM | 664-5015<br>(703) 604-5015 |
|---|---|---|---|

| MyNavy Career Center | Phone:  Toll Free<br>E-mail:<br>MyNavy Portal: | 1-833-330-MNCC (6622)<br>askmncc@navy.mil<br>https://my.navy.mil/ |
|---|---|---|

_____

| References | (a) DoD Instruction 1300.17 of 10 February 2009<br>(b) BUPERSINST 1730.11A<br>(c) BUMEDINST 6230.15B<br>(d) SECNAVINST 1730.9A<br>(e) SECNAVINST 1920.6D |
|---|---|

1.  **Policy**.  The Navy requires immunizations for all Sailors, based on its compelling interest in the health and safety of the military workforce.  Pursuant to references (a) and (b), religious exemptions of immunization requirements will include the justification and endorsements in paragraphs 4 and 5 of this article prior to routing to the Chief of Naval Personnel (CHNAVPERS) for decision.  Non-religious medical waivers of immunization requirements will be adjudicated by the health care provider as addressed in reference (c).

2.  **Authority**.  Authority to grant medical waivers of immunization requirements is vested at the Bureau of Medicine and Surgery (BUMED).  Authority to grant religious exemptions of immunization requirements is vested with CHNAVPERS.

3.  **Application Procedure**.  Service members requesting religious exemption of immunization requirements will forward their requests to CHNAVPERS via their commanding officers (CO) or immediate superiors in command.  Submission guidance for commands is provided in reference (b).

4.  **Contents of Service Member's Request**.  The request will include the following information:

    a.  Full name and grade,

b.   Immunization(s) exemption requested and the reason why the exemption is needed, and

c.   The following signed NAVPERS 1070/613 Administrative Remarks, using the following format:

---

"I request a waiver of the (state the type) immunization.  I hereby state that my request is based upon (religious objection to immunization or other reasons specifically described).  I acknowledge having received the following counseling:

1.   Failure to obtain immunization poses additional risk to my health upon exposure to disease.

2.   In the event of foreign travel, I may be detained during travel across foreign borders due to international health regulations.

3.   If granted, a waiver may be revoked by my commanding officer if I am at imminent risk of disease or due to international health regulations.

4.   If my job duties change, I may need to route a new request.

5.   If I am at my permanent change of station while my waiver is in effect, I may need to route a new request if my job duties change, my geographic region exposes me to the aforementioned disease, or other factors exist that could put me at imminent risk of disease.

Service Member's Signature

Witnessed:

---

5.   **Content of Commander's Endorsement**.  In line with reference (b), COs must endorse every request for religious accommodation through waiver of immunization requirements.  The content of the endorsement must include:

a.   An endorsement from a military chaplain in line with reference (d),

b.   A recommendation to approve or disapprove the request,

c.   Relevant information concerning the applicable operational or regional policies,

d.  Negative effect (if any) on mission accomplishment (i.e., military readiness, unit cohesion, good order, discipline, health, and safety),

e.  The number of Service members in the command that have been granted a similar exemption for non-religious purposes, and

f.  When recommending denial of the request, a determination that the denial furthers a compelling governmental interest (such as those identified in subparagraph 5d above), and that there is no less restrictive means of accommodating the request, such as an available alternative vaccination that meets both the religious need and the Navy's immunization requirements as determined by BUMED.

6.  **Applicant Counseling**.  COs will ensure applicants are counseled concerning the following, in line with subparagraph 4c above:

a.  The additional risk to health on exposure to disease against which the applicant will not be protected by a military physician who informs Service member of diseases concerned, and benefits and risks of vaccine;

b.  The possibility that the applicant may be detained during travel across international borders due to international health regulations; and

c.  The possibility that individuals granted such exemptions may have their waivers revoked if they are at imminent risk of disease (e.g., exposure to anthrax, measles, cholera, etc.) or due to international health regulations.

7.  **Revocation of Waiver by CO**.  COs may, without prior approval, revoke a Service member's authorized immunization waiver in the event of imminent risk of disease due to exposure or as a result of international health regulations incident to foreign travel.  If a Service member's immunization waiver is revoked, such action must be reported to CHNAVPERS and BUMED Public Health and Safety Division (M44) by message as soon as possible.

8.  **Administrative and Disciplinary Actions**

a.  In line with reference (a), Service members submitting requests for religious accommodations will comply with the

policy, practice, or duty from which they are requesting accommodation, unless or until the request is approved.

b.   Service members whose waivers have been disapproved, or those who refuse to take immunizations without approved waivers, may be subject to administrative and or disciplinary actions, as deemed appropriate by COs, for violation of a lawful order.

c.   Actions include:

(1) Formal counseling and warning recorded on NAVPERS 1070/613,

(2) Nonjudicial punishment,

(3) Court-martial, or

(4) Processing for administrative separation.

d.   See MILPERSMAN 1910-120, 1910-142, 1910-164, and 1910-402 for guidance on enlisted separations.  See reference (d) for officer separations.

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

---

**NAVY SEAL #1,** *et al.*

              Plaintiffs,

    v.

**JOSEPH R. BIDEN**, in his official capacity as
President of the United States, *et al.*

              Defendants.

Case No. 8:21-cv-02429-SDM-TGW

---

**DECLARATION OF CAPTAIN MERY-ANGELA SANABRIA KATSON, U.S. NAVY**

I, Captain Mery-Angela Sanabria Katson, U.S. Navy, hereby state and declare as follows:

    1.    I am a captain in the United States Navy, currently serving as the Branch Head, Enlisted Plans and Policy (OPNAV N132), located in Arlington, Virginia. I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

    2.    Subject to the data limitations and important context provided in my previous declaration, the attached exhibit reflects the data available as of February 3, 2022.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of February, 2022.

Mery-Angela Sanabria Katson

Captain, U.S. Navy

1

Exhibit 1 to Declaration of CAPT Katson

**U.S. Navy Court-Ordered Data**

Current as of 3 February 2022

(1) Number of religious exemption from COVID-19 vaccination:

| # Initial Requests Under Review | # Initial Request Approved | # Initial Requests Denied | # Denials Where Chaplain Determined Belief Sincere | Total Initial Requests |
|---|---|---|---|---|
| 285 | 0 | 3,728 | UNKNOWN | 4,095 |

| # Denials w/o Appeal Before Deadline[1] | # Appeals Under Review | # Appeals Denied | # Appeals Approved | Fully Resolved Requests | |
|---|---|---|---|---|---|
| | | | | Aggregate # of Approved Requests | Aggregate # of Denied Requests |
| UNKNOWN | 1,222 | 81 | 0 | 0 | 81 |

(2) Number of medical-exemption requests from COVID-19 vaccination:

| Temporary Medical Exemption Requests | # Medical Exemptions Denied | # Medical Exemptions Granted | | Total Medical Exemption Requests |
|---|---|---|---|---|
| | | Temporary[2] | Permanent | |
| UNKNOWN | UNKNOWN | 252 | 11 | UNKNOWN |

(3) Number of other exemptions from COVID-19 vaccination granted for any other reason (i.e. administrative exemptions):

| Emergency Leave | Permanent Change of Station (PCS) | Administrative Separation/ Terminal Leave | Administrative Temporary (i.e. no access to vaccine) |
|---|---|---|---|
| 0 | 50 | 410 | 35 |

(4) Number of courts-martial and separation proceedings pending or concluded against a service member whose request for a religious exemption was denied after appeal:

| Courts-Martial | | Administrative Separation (ADSEP) | |
|---|---|---|---|
| Pending | Concluded | ADSEP Initiated | ADSEP Completed |
| 0 | N/A | UNKNOWN | 240 |

---

[1] Appeals submitted after deadline will still be considered.

[2] This number reflects the total number of active temporary exemptions, but does not include expired medical exemptions. Absent a new exemption, a member is required to obtain the COVID-19 vaccine after their temporary medical exemption expires.

# Exhibit 5



# DoD Instruction 1332.45

# Retention Determinations for Non-Deployable Service Members

---

**Originating Component:**  Office of the Under Secretary of Defense for Personnel and Readiness

**Effective:**  July 30, 2018
**Change 1 Effective:**  April 27, 2021

**Releasability:**  Cleared for public release.  Available on the Directives Division Website at https://www.esd.whs.mil/DD/.

**Incorporates and Cancels:**  Office of the Under Secretary of Defense for Personnel and Readiness Memorandum, "DoD Retention Policy for Non-Deployable Service Members," February 14, 2018

**Approved by:**  Robert L. Wilkie, Under Secretary of Defense for Personnel and Readiness
**Change 1 Approved by:**  Virginia S. Penrod, Acting Under Secretary of Defense for Personnel and Readiness

---

**Purpose:**  In accordance with the authority in DoD Directive 5124.02, this issuance:

- Establishes policy, assigns responsibilities, and provides direction for retention determinations for non-deployable Service members.

- Provides guidance and instructions for reporting deployability data for the Total Force.

DoDI 1332.45, July 30, 2018
Change 1, April 27, 2021

# TABLE OF CONTENTS

SECTION 1:  GENERAL ISSUANCE INFORMATION ................................................................. 4
  1.1.  Applicability. ............................................................................................................... 4
  1.2.  Policy. ......................................................................................................................... 4
  1.3.  Information Collections. .............................................................................................. 4
  1.4.  Summary of Change 1. ................................................................................................ 4
SECTION 2:  RESPONSIBILITIES .......................................................................................... 6
  2.1.  Under Secretary of Defense for Personnel and Readiness (USD(P&R)). ...................... 6
  2.2.  Assistant Secretary of Defense for Manpower and Reserve Affairs (ASD(M&RA)). ..... 6
  2.3.  Assistant Secretary of Defense for Health Affairs. ......................................................... 6
  2.4.  Secretaries of the Military Departments. ......................................................................... 6
SECTION 3:  PROCEDURES .................................................................................................. 8
  3.1.  Tracking. ....................................................................................................................... 8
  3.2.  Reporting. ..................................................................................................................... 8
  3.3.  Deployable with Limitations. ......................................................................................... 9
  3.4.  Training and Transient. ................................................................................................. 9
    a.  Initial Entry Training. .............................................................................................. 9
    b.  Cadets and Midshipman. .......................................................................................... 10
    c.  All Other Training. ................................................................................................... 10
    d.  Transient. ................................................................................................................. 10
  3.5.  Temporary Non-Deployable Categories. ....................................................................... 10
    a.  Medical. .................................................................................................................. 10
    b.  Legal. ...................................................................................................................... 11
    c.  Administrative. ........................................................................................................ 11
  3.6.  Permanent Non-Deployable Categories. ....................................................................... 13
    a.  Medical. .................................................................................................................. 13
    b.  Administrative. ........................................................................................................ 13
    c.  Approved for Retention. ........................................................................................... 14
  3.7.  IMR Deficits. ............................................................................................................... 14
    a.  Overdue PHA. .......................................................................................................... 14
    b.  Dental Readiness (Dental Class 3). ........................................................................... 14
    c.  Overdue Dental Screening (Dental Class 4). .............................................................. 14
    d.  Additional IMR Categories. ...................................................................................... 15
  3.8.  Prioritization of Service Members by Category. ............................................................ 15
    a.  Deployed. ................................................................................................................ 15
    b.  Deployable with Limitations. .................................................................................... 15
    c.  Approved for Retention. ........................................................................................... 15
    d.  Permanent Non-Deployable. ..................................................................................... 15
    e.  Training and Transient. ............................................................................................. 16
    f.  Temporary Non-Deployable. ..................................................................................... 16
    g.  IMR Deficits. .......................................................................................................... 16
SECTION 4:  RETENTION DETERMINATION .......................................................................... 18
  4.1.  Retention Authority for Non-Deployable Service Members. ........................................... 18

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

4.2.  Retention Determination. ............................................................................................... 18

4.3.  Special Categories. ........................................................................................................... 19

SECTION 5:  AUTHORITIES FOR SEPARATIONS AND RETIREMENTS ............................................... 20

GLOSSARY .......................................................................................................................................... 21

G.1.  Acronyms. ......................................................................................................................... 21

G.2.  Definitions. ........................................................................................................................ 21

REFERENCES ....................................................................................................................................... 23

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 1:  GENERAL ISSUANCE INFORMATION

## 1.1.  APPLICABILITY.

This issuance applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this issuance as the "DoD Components").

## 1.2.  POLICY.

It is DoD policy that:

   a.  To maximize the lethality and readiness of the joint force, all Service members are expected to be deployable.

   b.  Service members who are considered non-deployable for more than 12 consecutive months will be evaluated for:

      (1)  A retention determination by their respective Military Departments.

      (2)  As appropriate, referral into the Disability Evaluation System (DES) in accordance with DoD Instruction (DoDI) 1332.18 or initiation of processing for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30.  This policy on retention determinations for non-deployable Service members does not supersede the policies and processes concerning referral to the DES or the initiation of administrative separation proceedings found in these issuances.

   c.  Implementation for this policy is October 1, 2018.

## 1.3.  INFORMATION COLLECTIONS.

The Monthly Non-deployable Report, referred to in Paragraph 3.2. of this issuance, has been assigned report control symbol DD-P&R(M)2671 in accordance with the procedures in Volume 1 of DoD Manual 8910.01.  The expiration date of this collection is listed in the DoD Information Collections Website at https://www.esd.whs.mil/Directives/collections_int/.

## 1.4.  SUMMARY OF CHANGE 1.

The changes to this issuance:

   a.  Reflect updates to reporting tracking procedures (Paragraph 3.1. of this issuance) and timelines (Paragraph 3.2. of this issuance).

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

b.  Provide additional clarity for reporting temporary non-deployable categories (Paragraph 3.5. of this issuance) and individual medical readiness (IMR) deficits (Paragraph 3.7. of this issuance).

c.  Update the formatting according to new issuance template guidelines.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 2:  RESPONSIBILITIES

## 2.1.  UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).

The USD(P&R) establishes and oversees policy on retention determinations for non-deployable Service members.

## 2.2.  ASSISTANT SECRETARY OF DEFENSE FOR MANPOWER AND RESERVE AFFAIRS (ASD(M&RA)).

Under the authority, direction, and control of the USD(P&R), the ASD(M&RA):

a.  Develops policy on the retention of non-deployable Service members.

b.  Monitors the implementation of this guidance.

c.  Tracks the number of non-deployable Service members and those non-deployable Service members retained in military service and the justification for such retention, in accordance with Section 3 of this issuance.

## 2.3.  ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS.

Under the authority, direction, and control of the USD(P&R), the Assistant Secretary of Defense for Health Affairs:

a.  Develops policy recommendations to the USD(P&R) for uniform retention medical standards in coordination with the Secretaries of the Military Departments.

b.  Provides oversight of related medical policies and programs.

## 2.4.  SECRETARIES OF THE MILITARY DEPARTMENTS.

The Secretaries of the Military Departments:

a.  Will:

(1)  Determine the deployability status of Service members.

(2)  Make retention determinations consistent with this issuance for Service members who have been non-deployable for more than 12 consecutive months.

(3)  Submit monthly reports identifying the number of non-deployable Service members for all components within their Departments to the Office of the USD(P&R) in accordance with Paragraph 3.2. of this issuance.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(4)  Monitor compliance with requirements established in DoDI 6025.19 to ensure required evaluations, assessments, and other medically related actions are accomplished to improve individual and overall unit readiness.

b.  May:

(1)  Retain in service those Service members whose period of non-deployability exceeds the 12 consecutive month limit in Paragraph 1.2. of this issuance if determined to be in the best interest of the Military Service.

(2)  Delegate the authority in Paragraph 2.4.(b)(1) of this issuance to retain in service those Service members whose period of non-deployability exceeds the 12 consecutive month limit.  Such a delegation must be in writing, and may only be made to Presidentially Appointed, Senate-Confirmed officials; Senior Executive Service members; or general/flag officers serving at the Military Department or Service headquarters.

(3)  Initiate administrative separation processing, or referral to the DES, as appropriate, prior to a non-deployable Service member being in a non-deployable status for 12 months when the Military Service determines there is a reasonable expectation that the reason will not be resolved and the Service member will not become deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 3: PROCEDURES

## 3.1. TRACKING.

a. The Military Departments will monitor and track the number of Service members by Military Service that are:

(1)  Non-deployable in accordance with the categories established in Paragraphs 3.5. and 3.6. of this issuance.

(2)  Deployable with limitations in accordance with Paragraph 3.3. of this issuance.

(3)  Deployable but have IMR deficits in accordance with Paragraph 3.7. of this issuance.

(4)  In training or in a transient status in accordance with the category defined in Paragraph 3.4. of this issuance.

b. To ensure accurate and consistent accounting across the DoD, Military Services will account for Service members in only one category.

(1)  If a Service member can be accounted for in more than one category, the Service member will be counted only once and in the category with the highest priority listed in accordance with Paragraph 3.8. of this issuance.

(2)  This restriction does not apply to Service members who may also be counted as IMR deficits in accordance with Paragraph 3.7. of this issuance.  In addition to the categories listed in Paragraphs 3.3. through 3.6. of this issuance, Service members with IMR deficits will also be counted in accordance with Paragraph 3.8.g. of this issuance.

## 3.2. REPORTING.

a. The Secretaries of the Military Departments will report to the ASD(M&RA) the number of non-deployable personnel (and other categories as provided in this section) for all Military Services, and their respective components, on a monthly basis.

(1)  The format for the Monthly Non-deployable Report can be found at https://prhome.defense.gov/M-RA/Inside-M-RA/MPP/OEPM/.

(2)  Reports are due **no later than** the 20th of each month with data current as of the last day of the previous month.  For example, the May Non-deployable Report is due by June 20th with non-deployable data as of May 31st.  Reports will be accepted earlier if available.

b. The number of non-deployable Service members is reported by categories, either temporary or permanent, and grouped into medical, legal, or administrative sub-categories.  Each sub-category is further broken down to account for the specific reasons or conditions that make a Service member non-deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

c.  The number of Service members who are deployable with limitations, in accordance with Paragraph 3.3. of this issuance, will be categorized separately on the monthly report.  Such Service members are not to be counted in the non-deployable populations.

d.  The number of Service members who require urgent or emergent dental treatment for dental readiness (Dental Class 3), are overdue for annual dental screening (Dental Class 4), or are overdue for a Periodic Health Assessment (PHA) are reported as IMR Deficits in accordance with Paragraph 3.7. of this issuance.  Such Service members are not counted in the non-deployable populations.

e.  The number of Service members who are in a training or transient status are reported in one of the four categories listed in Paragraph 3.4. of this issuance.

## 3.3.  DEPLOYABLE WITH LIMITATIONS.

Service members with a medical condition that requires additional medical screening, or Combatant Command approval prior to deployment outside the continental United States, will be categorized as Deployable with Limitations.  This includes, but is not limited to, conditions referred to in DoDI 6490.07.

## 3.4.  TRAINING AND TRANSIENT.

The Training and Transient category provides a means to track the human resources necessary to maintain a healthy force, within current end strength constraints.  This category contains Service members who are not immediately ready for deployment and fall into one of the following four categories:

### a.  Initial Entry Training.

These Service members are:

(1)  Enlisted Service members at recruit training, initial skill training, and other proficiency or developmental training accomplished before moving to the member's first permanent duty assignment.  This includes all in-transit time commencing upon entry into active service, through completion of the final course of initial entry training that terminates enlisted trainee status.

(2)  Enlisted trainees who enter officer candidate school, officer training school, and Service academy preparatory school following enlistment on active duty.  These members will be considered:

(a)  Enlisted trainees from initial entry on active duty until commissioning.

(b)  Upon commissioning, officer accession students and will remain in the initial entry training category for any subsequent initial entry training, or until they begin travel to their first permanent duty assignment.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(3)  Officers at officer basic courses, and all initial skill and proficiency training taken before travel to the Service member's first permanent duty assignment.  This includes all in-transit time from entry on active duty until completion of the last initial entry course of instruction.

(4)  Reserve Component (RC) Service members (enlisted and officer) who enter the Ready Reserve and are awaiting initial entry training.

### b.  Cadets and Midshipman.

These are individuals currently attending the U.S. Military Academy, the U.S. Air Force Academy, or the U.S. Naval Academy.  In accordance with Section 115 of Title 10, United States Code (U.S.C.), cadets and midshipman are counted in the active duty end strength for their respective Service, but by policy are non-deployable while attending school.

### c.  All Other Training.

These are Service members who are attending training that is 20 weeks or more in length, and is conducted after their initial entry training.  Examples include Command and Staff Colleges, Senior Service College, the United States Army Sergeants Major Academy, medical residencies, and all other post-graduate professional education opportunities.

### d.  Transient.

These are Service members who are not available for duty while executing permanent change of station orders at the time of the report.  This category does not include military personnel who are:

(1)  On temporary duty for training between permanent duty stations, or;

(2)  Moving between entry-level courses of instruction, specifically Service members who have departed from one duty station and are in transit but have not yet reported for duty at the next permanent duty station.

### 3.5.  TEMPORARY NON-DEPLOYABLE CATEGORIES.

### a.  Medical.

Service members are considered temporarily non-deployable for one of three reasons:

### (1)  Patient.

In accordance with DoDI 1120.11, Service members who are hospitalized and are projected to heal, recover, and return to full duty in less than 12 months are temporarily non-deployable.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(2)  Medical Condition That Limits Full Duty.

Service members who have temporary profiles or are in limited duty status are counted as temporarily non-deployable.  Light duty will not be reported as non-deployable unless the duration exceeds 30 days, with discretion given to the medical officer to extend light duty status for up to 60 days, making light duty no longer than 90 days for conditions expected to recover or stabilize within that time.  Service members who are considered to be classified as light duty are considered deployable and expected to be able to deploy, at the local commander's discretion, despite the medical condition causing their light duty status.

(3)  Pregnancy (including post-partum).

Service members who are pregnant or in the post-partum phase are temporarily non-deployable.  The post-partum phase ranges from 6 to 12 months after childbirth for female Service members and is determined by individual Service policy.

**b.  Legal.**

Service members are considered temporarily non-deployable for one of two reasons:

(1)  Prisoner.

Service members convicted by civilian or military authorities and sentenced to confinement of more than 30 days, but for 6 months or less, are temporarily non-deployable. Service members confined for more than 6 months are not included in end strength numbers and will not be included in the monthly non-deployability report.

(2)  Legal Action.

Service members who are under arrest, confined 30 days or less, pending military or civil court action, under investigation, a material witness, on commander directed hold, pending non-judicial punishment action under Section 815 of Title 10, U.S.C., also known as Article 15 of the Uniformed Code of Military Justice (UCMJ), or pending discharge based on action under the UCMJ are temporarily non-deployable.

**c.  Administrative.**

These Service members are considered temporarily non-deployable for one of eight reasons:

(1)  Absent Without Leave or Unauthorized Absence.

Service members who are absent without leave, as defined in Section 886 of Title 10, U.S.C., also known as Article 86 of the UCMJ, will be considered as temporarily non-deployable.

(2)  Family Care Plan.

In accordance with DoDI 1342.19, Service members required but failing to have a family care plan in place are temporarily non-deployable.

(3)  Adoption.

Service members who are single parents or one member of a dual military couple and are adopting a child are temporarily non-deployable.  They are non-deployable for at least 6 months after the child is placed in the home, or longer dependent on the administrative stabilization period prescribed by the jurisdiction in which the adoption occurred.

(4)  Service Member Under 18.

Service members who are not yet 18 years of age are temporarily non-deployable.  The Child Soldier Prevention Act of 2007 prohibits Service members under the age of 18 from taking part in hostilities as a member of governmental armed forces.

(5)  Humanitarian Assignment.

Service members assigned to a location to provide support to a family member are temporarily non-deployable.  These Service members typically receive 12 to 24 months stabilization by Military Service policy.

(6)  Service Discretion.

Military Services may designate Service members temporarily non-deployable when the previous categories do not apply.  Examples include:

(a)  Simultaneous Membership Program or Officer Candidate School.

(b)  Education stabilization; mobilization deferral for affiliation after release from Active Component.

(7)  Pending Administrative Separation.

Service members being processed for administrative separation are temporarily non-deployable.

(8)  Unsatisfactory Participants or Administrative Action Pending (RC Only).

Service members who are determined to be unsatisfactory participants (defined in DoDI 1215.13 as a Service member that has nine unexcused absences within a 12-month period or fail to perform prescribed periods of active duty for training), are considered temporarily non-deployable, after the 90 day recovery period has elapsed.  The Military Services will have no more than 90 days to recover the unsatisfactory participant before the unsatisfactory participant is counted as temporarily non-deployable.  The Military Services will determine when an RC

Service member who was classified as an unsatisfactory participant is considered recovered, and no longer counted as non-deployable.

## 3.6.  PERMANENT NON-DEPLOYABLE CATEGORIES.

### a.  Medical.

Service members are considered non-deployable for one of three reasons listed below.

#### (1)  Permanent Limited Duty.

Service members with a medical condition that permanently prevents deployment are non-deployable.  This includes Service members processed through the DES who are not deployable and were retained in the Military Service.  In accordance with Section 1214a of Title 10, U.S.C., Service members cannot be involuntarily administratively separated or denied reenlistment due to unsuitability based solely on the medical condition considered in the evaluation unless the request to separate the Service member is approved by the Secretary of Defense.  The Military Service may direct the Service member to reenter the DES process to be reconsidered for retirement or separation for disability.

#### (2)  Enrolled in DES.

In accordance with DoDI 1332.18, Service members currently enrolled in the DES process are non-deployable.  That includes those pending separation or retirement after receiving a "not fit for duty" determination through the DES.

#### (3)  Permanent Profile Non-duty Related Action Needed (RC).

Those RC Service members who have a permanent profile and are pending a decision on a line of duty determination are non-deployable.

### b.  Administrative.

These Service members are considered non-deployable for one of three reasons:

#### (1)  Sole Survivor, Surviving Family Member, or Deferred from Hostile Fire Zone.

Service members who acquired the status in accordance with DoDI 1315.15 are non-deployable.

#### (2)  Unable to Carry a Firearm.

Service members who are subject to the provisions of Section 922 of Title 18, U.S.C. are non-deployable.

    (3)  Conscientious Objector.

Service members who are granted restriction of military duties in accordance with DoDI 1300.06 are non-deployable.

### c. Approved for Retention.

This category accounts for Service members who are retained by the Military Department despite being in a non-deployable status for 12 months or longer.  Service members who the Military Departments retained in Service and are considered non-deployable for one of two reasons:

    (1)  Combat Wounded.

These are Service members whose injuries were the result of hostile action, meet the criteria for awarding of the Purple Heart, and whose injuries were not the result of their own misconduct.

    (2)  Other.

These are Service members who are not designated as combat wounded but are non-deployable and retained in the Military Service by the Secretary of the Military Department in accordance with Paragraph 2.4. of this issuance.

### 3.7.  IMR DEFICITS.

These IMR categories are not considered non-deployable conditions.  While Service members who do not have a current PHA (completed) or whose dental readiness assessment is classified as either Dental Class 3 or Dental Class 4 are not medically ready to deploy, they will not be reported in the non-deployable population.  Components are expected to immediately correct all IMR deficits to ensure Service members are medically ready to deploy.

### a. Overdue PHA.

These Service members are not compliant with the requirement to complete a PHA in accordance with DoDI 6025.19.

### b. Dental Readiness (Dental Class 3).

Service members who require urgent or emergent dental treatment.

### c. Overdue Dental Screening (Dental Class 4).

Service members who are not compliant with the requirement to complete a dental screening in accordance with DoDI 6025.19.

### d.  Additional IMR Categories.

In addition to dental categories (Dental Classes 3 and 4) and PHAs, the Military Departments track three additional areas of IMR:  immunization status, medical readiness and laboratory studies, and individual medical equipment.  In accordance with DoDI 6025.19, Service members who are not current in these areas are considered partially-medically ready.

### 3.8.  PRIORITIZATION OF SERVICE MEMBERS BY CATEGORY.

This paragraph sets the prioritization for the grouping of Service members into categories to provide consistent reporting among the Military Departments, in accordance with Paragraph 3.1.b. of this issuance.  With the exception of Service members who may be accounted for in IMR deficits, in accordance with Paragraph 3.1.b.(2) of this issuance, Service members will be counted only once, in a single category; Service members who may fall into more than one category will be reported in the priorities established in this paragraph.  These categories are listed below in descending order of priority.

### a.  Deployed.

This category includes Service members who are currently deployed.  These Service members will not be counted in any other category (including deployable with limitations or approved for retention).

### b.  Deployable with Limitations.

### c.  Approved for Retention.

(1)  Combat wounded – Non-deployable but retained.

(2)  Other – Non-deployable but retained.

### d.  Permanent Non-Deployable.

(1)  Medical permanent limited duty.

(2)  Administrative.

(a)  Sole survivor, surviving family member, or deferred from hostile fire zone.

(b)  Unable to carry a firearm (e.g., Lautenberg Amendment).

(c)  Conscientious objector.

(d)  Ex-prisoner of war.

(3)  Medical Enrolled in DES.

(4)  Permanent profile non-duty related action needed (RC).

**e.  Training and Transient.**

(1)  Initial entry training.

(2)  Cadets or Midshipmen.

(3)  All other training.

(4)  Transient (permanent change of station).

**f.  Temporary Non-Deployable.**

(1)  Medical.

(a)  Patient (assigned to "Individuals Account").

(b)  Medical condition that limits full duty.

(c)  Pregnancy (including post-partum).

(2)  Legal.

(a)  Prisoner.

(b)  Legal Action.

(3)  Administrative.

(a)  Absence without leave.

(b)  Family Care Plan.

(c)  Adoption.

(d)  Service member under 18.

(e)  Humanitarian assignment.

(f)  Service Discretion.

(g)  Pending Administrative Separation.

(h)  Unsatisfactory participants or admin action pending (RC).

**g.  IMR Deficits.**

Service members with IMR deficits may be counted as both overdue PHA and as either Dental Class 3 or Dental Class 4.

(1)  Overdue PHA.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

(2)  Dental readiness (Dental Class 3).

(3)  Overdue dental screening (Dental Class 4).

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 4: RETENTION DETERMINATION

## 4.1. RETENTION AUTHORITY FOR NON-DEPLOYABLE SERVICE MEMBERS.

In accordance with Paragraph 2.4. of this issuance, the Secretaries of the Military Departments have retention authority.

## 4.2. RETENTION DETERMINATION.

a. The Secretaries of the Military Departments may retain Service members who are non-deployable in excess of 12 consecutive months, on a case-by-case basis, if determined to be in the best interest of the Service, based on:

(1) The Service member's ability to perform appropriate military duties commensurate with his or her office, grade, rank, or skill.

(2) The likelihood that the Service member will resolve the condition or reason that is the underlying cause of his or her non-deployable status.

b. The Secretaries of the Military Departments may approve retention for Service members who are non-deployable in excess of 12 consecutive months for up to:

(1) The length of time remaining on a Service member's enlistment contract; or

(2) Three years for officers, including warrant officers, and those enlisted members serving on indefinite contracts.

(3) Upon expiration of the retention period, the Secretary of the Military Department concerned may renew retention for a Service member on a case-by-case basis for periods stated in this paragraph.

c. The Secretaries of the Military Departments may establish procedures for Service members who are or will be non-deployable for 12 months or longer due to an administrative reason to request retention consideration.

d. Approval of the retention for Service members who are non-deployable for 12 months or longer will only be made for individual Service members, not an entire cohort or skill set of Service members.

e. Except as required by DoDI 1332.18, the Secretaries of the Military Departments may request from the Secretary of Defense the authority to automatically exempt Service members serving in specified positions from the requirement for a retention determinations pursuant to Paragraph 2.4.b.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

f.  When appropriate, Service members not recommended for further retention will be considered for processing for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30, or referral for disability separation in accordance with DoDI 1332.18.

## 4.3.  SPECIAL CATEGORIES.

a.  Pregnant and post-partum Service members, as a group, are exempt from Paragraph 2.4.a., for pregnancy-related health conditions during pregnancy through the post-partum period.

b.  The Secretaries of the Military Departments have the authority to retain combat wounded Service members who have been evaluated through the DES and whose reason for non-deployability is a direct result of their combat wounds, if requested by the Service member.

(1)  Disapproval of retention for non-deployable combat wounded Service members, who wish to be retained and whose reason for non-deployability is a direct result of their combat wounds, may not be delegated.

(2)  Retention will be authorized in accordance with Paragraph 4.2.b.

c.  Unless found unfit for duty through the DES, Service members serving in specified positions approved by the Secretary of Defense pursuant to Paragraph 4.2.e. are exempt from requiring a retention determination based solely on being in a non-deployable status for 12 months or longer.  Upon reassignment, these Service members will again require a retention determination in accordance with Paragraph 4.2.a.

d.  Unless sooner discharged or retired under another provision of law, or discharged due to misconduct or sub-standard performance, the Secretaries of the Military Departments may retain those Service members who are, or will be, non-deployable for 12 months or longer due to administrative reasons and who have attained such years of creditable service so as to be within 3 years of qualifying for:

(1)  Regular retirement (or in the case of enlisted members of the Navy or Marine Corps, transfer to the Fleet Reserve or Fleet Marine Corps Reserve, as the case may be) pursuant to Sections 3911, 3914, 6323, 6330, 8911, or 8914 of Title 10, U.S.C.; or

(2)  Non-regular retirement (but for age) pursuant to Sections 12731 and 12735 of Title 10, U.S.C., if, in the case of RC members other than RC members within 3 years of qualifying for regular retirement, they have attained at least 17 years of qualifying creditable service as computed in accordance with Section 12732 of Title 10, U.S.C., and continue to attain qualifying creditable service as computed under Section 12732 of Title 10, U.S.C. to become eligible for non-regular retirement within the 3-year period.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# SECTION 5:  AUTHORITIES FOR SEPARATIONS AND RETIREMENTS

5.1.  In accordance with Paragraph 1.2. of this issuance, a Service member who has been non-deployable for an administrative reason (not medical or legal) for more than 12 consecutive months, will be processed for administrative separation in accordance with DoDI 1332.14 or DoDI 1332.30.  Military Services should ensure expeditious administrative separation proceedings in accordance with Military Department and Military Service policies.

5.2.  A Service member who has been non-deployable due to a physical disability that makes him or her potentially unfit for the duties of his or her office, grade, rank, or rating for more than 12 consecutive months will be referred into the DES in accordance with DoDI 1332.18.

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# GLOSSARY

## G.1. ACRONYMS.

| ACRONYM | MEANING |
|---|---|
| ASD(M&RA) | Assistant Secretary of Defense for Manpower and Reserve Affairs |
| DES | Disability Evaluation System |
| DoDI | DoD instruction |
| IMR | individual medical readiness |
| PHA | periodic health assessment |
| RC | Reserve Component |
| UCMJ | Uniformed Code of Military Justice |
| U.S.C. | United States Code |
| USD(P&R) | Under Secretary of Defense for Personnel and Readiness. |

## G.2. DEFINITIONS.

Unless otherwise noted, these terms and their definitions are for the purpose of this issuance.

| TERM | DEFINITION |
|---|---|
| **active duty** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **active service** | Defined in Section 101(d)(3) of Title 10, U.S.C. |
| **active status** | Defined in Section 101(d)(4) of Title 10, U.S.C. |
| **combat wounded** | Service members whose injuries were the result of hostile action, who meet the criteria for awarding of the Purple Heart, and whose injuries were not the result of their own misconduct. |
| **deployable** | A Service member who does not have a Service-determined reason that precludes him or her from deployment. |

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

| TERM | DEFINITION |
|---|---|
| **deployment** | The movement of personnel into and out of an operational area or in support of operations.  Deployment encompasses all activities from origin or home station through destination, specifically including inter-theater, and intra-theater movement legs, staging, and holding areas. |
| **Military Departments** | The Departments of the Army, Navy, and Air Force. |
| **Military Service Headquarters** | Headquarters, United States Army; Headquarters, United States Navy; Headquarters, United States Air Force; and Headquarters, United States Marine Corps. |
| **Military Services** | The United States Army, the United States Navy, the United States Air Force, the United States Space Force, and the United States Marine Corps. |
| **military specialty** | A military occupational specialty in the Army and the Marine Corps; an Air Force specialty code in the Air Force; or a rating or Navy enlisted classification in the Navy. |
| **non-deployable** | A Service member who has a Service-determined reason that precludes him or her from deployment. |
| **permanently non-deployable** | A Service member who has a reason that precludes them from deployment, and there is a Service expectation that the reason will not be resolved and the Service member will never be deployable. |
| **profile** | A document used to communicate to commanders the individual medical restrictions for Soldiers and Airmen. |
| **Ready Reserve** | Defined in the DoD Dictionary of Military and Associated Terms. |
| **reason code** | The term used to define non-deployable categories. |
| **separation** | A general term that includes discharge, release from active duty, release from custody and control of the Military Services, transfer to the Individual Ready Reserve, and similar changes in Active and Reserve status. |
| **temporarily non-deployable** | A Service member who has a reason or reasons that precludes him or her from deployment, and there is a Service expectation that the reason or reasons will be resolved and the Service member will be deployable. |

GLOSSARY

*DoDI 1332.45, July 30, 2018*
*Change 1, April 27, 2021*

# REFERENCES

DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

DoD Instruction 1120.11, "Programming and Accounting for Active Component (AC) Military Manpower," March 17, 2015

DoD Instruction 1215.13, "Ready Reserve Member Participation Policy" May 5, 2015

DoD Instruction 1300.06, "Conscientious Objectors," July 12, 2017

DoD Instruction 1315.15, "Special Separation Policies for Survivorship," May 19, 2017

DoD Instruction 1332.14, "Enlisted Administrative Separations," January 27, 2014, as amended

DoD Instruction 1332.18, "Disability Evaluation System (DES)," August 5, 2014, as amended

DoD Instruction 1332.30, "Commissioned Officer Administrative Separations," May 11, 2018, as amended

DoD Instruction 1342.19, "Family Care Plans," May 7, 2010, as amended

DoD Instruction 6025.19, "Individual Medical Readiness (IMR)," June 9, 2014, as amended

DoD Instruction 6490.07. "Deployment-Limiting Medical Conditions for Service Members and DoD Civilian Employees" February 5, 2010

DoD Manual 8910.01, Volume 1, "DoD Information Collections Manual:  Procedures for DoD Internal Information Collections," June 30, 2014, as amended

Office of the Chairman of the Joint Chiefs of Staff, "DoD Dictionary of Military and Associated Terms," current edition

The Child Soldier Prevention Act of 2007, 110th Congress, S.1175

United States Code, Title 10

United States Code, Title 18