## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

**NAVY SEALS 1-26,** et al.**,**

                Plaintiffs,

    v.

**LLOYD J. AUSTIN, III**, in his official capacity as
United States Secretary of Defense, *et al.*,

                Defendants.

Case No. 4:21-cv-01236-O

### DEFENDANTS' APPENDIX TO DEFENDANTS' OPPOSITION

### TO PLAINTIFFS' MOTION FOR A CLASS-WIDE PRELIMINARY INJUNCTION

#### Table of Appendix

| Bates Stamps | Description |
|---|---|
| App001–App018 | Ex. 1 - Declaration of Admiral Daryl L. Caudle |
| App019–App024 | Ex. 2 - Declaration of Vice Admiral William Merz |
| App025–App035 | Ex. 3 - Declaration of Captain Joon Yun |
| App036–App043 | Ex. 4 - Declaration of Rear Admiral Gayle D. Shaffer |

Dated: February 23, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director

*/s/ Amy E. Powell*
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW (NC Bar No. 46578)
LIAM HOLLAND
Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8467
Fax: (202) 616-8470
Email: courtney.d.enlow@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2022, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

/s/ Amy Powell
AMY E. POWELL
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Tel: (919) 856-4013
Fax: (202) 616-8470
Email: amy.powell@usdoj.gov

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **U.S. NAVY SEALs 1-26;**<br>**U.S. NAVY SPECIAL WARFARE**<br>**COMBATANT CRAFT CREWMEN 1-5;**<br>**U.S. NAVY EXPLOSIVE ORDNANCE**<br>**DISPOSAL TECHNICIAN 1; and**<br>**U.S. NAVY DIVERS 1-3,**<br>                                        Plaintiffs,<br><br>v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as<br>United States Secretary of Defense; **UNITED**<br>**STATES DEPARTMENT OF DEFENSE;**<br>**CARLOS DEL TORO**, in his official capacity as<br>United States Secretary of the Navy,<br>                                        Defendants. | Case No. 4:21-CV-01236-O |

## DECLARATION OF DARYL CAUDLE

I, Daryl L. Caudle, hereby state and declare as follows:

1.      I am an admiral[1] in the United States Navy, currently serving as the Commander,
United States Fleet Forces Command (USFFC), located in Norfolk, Virginia.  Commander,
USFFC is appointed by the President, by and with the advice and consent of the Senate.  I have
served in this position since December 7, 2021.  I make this declaration in support of the
Government's motion in opposition to Plaintiffs' motion for a preliminary injunction for putative
class members in this lawsuit.[2]  The statements made in this declaration are based upon my
personal knowledge, my military judgment and experience, and upon information that has been
provided to me in the course of my official duties.

---

[1] The rank of "admiral" is the highest military rank in the Navy.  The term "admirals" is also frequently referred to
as "flag officers."  Flag officers include the ranks of rear admiral (lower half), rear admiral (upper half), vice admiral
and admiral.  Flag officers comprise the most senior levels of uniformed leadership in the Navy.
[2] ECF 104, filed Feb. 7, 2022.

App002

## Preliminary Statement

2.      I have reviewed the preliminary injunction order issued by this Court on January

3, 2022, Admiral Lescher's declaration previously filed in this case and the motion for a

preliminary injunction for putative class members filed on February 7, 2022. I agree with

Admiral Lescher's assessment regarding the importance of a fully vaccinated force to blunt the

impact of the COVID-19 virus in the fleet and the significant harm that would come from

allowing a subset of the force to remain unvaccinated, putting themselves, their fellow service

members, and the mission at unacceptable risk. As Admiral Lescher stated, unvaccinated or

partially vaccinated service members are at higher risk to contract COVID-19, and to develop

severe symptoms requiring hospitalizations that remove them from their units and impact

mission execution. The medical data clearly shows that vaccination against COVID-19 is

essential to keeping Navy units on mission by mitigating the impact of COVID-19. Plaintiffs

now seek to expand the current injunction, which is already causing risk to military operational

readiness, from 35 personnel to potentially 2,500 to 4,000 personnel across various ranks,

occupational specialties, and unit assignments. Accordingly, the harm to military readiness and

interference in the Navy's ability to fight and win the nation's wars would be exponentially

greater if this Court were to grant Plaintiffs' pending motion for a class-wide preliminary

injunction. At this time, 88 ships are underway and tens of thousands of personnel are deployed

to deter conflict and, if required, win conflicts decisively. In the confined and enclosed working

environments in which Navy personnel perform their duties, the COVID-19 vaccination *in

addition to* other mitigation measures is the best way to keep the Navy underway and deployed

and prevent the COVID-19 virus from interfering with mission accomplishment. Having fully

vaccinated Navy forces is essential to ensure maximum health and readiness of forces to carry

2

out the Navy's mission throughout the world and, if required, engage in combat operations. Having thousands of unvaccinated personnel assigned across the Fleet, especially within operational units, degrades the effectiveness of the units and seriously endangers the Navy's ability to fully accomplish assigned missions.

### Navy Background and Experience

3.      The Chief of Naval Operations (CNO)[3] delegates to USFFC authorities and responsibilities under Title 10, U.S. Code, to train, certify and provide combat-ready Navy forces to combatant commanders that are capable of conducting prompt, sustained naval, joint and combined operations in support of U.S. national interests.  USFFC is the budget submitting office with financial management authority and responsibility for assigned forces, shore activities, military and civilian personnel, infrastructure, and budget.  CNO delegates to USFFC the authority to generate and communicate Navy global force management solutions to the Joint Staff concerning general purpose forces and ad hoc forces, whether assigned, unassigned, allocated, or service retained.  The Secretary of the Navy designates USFFC as U.S. Naval Forces Northern Command (NAVNORTH), the Navy Component to U.S. Northern Command (USNORTHCOM).[4]  USNORTHCOM designates NAVNORTH as the standing Joint Force Maritime Component Commander (JFMCC).  NAVNORTH and JFMCC exercise operational

---

[3] The CNO is the most senior uniformed officer in the United States Navy.
[4] USNORTHCOM is one of many geographical and functional combatant commands.  The combatant commanders exercise authority, direction and control over the commands and forces assigned to them and employ those forces to accomplish missions assigned to the combatant commander.  Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 1, ¶1.a through d.  USNORTHCOM is the combatant commander defends the homeland; deters, detects, and defeats threats to the United States; conducts security cooperation activities with allies and partners and supports civil authorities.  USNORTHCOM's AOR includes air, land and sea approaches and encompasses the continental United States, Alaska, Canada, Mexico and the surrounding water out to approximately 500 nautical miles.  It also includes the Gulf of Mexico, the Straits of Florida, and portions of the Caribbean region to include The Bahamas, Puerto Rico, and the U.S. Virgin Islands.

App004

control over allocated forces as delegated by USNORTHCOM. CNO delegates USFFC authority to deploy and attach to USNORTHCOM service-retained Navy forces for execution of maritime homeland defense, maritime homeland security, and defense support to civil authority's operations. Commander, U.S. Strategic Command (USSTRATCOM)[5] designates USFFC as U.S. Naval Forces Strategic Command (NAVSTRAT) and USSTRATCOM JFMCC. As directed, NAVSTRAT and USSTRATCOM JFMCC coordinate and synchronize operations with combatant commanders and other USSTRATCOM components.

4. I have served in the United States Navy for over 37 years. I graduated from North Carolina State University (magna cum laude) with a degree in chemical engineering in 1985 and served in several assignments throughout my career. I hold advanced degrees from the Naval Postgraduate School, Master of Science (distinction) in Physics; from Old Dominion University, Master of Science in Engineering Management; and the School of Advanced Studies, University of Phoenix, Doctor of Management in Organizational Leadership with a specialization in Information Systems and Technology. As a flag officer, I most recently served as Commander, Submarine Force Atlantic; Commander, Task Force (CTF) 114, CTF 88, and CTF 46; and Commander, Allied Submarine Command. My other flag assignments include Deputy Chief for Security Cooperation, Office of the Defense Representative, Pakistan; Deputy Commander, Joint Functional Component Command-Global Strike; Deputy Commander, U.S. 6th Fleet; Director of Operations, U.S. Naval Forces Europe-Africa; Commander, Submarine Group Eight;

---

[5] The mission of USSTRATCOM is to deter strategic attack and employ forces, as directed, to guarantee the security of our Nation and our Allies. The command enables Joint Force operations and is the combatant command responsible for strategic deterrence, nuclear operations, nuclear command, control, and communications (NC3) enterprise operations, joint electromagnetic spectrum operations, global strike, missile defense, analysis and targeting, and missile threat assessment.

4

Commander, Submarine Force, U.S. Pacific Fleet; and Vice Director for Strategy, Plans, and
Policy on the Joint Staff (J-5) in Washington, D.C.

### Major Components and Functions of the Navy

5.      The United States is a maritime nation, and the U.S. Navy protects America at
sea.  The Navy defends freedom, preserves economic prosperity, and keeps the sea lanes open
and free.  America's maritime forces preserve peace, deter aggression and, when directed by the
President and Secretary of Defense, engage in combat operations and win decisively.   The Navy
projects power above, on, and below the surface of the world's oceans, which cover 70% of the
surface of the Earth.  Our nation is engaged in strategic competition with The People's Republic
of China and Russia, and we, along with our partners and allies, face grave threats from rogue
nations and non-state actors.  To defend American interests around the globe, the Navy must be
in a constant state of readiness to execute the missions the President directs.  As of February 10,
2022, the Navy is composed of approximately 350,000 active duty personnel, approximately
3,700 operational aircraft, and 296 deployable ships, 88 of which are currently underway at sea.

6.      Whether they serve at sea, overseas, or ashore, every Sailor is important to
mission accomplishment and must be available to perform their duties globally when called
upon.  Because the stakes in war can be so high - both for the success and survival of individual
units at sea and for the success of the mission - it is imperative that all Sailors are medically and
physically ready to execute their duties and responsibilities without fail, even while exposed to
extreme danger, emotional stress and harsh environments.  The loss of personnel due to illness,
disease, injury, or bad health diminishes military effectiveness.  The Navy's medical standards
are therefore designed to minimize the odds that any given Sailor will be unable to perform his
or her duties because of illness, disease, or injury.  These standards are particularly vital in the

5

deployed or at sea environments where a Sailor may not have access to robust medical care and may require medical evacuation.  Those who seek to enter military service must be free of contagious diseases; free of medical conditions or physical defects that could require treatment, hospitalization, or eventual separation from service for medical unfitness; medically capable of satisfactorily completing required training; medically adaptable to the military environment; and medically capable of performing duties without aggravation of existing physical defects or medical conditions.[6]  Further, each service member must receive (or show that they have previously received) nine vaccinations—now ten with the inclusion of the COVID-19 vaccination—upon entry into Navy service.[7]  Because COVID-19 presents a severe risk to the mission of Navy units, and the COVID-19 vaccination is the most effective means of mitigating that risk, the Navy requires every person assigned to operational units to be vaccinated against COVID-19.  Any request to waive this requirement or any other medical standard introduces potential additional risk to the mission.  Accordingly, such a waiver request requires a case by case military operational risk assessment regardless of the basis of the waiver request.  As explained in detail below, Plaintiffs' requested injunction would take that risk assessment away from the military, exposing the Navy's mission, units, and personnel to unacceptable and unmanaged risk.

7.    Surface Operations.  The surface fleet is composed of 296 ships consisting of aircraft carriers, amphibious assault ships, cruisers, destroyers, littoral combat ships, minesweepers, and patrol craft.  The objective of surface operations is to achieve and sustain sea control at the time and place of the Nation's choosing to protect the homeland from afar; build and maintain global security; project the national power of the United States; and win decisively.

---

[6] See DOD Instruction 6130.03, Vol 1 ¶1.2.c.
[7] AR 40–562/BUMEDINST 6230.15B/AFI 48–110_IP/CG COMDTINST M6230.4G, Appx D.

App007

It is essential to security and prosperity that the Navy maintain the ability to maneuver globally on the seas and to prevent others from using the sea against the interests of the United States, our allies and partners, or any other nation.  Additionally, sea control is the pre-requisite to achieving the objectives of all domain[8] access, deterrence, power projection, and maritime security.

8.       Personnel on surface ships work in close proximity in confined spaces almost exclusively in the interior of the ship with no exterior ventilation.  While masking and frequent cleaning assist in mitigating the spread of the COVID-19 virus, Sailors sleep in confined berthing often stacked three "racks" (beds) high with as many as 60 enlisted personnel sharing these quarters.  These are ideal conditions for the spread of a respiratory virus, as evidenced by the COVID-19 outbreak on USS THEODORE ROOSEVELT (CVN 71).[9]  Personnel cannot distance themselves from other personnel in berthing or in confined workspaces.  Sailors who operate surface ships cannot telework.  While aircraft carriers (11 total) and large amphibious assault ships (nine total) have over a dozen medical personnel and advanced equipment, including ICU beds, to treat injuries sustained in combat, some personnel have experienced such severe COVID-19 symptoms that they have had to be evacuated from even aircraft carriers.  The remaining ships in the Fleet have much more limited medical capabilities and personnel.  Those ships may have one or possibly two independent duty Navy Hospital Corpsman (HM), who are enlisted personnel with specialized medical training.  HMs are well trained but are not physicians

---

[8] Domains are distinct operating areas that cross political and geographic boundaries.  Simply put, they are areas in which military forces operate and, if necessary, fight.  The five commonly accepted domains of warfare are land, maritime, air, space and cyberspace.

[9] By April 1, 2020, USS THEODORE ROOSEVELT (CVN 71) had approximately 1,000 crew removed from the ship with a small skeleton crew remaining to maintain the nuclear reactor and other essential systems.  At this time, this ship was off mission in port in Guam.  By April 20, 2020, 4,069 Sailors had been removed from the ship out of a crew of approximately 4,800.  The ship was unavailable for 51 days to partner with allies, maintain presence in the maritime commons, which include the world's busiest sea lanes, and, if required, engage in combat operations, creating a national security vulnerability in an area vital to the United States' national interests.  The extended absence and unavailability of the aircraft carrier could likely have emboldened potential adversaries and set the conditions for instability in an area essential to global commerce.

or nurses and the ships to which they are assigned as independent duty HMs lack sophisticated medical equipment. Unlike doctors and nurses, formal civilian medical licenses and formal medical education are not required for HMs. They do not generally have the capability, capacity, or training to intubate a patient or use a ventilator. Personnel with severe COVID-19 symptoms would need to be medically evacuated from these ships. Prior to the availability of the vaccine and requirement for deployable units to be fully vaccinated, ships with unvaccinated personnel needed to remain within 72-hours of higher-level medical care, placing an undesirable restraint on where they could transit.

       9.    <u>Undersea Operations</u>. All U.S. Navy submarines are nuclear-powered, as only nuclear propulsion allows for the combination of persistent stealth, long duration, high-speed, and sustained underwater movement that makes modern nuclear submarines vital to a modern blue-water navy. Today's submarine force, consisting of 71 submarines, is the most capable force in the history of the U.S. Navy and the world. Our existing fleet of ballistic submarines currently carries 54 percent of our nation's nuclear deterrent arsenal, and their replacements under development and eventual construction will carry an even greater percentage of strategic warheads. The U.S. Navy operates three types of submarines: ballistic missile submarines, guided missile submarines, and attack submarines. U.S. Navy (nuclear) ballistic missile submarines carry the most survivable leg of the U.S. strategic triad; the other legs are the land-based U.S. strategic missile force and the air-based U.S. strategic bomber force. These submarines have only one mission: to carry and, if called upon, launch the Trident D5 strategic missile. The primary missions of attack and guided missile submarines in the U.S. Navy are peacetime engagement, surveillance and intelligence, special operations, precision strikes, and control of the seas. To these, attack submarines also add support to the battlegroup operations

mission. Attack and guided missile submarines have several tactical missions, including sinking ships and adversary submarines, launching cruise missiles, gathering intelligence, and supporting special operations missions.

10.    Submarines can remain submerged for extended periods of time and the primary limitation for the duration of a submerged patrol is the amount of food on the submarine. Submarines have limited medical capabilities similar to small surface ships. Berthing is even more confined than on surface ships, making the spread of a respiratory disease highly likely. Space is so limited and confined that frequently the most junior Sailors on the boat are required to "hot rack" (i.e., crew members take turns sleeping in the same rack). Like smaller surface ships, submarines have one independent duty Navy HM. If a member of the crew were to become seriously ill with the COVID-19 virus, the submarine would be required to evacuate the ill crew member, requiring it to navigate to a location suitable for evacuation and forcing it to rise to the surface of the ocean. This would very likely result in the compromise, disruption, or even termination of critical missions for which the avoidance of detection is vital. Additionally, depending on where the submarine is located, the rapid evacuation of an ill crew member may be nearly impossible, jeopardizing the crew member's safety.

11.    Air operations. There are ground-based Navy aviation units for larger patrol aircraft and other platforms, but projecting air power from the sea is the core function of naval aviation. The Navy has approximately 3,700 operational aircraft. Many surface ships have rotary wing aircraft (i.e., helicopters) onboard. There are 11 aircraft carriers in the Fleet, and each aircraft carrier has a carrier air wing (CVW) made up of nine squadrons of fixed wing and rotary wing aircraft with a combined total of more than 70 aircraft when the carrier is at full strength. Each CVW is composed of approximately 1,500 personnel. The personnel in the

CVW live and work in the same conditions as the other 3,000 personnel assigned to the carrier. They live in confined spaces and almost always share berthing, eat meals together in close quarters, and participate in frequent briefings or meetings in small spaces referred to as "ready rooms." If members of the squadron succumb to illness, the squadron's readiness is diminished. If aviators fall ill and cannot operate their aircraft, the aircraft carrier cannot serve its purpose to project air power from the sea. Without the CVW, the aircraft carrier goes from being the centerpiece of a multi-vessel strike group from which to project force and take the fight to the adversary, to being a vulnerability that must be protected by other assets.

12.     Naval Special Warfare.  Admiral Lescher's declaration provides extensive background on the training and operating environments in which Navy special operations personnel perform their duties and the associated risks from being unvaccinated.

13.     Cyber and other functions.  The Navy performs a variety of other missions and support functions through its vast array of shore installations and organizations. While it would take considerable time to explain the myriad functions and missions ashore, cyberspace operations represents one particular function of increasing strategic importance and an example of vital work frequently performed outside of ships, submarines, and aircraft. Every operational plan and every mission across the Navy builds from the assumption that we will be able to assure that the bandwidth and data that our forces require will be accessible and trustworthy. Since its establishment on January 29, 2010, U.S. Fleet Cyber Command/U.S. TENTH Fleet has grown into an operational force composed of more than 14,000 Sailors and civilians organized into 28 active commands, 40 Cyber Mission Force units, and 27 reserve commands around the globe. U.S. Fleet Cyber Command is responsible for Navy information network operations, offensive and defensive cyberspace operations, space operations, and signals intelligence. As such, U.S.

App011

Fleet Cyber Command serves as the Navy component command to U.S. Cyber Command, the Navy space component to U.S. Space Command, and the Navy's Service Cryptologic Component Commander under the National Security Agency/Central Security Service. U.S. TENTH Fleet is the operational arm of Fleet Cyber Command and executes its mission through a task force structure similar to other warfare commanders. Personnel assigned to cyber units almost exclusively perform their work in a secured compartmentalized information facility (SCIF). These are enclosed, windowless spaces in which the most highly classified work of the U.S. government is performed. Personnel assigned to these units cannot do their jobs remotely in a telework environment. The confined nature of a SCIF creates a significant risk for the spread of a highly contagious respiratory virus. Having unvaccinated personnel in such an environment creates significant risk for the unvaccinated person and potentially others, in addition to the critical mission performed by our cyberspace operators.

### The Necessity of Vaccinations in Response to COVID-19 Pandemic

14. The Supreme Court has acknowledged that the life and death work of the military demands a level of obedience without counterpart in civilian life.[10] The Uniform Code of Military Justice, a commander's principal tool to enforce that obedience, states that orders are inferred to be lawful and are "disobeyed at the peril of the subordinate." Moreover, "the dictates of a person's conscience, religion, or personal philosophy cannot justify or excuse the disobedience of an otherwise lawful order."

But the Navy has made room for personal religious values to be considered, when time permits, by establishing a process for those with religious objections to the COVID-19 vaccine to request an exemption from the requirement to take the vaccine. Each exemption request is

---

[10] Parker v. Levy, 417 U.S. 733, 758-59 (1974).

App012

reviewed and a determination is made based upon the merits of that case. If initially denied an exemption, a Sailor may appeal the decision. If the appeal is denied, the Sailor must comply with the order to take the vaccine.

In the Navy, we champion self-sufficiency and the ability to operate effectively with limited external guidance. This is known as "mission command" and is an operational imperative for our Navy to be ready to deploy worldwide at a moment's notice to execute the commander's intent without persistent supervision or additional orders. Trust is the cornerstone of mission command and a commander cannot trust those who choose to disobey lawful orders. Although we train Sailors to be thoughtful and inquisitive, compliance with lawful orders must be instinctive and expeditious.

In the deadly business of protecting our national security, we cannot have a Sailor who disobeys a lawful order to receive a vaccine because they harbor a personal objection any more than we can have a Sailor who disobeys the technical manual for operating a nuclear reactor because he or she believes they know better. Our success, our national security, and the safety of our people depends on instinctive compliance with orders, and unless an order is "patently illegal," the Sailor should robustly follow the order.

The judgment of the Military Services is that the direction to take the vaccine is a lawful order and are the most effective and readily available tool the Armed Forces has to keep Sailors safe, fully mission capable, and prepared to execute the Commander-in-Chief's orders to protect vital United States' national interests.[11] Simply put, the less people who are vaccinated, the less ready the Navy is to deter aggression and, if required, fight and win in combat. As of February 16, 2022, there have been 17 deaths among uniformed personnel - 16 were unvaccinated and one

---

[11] Memorandum for the Joint Force from General Mark A. Milley, Chariman of the Joint Cheifs of Staff, CM-0141-21 (Aug. 9, 2021).

App013

was partially vaccinated.  There have been 84,924 Navy uniformed personnel infected with the COVID-19 virus.  There have been 623 hospitalizations - 546 unvaccinated, 32 partially vaccinated, 44 fully vaccinated, and one fully vaccinated with a booster shot.  Readiness is not just measured by deaths and hospitalizations.  Taking the 84,924 cases of infection multiplied by the previous 14 days[12] of restriction of movement (i.e., a period in which the member is isolated and unavailable to perform normal duties), the result is a rough estimate of 1,188,936 lost days in the Navy since the inception of the COVID-19 pandemic.  In addition to the irreplaceable loss of 17 Sailors, the lost opportunities resulting from this massive loss of time and readiness cannot be replaced.

### Harm to Readiness if Preliminary Injunction Issued

15.     A preliminary injunction requiring unvaccinated members be assigned to deployable units or critical shore assignments will create an unacceptable risk to personnel.  It is well-established and understood that commanders have absolute responsibility to maintain a safe working environment, protect Sailors, and soundly assess and balance risk.  Commanders are given the authority to ensure that Sailors are safe.  If commanders fail in this responsibility or exercise poor judgment in balancing risk, they will be subject to the absolute accountability of being relieved of command and perhaps other more severe consequences.  In following the direction and guidance of the Secretary of Defense, the Navy determined that there is a compelling interest in ensuring Sailors remain healthy and ready to fight.  The survival rate of

---

[12] Recent CDC guidance issued several weeks ago has lowered the isolation period to as little as five days, but noting that fully vaccinated, boosted and asymptomatic persons *exposed* to a COVID positive person do not need to isolate for five days, but do need to wear a mask for up to 10 days.  On the other hand, unvaccinated or non-boosted persons *exposed* to a COVID positive person need to isolate for five days regardless if they have no symptoms. CDC Updates and Shortens Recommended Isolation and Quarantine Period for General Population | CDC Online Newsroom | CDC

App014

vaccinated people is significantly higher than unvaccinated people.[13]  The Department of

Defense and Navy have determined that COVID-19 is a risk that can be best managed by

vaccination *in addition to* other mitigation measures and *is* the least intrusive means to maintain

maximum readiness while creating the lowest risk the Navy is willing to accept to the force.

Having 4,000 unvaccinated Sailors deployed across the Fleet will create an unacceptable risk to

readiness and could result in unnecessary deaths.

  16. A preliminary injunction will result in irreparable harm to readiness and mission

accomplishment by prohibiting several necessary actions to ensure the health and readiness of

naval forces.  Plaintiffs ask the Court to maintain the status quo, which effectively is a request

for the Court to order the Navy to leave unvaccinated personnel in their units, performing their

same duties and deploying regardless of the substantial risk to personnel and mission that will

result.  By obliging the Plaintiffs' request, an injunction would seriously degrade the military

readiness, and unnecessarily limit the Navy's ability to respond to the most challenging crises,

and may result in the failure of critical military missions and irreparable harm to our national

security.  Contrary to the Court's and Plaintiffs' understanding, serious illness resulting from the

COVID-19 virus remains a threat *to the unvaccinated and, therefore, the mission if unvaccinated*

*Sailors remain in deployable units.*  For example, the USS MILWAUKEE (LCS-5) outbreak

during deployment in late 2021 and early 2022 demonstrated the risk COVID-19 still poses *and*

the success of the vaccine.  Approximately, one-third (i.e., about 30 of a crew of approximately

100) of the 100% vaccinated crew tested positive in January 2022, but all positive personnel

---

[13] "During October–November [2021], unvaccinated persons had 13.9 and 53.2 times the risks for infection and COVID-19–associated death, respectively, compared with fully vaccinated persons who received booster doses, and 4.0 and 12.7 times the risks compared with fully vaccinated persons without booster doses." Available at COVID-19 Incidence and Death Rates Among Unvaccinated and Fully Vaccinated Adults with and Without Booster Doses During Periods of Delta and Omicron Variant Emergence — 25 U.S. Jurisdictions, April 4–December 25, 2021 | MMWR (cdc.gov)

App015

experienced mild symptoms or were asymptomatic.  While the ship remained in port for 14 days due to the outbreak, had they been at sea, they would have been able to continue normal operations.  Contrast that situation to the one on USS THEODORE ROOSEVELT (CVN 71) before the vaccine existed, or even the early days of vaccine availability when USS PHILIPPINE SEA (CG-58) had 20 Sailors of a crew of approximately 330 test positive, yet spent an entire month in port in Bahrain - off mission in the strategically important Arabian Gulf and adjacent areas - due to the outbreak.  Bottom line: fully vaccinated units withstand COVID outbreaks with significantly less impact to the mission.  The Court's order of January 3, 2022, takes the position that the incremental impact of adding one unvaccinated member, then another, then another and so on will have a minimal impact on the unit and operations.  This is incorrect and dangerous logic.  With each unvaccinated member added to a unit, the risk to personnel and risk to mission increases exponentially and unacceptably in the professional judgment and experience of the Military Services.

17.     A preliminary injunction would essentially prohibit discipline, adverse administrative action, and non-adverse, routine personnel actions and, therefore, irreparably harm good order and discipline in the Navy.  Such an order creates two different sets of rules applied to Plaintiffs and non-Plaintiffs.  If issued, the order will set the conditions for Plaintiff Sailors to judicially challenge every order or assignment a commander directs.  Irrespective of the nature of the government interest or how compelling it is, Sailors will be invited to challenge a commander's professional military judgment, whether it concerns training, assignment of duties, or other everyday orders essential to the Navy's mission that they might find to be objectionable.  The Navy's protection of its people and preservation of our national security demands a force that complies with the lawful orders of superiors, and Navy leadership must be

App016

empowered to equitably enforce strict adherence with those orders. A preliminary injunction will result in decreased morale and a breakdown of discipline across the organization and the Navy. The order would create a bifurcated system for leading, assigning, disciplining, and employing Sailors in a unit. The lack of uniformity and disparate treatment necessitated by the order would significantly corrode good order and discipline to the point in which unit effectiveness would very likely suffer.

### Conclusion

18.     The professional military judgment of United States Navy military and civilian leadership is that the working conditions and operations that Navy personnel are engaging in or need to be immediately prepared to engage in require a fully protected and medically ready force. The least constrictive manner to accomplish this compelling and vital imperative is the COVID-19 vaccine *in addition to* other mitigation measures. The vaccine is to be viewed as the same as any other protective equipment that Sailors need to accomplish the mission safely and return home. Extending the preliminary injunction to potentially 4,000 personnel and requiring the Navy to deploy unvaccinated service members who are not medically fit for deployment will severely undermine military readiness through the spread of disease and cause irreparable harm to military operations by allowing unvaccinated service members to remain in their current status. Furthermore, having 4,000 unvaccinated personnel who refuse the lawful order to be vaccinated in such units will further undermine mission accomplishment by subverting good order and discipline.

16

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2022.

D. L. CAUDLE

17

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3;** et al., | |
| Plaintiffs, | |
| v. | |
| **LLOYD J. AUSTIN, III,** in his official capacity as United States Secretary of Defense; et al., | Case No. 4:21-CV-01236-O |
| Defendants. | |

## SUPPLEMENTAL DECLARATION OF WILLIAM MERZ

I, William Merz, hereby state and declare as follows:

1.      I am a Vice Admiral in the United States Navy, currently serving as the Deputy

Chief of Naval Operations, Operations, Plans and Strategy (OPNAV N3/N5), located in

Arlington, Virginia at the Pentagon. I make this declaration in support of the Government's

motion in opposition to Plaintiffs' motion for a preliminary injunction for putative class

members in this lawsuit.[1] The statements made in this declaration are based upon my personal

knowledge, my military judgment and experience, and upon information that has been provided

to me in the course of my official duties.

2.      I have reviewed Admiral Lescher's declaration previously filed in this case, and

I agree with Admiral Lescher's appraisal of the importance of vaccines in addition to other

mitigation measures to reduce the impact of the COVID-19 virus to operations and mission

accomplishment. An order directing the Navy to allow potentially 2,500 to 4,000 personnel to

---

[1] ECF 104, filed Feb. 7, 2022.

1

remain unvaccinated while maintaining the status quo, including unvaccinated personnel remaining in deployable units, would cause irreparable harm and unnecessarily endanger readiness and Sailors' lives. Two years into this pandemic, the medical evidence is beyond dispute in that fully unvaccinated personnel develop severe symptoms requiring hospitalizations and emergency medical evacuation or death at a significantly higher rate than their vaccinated peers. The difference is even more dramatic when comparing those fully vaccinated with a booster dose with the unvaccinated. The bottom line is the COVID-19 vaccine is keeping ships at sea, submarines on patrol and aircraft flying to protect and defend the Nation's and our partners' and allies' interests. Directing the Navy to allow thousands of unvaccinated personnel to remain in deployable units puts the Nation's ability to respond to crises around the world at unnecessary and self-inflicted risk.

3.      I also reviewed Plaintiffs' and the Court's characterization[2] of my comments to the *Navy Times* and believe they fundamentally misunderstand and selectively quote those statements. In that article, I stated the Omicron variant has had less of an impact on naval operations *because* the Navy is now requiring 100% vaccination of its service members. The facts and results fully support this conclusion. The outbreak on the USS MILWAUKEE (LCS 5) is an example that a 100% vaccinated force is the best way to mitigate COVID-19's impact on the force. Because the vaccine kept service members from getting seriously ill and therefore

---

[2]      Defendants have not provided sufficient evidence that the Navy will be irreparably injured absent a stay. Vice Admiral Merz, deputy chief of naval operations, describes a highly effective force despite the spread of the Omicron variant. Pls.' App. 3–4, ECF No. 100. Even fully vaccinated ships have experienced outbreaks, but "Omicron has a quick turn around and isn't causing severe illness in sailors." Pls.' App. 4, ECF No. 100. In short, "[Omicron] is coming and going all the time, very small numbers, and really no operational impact." *Id.* Defendants' briefing presents a much grimmer version of the facts. They argue that unvaccinated servicemembers will derail missions, require medical attention where healthcare is limited, and jeopardize the health of other servicemembers. Defs.' Br. 7–9, ECF No. 86.

Court's Order at 8, ECF No. 116

2

minimized the operational impact, the ship encountered minimal disruption. When compared to a situation before the vaccine was available, when the USS THEODORE ROOSEVELT (CVN 71), a capital asset in the Nation's ability to maintain stability and project force around the globe, remained in port nearly two months due to a COVID outbreak[3] this only further demonstrates the Navy's compelling interest in mandating the COVID-19 vaccine.

    4.      An injunction requiring the Navy to reintroduce unvaccinated service members to operational units (that the Navy previously removed due to their unvaccinated status) or requiring the Navy to keep unvaccinated service members in operational units, would risk jeopardizing the unit's full operational status, returning Navy units to a condition before the vaccine mandate and presenting an unacceptable risk to naval operations. For example, the risk of severe illness from COVID is greatly reduced for vaccinated people, thus minimizing the need for a unit to remain within a certain distance of medical care (which limits what a unit can do) or the cost of diverting that unit to remove Sailors who become severely ill or ill to a point beyond which organic resources can handle their medical care. As I explained in the *Navy Times* article, "[t]hose who have a waiver or are seeking a COVID-19 vaccine exemption are transferred to a shore tour to ensure sailors in operational units are fully vaccinated." I further explained that it is "significantly less expensive to separate a sailor than to conduct a medical evacuation due to a COVID-19 outbreak." These statements further support the Navy's compelling interest in the vaccination of its forces and its units. Finally, the health impact of any COVID variant on any unvaccinated individual is not predictable, and could be fatal even absent pre-conditions. Because sailor health has been the driving concern, having any unvaccinated sailors

---

[3] At the height of the outbreak, over 4,000 crew out of a crew of approximately 4,800 had to be removed from the ship and tragically one Sailor died. ADM. Lescher decl. ¶ 12.

onboard forces the Navy to adjust operations to ensure medical care is within reach. Just one unvaccinated sailor can derail an operational plan.

     5.      The costs of the COVID-19 virus are significant, but are preventable with vaccination. Seventeen Sailors have died and all of those Sailors were not fully vaccinated. Over 600 Sailors have been hospitalized; 578 of the personnel hospitalized were not fully vaccinated. There have been nearly 85,000 infections resulting in over one million lost days in which Sailors were unable to perform duties or train. Even when the unvaccinated do not fall seriously ill, the entire unit bears the burden of a preventable situation. For example, morale has suffered during the pandemic. During the pandemic, the Navy has set records – not records of which we are proud – for days spent at sea without a port visit. Ships have spent from 160 days to up to over 200 consecutive days at sea without a port visit. Prior to the pandemic, 60 days would be considered a lengthy time at sea without a port visit. A single unvaccinated crew member could potentially keep a ship out of a foreign port if that nation requires a COVID-19 vaccination for entry, keeping a ship at sea. Having unvaccinated service members in the crew also results in more time spent away from families with crews having to quarantine away from family for two weeks prior to deployment and, in the case of submarines, also two weeks post deployment. The added financial burden diverts scarce resources from essential programs to COVID-related expenses. For example, the Navy has spent nearly $31,000,000 on COVID-19 medical supplies exclusive of the actual vaccines. Sailors, including new recruits reporting to boot camp, are required to quarantine in hotels or in on-base lodging prior to commencing training or an overseas move. This also comes at great financial cost. By allowing thousands of unvaccinated personnel to remain in these units, all of these costs will continue until the pandemic burns itself out.

4

6.     Navy leadership owes a sacred duty to the Sailors who have voluntarily raised their right hand to serve and wear the uniform of our country. That sacred duty is also owed to those Sailors' families. That duty is for Navy leadership to do everything within its power to ensure Sailors are safe and can succeed – both personally and at the unit level. Commanders would not send Sailors into harm's way without the tools and capabilities necessary to succeed and safely return home to their families. Deploying thousands of unvaccinated Sailors when the vaccine is readily available, safe and effective is a betrayal of the trust and confidence the American people have placed in the United States Navy to protect their sons, daughters, husbands, wives, fathers and mothers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2022.

W. R. MERZ

App024

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| |
|---|
| U.S. NAVY SEALs 1-26;<br>U.S. NAVY SPECIAL WARFARE<br>COMBATANT CRAFT CREWMEN 1-5;<br>U.S. NAVY EXPLOSIVE ORDNANCE<br>DISPOSAL TECHNICIAN 1; and<br>U.S. NAVY DIVERS 1-3,<br>　　　　　　Plaintiffs,<br><br>v.<br><br>LLOYD J. AUSTIN, III, in his official capacity as<br>United States Secretary of Defense; UNITED<br>STATES DEPARTMENT OF DEFENSE;<br>CARLOS DEL TORO, in his official capacity as<br>United States Secretary of the Navy,<br>　　　　　　　　　　Defendants. |

Case No. 4:21-CV-01236-O

## DECLARATION OF JOON YUN

I, Captain Joon Yun, United States Navy, hereby state and declare as follows:

1.　　I am a Captain in the United States Navy, currently serving as CTF-80 Surgeon, located in U. S. Fleet Forces Headquarter, Norfolk, Virginia. I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

2.　　As the Fleet Chief Medical Officer, I am primarily responsible for overseeing quality healthcare delivery within the Fleet and supervision of the credentialing and privileging process.  I make this declaration in my official capacity, based upon my personal knowledge and upon information that has been provided to me in the course of my official duties.

3.　　I have been assigned to my current position since July 30, 2021.  Prior to my current assignment, I served as the Chief Medical Informatics Officer at Naval Medical Forces

1

Atlantic, Director of Medical Services at Naval Medical Center Portsmouth, Director of Medical Services at U. S. Naval Hospital Okinawa and as the Navy Specialty Leader for the Pulmonary and Critical Care Community. I am board certified in Pulmonary Medicine, Critical Care Medicine and Internal Medicine and serves as an Assistant Professor of Medicine at the Uniformed Services University of Health Sciences.

4.      I have reviewed the preliminary injunction order issued by this Court on January 3, 2022 and the motion for a preliminary injunction for putative class members filed on February 7, 2022. I understand that the motion filed on February 7, 2022 essentially requests the Court to apply the same or similar injunction to a broader class of Navy personnel – perhaps as many as 2,500 to 4,000. In the order, the Court concludes that medical exemptions are given more preferential treatment (e.g., remaining deployable) than other administrative exemptions, including religious accommodations. ECF No. 66 at 21-22. This conclusion, however, is incorrect.

5.      The Court's conclusion is premised on an incorrect assumption that there are a large group of unvaccinated personnel who continue to serve without "adverse consequence." The Court incorrectly accepts Plaintiffs' contentions that personnel with pending or approved medical exemptions are given preferable treatment and status as compared to those with pending or approved religious accommodations. Medical exemptions only pertain to the requirement to receive the COVID-19 vaccination. A service member with a medical exemption is still subject to restrictions and/or limitations related to the fact that they are unvaccinated (e.g., deployment eligibility, foreign country entry restrictions, frequent COVID-19 testing or extended quarantine requirements, restrictions from all non-mission essential travel, etc.). Therefore, receipt of a medical exemption is not a "golden ticket" that permits the recipient to continue to freely

2

perform any and all duties without consequences. That member will likely be reassigned and non-deployable just as any other unvaccinated person with or without a pending religious accommodation.    Moreover, receiving any type of exemption from the vaccine requirement may require an additional medical waiver in order to deploy overseas, go on sea duty, or engage in other special duties or assignments.

6.    A medical waiver to the physical standards is a separate determination that would come after a medical exemption or administrative exemption, such as religious accommodation, for the COVID-19 vaccine. Accordingly, if a service member receives an exemption to the COVID-19 vaccine for any reason they would have to engage in this subsequent process to be cleared for full duty by the Navy. That is, a service member who receives an exemption from the COVID-19 vaccination requirement, whether for religious or secular reasons, may not be medically qualified for certain duties unless he or she obtains separate medical clearance. Moreover, the service member may also need a separate medical waiver from the Combatant Command[1] to enter that commander's geographic area of responsibility. Different Combatant Commands may have specific requirements for vaccination based on the endemic biomedical threats that naturally exist in their geographic area as well as any biowarfare threats from adversaries. An unvaccinated member who deploys to a geographic region where there is an endemic infectious disease would put not only his health at risk, but also the health of any other service member. Thus, a determination that a member is not deployable takes into account the risk to other personnel, the risk to mission as well as the unvaccinated member.  These

---

[1] Since the passage of the Goldwater-Nicholas Department of Defense Reorganization Act of 1986, combatant commanders are vested with vast authorities and responsibilities for military operations within their area of responsibility. The Navy and other branches of the Armed Forces provide forces to the combatant commanders to execute those responsibilities and functions. The combatant commanders exercise authority, direction and control over the commands and forces assigned to them and employ those forces to accomplish missions assigned to the combatant commander. Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 1, ¶1.a through d.

3

deployment determinations do not take into account whether a member is unvaccinated for secular or religious reasons; all unvaccinated service members are treated the same for purposes of determining whether they should receive a medical waiver that would render them fit for certain types of duty.

      7.     Receiving a medical exemption for the COVID-19 vaccine does not automatically render a service member deployable; he or she must undergo the process described in the prior paragraph. Indeed, many of the common reasons that a service member may receive a medical exemption from an immunization requirement may also make the service member not medically qualified and non-deployable. For example, BUMEDINST 6230.15B ¶ 2.6 lists immune competence, pharmacologic or radiation therapy, pregnancy and/or previous adverse response to immunization as common reasons for a medical exemption from an immunization.[2] The first three conditions would almost certainly lead to a finding of unsuitability for deployment and an inability for the service member to serve on Navy vessels, submarines, aircraft or go overseas on deployment.

      8.     The judgment of the Military Services is that vaccines are the most effective and readily available tool the Armed Forces has to keep Sailors safe, fully mission capable and prepared to execute the Commander-in-Chief's orders to protect vital United States' national interests. Disagreeing with the judgment of the Military Services and concluding that the worst of the COVID pandemic is behind the Nation and Armed Forces, the Court states, "[f]ortunately, the future does not look so dire. Nearly 100% of the Navy has been vaccinated. Hospitalizations

---

[2] BUMEDINST 6230.15B ¶ 2.6 also lists evidence of immunity based on serologic tests, documented infection, or similar circumstances as a possible basis for a medical exemption for an immunization. However, pursuant to DoD policy a prior COVID-19 infection, by itself, is not grounds for a medical exemption to the COVID-19 vaccination requirement.

are rising at a much slower rate than COVID-19 cases. COVID-19 treatments are becoming more effective and widely available." The court's statement would be correct if it concluded that the worst of the pandemic is over for the fully vaccinated and boosted personnel and Navy units that are fully vaccinated. Furthermore, empirical data supports that the "future does look dire" for unvaccinated personnel, who remain in the worst pandemic. Transmission rates are five times higher among unvaccinated Sailors and Marines than they are among vaccinated personnel. Exhibit A, Figure 1. From December 17, 2020 to February 6, 2022, 15,655 non-fully vaccinated Sailors became infected with the COVID-19 virus, *96 were hospitalized and eight died*. During the same period, 27,035 fully vaccinated Sailors became inflected, but *only four were hospitalized and none died.* The availability of the booster shot has further widened the gap from the unvaccinated – 1,931 COVID-19 cases *and zero hospitalizations or deaths*. Exhibit A, Figure 2. Not surprisingly, since vaccines have become widely available, shipboard outbreaks and impacts to ships' availability has been mitigated and no vaccinated Sailor assigned to a ship with an outbreak has required hospitalization. Exhibit A, Figure 3. The medical data does not lie and that data leads to the irrefutable conclusion that assigning unvaccinated personnel – regardless if medically exempt or administratively exempt – to deployable units is an unacceptable risk and has the significant potential to interfere with mission accomplishment (e.g., even one critically ill member could be required to be medically evacuated at great risk to the ill member, the evacuation crew and the mission depending on the circumstances of the ship's, submarine's or squadron's deployment).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of February, 2022.

JOON YUN

6

Exhibit A to CAPT Yun Declaration

1.      **Data concerning health to force/personnel**

•      **Transmission rates, especially comparisons of vaccinated/unvaccinated, and especially if known WRT known ship outbreaks**

In the early days of the pandemic, there were no vaccines available.  At that time, the US Navy experienced several significant COVID-19 outbreaks aboard ships causing widespread mission disruption, hospitalizations and a death.  Restriction of Movement (ROM) policies such as pre-deployment ROM-Sequester, isolation and quarantine, as well as widespread aggressive testing policies were enacted to prevent COVID-19 introduction onto ships so as to preserve mission capability.  The costs in terms of lost duty time and diversion of assets for testing were extensive.  COVID-19 rates were significantly reduced with the introduction of vaccination, allowing for the elimination of ROM-sequester and ship-wide testing strategies.

Figure 1.



By September 2021, SARS-CoV-2 infection rates among unvaccinated personnel were approximately four times that of vaccinated personnel (Figure 1).   Importantly, severity of disease was also dramatically reduced.  Figure 2 below, current through 8 Feb2022, shows the total numbers of cases, hospitalizations, and deaths by vaccination status.  There is a clear reduction in both hospitalizations and deaths with vaccination status, with no deaths occurring in fully vaccinated US Navy or Marine Corps personnel and only ten hospitalizations (4 US Navy, 6 US Marine Corps).

Figure 2.

| Department of the Navy Active Duty: Total COVID-19 Case Occurrence by Vaccination Status[1] 17DEC2020-08FEB2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Service | | | | | |
| | | Marine Corps | | Navy | | Total | |
| Vaccination Status[1] and Severity[2] | | Number of COVID-19 Cases | % | Number of COVID-19 Cases | % | Number of COVID-19 Cases | % |
| Vaccination Status[1] | Severe Case[2] | | | | | | |
| Not fully immunized[1] prior to the COVID-19 incident date | No | 11,674 | 42.92% | 15,655 | 35.00% | 27,329 | 37.99% |
| | Yes-Hospitalized | 78 | 0.29% | 96 | 0.21% | 174 | 0.24% |
| | Yes-Death | 2 | 0.01% | 8 | 0.02% | 10 | 0.01% |
| Fully immunized[1] but not boosted: COVID-19 incident date >=14 days after final dose of regular series, no booster | No | 15,050 | 55.33% | 27,035 | 60.44% | 42,085 | 58.51% |
| | Yes-Hospitalized | 6 | 0.02% | 4 | 0.01% | 10 | 0.01% |
| | Yes-Death | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Boosted: COVID-19 incident date >=7 days after receiving booster | No | 390 | 1.43% | 1,931 | 4.32% | 2,321 | 3.23% |
| | Yes-Hospitalized | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| | Yes-Death | 0 | 0.00% | 0 | 0.00% | 0 | 0.00% |
| Total | | 27,200 | 100.00% | 44,729 | 100.00% | 71,929 | 100.00% |

[1] Two vaccine doses were considered complete for the Pfizer-BioNTech and Moderna COVID-19 vaccines, and one vaccine dose was considered complete for the J&J/Janssen COVID-19 vaccine. Individuals were considered fully vaccinated 14 days after receipt of the final dose. An individual was considered not fully immunized if they did not receive any vaccine doses, have only received a partial series, or have not yet reached 14 days after the completion of their vaccine series. COVID-19 vaccines with an error in the Medical Readiness Reporting System were removed from this analysis.

[2] Severe COVID-19 case defined as hospitalization or death reported in the Armed Forces Health Surveillance Division COVID-19 Master Positive List.
All hospitalized cases among fully immunized and boosted service members are manually reviewed by a clinician. Hospitalizations among not fully immunized service members are not manually reviewed.
Data Source: Medical Readiness Reporting System, Armed Forces Health Surveillance Division COVID-19 Master Positive List.
Prepared by the EpiData Center Department, Navy and Marine Corps Public Health Center, 09FEB2022.

Recently, with the introduction of the highly transmissible Omicron variant, US Navy personnel experienced another surge in cases despite widespread vaccination.  Importantly, though, the severity of cases has remained low and mission impact is significantly less as compared with predominance of prior strains (e.g., Delta variant).

Figure 3. Shipboard Outbreak Related Statistics

| Vessel/Location | Timeframe | Vaccination Rate | Attack Rate (Number of Cases) | Hospitalized | Deaths | Circumstances |
|---|---|---|---|---|---|---|
| CVN | March 2020 | 0 | 27% (1271) | 23 | 1 | Port visit exposure led to significant shipboard spread; major mission impact |
| DDG | April 2020 | 0 | 36% (121) | 4 | 0 | Port visit exposure led to significant shipboard spread; major mission impact |
| LHD | March 2021 | 0 | 7% (59) | 2 | 0 | 30 day ship certification event shortened by 19 days with early return to port due to outbreak 4 LIMDU from event, NY COVID variant. |
| DDG | July 2021 | >98% | 6% (22) | 0 | 0 | Port visit exposure led to minimal shipboard spread; no mission impact |
| LCS | Dec 2021 | 100%; 6+ months | 25% (29) | 0 | 0 | Home port exposure led to some shipboard spread; minimal mission impact |
| DDG | Dec 2021 | >98%; 6+ months | 37% (120) | 0 | 0 | Port visit exposure; outbreak while docked at port; some mission impact due to mitigation measures, cases were very mild |
| LHD* | Oct 2021-Jan 2022 | 98%; 6+ months | 7% (168) | 1** | 0 | Home port exposure led to continued baseline level of shipboard spread; two surges possibly linked to port visits; no mission impact |
| *Note that underestimation of cases is suspected<br>**Note that the single hospitalized case was unvaccinated<br>Prepared by the Preventative Medicine Directorate, Navy and Marine Corps Public Health Center | | | | | | |

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

U.S. NAVY SEALs 1-3; et al.,

                              Plaintiffs,

v.

LLOYD J. AUSTIN, III, in his official capacity as
United States Secretary of Defense; et al.,                    Case No. 4:21-CV-01236-O
                              Defendants.

## DECLARATION OF REAR ADMIRAL GAYLE D. SHAFFER

I, Rear Admiral Gayle D. Shaffer, U.S. Navy, hereby state and declare as follows:

1.      I am the Navy Deputy Surgeon General and Deputy Chief, Bureau of Medicine
and Surgery (BUMED), and I am currently stationed in Falls Church, Virginia.  I make this
declaration in my official capacity, based upon my personal knowledge and upon information
that has been provided to me in the course of my official duties.

2.      I began serving as the Navy Deputy Surgeon General and Deputy Chief, BUMED
on February 28, 2020.  In that capacity, I am thoroughly familiar with BUMED policy and
guidance to Navy medical providers regarding immunizations and vaccinations generally and
vaccination against COVID-19 in particular. I am also thoroughly familiar with the Medical
Readiness Reporting System (MRRS) and BUMED guidance for recording vaccinations and
deferral codes in MRRS.

3.      Per BUMED Instruction ("BUMEDINST") 6230.15B, *Immunizations and
Chemoprophylaxis for the Prevention of Infectious Diseases*, (Oct. 7, 2013), "[t]here are two

1

types of exemptions from immunization—medical and administrative. Granting medical exemptions is a medical function. Granting administrative exemptions is a nonmedical function." ¶ 2-6. BUMEDINST 6230.15B details two types of administrative exemptions applicable to service members—exemptions for separation or retirement and religious exemptions. Per BUMED Notice ("BUMEDNOTE") 6230, *Inapplicability of Administrative Exemption for Separation or Retirement to Immunization from Coronavirus Disease 2019* (Sep. 16, 2021), the separation or retirement exemption does not apply to immunization from COVID-19. Religious exemptions are granted by the Chief of Naval Personnel. *See* Bureau of Naval Personnel Instruction ("BUPERSINST") 1730.11A, *Standards and Procedures Governing the Accommodation of Religious Practices* (Mar. 16, 2020).

   4.  BUMEDINST 6230.15B, Appendix C, includes a table of standard administrative exemption codes. See Figure 1.1 below.  These codes are used in the Navy's electronic immunization tracking system, MRRS, and are assigned at the command level. There is no standardized process for requesting or granting these exemption codes.

2

**Figure 1.1**

| Administrative exemption codes | | | |
|---|---|---|---|
| Code | Meaning | Explanation of example | Duration |
| AD | Administrative, deceased | Individual is deceased. | Indefinite |
| AL | Administrative, emergency leave | Individual is on emergency leave. | Up to 30 days |
| AM | Administrative, missing | Missing in action, prisoner of war. | Indefinite |
| AP | Administrative, PCS | Permanent change of station. | Up to 90 days |
| AR | Administrative, refusal | Personnel involved in actions under the Uniformed Code of Military Justice, religious waiver. (Indefinite and revocable. May be revoked at any time. See paragraph 2–6b(2. | Until resolution |
| AS | Administrative, separation | Pending discharge, separation (typically within 60 days), and retirement (typically within 180 days). | Until 180 days |
| AT | Administrative, temporary | Absent without leave, legal action pending (other than code AR). | Until 90 days |
| NR | Not required | Individuals who received immunization while eligible, subsequently changed occupational category and now serve as civilian employees or contract workers not otherwise required to be immunized. | Indefinite |

BUMEDINST 6230.15B, App. C, Table C-2.

     5.     The exemption codes were updated for COVID-19 vaccination via

BUMEDNOTE 6150, *Guidance for Coronavirus Disease 2019 Vaccination Deferral Status*

*Reporting* (Sep. 21, 2021). Notably, BUMEDNOTE 6150 directed expiration of most temporary

administrative exemptions in 30 days, instead of 90 days, in order to ensure individual

vaccination status is updated at least every month. Although the BUMED Notice 6150 table

below indicates a 30-day duration for Administrative Separation (AS), those exemptions do not

expire in MRRS until 90 days have passed. See Figure 1.2. All other administrative exemptions

have the duration listed. Once expired, the exemption code in MRRS converts to an "Expired

Deferral" code to inform unit leadership and prompt MRRS users to update the system.

3

**Figure 1.2.**

| Deferral Code | Definitions | Duration |
|---|---|---|
| Admin Deceased (AD) | Individual is deceased | Indefinite |
| Admin Emergency Leave (AL) | Individual is on emergency leave | These designations will be in effect for only 30 days. After 30 days, the Service member will need to either receive the vaccine or update their deferral status. |
| Admin Permanent Change of Station (AP) | For individual already checked out of the command due to permanent change of station and awaiting to be gained at their next command. (Individuals should be vaccinated prior to permanent change status whenever possible) | |
| Admin Refusal (AR) | For individual without a medical contraindication who refused the vaccine and subjected to actions under the Uniformed Code of Military Justice. (May be revoked at any time.) | |
| Admin Separation (AS) | Individuals currently on terminal leave only. | |
| Admin Temporary (AT) | For individual that is operationally unavailable for vaccination. For example, deployed to a location or region where the mandatory vaccine is unavailable. | |
| Religious Accommodation Requested (RA) | RA is a subcategory of AR but for COVID-19 vaccinations, RA will be used separately to identify individuals awaiting determination of a religious accommodation exemption. | |
| Medical Temporary (MT) | 1. Individuals undergoing workup for Medical Contraindication to vaccination.<br>2. Confirmed COVID-19 cases awaiting recovery.<br>3. Pregnancy or other temporary medical contraindication as determined by a medical provider.<br>Note: Unless a Medical Evaluation Board is specifically related to a vaccine contraindication, MT must not be used for individuals awaiting Medical Evaluation Board, physical evaluation boards, or on limited duty. | |
| Medical Permanent (MP) | Not an appropriate option to be entered at the unit-level. Permanent medical exemptions should be entered by the appropriate authority after approval has been granted per references (e) and (i). | Indefinite |

BUMEDNOTE 6150, at 3.

4

6.      The Navy uses MRRS to track the medical readiness of the force, including the status of COVID-19 vaccinations.  MRRS provides an overview and accounting of the overall force's vaccination status.  MRRS entries are made at the command level.  Each command has a designated MRRS representative who updates medical readiness data, including vaccinations, for individual command members in the database.  That representative is responsible for entering a MRRS code, as it pertains to COVID-19 vaccination status, for each person attached to the command.  A MRRS administrator can generate reports at the command level or aggregated to show the vaccination status for the entire force.

7.      Most administrative exemption codes in MRRS only last 30 days before converting to an expired status to prompt command level follow up.  Thus, as various circumstances that result in the code are resolved, the number of administrative exemption codes declines.  Expired codes remain visible in MRRS for reporting and management of command-level readiness and overall force vaccination status.

8.      Admin Refusal (AR) and Expired Deferral-AR codes are not an exemption from vaccination. They are used to track those who have refused the vaccine and do not have an exemption request pending or approved exemption. Admin Separation (AS) and Expired-AS codes are not an exemption from vaccination. They are used when a member has begun terminal leave, which is a period of leave immediately preceding official separation or retirement from the Navy. The AS code converts to an expired code after 90 days.  Medical Permanent exemption codes in MRRS reflect both the number granted as well as the number pending adjudication.

5

9.      MRRS table from December 13, 2021

| TOTAL DEFERRAL | | |
|---|---|---|
| Deferral Type | USN | USNR |
| Admin Deceased | 5 | 3 |
| Admin PCS | 73 | 6 |
| Admin Refusal | 1445 | 442 |
| Admin Separation | 330 | 151 |
| Admin Temporary | 41 | 33 |
| Expired Deferral - AP | 74 | 9 |
| Expired Deferral - AR | 324 | 65 |
| Expired Deferral - AS | 12 | |
| Expired Deferral - AT | 31 | 37 |
| Expired Deferral - MT | 167 | 89 |
| Expired Deferral - RA | 530 | 157 |
| Medical Permanent | 17 | |
| Medical Temporary | 332 | 116 |
| Relig. Accom. Req | 1098 | 336 |
| Grand Total | 4479 | 1444 |

10.     MRRS table from January 10, 2022

| TOTAL DEFERRAL | | |
|---|---|---|
| Deferral Type | USN | USNR |
| Admin Deceased | 5 | 5 |
| Admin Emergency lv | 0 | 0 |
| Admin PCS | 47 | 0 |
| Admin Refusal | 1181 | 2275 |
| Admin Separation | 248 | 252 |
| Admin Temporary | 18 | 39 |
| Expired Deferral - AL | 0 | 0 |
| Expired Deferral - AP | 70 | 7 |
| Expired Deferral - AR | 530 | 133 |
| Expired Deferral - AT | 46 | 39 |
| Expired Deferral - MT | 201 | 39 |
| Expired Deferral - RA | 687 | 118 |
| Medical Permanent | 18 | 1 |
| Medical Temporary | 179 | 101 |
| Relig. Accom. Req | 706 | 351 |
| Grand Total | 3936 | 3360 |

6

11.    MRS table from February 14, 2022

| TOTAL DEFERRAL | | |
|---|---|---|
| Deferral Type | USN | USNR |
| Admin Deceased | 6 | 5 |
| Admin Emergency lv | 0 | 0 |
| Admin PCS | 29 | 1 |
| Admin Refusal | 1237 | 799 |
| Admin Separation | 227 | 226 |
| Admin Temporary | 13 | 8 |
| Expired Deferral - AL | 0 | 0 |
| Expired Deferral - AP | 58 | 5 |
| Expired Deferral - AR | 455 | 1184 |
| Expired Deferral - AS | 48 | 25 |
| Expired Deferral - AT | 40 | 52 |
| Expired Deferral - MT | 149 | 68 |
| Expired Deferral - RA | 644 | 210 |
| Medical Permanent | 16 | 1 |
| Medical Temporary | 151 | 47 |
| Relig. Accom. Req | 502 | 195 |
| Grand Total | 3575 | 2826 |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct. Executed this 22nd day of February, 2022.

G. D. SHAFFER
Rear Admiral, U.S. Navy

7