### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3;** on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; U.S. **NAVY SEALS 4-26; U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>                    Plaintiffs,<br><br>     v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>                    Defendants. | Case No. 4:21-cv-01236-O |

### APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASSWIDE PRELIMINARY INJUNCTION

| Ex. | Description | Bates Number(s) |
|---|---|---|
| 1 | Declaration of Commander Robert A. Green, Jr., USN | 0001-0035 |
| 2 | Declaration of Brian J. Ferguson | 0036-0102 |
| 3 | Declaration of Lieutenant Commander Erik V. De Sousa, USN | 0103-0129 |
| 4 | Declaration of Lieutenant Daniel Franklin, USN | 0130-0148 |
| 5 | Letter from United States Senator James Lankford to Secretary Lloyd J. Austin | 0149-0152 |

| 6 | Letter from United States Senator James Lankford to Acting Inspector General Sean O'Donnell | 0153-0155 |

Respectfully submitted this 28th day of February, 2022.

KELLY J. SHACKELFORD
  Texas Bar No. 18070950
JEFFREY C. MATEER
  Texas Bar No. 13185320
HIRAM S. SASSER, III
  Texas Bar No. 24039157
DAVID J. HACKER
  Texas Bar No. 24103323
MICHAEL D. BERRY
  Texas Bar No. 24085835
JUSTIN BUTTERFIELD
  Texas Bar No. 24062642
Danielle A. Runyan *
  New Jersey Bar No. 027232004
Holly M. Randall *
  Oklahoma Bar No. 34763
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
jmateer@firstliberty.org
hsasser@firstliberty.org
dhacker@firstliberty.org
mberry@firstliberty.org
jbutterfield@firstliberty.org
drunyan@firstliberty.org
hrandall@firstliberty.org


JORDAN E. PRATT
  Florida Bar No. 100958*  **
FIRST LIBERTY INSTITUTE
227 Pennsylvania Ave., SE
Washington, DC 20003
Tel: (972) 941-4444
jpratt@firstliberty.org


*Admitted pro hac vice.
** Not yet admitted to the D.C. Bar, but
admitted to practice law in Florida. Practicing
law in D.C. pursuant to D.C. Court of
Appeals Rule 49(c)(8) under the supervision
of an attorney admitted to the D.C. Bar.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER
  Texas Bar No. 24103325
ANDREW B. STEPHENS
  Texas Bar No. 24079396
HACKER STEPHENS LLP
108 Wild Basin Road South, Suite 250
Austin, Texas 78746
Tel.: (512) 399-3022
heather@hackerstephens.com
andrew@hackerstephens.com

*Attorneys for Plaintiffs*

# Exhibit 1

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| **U.S. NAVY SEALs 1-3**, on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, <br><br>                    Plaintiffs, <br><br>        v. <br><br> **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, <br><br>                    Defendants. | Case No. 4:21-cv-01236-O |

## DECLARATION OF COMMANDER ROBERT A. GREEN, JR., USN

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury as follows:

1.     I am over the age of eighteen and am competent to make this declaration.

2.     I have served in the United States Navy since entering the Naval Academy in the summer of 2003. I have had an exemplary career marked by sustained superior performance in challenging billets from a diverse variety of Navy warfighting communities and command echelons. I spent five years as a reserve officer and government civilian (GS-13) within the Navy's Acquisitions Workforce before reaffiliating back to permanent active duty in 2019. I have completed highly technical postgraduate education programs at multiple academic

1

institutions and have leveraged that education to help initiate data analytics efforts at several major commands.  In my promotion to the rank of Commander (O-5), the Navy saw fit to reward my exemplary performance with a merit reorder, essentially an early promotion based on merit. I was the Executive Officer (XO), or second-in-command, of Maritime Expeditionary Security Squadron EIGHT (MSRON-8).  I am currently assigned to the staff of Maritime Expeditionary Security Group TWO (MESG-2).

3.     I have sincere religious beliefs that preclude me from receiving the COVID-19 vaccination as ordered by my superiors in the Navy.  I submitted a religious accommodation request on September 15, 2021, requesting that the Navy waive the requirement for me to become vaccination against the COVID-19 virus. I submitted an addendum to that request on October 19, 2021.

4.     The Deputy Chief of Naval Operations (DCNO) (N1), Vice Admiral John B. Nowell, signed and dated a disapproval of my request on November 23, 2021. A copy of my denial letter is attached to this declaration as part of Exhibit A.  I have subsequently submitted an appeal of Vice Admiral Nowell's disapproval to Admiral Michael M. Gilday, the Chief of Naval Operations (CNO).  To my knowledge that appeal is still pending and has not been adjudicated.

5.     On December 23, 2021, I filed a complaint under Article 1150, U.S. Navy Regulations, against Vice Admiral Nowell, for his violations of law and military regulations.  In it I clearly explained that my complaint was a protected communication under the Military Whistleblower Protection Act, 10 U.S.C. § 1034. The basis for the complaint is that (1) the disapproval of my religious accommodation request was pre-determined, (2) the letter Vice Admiral Nowell sent disapproving my religious accommodation request was a form template, and (3) the case-by-case review of my request required by law and regulation was a fraud

2

designed to have the appearance of following regulation but was actually conducted after my disapproval letter was written, all DCNO (N1) documentation supporting my disapproval was packaged, and all intermediate routing steps of my religious accommodation request were completed.  A copy of my complaint is attached to this declaration as Exhibit A.

6.      In support of my complaint against Vice Admiral Nowell, I attached the Standard Operating Procedure (SOP) used by Vice Admiral Nowell and his staff to deny religious accommodation requests, which I was given by a member of Vice Admiral Nowell's staff.  The SOP demonstrates clear violations of 42 U.S.C. §2000bb-1, DODINST 1300.17, and BUPERSINST 1730.11A by Vice Admiral Nowell and his staff.  A copy of the SOP is attached to this declaration as part of Exhibit A.

7.      Aside from the fact that the person I received the SOP from was a member of the DCNO's staff, the metadata in the SOP file demonstrates that it was created by the DCNO's office.  The file shows that the author of the SOP was "Neuer, Richard A LTJG USN COMNAVDIST WASH DC (USA)."   Richard Neuer, now a Lieutenant in the Navy, is a member of the DCNO N1 staff.  In addition, the form denial letter shown in the SOP is nearly identical to my own denial letter, and nearly identical to all other denial letters I've seen that were given to others seeking religious accommodations, including sailors in circumstances very different from my own.

8.      On Friday, January 7, 2022, four days after this Court issued the preliminary injunction relying in part on the SOP document attached to my complaint, I was relieved of my duty as XO of MSRON-8 and assigned to the staff of MESG-2.

9.      In an email to the command, my commanding officer stated that I was relieved of duty "while a vaccine waiver works its way through the system."  I was not relieved because of

my job performance.  My commanding officer specifically stated:  "Effective immediately CDR Green is no longer XO of MSRON EIGHT.  He has been reassigned TAD to MESG2 while a vaccine waiver works its way through the system.  CDR Green leaves huge shoes to fill, he was a professional who did excellent work and his presence and professionalism will be difficult to replace."  A copy of this email is attached to this declaration as Exhibit B.

10.     On January 7, 2022, I sent a memorandum to the members of the House and Senate Armed Services Committee under the Military Whistleblower Protection Act, 10 U.S.C. § 1034, urging Congress to call for an immediate end of religious discrimination in the military and urging them hold Navy leaders accountable for violating the constitutional rights of sailors. The memorandum is attached to this declaration as Exhibit C.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2022.


_____

ROBERT A. GREEN, JR.

# EXHIBIT A

23 Dec 21

From:   Commander Robert A. Green Jr., USN/1117
To:     Chief of Naval Operations
Via:    (1) Commander, Maritime Expeditionary Security Squadron EIGHT
        (2) Vice Admiral John B. Nowell
        (3) Commander, United States Fleet Forces Command
        (4) Commander, Navy Expeditionary Combat Command
        (5) Commander, Maritime Expeditionary Security Group TWO

Subj:   COMPLAINT OF WRONG UNDER ARTICLE 1150, U.S. NAVY REGULATIONS

Ref:    (a) Article 1150, U.S. Navy Regulations
        (b) JAGINST 5800.7G, Chapter III
        (c) SECDEF Memo of 24 Aug 2021, Mandatory Coronavirus Disease 2019 Vaccination of
        Department of Defense Service Members
        (d) SECNAV WASHINGTDON DC 302126Z Aug 21(ALNAV 062/21)
        (e) CNO WASHINGTON DC 311913Z Aug 21 (NAVADMIN 190/21)
        (f) 42 U.S.C. 2000bb-1
        (g) DOD Instruction 1300.17, Religious Liberty in the Military Services
        (h) BUPERSINST 1730.11a, Standards and Procedures Governing the Accommodation of
        Religious Practices

Encl:   (1) DCNO (N1) Standard Operating Procedure (SOP), Religious Accommodations SOP Nov 2021
        (2) DCNO (N1) Disapproval of Religious Accommodation Through Waiver of Immunization
        Requirements, To CDR Robert A Green Jr., 23 Nov 21

1.  This complaint of wrong under reference (a) is submitted in compliance with reference (b).

2.  Complainant Information:

    a.  Current Command: Maritime Expeditionary Security Squadron EIGHT

    b.  Command at time of alleged wrong: Maritime Expeditionary Security Squadron EIGHT

    c.  PRD: August, 2022

    d.  Current mailing address and e-mail address:

        
        robert.a.green1@navy.mil

    e.  Permanent home address and email address:

        
        robert.a.green1@navy.mil

3.  Respondent Information:

    a.  Rank and Name: Vice Admiral John Nowell, USN

    b.  Organization: Deputy Chief of Naval Operations (N1)

1

4.   Complaint:

    a.   Type of Alleged Wrong: Denial of complainant's Constitutional rights under the First and Fifth Amendments through a violation of 42 U.S.C. 2000bb-1, DODINST 1300.17, and BUPERSINST 1730.11A.

        (1)   Date alleged wrong discovered: 29 November, 2021

        (2)   Date written request for redress was submitted to complainant's commanding officer: N/A

        (3)   Date answer to request for redress was received: N/A

        (4)   Number of calendar days between alleged wrong and submission of complaint: 24 days

        (5)   Specific, detailed explanation of alleged wrong committed:

On 15 September 2021, I submitted a request to waive COVID-19 immunization requirements due to my religious beliefs that preclude me from receiving a COVID-19 vaccination.  I submitted an addendum to that request on 19 October 2021.  The Deputy Chief of Naval Operations (DCNO)(N1), Vice Admiral Nowell, signed and dated a disapproval of my request on 23 November 2021.

My religious accommodation request was processed by the OPNAV N131 Religious Accommodation team.  Enclosure (1) is the Standard Operating Procedure (hereafter DCNO(N1) SOP) that Vice Admiral Nowell and his staff followed to handle the vast increase in COVID-19 related immunization waiver requests resulting from the various military COVID-19 vaccine orders, references (c) through (e).  The DCNO(N1) SOP instructs OPNAV N131 staffers on the exact steps to take upon receipt of a religious accommodation request including computer screenshots that demonstrate what lines of text to write and what buttons to click.  The DCNO(N1) SOP is broken down into 6 phases, complete with 50 total steps.  Many of the steps are fairly innocuous such as Phase 0 Step 2 which requires the staffer to "[r]eply all to the [accommodation request] email and acknowledge receipt of the request with the following response:"  Several of the DCNO(N1) SOP steps, however, are not innocuous and provide clear evidence of violations of law per 42 U.S.C. 2000bb-1, and regulations per DODINST 1300.17 and BUPERSINST 1730.11A.  I will demonstrate in this complaint that I have been wronged by Vice Admiral Nowell's violations of law and regulations through his use of the DCNO(N1) SOP process in denying my request for religious accommodation.  Specifically, I will use the DCNO(N1) SOP to demonstrate 1) that the disapproval of my religious accommodation request was pre-determined, 2) that the letter Vice Admiral Nowell sent disapproving my religious accommodation request was a form template, and 3) that the case-by-case review of my request required by law and regulation was a fraud designed to have the appearance of following regulation but was actually conducted after my disapproval letter was written, all DCNO(N1) documentation supporting my disapproval was packaged, and all intermediate routing steps of my religious accommodation request was completed.

The first 13 steps of the DCNO(N1) SOP are preparation steps in which the OPNAV N131 staffer verifies that the request has all of the required documents and that those documents are moved to the appropriate folder on the shared drive.  If the religious accommodation request does have all of the proper documents, then astonishingly, the very first processing step a staffer makes is to add the disapproval template to the folder and to rename the disapproval template file to include the Last Name, First Name, and Rank of the religious accommodation requester.  This is done in Step 14.

2

The very next step, Step 15 on page 7, asks the staffer to open the disapproval template and update the "TO:" line with the requester's Name, Rank, and Designator. DCNO(N1) SOP Step 15 also shows a picture of the disapproval template complete with highlighted portions to indicate what must be replaced with the requester's information in order to prepare the disapproval for routing. There is no approval template mentioned in the SOP. In fact, there is no indication that an approval template has ever been written. I found it shocking that Vice Admiral Nowell permits a process so riddled with systemic religious discrimination that my request was not even reviewed before a disapproval letter was added, tailored to include my name, and only then was routed for review.

The next several steps of the DCNO(N1) SOP direct the OPNAV N131 staffer to prepare the religious accommodation package for routing within their document routing system. Step 20 lists who must review the religious accommodation request including BUMED (Rear Admiral Gillingham), Policy and Strategy (N0975), the Officer Plans and Policy Office, the Special Assistant for Legal Matters, N1 Fleet Master Chief, Total Force Manpower and Personnel Plans and Policy (N13 Front Office), and finally Manpower, Personnel, Training, and Education (N1 Front Office). I felt betrayed to know that my religious accommodation request went to these offices for review with a pre-prepared disapproval letter already included within the package.

Once routing/review is completed by the above offices, the OPNAV N131 staffer begins to package groups of religious accommodation requests together for final signature. This is done in Steps 30 through 32. Step 33 directs the OPNAV N131 staffer to update an internal memo from N13 to Vice Admiral Nowell. This internal memo asks Vice Admiral Nowell to "sign TABs A1 through A10, letters disapproving immunization waiver requests based on sincerely held religious beliefs." TAB B lists all supporting documents including the original religious accommodation request from the requester. It is clear from the DCNO(N1) SOP that all TAB A letters are the same disapproval template letters prepared by the OPNAV N131 staffers in Step 15 immediately upon receipt of the initial religious accommodation request.

Steps 35-38 list the first time an OPNAV N131 staffer is asked to actually read through the religious accommodation request and begin to list details from the request in a spreadsheet for Vice Admiral Nowell's "review". There is a note in ALL CAPS which emphasizes the importance of this review to building the façade that the religious accommodation requests are receiving a case-by-case examination. The note states: "THIS IS THE MOST CRITICAL STEP IN THE ENTIRE PROCESS AND THE CNO AND CNP ARE RELYING ON YOU TO ENSURE THAT YOUR REVIEW IS THOUROUGH AND ACCURATE. DO NOT RUSH THIS PROCESS AND ENSURE THAT YOU UNDERSTAND BEFORE MOVING FORWARD." This step is critical to disguising the systemic religious discrimination within the DCNO(N1) SOP process because according to reference (h) they are required to review each request "on a case-by-case basis, giving consideration to the full range of facts and circumstances relevant to the specific request." Reference (h) goes on to state that "[r]equests to accommodate religious practices should not be approved or denied simply because similar requests were approved or denied." The most significant problem with the DCNO(N1) SOP is that the case-by-case "review" does not happen until Step 35 in the process. By this point, my disapproval letter had already been written (Step 15), my religious accommodation request and related documents had already been returned from the various required reviewing offices (Steps 16-29), my disapproval and religious accommodation request had already been packaged within a batch of other similar requests (Steps 30-32), and, finally, an internal memo had already been drafted from DCNO (N13) to DCNO (N1) requesting that Vice Admiral Nowell disapprove my religious accommodation request (Step 33). All this occurred prior to the official "review" of my religious accommodation request required by law and regulation.

After my entire disapproval package was built and then prepared for Vice Admiral Nowell to sign, the DCNO(N1) SOP Steps 35-38 finally direct the OPNAV N131 staffer to read the entirety of my religious accommodation request package including my original request, the BUMED Memo, and the Legal Memo.

3

They are then directed to add any additional pertinent information from the package and place that information into a spreadsheet. This spreadsheet is evidence, not of a true case-by-case review of the religious accommodation request, because the result at this point in the DCNO(N1) SOP process, is a forgone conclusion. This spreadsheet is evidence instead of the systematic and deliberate attempts taken by Vice Admiral Nowell and his staff to appear compliant with regulatory requirements while actually depriving me of my rights to due process under the Fifth Amendment and my rights to freedom of religious expression under the First Amendment of the Constitution.

In addition to fraudulently attempting to appear legal and in compliance with regulation, it is plainly clear that the DCNO(N1) SOP process is also designed to streamline the subsequent (and pre-determined) disapproval upon receipt of a religious accommodation request. The DCNO(N1) SOP, especially Step 35, makes it clear that the secondary goal (after streamlining the pre-determined disapproval), is to protect Vice Admiral Nowell from potential legal blowback in the event he is asked for proof that a case-by-case review was completed for each religious accommodation request. Even though the DCNO(N1) SOP is blatantly defying requirements under both law and regulation, in my personal disapproval letter, enclosure (2), Vice Admiral Nowell made the statement that "[a]ll requests for accommodation of religious practices are assessed on a case-by-case basis." Vice Admiral Nowell goes on to state that "[i]n making this decision, I reviewed reference (g) [my religious accommodation request], including the endorsements from your chain of command, the local chaplain and the advice of Chief, Bureau of Medicine and Surgery in reference (h)." While the DCNO(N1) SOP cannot prove that Vice Admiral Nowell is lying in making this last statement, enclosure (1) does prove that any review of my religious accommodation request that Vice Admiral Nowell may or may not have conducted, had no bearing on my discriminatory and pre-determined disapproval which he signed on 23 November, 2021.

Vice Admiral Nowell and his staff are ignoring the requirements of both the Religious Freedom Restoration Act and DODINST 1300.17. The requirements under law, per reference (f), and the requirements of policy, per reference (g), oblige the Navy to accommodate my religious freedom unless 1) the military policy, practice, or duty is in furtherance of a compelling governmental interest, and 2) it is the least restrictive means of furthering that compelling governmental interest. Both references (f) and (g) also place the burden of proof for the compelling governmental interest and least restrictive means "upon the DoD Component and not upon the individual requesting the exemption." In denying my request, as demonstrated throughout both enclosures (1) and (2), Vice Admiral Nowell failed to prove a compelling governmental interest. In fact, Vice Admiral Nowell denied my request using a disapproval template and relied upon a BUMED Memo which was also a preprepared template. Neither the disapproval template used by Vice Admiral Nowell, nor the BUMED template used by Rear Admiral Gillingham, addressed in any way the overwhelming evidence I provided in my original religious accommodation request from 15 September 2021, and my addendum from 19 October 2021.

Vice Admiral Nowell has violated both law and regulation in utilizing the discriminatory process established in the DCNO(N1) SOP. This process attempts to circumvent established standards required by both law and regulation while attempting to hide unlawful actions behind an intentionally designed façade meant to wrongfully appear compliant with regulatory standards. The discriminatory process used by Vice Admiral Nowell to disapprove my religious accommodation request has caused me personal detriment by denying me my right to due process under the Fifth Amendment and my right to freedom of religious expression under the First Amendment of the Constitution. The process used by Vice Admiral Nowell to review religious accommodation requests must be brought into compliance with law and regulation immediately before more sailors are harmed.

I have deep concerns that this complaint, detailing the discriminatory disapproval process for religious accommodations in the Navy, will not be properly address and will instead be ignored and dismissed. Due to these concerns I intend to copy this communication to both the House and Senate Armed

4

Services Committees in the hope that this will ensure that all unlawful religious discrimination in the Navy is properly addressed. I also remind reviewers of this complaint that this is a protected communication under 10 U.S.C. 1034 and its implementing regulations.

> (6) As redress I respectfully request that you immediately cease the unlawful and discriminatory review process for Navy Religious Accommodations and that you rescind my disapproval and all such disapprovals executed to date. I also request that you re-review each such religious accommodation request in accordance with law and regulation, including meeting the government's burden of proof as required by 42 U.S.C. 2000bb-1 and DODINST 1300.17.

5. I CERTIFY THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, AND THIS COMPLAINT IS SUBMITTED PER THE GUIDELINES AND PROCEDURAL REQUIREMENTS IN CHAPTER III, MANUAL OF THE JUDGE ADVOCATE GENERAL.

SIGNATURE OF COMPLAINANT:  Date: 12/23/21

SIGNATURE OF WITNESS:  Date: 23dec 21

## PRIVACY ACT STATEMENT

1. Authority. 10 U.S.C. §§ 938, 8013.

2. Principal purpose(s). Used by command authorities and the Office of the Judge Advocate General to review, take action, and make recommendations to the Secretary of the Navy on Article 138, UCMJ, and Article 1150, U.S. Navy Regulations, complaints of Wrong.

3. Routine uses. The Blanket Routine Uses that appear at the beginning of the Department of the Navy's compilation in the Federal Register apply.

4. Mandatory or voluntary disclosure and effect on individual not providing information. Providing requested information is voluntary; however, failure to do so may result in delayed command action and Secretarial review, or the inability to notify complainant of the Secretary's decision.

5

## Religious Accommodations

**Background:** On 22 January 2014, SECDEF released a new DoDI (see TAB A) changing the way requests for religious accommodation would be routed and reviewed. Previously, Commanding Officers had the authority to approve or deny requests for religious accommodation. There was no consistency and some Commanding Officers did not significantly evaluate the request. The DoDI transferred the decision authority for all requests for religious accommodation that fall outside current uniform and grooming standards as well as Navy policy to CNP. In order to ensure each request is given due consideration, the DoDI instructs CNP to view each request in its entirety. Each request is evaluated on a case by case basis. For example, a request from an operational member to grow a beard may be denied, while the same request made by a Sailor on shore duty could be approved. Whatever the decision, it is only valid while the Sailor's circumstances remain the same. If the Sailor executes PCS orders or the nature of the Sailor's work changes significantly, a new request will have to be routed. The Sailor must abide by current Navy standards and policy while the request is being adjudicated. Reservists also fall under this instruction. They are required to submit their requests via the same channels as active duty.

# Step-by-Step Instructions

## Phase 0 (Steps 1 – 5)

1. N131 receives Religious Accommodation (RA) requests via a functional email distro, ALTN_Navy_Religious_Accommodations@navy.mil. The inbox only reliably receives email from NMCI email addresses, so submitters are encouraged to send an email without an encrypted endorsement first to ensure communication is received. Here is an example of an email requesting consideration of an RA:



2.  Reply all to the email and acknowledge receipt of the request with the following response:

---

YN2,

I have received your message and will begin routing the RA package for ███████████.

An individual response letter will be returned to the command once the member's accommodation has been adjudicated.

Very Respectfully,

---

3.  Go to the Phase 0 - N131 Pre-Tracker folder on the shared drive and select the appropriate folder.



4.  Create a new folder with the following nomenclature: Last, First RANK.



5.  Drag and drop a copy of the request and the original email.



## Phase 1a (Steps 6 – 13)

6. Open the RA Tracker located on the shared drive at N131 > N131D > 2N131D23 RA Tracker > Data tab. Add the new request to the bottom of the spreadsheet and ensure there are no duplicate entries. Fill in all vacant fields using the Original request as the authoritative data source



7. Move the file to the Phase 1 - Initial Intake\Phase 1 - Immunizations\00 Initial Drop Off folder.

BUPERS_ALTN_N45997_N13 (\\naeawnydfs101v.nadsusea.nads.navy.mi\cs022$) (Z:) › N131 › N131D › 2N131D22 RA Adjudications › Phase 1 - Inital Intake › Phase 1 - Immunizations › 00 Initial Drop Off

| Name | Date modified | Type | Size |
|---|---|---|---|
| ▮▮▮MA2 | 11/2/2021 11:42 PM | File folder | |
| ▮▮▮LCDR | 11/1/2021 6:21 PM | File folder | |
| ▮▮▮AM2 | 11/2/2021 11:46 PM | File folder | |
| ▮▮▮FTC | 11/2/2021 11:47 PM | File folder | |

8. Open the original request to ensure the following are included IAW BUPERSINST 1730.11A and MILPERSMAN 1730-020: (Appeals only require member's request and command endorsement)
   a. Member's Request
   b. Command Endorsement (+Second Endorsement if not an O-6 Command)
   c. Chaplain Memo
   d. Chaplain Checklist
   e. Page 13 (Immunizations Only)

9. The Member's request should look like this and addressed to the CO, or CNO or DCNO (N1)



10. A Command Endorsement with a CO recommendation (ISIC required if not an O-6);



11. Chaplain Memorandum for the Record and interview checklist from the Chaplain who interviewed the Sailor about the request for religious accommodation.



12. Page 13 (Immunizations Only)



13. If all the documents are included and completed properly route to RA Adjudications\Phase 1 - Initial Intake\Phase 1 - Immunizations\01 Ready For Processing

    a. If any of those items are missing, send to 02 Packages Awaiting Documents so the command can be contacted to inquire their whereabouts or the reasons for the error.
        i. Contact Command via email and follow up with a phone call within 48 hours
        ii. Ensure the folder is labeled with the missing documents

    b. If there are multiple files send to 03 Folders That Need to Be Consolidated so the items can be consolidated and routed to are missing, send to 02 Packages Awaiting Documents so the command can be contacted to 01 Ready For Processing.

    c. If the request is for a Sailor assigned to a joint command, move it to 04 Sailors Jointly Assigned - Do Not Process

    d. If the member sends an email withdrawing their request, add the email to their folder and move to 05 Member Withdrawn - DO NOT PROCESS\

    e. For any other issues, move to 06 Other Issues - LT Neuer Review

## Phase 1 (Steps 14 – 15)

14. Inside the Phase 1 - Immunizations\01 Ready For Processing folder, add the most recent RA Response Letter template and rename the files to the following nomenclature:
    a. 1 - RA Response Letter ICO *Last First RANK*
    b. 2 - RA Request ICO *Last First RANK*
    c. 5 - Original Email ICO *Last First RANK*



> N131D > 2N131D22 RA Adjudications > Phase 1 - Initial Intake > Phase 1 - Immunizations > 01 Ready For Processing > FCC Hickman (A-F) > Achanzar, Joshua HN

| Name | Date modified | Type | Size |
|---|---|---|---|
| 1 - RA Response Letter ICO ▆▆▆▆ HN | 10/27/2021 9:35 AM | Microsoft Word D... | 43 KB |
| 2 - RA Request ICO ▆▆▆▆ HN | 10/28/2021 7:10 PM | Adobe Acrobat D... | 512 KB |
| 5 - Original Email ICO ▆▆▆▆ HN | 11/1/2021 11:34 AM | Outlook Item | 618 KB |

15. Open 1 - RA Response Letter ICO Last, First RANK to update the response letter to reflect the new request's specific information from the 2 – RA Request ICO Last, First RANK document. The highlighted sections below are the sections that will need to be updated. Save those changes and route to Phase 3 after verification of all five initial documents are confirmed from Step 8.



DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/

From: Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To: RATE/RANK (DESIG) First MI Last, USN
Via: Commanding Officer, PCU HYMAN G. RICKOVER (SSN 795)

Subj: REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF IMMUNIZATION REQUIREMENTS

Ref: (a) 42 U.S.C. §2000bb-1
     (b) DoD Instruction 1300.17 of 1 September 2020
     (c) SECNAVINST 1730.8B
     (d) ASN (M&RA) memo of 6 June 13
     (e) MILPERSMAN 1730-020
     (f) United States Attorney General memo of 6 October 17
     (g) Your ltr of 20 Dec 20 w/ends
     (h) BUMED ltr 6320 Ser M44/21UMXXXXX of dd Mmm yy

1. Pursuant to references (a) through (h), your request for religious accommodation through waiver of immunization requirements is disapproved. You must receive all required vaccines. However, you are free to request from your healthcare provider alternative vaccines that are available and meet the Navy's immunization requirements, as determined by a credentialed military healthcare provider. You are free to choose which COVID-19 vaccine to take. If you choose a COVID-19 vaccine that requires two doses, you must receive your first dose within five calendar (5) days upon receipt of this letter and complete the series as prescribed. If you choose a one-dose vaccine you must meet the established vaccination timeline or receive the vaccine within five calendar (5) days upon receipt of this letter, whichever is later.

2. In line with references (b) through (d), I am designated as the approval authority for requests for religious accommodation.

3. Reference (a), the Religious Freedom Restoration Act (RFRA), states that the Government may substantially burden an individual's exercise of religion only if it demonstrates that application of the burden to the person is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. Reference (b) incorporates the RFRA and notes that the Government has a compelling interest in mission accomplishment, to include military readiness, unit cohesion, good order and discipline, health and safety, on both individual and unit levels. Additionally, unless it will have an adverse impact on mission accomplishment, including military readiness, unit cohesion and good order and discipline, the Navy will accommodate individual expressions of sincerely held beliefs of Sailors. Reference (f)

## Phase 3 (Steps 16 – 28)

16. Uploaded into DonTracker. Visit dontracker.navy.mil to log in.



17. Once logged in, go to Taskers > Inbox



18. Once at the Inbox, select New > Templates > Religious Accommodation Request.



19. Under Tasker Details fill in the following information:

    a. Subject—Religious Accommodation ICO *Rank/Rate Last Name*;

    b. Due Date—Due date is 7 days, but select the next business day;

    c. Priority—Select Medium;

    d. Point of Contact—Insert the name of the person who is responsible for the process.



20. Under Responders, is where you designate who reviews the tasker and their respective deadlines.

    e.   Due Dates will automatically be populated based on the 7-day deadline;

            i.   BUMED (SECRETARIAT - TASKER GROUP) (BUMED (FRONT OFFICE))

           ii.   POLICY AND STRATEGY (N0975 TASKER GROUP)

          iii.   SPECIAL ASSISTANT FOR LEGAL MATTERS (CNP LEGAL FRONT OFFICE)

          iv.   N1 FLEET MASTER CHIEF (N1 FLEET)



21. In the Attachments section, select Add Attachment > Add Local Files > then select and categorize the following files:

    f.   1 - RA Response Letter ICO *Last First RANK* (Organizational Response)

    g.   2 - RA Request ICO *Last First RANK* (Original Source Document)



22. Below is completed tasker. If no other changes are necessary, click Send to begin the workflow.



23. Once the workflow has started, you will receive the following message.



24. You must periodically check the status of the by going to your Inbox > Awaiting Responses. The taskers can be sorted by tasker number, subject, due date, etc. By clicking on a tasker, you can see where the tasker is in the process in the Tasker Details window,



25. Retrieve legal memos from the following folder: RA Adjudications\New Legal Memo Dropoff and add to the folder.

26. Once a response by BUMED populates, download the BUMED Memo to the member's folder. Ensure the name and date of member's request are accurate (if not correct send back for rework).

27.  Update Date/Serial in Ref H on the Response Letter (1 - Response Letter ICO Last, First RANK)



DEPARTMENT OF THE NAVY
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/

From:   Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To:     RATE/RANK (DESIG) First MI Last, USN
Via:    Commanding Officer, PCU HYMAN G. RICKOVER (SSN 795)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
        IMMUNIZATION REQUIREMENTS

Ref:    (a) 42 U.S.C. §2000bb-1
        (b) DoD Instruction 1300.17 of 1 September 2020
        (c) SECNAVINST 1730.8B
        (d) ASN (M&RA) memo of 6 June 13
        (e) MILPERSMAN 1730-020
        (f) United States Attorney General memo of 6 October 17
        (g) Your ltr of 20 Dec 20 w/ends
        (h) BUMED ltr 6320 Ser M44/21UMXXXXX of dd Mmm yy

1.   Pursuant to references (a) through (h), your request for religious accommodation through
waiver of immunization requirements is disapproved.  You must receive all required vaccines.
However, you are free to request from your healthcare provider alternative vaccines that are
available and meet the Navy's immunization requirements, as determined by a credentialed
military healthcare provider. You are free to choose which COVID-19 vaccine to take. If you
choose a COVID-19 vaccine that requires two doses, you must receive your first dose within five
calendar (5) days upon receipt of this letter and complete the series as prescribed. If you choose a
one-dose vaccine you must meet the established vaccination timeline or receive the vaccine
within five calendar (5) days upon receipt of this letter, whichever is later.

2.   In line with references (b) through (d), I am designated as the approval authority for requests
for religious accommodation.

3.   Reference (a), the Religious Freedom Restoration Act (RFRA), states that the Government
may substantially burden an individual's exercise of religion only if it demonstrates that
application of the burden to the person is in furtherance of a compelling governmental interest
and is the least restrictive means of furthering that interest.  Reference (b) incorporates the RFRA
and notes that the Government has a compelling interest in mission accomplishment, to include
military readiness, unit cohesion, good order and discipline, health and safety, on both individual
and unit levels.  Additionally, unless it will have an adverse impact on mission accomplishment,

28.  Once a tasker has been responded to by N0975, CNP LEGAL FRONT OFFICE, N1 FLEET, and
BUMED, send to the Phase 4 folder  - 0 Ready For Processing / 00 Phase 3 Drop Off



| Name | Date modified | Type | Size |
|------|---------------|------|------|
| 0 Ready For Processing | 11/2/2021 8:17 PM | File folder | |
| 1 Awaiting LT | 11/2/2021 8:11 PM | File folder | |

29.  Do not forward unless all stakeholders have reviewed and following documents are in the folder:
   a.   1 - RA Response Letter ICO *Last First RANK*
   b.   2 - RA Request ICO *Last First RANK*
   c.   3 - RA Legal Memo ICO *Last First RANK*
   d.   4 - BUMED Memo ICO *Last First RANK*
   e.   5 - Original Email ICO *Last First RANK*

## Phase 4 (Steps 29 – 44)

30. Create a new folder with the following nomenclature:
    a. DD_MON_YY – In Progress



31. Add 10 folders from 00 Phase 3 Drop Off folder
    a. Priority (CMD Triad/Other Priority)
    b. Officers/E-9
    c. Oldest to Newest Active Duty/MOB/RECALL
    d. SELRES

32. Add the following documents to the DD_MON_YY – In Progress folder
    a. N13 to N1 Buckslip - Template
    b. REF B - RA Immunizations Requests Tracker Template
    c. TAB C Coordination Page RA Template
    d. REF A - DCNO N1 1730 ltr Ser 114168 of 20 Aug 21

33. Open N13 to N1 Buckslip. Update the date and list of 10 attachments based on the selected files.



34. Open the following document: REF B - RA Immunizations Requests Tracker Template



35. Begin filling in the spreadsheet after reading through the entirety of the buckslip, original request, BUMED and Legal Memos and add any pertinent information for DCNO (N1) to consider. THIS IS THE MOST CRITICAL STEP IN THE ENTIRE PROCESS AND THE CNO AND CNP ARE RELYING ON YOU TO ENSURE THAT YOUR REVIEW IS THOUROUGH AND ACCURATE. DO NOT RUSH THIS PROCESS AND ENSURE THAT YOU UNDERSTAND BEFORE MOVING FORWARD.

36. Ensure all the information (dates/name spellings/letter formatting) match.

37. Move to the right side of the spreadsheet.



38. When Complete, save changes as DD_MON_YY

39. Open "TAB C - Coordination Page – *Rank/Rate Last Name*" to update the dates on the coordination page to the current date of processing to match the folder. Save the changes.



COORDINATION PAGE

**Sailor Request** - Accommodation from MILPERSMAN 1730-020 to waive immunization requirements.

**DCNO N1 Response** – Disapproval (Member and Fleet Safety)

| Office/Dept | Point of Contact/Title | Phone | Date | Remarks |
|---|---|---|---|---|
| OPNAV (N0975) | LCDR S. Deese | (703) 695-3824 | 25 Sep 21 | The interviewing chaplain adequately advised the command on the requestor's sincerity and the religious nature of their beliefs. |
| OPNAV N1 FLT equity for Officers | FLTCM W. Koshoffer | (703) 604-2616 | 25 Sep 21 | Concur/ No |
| OPNAV N1 JAG | CDR A. Leahy | (703) 604-5804 | 25 Sep 21 | Concur |
| OPNAV (N131) | CDR D. Cua | (703) 604-5023 | 25 Sep 21 | Concur |
| OPNAV (N13) | RADM J. P. Waters | (703) 604-5040 | | |
| OPNAV (N1) | VADM John B. Nowell, Jr | (703) 604-2748 | _____ | _____ |

40. Upon Completion of the file modification, move entire file to 4 - Ready for N131 Review\2 Awaiting N131 Review (LT Didawick) or 3 Awaiting N131 Review (CDR Cua) based on your assigned reviewer identified on the organization chart.

41. Rename Folder and files with appropriate batch number
    a. DD_MON_YY-1 (1st Batch)
    b. DD_MON_YY-2 (2nd Batch)

42. After Review from Phase 4 is complete, drop files in the following folder:
    \\naeawnydfs101v.nadsusea.nads.navy.mil\CS021$\BUPERS_ALTN_N45997_N1\COVID-19 RA

43. Link the spreadsheet in the folder to the locations by pressing CTRL+K on the word "here"

44. Email the N13 Front office that the folder is ready.



| Send | To... | Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) |
|---|---|---|
| | Cc... | Ausen, Kelsey R PO1 USN DCNO N1 (USA); Molina, Gary LCDR USN DCNO N1 (USA); Didawick, Joshua A LT USN DCNO N1 (USA) <joshua.didawick@navy.mil> |
| | Subject | Ready for Review 2_Nov_21-2 |

Deputy,

Please see RA 2_Nov_21-2 at your earliest convenience here.

V/r

## Phase 5 (Steps 45 – 47)

45. The request will be routed through the deputy to N13. Once a decision is made by N13, the N13 Administrative Assistant will update the Coordination Page and Buckslip then send the request to N1 via email.

46. Once a final decision has been made on the request, N1 will return the signed TAB A – Response Letter – RA ICO *Rank/Rate Last Name*.

47. N13 Front Office will save the letter in the Sailor's RA Request folder as "DCNO Signed – *Rank/Rate Last Name* RA" and a notification email will be sent to N131.

## Phase 6 (Steps 48 – 50)

48. An email containing that letter is emailed to the Sailor via their command by replying to the original email request.



49. Update the RA Tracker workbook's Data tab to reflect the dates of the process and approval/disapproval.

50. Move the folder to RA Adjudications > 00 ARCHIVED REQUESTS.





**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/115772
23 Nov 21

From: Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To:     CDR Robert A. Green Jr., USN
Via:    Commanding Officer, Maritime Expeditionary Security Squadron EIGHT

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
       IMMUNIZATION REQUIREMENTS

Ref:   (a) 42 U.S.C. §2000bb-1
       (b) DoD Instruction 1300.17 of 1 September 2020
       (c) SECNAVINST 1730.8B
       (d) ASN (M&RA) memo of 6 Jun 13
       (e) MILPERSMAN 1730-020
       (f) United States Attorney General memo of 6 Oct 17
       (g) Your ltr of 19 Oct 21 w/ends
       (h) BUMED ltr 6320 Ser M44/21UM41350 of 28 Oct 21

1.  Pursuant to references (a) through (h), your request for religious accommodation through
waiver of immunization requirements is disapproved. You must receive all required vaccines.
However, you are free to request from your healthcare provider alternative vaccines that are
available and meet the Navy's immunization requirements, as determined by a credentialed
military healthcare provider. You are free to choose which COVID-19 vaccine to take. If you
choose a COVID-19 vaccine that requires two doses, you must receive your first dose within five
calendar (5) days upon receipt of this letter and complete the series as prescribed. If you choose
a one-dose vaccine you must receive the vaccine within five calendar (5) days upon receipt of
this letter.

2.  In line with references (b) through (d), I am designated as the approval authority for requests
for religious accommodation.

3.  Reference (a), the Religious Freedom Restoration Act (RFRA), states that the Government
may substantially burden an individual's exercise of religion only if it demonstrates that
application of the burden to the person is in furtherance of a compelling governmental interest
and is the least restrictive means of furthering that interest. Reference (b) incorporates the RFRA
and notes that the Government has a compelling interest in mission accomplishment, to include
military readiness, unit cohesion, good order and discipline, health and safety, on both individual
and unit levels. Additionally, unless it will have an adverse impact on mission accomplishment,
including military readiness, unit cohesion and good order and discipline, the Navy will
accommodate individual expressions of sincerely held beliefs of Sailors. Reference (f)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
IMMUNIZATION REQUIREMENTS

emphasizes that only those interests of the highest order can overbalance legitimate claims to the free exercise of religion.

4.   All requests for accommodation of religious practices are assessed on a case-by-case basis. In line with references (b) and (c), determination of a request for religious accommodation requires consideration of the following factors:

a.   Impact on military readiness, unit cohesion, good order and discipline, health and safety

b.   Religious importance of the request

c.   Cumulative impact of repeatedly granting similar requests

d.   Whether there are alternatives available to meet the requested accommodation and

e.   How other such requests have been treated

5.   In making this decision, I reviewed reference (g), including the endorsements from your chain of command, the local chaplain and the advice of Chief, Bureau of Medicine and Surgery in reference (h).

a.   A waiver of immunizations would have a predictable and detrimental effect on your readiness and the readiness of the Sailors who serve alongside you in both operational and non-operational (including training) environments. Primary prevention of disease through immunizations has been a key enabler for maintaining force health and avoiding disease-related non-battle injury. Granting your request will have a direct and foreseeable negative impact on the compelling Government interests of military readiness and health of the force.

b.   While serving in the U.S. Navy, you will inevitably be expected to live and work in close proximity with your shipmates. I find that disapproval of your request for a waiver of immunization requirements is the least restrictive means available to preserve the Department of Defense's compelling interest in military readiness, mission accomplishment and the health and safety of military Service Members.

6.   The Navy is a specialized community governed by a discipline separate from that of the rest of society. While every Sailor is welcome to express a religion of choice or none at all, our greater mission sometimes requires reasonable restrictions. You have my sincere best wishes for your continued success in your Navy career.

NOWELL.JOHN.BL   Digitally signed by
ACKWELDER.JR.1   NOWELL.JOHN.BLACKWELDER
057611835   JR.105761835
Date: 2021.11.23 12:58:47 -05'00'

JOHN B. NOWELL, JR

Copy to:
OPNAV (N131, N0975)
BUMED

2

# EXHIBIT B

Effective Immediately

T me   age

**From:** ███████████ CDR USN MESG TWO (USA) ███████████@navy.mil>
**Date:** Friday, Jan 07, 2022, 3:35 PM
**To:** ███████ CAPT USN MSRON EIGHT (USA)████████ mil@us.navy.mil>, MSRON8_NWPT_ALL_OFFICERS <MSRON8_NWPT_ALL_OFFICERS@navy.mil>
**Cc:** ███████ MCPO USN MSRON EIGHT (USA)████████ mil@us.navy.mil>, ███████ CPO USN MSRON EIGHT (USA)████████ mil@us.navy.mil>, ███████ CDR USN NAVINSGEN WASH DC (USA)████████.mil@us.navy.mil>, ███████ CDR USN USFFC (USA) <████████.mil@us.navy.mil>
**Subject:** RE: Effective Immediately

Ladies and Gentlemen

I will be traveling up there Sunday and check in Monday morning with the CO.  Please do not hesitate to reach out as I will do my best to keep up the hard work CDR Green did a    O

VR
CDR ███████

███████████

**From:** ███████████ CAPT USN MSRON EIGHT (USA)████████ mil@u   navy mil
**Date:** Friday, Jan 07, 2022, 3 09 PM
**To:** MSRON8_NWPT_ALL_OFFICERS <MSRON8_NWPT_ALL_OFFICERS@navy mil
**Cc:** ███████ MCPO USN MSRON EIGHT (USA)████████ mil@u   navy mil , ███████ CPO USN MSRON EIGHT (USA)████████ mil@u   navy mil , ███████ CDR USN MESG TWO (USA)████████ @navy mil , ███████ CDR USN NAVINSGEN WASH DC (USA)████████ mil@u   navy mil , ███████ CDR USN USFFC (USA)████████ mil@u   navy mil
**Subject:** Effective Immediately

Pls.' Mot. for Classwide Prelim. Inj. App. 0032

1/2

███████   ████████ Effective Immediately

MSRON Eight Wardroom, good afternoon.

Effective immediately CDR Green is no longer XO of MSRON EIGHT. He has been reassigned TAD to MESG2 while a vaccine waiver works its way through the system. CDR Green leaves huge shoes to fill, he was a professional who did excellent work and his presence and professionalism will be difficult to replace

Starting Monday, CDR ████████████ will be (acting)  O of MSRON EIGHT  CDR ████████ i  currently CSO at MESG2, he i  a former HVU OIC and NOSC CO. Include CDR ██████ on any XO appropriate correspondence.

Feel free to call with any questions or to discuss further.

Wr

CAPT ███████████████

Commanding Officer MSRON EIGHT

Purebred mobile: ███████████

SIPR: ██████████ @navy.smil.mil

POSITIVE ATTITUDE, POSITIVE EFFORT!!

"Nearly every man who develop  an idea work  it up to the point where it look  impo  ible, and then he get  di  couraged  That'  not the place to become discouraged."

Thomas Edison

Pls.' Mot. for Classwide Prelim. Inj. App. 0033

2/2

EXHIBIT C

7 January 2022

Memorandum for all Members of the House and Senate Armed Services Committees

From: Commander Robert Alan Green Jr., U.S. Navy

Subject: Report of Navy-Endorsed Violations of Law, Regulation, and Constitutional Rights

Encl:   (1) Article 1150 Complaint of Wrong Against Vice Admiral Nowell for Unlawful
            Religious Discrimination, submitted by CDR Robert A. Green Jr. on 23 December 2021
        (2) DCNO (N1) Standard Operating Procedure for Religious Accommodations Nov 2021

     I am an active duty U.S. naval officer and hereby submit this report under the Military Whistle-blower Protection Act (10 U.S.C. § 1034) to share my internal Navy complaint, enclosure (1), which documents multiple violations of law, regulation, and constitutional rights.  These violations are being committed by Navy leadership against military service members who express sincere religious beliefs that preclude them from receiving a COVID-19 vaccination.

     I received the Navy's standard operating procedure (SOP) for processing religious accommoda-tions, enclosure (2), after the document was made public by another whistleblower.  The SOP was drafted by the Navy's Manpower, Personnel, Training, and Education Office, which is led by Vice Admiral John Nowell.  The SOP outlines the process for systematically denying COVID-19 religious accommodation requests, and provides proof of religious discrimination and multiple violations of regulation and constitu-tional rights.  The SOP has been utilized by Vice Admiral Nowell and his staff to process the surge in religious accommodation requests following the Secretary of Defense's vaccine order of 24 August 2021.  On 23 December 2021, I filed a complaint against Vice Admiral Nowell, enclosure (1), for his use of this unlawful and discriminatory process.  My complaint was filed as an exhibit in the U.S. NAVY SEALs 1-26, et al., v. BIDEN, et al., federal court case in the Northern District of Texas that very afternoon.  The evidence I provided in my complaint proved to be a crucial element in the case and was referenced multiple times by Judge O'Connor in his ruling, which granted a preliminary injunction to the plaintiffs on 3 January 2022.

     In his ruling, Judge O'Connor stated "[t]he Navy provides a religious accommodation process, but by all accounts, it is theater."  Additionally, he highlighted policy inconsistencies, pointing out that the Navy has granted exemptions to the vaccine mandate for a wide range of secular reasons, but insists on 100% vaccination or disciplinary action for all service members seeking religious accommodation.  This is clearly discriminatory and a violation of the Constitution, federal law, and military regulation.

     Despite Judge O'Connor's ruling, it appears the Navy intends to continue this discriminatory denial process.  The Navy has proven incapable of policing itself.  Therefore, I am requesting your involvement to ensure the free exercise of religion in the Navy, and throughout the military.  Please demand accountability of our senior naval leaders for their unlawful actions and join in the call for an immediate end to religious discrimination in our military.  The defense of our Nation requires that service members are free to serve without fear of discrimination or retaliation for faithfully adhering to the dictates of their conscience.

R. A. GREEN JR
CDR        USN

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3**, on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, | |
| Plaintiffs, | Case No. 4:21-cv-01236-O |
| v. | |
| **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, | |
| Defendants. | |

## DECLARATION OF BRIAN J. FERGUSON

Pursuant to 28 U.S.C. § 1746, I, Brian J. Ferguson, declare under penalty of perjury that the following is true and correct:

1.      I am over the age of eighteen and am competent to make this declaration.

2.      I am a lawyer licensed to practice in the great State of Texas. I am admitted to United States District Court for the Western District of Texas, the Navy-Marine Corps Court of Criminal Appeals and the United States Court of Appeals for the Armed Forces.

1

3.      I primarily represent service members in the United States Navy and United States Marine Corps *pro bono* as a civilian attorney. I have represented over 100 service members *pro bono* as a civilian since 2011.

4.      I am also a judge advocate in the Air Reserve Component of the Air Force Judge Advocate General's Corps. This declaration is made entirely within my civilian capacity.

5.      My military clients have included Navy Explosive Ordnance Disposal Technicians, SEALs, Special Warfare Combatant Craft Crewmen, and Navy Divers. Most of these clients are Navy Sailors attached to United States Special Operations Command units.

**Least Restrictive Means FOIA**

6.      On December 23, 2021, I submitted a Freedom of Information Act (FOIA) request to the Office of the Chief of Naval Operations. I requested all records for the "least restrictive means analysis" used by the Navy to deny COVID-19 related religious accommodation waivers.

7.      On January 20, 2022, I received a response to my FOIA request from Mr. Gregory Cason, Deputy Director of the Department of the Navy FOIA/PA Program office. A copy of the response is attached hereto as Exhibit A.

8.      The Navy's response states that the FOIA/PA Program Office "contacted the Chief of Naval Personnel (N1) and the Navy Bureau of Medicine and Surgery (BUMED) to conduct a search for applicable records regarding all responsive records supporting the following 'least restrictive means analysis' used to deny COVID-19 related religious accommodation waivers."

9.      The Navy's response states that the Navy "identified 2 records totaling 50 pages that are responsive to your request." Those records were produced to me with the Navy's response and are attached hereto as Exhibit B and Exhibit C.

2

10.     The Navy has not identified or produced any other documents in response to this FOIA request.

### Records Actually Reviewed to Deny Request FOIA

11.     I am *pro bono* counsel for EOD1 Branden M. Vriens, USN, for matters before the United States Navy. His request for a Request for Religious Accommodation Through Waiver of Immunization was denied by the Navy.

12.     EOD1 Vriens is not a named Plaintiff in this matter. He is currently pending medical discharge from the Navy for combat related injuries. His military pay rate makes hiring an attorney experienced in federal court litigation cost prohibitive.

13.     On December 6, 2021, EOD1 Vriens submitted a FOIA request to the Department of the Navy. He requested "[a]ll responsive records reviewed by the Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1) in adjudicating the Request for Religious Accommodation Through Waiver of Immunization Requirements for EOD1 Branden M. Vriens, USN."

14.     On January 23, 2021, Mr. Gregory Cason, Deputy Director of the Department of the Navy FOIA/PA Program Office, responded to EOD1 Vriens FOIA request. A copy of Mr. Cason's response is attached hereto as Exhibit D.

15.     The Navy's response states that the FOIA/PA Program Office contacted OPNAV Office N1 for the responsive records.

16.     The Navy's response states that the Navy reviewed the responsive records, and "they are releasable in their entirety." While the Navy used the plural, they produced a single record to EOD1 Vriens as part of the response. The record is attached hereto as Exhibit E.

17.     The Navy has not identified or produced other records as part of this request.

### The Administrative Separation and Appeal Process

18.     I have represented Naval Special Warfare members in Administrative Separation Boards since 2015. I have extensive experience with the discharge process, including appeals to the Naval Discharge Review Board, the Board of Correction of Naval Records, and the Court of Federal Claims.

19.     Based on my experience, the administrative separation and discharge process can take months or years.

20.     The appeal process to the Naval Discharge Review Board (NDRB) and Board of Correction for Naval Records (BCNR) routinely takes years.

21.     Even when service members are granted relief via these processes, there are additional delays in providing that relief.

22.     To illustrate the delay in administrative separation: I represented a Special Warfare Combatant Craft Crewmen before an Administrative Separation Board on October 24, 2019. The member's final separation did not occur until June of 2021.

23.     To illustrate the delay in appeals: I submitted an appeal to the Naval Discharge Review Board for a former Naval Special Warfare member on December 8, 2020. There has still been no notification of action on the submission. A request for an update, submitted on February 17, 2022, has not received a reply.

24.     To illustrate the delay in relief: I currently represent a former Naval Special Warfare member before the Court of Federal Claims. The member's command falsely accused him of misconduct. Despite his demand for an opportunity to prove his innocence at a court-martial, the Navy instead opted to send him directly to an Administrative Separation Board. The Board, conducted on May 31, 2017, returned a finding of no misconduct. Nevertheless, despite the Board

4

results, the Navy wrongfully separated the member on March 23, 2018.  On November 1, 2018, the member filed suit against the Navy in the Court of Federal Claims. The case was remanded to the Navy for appeals to the NDRB and BCNR.   On December 17, 2019, the NDRB accepted the member's application for discharge review. In August 2020, the NDRB found in favor of the member. Similarly, the BCNR entered a finding in favor of the member on June 18, 2021. The case is still pending before the Court of Federal Claims because the member has yet to receive the relief granted by the Navy's own board.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on January 28, 2022.

_____

BRIAN J. FERGUSON

5

Pls.' Mot. for Classwide Prelim. Inj. App. 0041

# EXHIBIT A

**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

5720
Ser DNS-36GC/2U103150
January 20, 2022

Sent via email to: ferguson@abileneoperating.com

Mr. Brian Ferguson
PO BOX 302204
Austin, TX 78703

Dear Mr. Ferguson

    This is in reference to your Freedom of Information Act
(FOIA)/Privacy Act (PA) request dated December 23, 2021. Your
request was received in our office on the same day and assigned
case number DON-NAVY-2022-002750

    In the course of processing your FOIA request this office
contacted the Chief of Naval Personnel (N1) and the Navy Bureau
of Medicine and Surgery (BUMED) to conduct a search for
applicable records regarding All responsive records supporting
the following "least restrictive means analysis" used to deny
COVID-19 related religious accommodation waivers: "All
alternative measures for preventing spread of disease are
insufficient due to unique circumstances inherent in naval
service. Vaccination is the only viable option for achieving the
compelling interest."

    Those offices have identified 2 records totaling 50 pages
that are responsive to your request. Upon review of these
records, it has been determined that they contain instances of
personally identifiable information (PII), such as the names,
dates of birth, and social security numbers of individuals.
These instances of PII are exempt from disclosure under 5 U.S.C.
§ 552(b)(6), since release of this information would result in a
clearly unwarranted invasion of their personal privacy. The
remainder of the records are released to you.

    You have the right to an appeal within 90 calendar days
from the date of this letter.  There are two ways to file an
appeal:  through FOIAonline or by mail.

        (1) Through FOIAonline.  This will work only if you set
up an account on FOIAonline before you make the request that you
would like to appeal.  To set up an account, go to FOIAonline
(this is a website that will appear as the top hit if you search

the internet for "FOIAonline"), click "Create Account" (a link located within the blue banner at the top in the upper right corner), enter your data into the field that subsequently appears, and click "Save" (at the bottom left of the screen). With your account thereby created, you will have the power to file an appeal on FOIAonline to any request you file on FOIAonline thereafter.  To do so, locate your request (enter a keyword or the request tracking number in the "Search for" field on the "Search" tab), click on it, then the "Create Appeal" tab in the left-hand column.  Complete the subsequent field, click "Save," and FOIAonline will submit your appeal.

(2) By mail.  Address your appeal to:

The Judge Advocate General (Code 14)
1322 Patterson Avenue SE, Suite 3000
Washington Navy Yard, DC 20374-5066

If filing an appeal by mail please provide a letter that explains what you are appealing with any supporting arguments or reasons you think may be worthy of consideration;

b.  A copy of your initial request;

c.  A copy of the letter of denial.

Also, please provide me a copy of your appeal letter at:

DONFOIA-PA@NAVY. MIL

For this determination, you have the right to seek dispute resolution services from either the DoD Navy Component FOIA Public Liaison, Mr. Chris Julka, at: christopher.a.julka@navy.mil, via phone: (703) 697-0031; or by contacting the Office of Government Information Services at:(https://ogis.archives.gov/), (202) 741-5770, ogis@nara.gov.

In this instance, the fees associated with the processing of your request are waived, but this action is not indicative of how future requests will be handled.

2

Questions regarding the action this office has taken during the processing of your request may be directed to our FOIA service center at (202) 685-0412 or via email at DONFOIA-PA@navy.mil, and reference the FOIA tracking numbers cited above.

Sincerely,

*Gregory Cason*

G. Cason
Deputy Director,
DON FOIA/PA Program Office

3

# EXHIBIT B

**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N13/306
17 Nov 21

MEMORANDUM

From:  Director, Military Personnel Plans and Policy (N13)
To:    Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)

Subj:  RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING IMMUNIZATION WAIVERS

Ref:   (a) 42 U.S.C. §2000bb-1
       (b) DoD Instruction 1300.17 of 1 Sep 20
       (c) SECNAVINST 1730.8B Ch-1
       (d) BUPERSINST 1730.11A
       (e) MILPERSMAN 1730-020
       (f) ASN (M&RA) memo of 6 Jun 13
       (g) BUMEDINST 6230.15B
       (h) OPNAVINST 1300.20

Encl:  (1) CHBUMED ltr 6320 Ser M44/21UM401 of 22 Sep 21
       (2) CDC Information of 15 Sep 21

1. <u>Purpose</u>.  This memorandum provides analysis of the least restrictive means for achieving the Navy's compelling government interest in preventing the spread of diseases to support mission accomplishment, including military readiness, unit cohesion, good order and discipline, or health and safety, at the individual, unit, and organizational levels.  This includes reducing vaccine preventable diseases in individual Sailors and preventing the spread of vaccine-preventable communicable diseases among Sailors.  The compelling government interest is not in dispute and is addressed here only briefly.  Navy leaders have determined that requiring all Navy Service Members ("Sailors") to be vaccinated against certain diseases is the least restrictive means of achieving that compelling government interest.  This memorandum explains the analysis behind that determination and addresses the risk to mission accomplishment inherent in deviating from requiring vaccination of all Sailors.

2. <u>References</u>.  Reference (a), the Religious Freedom Restoration Act (RFRA), prohibits the U.S. Government from substantially burdening a person's exercise of a sincerely held religious belief unless the restriction, as applied to the specific person, is in furtherance of a compelling government interest and is the least restrictive means of furthering that compelling government interest.  References (b) through (d) establish procedures for Sailors seeking religious accommodations (RAs).  Reference (e) provides amplifying details on RA requests for

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
IMMUNIZATION WAIVERS

immunization waivers.[1]  Reference (f) designates the Deputy Chief of Naval Operations
(Manpower, Personnel, Training, and Education) (DCNO N1) as the U.S. Navy adjudication
authority for RAs, including requests for immunization waivers.  In cases where DCNO N1 has
disapproved a request, and the member submits an appeal, the adjudication authority rests with
the Chief of Naval Operations (CNO), in line with references (c) and (d).

Compelling Government Interest

3.  The Navy's compelling government interest in preventing spread of diseases to support
mission accomplishment, including military readiness, unit cohesion, good order and discipline,
or health and safety, at the individual, unit, and organizational levels is addressed in enclosures
(1) and (2), along with the Bureau of Medicine and Surgery (BUMED) endorsement on each RA
request seeking an immunization waiver.  Vaccine-preventable diseases cause severe illness,
long-term health effects, and death, interfere with the ability of Sailors to accomplish the Navy's
mission at the individual, unit, and organizational levels, decrease the overall health of the force,
and place additional strain on medical resources.  Spread of communicable diseases among
Sailors who live and work in tight quarters aboard ships or in communal environments while
deployed, or who live or work in close proximity to others in the shore establishment, have the
potential to cause mission failure when one or more personnel become too sick to effectively do
their jobs.  Logistical challenges inherent in moving personnel to and from deployed ships and
other deployed environments make it difficult to quickly evacuate sick personnel and replace
them with healthy personnel who are adequately trained and ready at a moment's notice.  The
Navy's lean manning methodology to operate successfully during prolonged budget constraints
further limits the quick replacement of personnel in deployed environments.  In the case of
personnel operating in foreign locations, the spread of communicable diseases from U.S. Navy
personnel to host-nation personnel would have a detrimental impact on U.S. foreign relations,
especially if the illness was viewed as preventable.  Additionally, Navy ships have limited
medical and long-term placement capabilities.  If even one Sailor infected with a communicable
disease requires treatment beyond the capabilities of a ship's medical department, or if multiple
Sailors must be placed in critical care, a decision will have to be made whether the ship may
have to abandon its mission and transit to a location that offers more adequate treatment.
Foreign medical facilities may also refuse to accept a U.S. Navy patient infected with a
communicable disease, requiring the ship to transit farther—potentially thousands of miles,
exacerbating an already difficult situation.  Foreign ports may refuse entry to a Navy ship with a
communicable disease onboard.  The ship may be denied free pratique and not allowed to enter

---

[1] As of the date of this memorandum, reference (e) is out of conformity with reference (b), rendering many
provisions of reference (e) invalid.  For example, a commanding officer (CO) cannot order a Sailor with an RA
approved by DCNO N1 to receive a vaccine waived by the RA because reference (b) allows rescission of an RA
only by an official at the level in the chain of command that granted the RA.  In other words, if DCNO N1 grants an
RA, then only DCNO N1 (or someone senior to DCNO N1) may rescind the RA.  The only exception is for exigent
circumstances amounting to a life-threatening or mission critical emergency.  (For example, a CO could order a
Sailor to shave a religious beard approved by DCNO N1 to get an effective seal on a gasmask in response to credible
intelligence of an imminent chemical weapons attack.)  Because immunizations do not provide immediate
immunity, it is unlikely a CO would have bona fide exigent circumstances to order a Sailor to receive an
immunization where a RA waived the requirement for a Sailor to receive that immunization.  See, e.g., CDC
guidance on the COVID-19 Delta variant, available online at: https://www.cdc.gov/coronavirus/2019-
ncov/variants/delta-variant.html?s_cid=11617:delta%20variant%20covid:sem.ga:p:RG:GM:gen:PTN.Grants:FY22.

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
            IMMUNIZATION WAIVERS

port or allow personnel to embark or disembark.  While the consequences of disease are most severe in deployed ships, they are nevertheless compelling in Navy billets ashore.  A significant portion of the shore establishment is collocated with the operating forces and supports those forces with readiness activities such as maintenance, technical support, training, and medical care.  Many shore duty billets require in-person work in enclosed office spaces where spread of disease is possible.  Even Sailors who might be able to work in isolation a large portion of the time have certain military duties, such as medical exams, physical fitness tests, urinalysis, and ad hoc meetings.  Finally, because the Navy prioritizes manning on deployable units first, many shore units are manned only at or *below* the planned manning levels, magnifying the impact of preventable sickness on mission accomplishment.

4.   There are specific compelling government interest concerns for each required vaccination.

    a.  COVID-19 can cause severe illness and death in young, otherwise healthy individuals, including the eight active duty Sailors and two active duty Marines killed by the disease as of 26 October 2021.  All ten of these personnel were not fully vaccinated.  No deaths caused by COVID-19 have been reported in fully vaccinated service members, active or reserve.  The highly transmissible Delta variant is of particular concern and is more transmissible than other variants.[2]  As reported in enclosure (1), studies of available mRNA vaccines, including the FDA-approved Comirnaty vaccine manufactured by Pfizer, have shown an 88% efficacy rate against the Delta variant.  Further, enclosure (1) discusses a recent study showing over 71% of recent COVID infections occurring in unvaccinated individuals and more than 85% of hospitalizations in unvaccinated individuals.  For people evaluated in the study, the hospitalization rate of unvaccinated individuals was more than 29 times that of fully vaccinated individuals.  While anyone can spread COVID-19, fully-vaccinated people will likely spread the virus for less time and to fewer people than unvaccinated people.

    b.  In the case of Sailors, including those in the accession pipeline, who are requesting waiver of all future immunizations, the following considerations apply to vaccinations required by reference (g) for all Sailors, regardless of location:

        (1) Every year, the influenza vaccine is required for all Sailors who do not have a medical or administrative exemption.  As explained in enclosure (1), the spread of influenza will deprive the Navy of medical resources and commands of personnel needed to accomplish the mission while those personnel recover and place additional strain on those who must augment to fill the sick Sailors' positions.  In severe cases, personnel infected with influenza require hospitalization.  Influenza outbreaks can be explosive, with the potential to incapacitate many Sailors assigned to one command.

        (2) Every 10 years, the Tdap (tetanus, diphtheria, pertussis) or Td (tetanus, diphtheria) vaccine is required for all Sailors who do not have a medical or administrative exemption.  Enclosure (1) explains the specific, debilitating consequences of infection with each of the diseases prevented by the highly effective Tdap vaccine.  For example, the Tdap vaccine is almost 100% effective at preventing tetanus, a disease with an 11% mortality rate.  Infection

---

[2]  Centers for Disease Control and Prevention. "Delta Variant: What We Know About the Science" 26 Aug 2021.

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
         IMMUNIZATION WAIVERS

with tetanus would prevent a Sailor from performing their individual mission and affect mission accomplishment at the unit level, and recovery takes months. Tdap is 97% effective at preventing diphtheria, which is common in some areas outside of the United States. Before the development of a vaccine, diphtheria was a leading cause of death among children in the United States. Diphtheria has a 5 to 10% mortality rate. Tdap is 80 to 85% effective at preventing pertussis, a disease that causes bacterial pneumonia in more than 13% of cases. A Sailor infected with any of the diseases that Tdap successfully prevents could be inhibited from accomplishing their mission for months, and death is possible.

c. A number of vaccines are required by reference (g) for deployment and/or overseas assignment. These location-specific vaccinations protect Sailors against local threats, including anthrax, Japanese encephalitis, yellow fever, typhoid fever, and smallpox. The Geographic Combatant Command (GCC) establishes these requirements, and the GCC Command Surgeon serves as the approval authority for waivers of the GCC requirements. The following information is from the Centers for Disease Control and Prevention (CDC) website (www.cdc.gov) and other public sources:

(1) The CDC website reports the anthrax vaccine is 93% effective. Anthrax inhalation[3] is almost always fatal in unvaccinated individuals who do not receive immediate treatment, and even with aggressive treatment, anthrax inhalation kills 45% of unvaccinated patients.

(2) The World Health Organization website (www.who.int) indicates the Japanese encephalitis vaccine is more than 99% effective. The CDC website indicates that, although Japanese encephalitis is rare, one in four cases is fatal.

(3) According to the CDC, typhoid fever is common in developing nations, with as many as 21 million cases occurring each year, mostly in South Asian and Southeast Asian nations frequented by deployed Sailors. Because antibiotic treatments are effective against the disease, only about 200,000 of these patients die each year. However, the CDC reports a growing incidence of typhoid fever resistant to antimicrobial drugs. The disease can be spread both by contaminated food and water and by contact with infected persons.

(4) The CDC website reports that, although yellow fever infection is rare, 30 to 60% of those who develop severe yellow fever disease die.

(5) The smallpox vaccination is so effective that it eradicated a disease the World Health Organization characterizes on its website as "one of the most devastating diseases known to humanity." Before mass vaccination, millions of people were killed or disfigured by the disease. It is believed that smallpox no longer exists in nature. However, the CDC reports, "There is a credible concern that in the past some countries made the virus into weapons, which may have fallen into the hands of terrorists or other people with criminal intentions."

---

[3] The anthrax immunization requirement in reference (g) is designed to protect personnel against weaponized anthrax. Research into the harm of anthrax has been possible because of exposure to naturally occurring anthrax.

4

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
        IMMUNIZATION WAIVERS

d.  Requiring new accessions to the Navy to have completed or receive traditionally childhood immunizations is also critical to mission accomplishment.  Although an individual breakdown of these required immunizations is beyond the scope of this memorandum, it is addressed in Appendix D to reference (g).  Examples of diseases for which new accessions must receive immunizations, if not previously immunized, include adenovirus, polio, measles, mumps, rubella, hepatitis A and B, and varicella.

<u>Non-Pharmaceutical Interventions (NPIs)</u>

5.  BUMED reports that the CDC recommends use of NPIs in conjunction with vaccination to stem the spread of diseases transmitted by respiratory droplets, including COVID-19, influenza, and pertussis.  Specifically, the CDC recommends respiratory hygiene (covering mouth and nose while coughing or sneezing), avoiding touching the face, frequent hand washing with soap for at least 20 seconds, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  BUMED reports that masking is appropriate in some circumstances, as well as social distancing of six feet or more to stem the spread of certain respiratory illnesses.  Unfortunately, BUMED reports that there is very limited data available on the effectiveness of NPIs.  This makes it difficult to compare scientifically proven efficacy rates of NPIs not accompanied by vaccination to the efficacy rates of vaccination or vaccination with NPI usage.  BUMED states that NPIs are known to be more effective at preventing spread of disease when implemented as community-wide mandates than when implemented by one individual.  This factor is key in the determination that NPIs are not sufficient alone to protect Sailors from the risks imposed by COVID-19 and other communicable diseases, and ultimately to ensure the Navy's ability to achieve mission accomplishment, including readiness, unit cohesion, good order and discipline, or health and safety, at the individual, unit, and organizational levels.

<u>Least Restrictive Means</u>

6.  <u>COVID-19</u>.  As discussed below, mandatory immunization of all Sailors against COVID-19 is the least restrictive means of achieving the Navy's compelling government interest in reducing to zero any preventable impairment to mission accomplishment, including readiness, health, and safety, at the individual, unit, and organizational levels in the operating forces and shore establishment.

a.  <u>Health and Safety</u>.  The Navy has not identified any means equally or more effective than mandatory immunization against COVID-19 to ensure the health and safety of Sailors, including a Sailor who seeks a religious accommodation from the mandatory COVID-19 vaccination requirement.  As discussed in paragraph 4 and enclosure (1), the scientific data shows that a fully vaccinated Sailor is at far less risk of serious illness or death in the event of a "breakthrough COVID-19 case."  To date, not one fully vaccinated Sailor has died from COVID-19.  Among those Sailors who are fully vaccinated, only 1.7 percent contracted a "breakthrough case" between 17 December 2020 and 26 October 2021.  In the same timeframe, 23.3% of unvaccinated active duty Sailors experienced COVID-19 infections.  Regardless of whether a Sailor is assigned to the operating forces or the shore establishment, mandatory COVID-19

5

Subj:  RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
    IMMUNIZATION WAIVERS

immunization is the least restrictive means to ensure readiness and health and safety at the
individual, unit, and organizational levels of the Navy.

   b.  Restriction of Movement (ROM).  For more than a year during the COVID-19 pandemic,
the Navy imposed stringent restrictions across the force in every location to limit the activities
and behaviors of Sailors assigned to both shore and operational units to keep them and the force
healthy.  Almost all quality-of-life port visits were cancelled, and Sailors were ordered to
quarantine within the bubbles of their ships for two weeks before getting underway.  (This
quarantine is referred to as restriction of moment (ROM).)  Ashore, Sailors were ordered to
forego haircuts, prohibited from dining in restaurants, and restricted from recreation to a far
greater degree than the general public.  COVID-19 vaccinations have allowed the lives of many
Sailors to start getting back to normal.  ROM periods have been relaxed for fully vaccinated
Sailors and for crews of ships with very high vaccination rates.

   (1)  In the best of times, Navy life is hard on Sailors' family and social lives.  There are
many challenges that our Sailors face that are unique to naval service.  In the case of an
operational unit preparing to deploy, additional stress is expected as the Sailors must balance the
demands of work and home.  Long periods of time underway are known to strain the emotional
and psychological wellbeing of Sailors.  Adding additional periods of time isolated from family,
friends, and society at large due to ROM requirements has exacerbated these concerns and
negatively impacted readiness.  This concern is equally as important on shore duty, which the
Navy relies on as a periodic respite from the stress of sea duty.  However, the ROM periods were
justified as a necessary mitigation technique to avoid COVID-19 infections that could interfere
with mission accomplishment, and were largely effective.

   (2)  It is not safe for a vessel to deploy with even one unvaccinated Sailor unless the entire
crew goes through a ROM period and port visits continue to be cancelled.  As explained in
enclosure (2), "Vaccinated people can still become infected and have the potential to spread the
virus to others, although at much lower rates than unvaccinated people."  Further, unvaccinated
personnel are significantly more likely to require hospitalization than vaccinated individuals with
breakthrough infections.  Taken together, these two facts make clear that imposing ROM
measures only on unvaccinated Sailors would be insufficient to protect against risk of mission
failure inherent in allowing unvaccinated Sailors to go to sea because an unvaccinated Sailor can
be exposed to COVID-19 via a breakthrough case in a vaccinated shipmate who was not required
to ROM.  There is an appreciable risk that acquiring treatment for one unvaccinated Sailor would
require a ship to abandon its mission and transit to a location with a shore-based medical facility
able and willing to care for the COVID-19 patient.  Some countries may deny a Navy ship free
pratique, that is entry into port and disembarkation or embarkation of personal, if there is a
communicable disease onboard, or host-nation medical facilities may be unwilling or unable to
accept unvaccinated U.S. COVID-19 patients, which could lead to a ship abandoning its mission
and transiting thousands of miles in an effort to save a life, with negative impact on unit and
organizational mission accomplishment.

   (3)  Continuing to require 14-day ROM periods for all Sailors and canceling future port
visits is not a sustainable approach.  Port visits serve as a much-needed venue to acquire parts,
mail, fresh food, and a quality of life respite for Sailors.  This approach would involve a very

6

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
IMMUNIZATION WAIVERS

high cost to the emotional and psychological wellbeing of other Sailors, decreasing the readiness of the entire crew.  Further, a deployment with no port visits that locks Sailors to their ships weeks before getting underway will likely lead to diminished job satisfaction and discourage Sailor recruitment and retention.  While this tradeoff was temporarily acceptable during the COVID-19 pandemic before vaccinations were available, use of ROM as permanent means of accomplishing the Navy's compelling governmental interest in mission accomplishment is untenable.

c.  Other available NPIs, both those identified by BUMED and others discussed by recent news articles, are insufficient to protect unvaccinated Sailors aboard U.S. Navy ships for the following reasons:

(1) Masking.  The Navy can require all Sailors to wear masks, but full-time tight quarters on a ship severely limits its effectiveness, as does communal living in barracks or working in close quarters ashore.  Aboard ship, unvaccinated Sailors will have to eat, sleep, shower, and brush their teeth in the same spaces as vaccinated Sailors who have gone on liberty among the general public and been excused from ROM requirements.

(2) Ventilation.  U.S. Navy ships have almost no windows, and fresh air circulation is limited by steel construction that includes collective protection systems (CPS) in place to seal off areas of ships for protection against chemical, biological, or radiological weapons attacks.  During training drills, the ship will secure ventilation to demonstrate the required actions in the case of a damage-control emergency.

(3) Social distancing.  Maintaining a social distance for Sailors on U.S. Navy ships is impossible.  Narrow passageways do not allow for Sailors to maintain social distances when transiting a ship.  Almost all enlisted berthing compartments feature three-foot by six-foot bunks, referred to as "racks," that are stacked three high and have only narrow passages between rows.  Enlisted berthing compartments have as few as 12 and as many 210 personnel sleeping in the same space, where there are generally racks for six Sailors in every thousand cubic yards.  Sailors in larger berthing compartments are never alone in the head when they shower or brush their teeth while underway because a head the size of a studio apartment can be shared among 200 or more personnel.  In the case of fast-attack submarines, populations are smaller, but some Sailors have to take turns sleeping in shared racks.  Most officers share small staterooms with between one and five of their peers, and tiny heads are often shared between many officers.  In addition to sleeping and engaging in personal hygiene, meals are also unconducive to use of NPIs.  Sailors are fortunate if they can keep their elbows and knees six inches from those around them while eating on mess decks.  The wardrooms where officers dine are only slightly more spacious.  Extending meal hours to allow fewer people to dine at a time would unfairly burden Culinary Specialists and Food Service Attendants, who are already known in the Navy for having some of the longest and most arduous working hours, and would not be sustainable.  There are few alternative locations for Sailors to eat on ships, and allowing Sailors to take meals out of areas designated for eating has the potential to invite rodent and insect infestations.  Even if the recommended 6-foot spacing were possible, it may not be adequate aboard ships due to the ventilation characteristics of the vessel.  Social distancing may be more tenable ashore, but is highly dependent on the type of work a Sailor does and the configuration of their workspace(s).

7

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
          IMMUNIZATION WAIVERS

    (4) Cleanliness. As hard as Sailors work to keep their ships clean, safe transit up and down ladders and through watertight doors requires everyone to touch all of the same handrails and handles frequently. Further, although Sailors can be reminded to use hand sanitizer, frequent handwashing is not generally possible because Sailors have to transit up and down ladders, with those shared handrails, to get between their workspaces and the heads in which they can wash their hands.

    (5) Self Quarantine. It is very difficult to quarantine individual Sailors onboard an underway U.S. Navy ship because there are limited extra spaces. On smaller ships, medical divisions operate out of one space. Even on larger ships, medical departments have limited space to quarantine or isolate personnel. Further, vaccinated or unvaccinated Sailors with COVID-19 infections may be asymptomatic or may suffer such mild symptoms that they do not realize they are contagious until after an unvaccinated shipmate has become infected.

    d. Because shipboard environments significantly limit the effectiveness of all NPIs, and because even one serious COVID-19 infection can pull a ship off station resulting in mission failure at the unit and possibly organizational levels, immunization of all Sailors against COVID-19 is absolutely necessary and is the least restrictive means of achieving the Navy's compelling government interest in preventing spread of communicable disease to ensure mission accomplishment.

    e. Although the drawbacks of NPIs are most acute shipboard, the NPIs still do not meet the compelling government interest ashore. Ashore, a Sailor is in more frequent contact with the public, and has significant interaction outside the Navy workplace. Therefore, the opportunity to be in close contact with an infected person is actually greater. Additionally, none of the NPI, individually or together, is sufficiently effective to meet the Navy's compelling government interest.

7. Other Respiratory Illnesses. NPIs are ineffective at stemming the spread of other respiratory illnesses aboard ships for the same reasons NPIs are ineffective against COVID-19. For many years, U.S. Navy units have been spared serious outbreaks of influenza, diphtheria, and pertussis by widespread vaccination among the U.S. population and among Sailors in particular. Unfortunately, vaccine hesitancy in recent years has allowed for an uptick in communicable disease in the American public. Due to the tight quarters aboard ships discussed above, infection with one of these respiratory illnesses by an unvaccinated Sailor is likely to spread quickly and incapacitate other unvaccinated Sailors. Because of lean shipboard manning and the possible need to abandon a mission to seek higher-level medical care for an infected Sailor, one of these diseases could lead to mission ineffectiveness or mission failure. Therefore, immunization is the least restrictive means available to achieve the Navy's compelling government interest in reducing to zero any preventable impairment to mission accomplishment because it helps to prevent the spread of these diseases through individual infections or community spread of these diseases.

8. Mosquito-Borne Illnesses. Japanese encephalitis and yellow fever are transmitted by mosquitos. Sailors traveling to or stationed in parts of the world where one of these diseases is

8

Subj:   RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
         IMMUNIZATION WAIVERS

endemic can protect themselves through very careful use of mosquito repellents.  Unfortunately, there is risk in forgetting to apply repellent or getting bitten immediately after showering but before having an opportunity to apply repellent.  Also, the potential harm from these diseases is great, including risk of death.  Because NPIs are significantly less reliable than immunization, NPIs alone are not sufficient to prevent spread of mosquito-borne illnesses, and immunization is the least restrictive means available for preventing the spread of these diseases to allow for mission accomplishment.  These vaccines are required only of Sailors who are likely to be deployed to areas of the world where the diseases are common.

9.  <u>Contamination-Related Illnesses</u>.  Typhoid fever is usually caused by consumption of contaminated food or water or by close contact with an infected person, and is common in certain parts of the world.  Tetanus is caused by bacterium spores entering the body through broken skin.  Ships, piers, and shipyards are industrial environments in which any scrape or scratch could cause a tetanus infection for an unvaccinated Sailor.  There are no NPIs to prevent the spread of these illnesses, and risk of harm is great.  Therefore, immunization is the least restrictive means available for preventing harm from these diseases to allow for mission accomplishment.  The Typhoid vaccine is required only of Sailors who are likely to be deployed to areas of the world where the disease is common.

10.  <u>Weaponized Disease</u>.  Anthrax and smallpox present a threat to Sailors only if weaponized by an enemy or terrorist organization.  Immunization is the only measure to prevent either of these diseases.  Therefore, immunization is the least restrictive means for preventing harm from these diseases to allow for mission accomplishment.

11.  <u>Sailors on Shore</u>.  The U.S. Navy budget, end-strength limits, and personnel strategy dictate that every Sailor must be deployable and do not allow for keeping Sailors on the payroll who are unable to deploy.  This policy is documented by reference (h), OPNAVINST 1300.20, "Deployability Assessment and Assignment Program," which requires administrative separation processing or referral to the Disability Evaluation System for any Sailor who is undeployable for 12 months or longer.  It is very rare for a Sailor to be retained in a permanent limited duty status because the Navy needs Sailors who can go to sea or otherwise deploy.

   a.  Authorizing Sailors assigned to shore duty or the Navy Reserve to forego required immunizations is untenable because of the need for Sailors to be ready to deploy at a moment's notice.  Even a Sailor on shore duty pending retirement can be called up to deploy when necessary to achieve mission requirements.  Presidential recall under Title 10, U.S. Code, authorizes the Reserve Component to mobilize in a variety of geographic locations, including overseas.

   b.  Immunity is not instantaneous.  Every vaccination requires time to confer immunity.  In the case of the now-mandatory COVID-19 Pfizer vaccination, immunity is achieved five weeks after the first dose (two weeks after the second dose).  For a short-notice mission, whether in response to tasking or to relieve other Sailors impacted by injury or illness, mission failure could result if Navy leaders are required to wait five weeks to safely deploy Sailors waived from vaccination requirements because of assignment to shore duty.

9

Subj:  RELIGIOUS ACCOMMODATION (RA) REQUESTS FROM SAILORS SEEKING
    IMMUNIZATION WAIVERS

c. Even one unvaccinated Sailor, after contracting COVID-19, affects mission accomplishment at the individual level, and can infect dozens of other Sailors, exacerbating the problem of shore and Reserve deployability. Vaccines for worldwide-deployable Sailors throughout the force (shore and sea) constitute the least restrictive means of ensuring a ready, agile fighting force.

d. In addition, individual Sailors and units ashore perform important duties in support of the Navy mission. As an "optimally" manned organization, the Navy relies on each Sailor and unit to be fully ready to accomplish their mission because there is often no backup person with the same skillset. Therefore, even a Sailor who is not subject to imminent deployment must be ready, healthy, and safe to perform their shore-based mission.

12. To achieve its mission, the Navy relies on all Sailors receiving required immunizations, except where the health risk of vaccination exceeds the benefits of vaccination, such as in the case of life-threatening allergies to vaccine components. The small group of Sailors who have temporary medical exemptions and the very small group with permanent medical exemptions are at higher risk for infection, hospitalization, and death, making it even more important that those who work with and around them to be vaccinated. Deviating from this standard will put the mission, our medical capabilities, our Sailors, and their families at risk.



J. P. WATERS
Rear Admiral, U.S. Navy

10

# EXHIBIT C

**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
7700 ARLINGTON BOULEVARD
FALLS CHURCH VA 22042

IN REPLY REFER TO
6320
Ser M44/21UM401
22 Sep 21

From:   Chief, Bureau of Medicine and Surgery

To:      Deputy Chief of Naval Operations, Manpower, Personnel, Training, and Education (N1)

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
         STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

1.  Subject matter experts at the Bureau of Medicine and Surgery have compiled the below facts on certain mandatory vaccines for United States (U.S.) Navy Active Duty and Reserve personnel.  The information below provides some of the scientific and medical rationale for the vaccine requirements for vaccine-preventable diseases that would otherwise create risk to the readiness of the Force.

2.  <u>Coronavirus Disease 2019 (COVID-19)</u>

    a.  <u>Means of infection and infectivity</u>.  Person-to-person transmission via respiratory fluids, composed mainly of respiratory droplets and aerosol particles.  Basic reproduction numbers (i.e., the number of people who become ill due to exposure to a single case) are estimated to be 2.8 for the original strain, 4-5 for the Alpha variant, and 5-8 for the Delta variant.  In other words, every case of Delta variant COVID-19 can infect 5-8 people if effective countermeasures are not employed.

    b.  <u>Disease's specific harm to health</u>.  COVID-19 symptoms are extremely unpredictable, and range from non-existent (asymptomatic) to death.  The most common symptoms are: fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, loss of taste or smell, sore throat, congestion, nausea or vomiting, and diarrhea.  These more minor symptoms result in clinic visits, time off work, reduced productivity, possible temporary incapacitation (requiring bed rest).  Most serious cases may require hospitalization, the need for oxygen support, and mechanical ventilation.  Between 17 December 2020 and 31 August 2021, six Sailors and one Marine have died due to COVID-19; none of them were fully immunized.

        (1)  The risk of complications from COVID-19 illness is significant.  A recent Center for Disease Control and Prevention (CDC) report showed COVID-19 patients had nearly 16 times the risk for myocarditis compared with patients who did not have COVID-19, and this risk was higher in younger age groups.

        (2)  In addition, there is a significant risk of persistent COVID symptoms after recovery from acute illness, or "long COVID."  A recent study found that in patients who had recovered from COVID-19, 87.4% reported persistence of at least one symptom, particularly fatigue and

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

dyspnea at an average of 60 days after symptoms onset.  Another found that nearly 2/3 of people hospitalized with COVID-19 still had symptoms 6 months later.

   c.  Treatment required and level of medical treatment facility capable of delivering that treatment.  While mild cases may only require isolation and routine symptomatic care, severe cases may rapidly require intensive resources (Role 3 hospital with Intensive Care Unit (ICU) level care and mechanical ventilation) that are not routinely available in a deployed setting.  A recent study of over 43,000 COVID-positive patients in England showed the rate of hospitalization within 14 days of testing was 2.2% for the Alpha variant and 2.3% for the Delta variant (74% were unvaccinated).

   d.  Efficacy/effectiveness of available vaccine(s).  In large phase III trials, the Food and Drug Administration (FDA) approved COVID-19 vaccine was shown to have over 94% efficacy at preventing symptomatic COVID-19.  For the same vaccine, against the Delta variant in a real world setting, studies show 88% effectiveness against symptomatic disease, to include hospitalization and death.  Nationally in the United States, per the CDC, from January through August 2021, the unvaccinated comprised over 99% of all hospitalized COVID patients (over 1.6 million) as well as over 99% of all COVID-19 deaths (over 264,000).  There have been zero COVID-19 deaths of Sailors or Marines among those fully immunized, and zero deaths of Sailors or Marines due to vaccination administration.

   e.  Likelihood of infection if unvaccinated.  In a recent (24 Aug 2021) CDC report of over 43,000 SARS-CoV-2 infections in Los Angeles County, California (population approx. 9.6M), over 71% of the infections were unvaccinated and over 85% of hospitalizations were unvaccinated.  The same study reported infection and hospitalization rates among unvaccinated persons were 4.9 times and 29.2 times the rates of those for fully vaccinated people, respectively.  According to current surveillance data, nearly 87% of hospitalized Department of the Navy (DON) Active Duty COVID-19 cases since 17 December 2020 are among unvaccinated service members.  For DON Service members who had COVID-19 since December 2020, surveillance data indicates that hospitalization rates are approximately 500 per 100,000 cases, which is substantially higher than for influenza (see paragraph 2b).

   f.  Other methods of prevention.  For diseases transmitted by respiratory droplets and aerosol particles such as COVID-19, the CDC recommends non-pharmaceutical interventions (NPI) in addition to vaccination.  NPIs recommended by the CDC to avoid contracting or spreading COVID-19 have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), wearing facemasks, ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.

   g.  Efficacy of non-pharmaceutical interventions.  Despite the ability of NPIs to prevent respiratory virus transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(where NPI impacts both source control and personal protection) would not be applicable at the individual level.

    (1)  Recent studies have shown efficacy of mask wearing to prevent COVID-19.  During a COVID-19 outbreak on the *USS THEODORE ROOSEVELT*, persons who wore masks experienced a 70% lower risk of testing positive for SARS-CoV-2 infection.  Similar reductions have been reported in case contact investigations when contacts were masked and in household clusters in which household members were masked.

    (2)  However, in order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

    (3)  Similarly, NPI such as masks provide measures of community protection, as described above, only while they are in use.  Because the scientific and medical communities predict that SARS-CoV-2 will remain in global circulation as an endemic virus, the risk to the Force associated with COVID-19 in unvaccinated personnel may exist in perpetuity.

    h.  <u>Scientific and Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest</u>.  Any combination of NPI, in the absence of vaccination, are not likely to be effective at preventing COVID-19 outbreaks and their resulting impacts on the Navy's mission, especially in the setting of the highly contagious Delta variant.  Unlike NPI, vaccination provides its full measure of protection in an enduring capacity, subject to potential boosters as recommended by the FDA.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, vaccination is significantly superior to NPI, and mask wearing, for preventing respiratory infections such as COVID-19, especially when only implemented at the individual level and not by the entire community.

3.  <u>Influenza</u>

    a.  <u>Means of infection</u>.  Person-to-person transmission via respiratory droplets.  Basic reproduction numbers are estimated to be 0.9-2.1, which means, on average, a person infected with influenza will spread the virus to 1-2 other people, if no additional protective measures are in place.

    b.  <u>Disease's specific harm to health</u>.  Typical symptoms include: fever, cough, sore throat, runny nose, muscle aches, headaches, fatigue, and vomiting / diarrhea (more common in children than adults).  This results in clinic visits, time off work, reduced productivity, possible temporary incapacitation (requiring bed rest), and viral shedding, potentially infecting those who come in contact with the person.  Hospitalization is rare among young adults with influenza, 3-7 per 100,000 age 18-49.  The most common complications of influenza include secondary bacterial

3

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

pneumonia, exacerbations of underlying respiratory conditions, otitis media,
laryngotracheobronchitis, and bronchitis.  Other complications may include primary pneumonia,
encephalitis, aseptic meningitis, transverse myelitis, myocarditis, pericarditis, and Guillain-Barré
syndrome.

   c.  Treatment required and level of medical treatment facility capable of delivering that
treatment.  For mild cases, rest at home /in quarters (in isolation), oral rehydration, antipyretics,
and medications to target symptoms.  For severe cases or those with complications,
hospitalization (role 3 hospital, minimum) and ICU-level care with mechanical ventilation may
be required.

   d.  Efficacy of available vaccine(s).  Although influenza vaccine effectiveness is variable from
season to season, since 2003, on average it has been 40% (range 10-60%).  In addition, influenza
vaccination has been shown in several studies to reduce severity of illness in people who get
vaccinated but still get influenza illness.  Influenza vaccination can also reduce transmission of
the virus, thus protecting family members, co-workers, and other contacts from getting sick.
Some of these contacts may be more vulnerable to serious influenza illness, like babies and
young children, the elderly, and those with certain chronic health conditions.

   e.  Periodicity of vaccine boosters.  Annual vaccination is required due to changes in the
circulating viruses.

   f.  Likelihood of infection if unvaccinated.  If unvaccinated for influenza, a Sailor will have a
higher risk of contracting the disease and transmitting it to co-workers.  According to the Centers
for Disease Control and Prevention, the estimated annual incidence of influenza infection is
approximately 8% (varying from 3% to 11%); approximately half of these cases would be
symptomatic.  However, outbreaks can be explosive, with attack rates exceeding 60% over
periods as short as 10 days.

   g.  Other methods of prevention.  For diseases transmitted by respiratory droplets such as
influenza, the CDC recommends NPI in addition to vaccination.  NPIs recommended by the
CDC to avoid contracting or spreading respiratory infections have been categorized as either
personal or community based.  Personal interventions comprise respiratory hygiene (covering the
mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand
washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding
sick people, and self-quarantine when a person feels unwell.  Community-based actions include
public education through a variety of communication strategies, social distancing (6 feet),
ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of
masks may be appropriate in certain situations such as during periods of high community
transmission and when an individual or contact is immunocompromised.

   h.  Efficacy of other methods of prevention.  Despite the potential for NPIs to prevent
respiratory virus transmission, there are very limited data available on their effectiveness at the
individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates
(where NPI impacts both source control and personal protection) would not be applicable at the
individual level.

4

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(1)  One published observational study out of Japan regarding influenza transmission showed the overall effectiveness of mask wearing was 8.6%, while handwashing showed a negative association (i.e., not protective).  A meta-analysis of NPIs to prevent 2009 pandemic influenza infection showed a statistically significant protective effect for regular hand hygiene (38%) and a statistically non-significant protective effect for facemask use.

(2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

i.  <u>Medical opinion on whether other methods of prevention, alone or in concert, will be successful in meeting the compelling government interest</u>.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing influenza outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as influenza, especially when only implemented at the individual level and not by the entire community.

4.  <u>Tetanus</u>

a.  <u>Means of infection</u>.  The bacteria that causes tetanus, *C. tetani*, usually enters the body through a wound.  In the presence of anaerobic conditions, the spores germinate.  Toxins are produced and disseminated via blood and lymphatics.

b.  <u>Disease's specific harm to health</u>.  On the basis of clinical findings, three different forms of tetanus have been described.

(1)  The most common type (more than 80% of reported cases) is generalized tetanus.  The disease usually presents with a descending pattern.  The first sign is trismus, or lockjaw, followed by stiffness of the neck, difficulty in swallowing, and rigidity of abdominal muscles.  Other symptoms include elevated temperature, sweating, elevated blood pressure, and episodic rapid heart rate.  Spasms may occur frequently and last for several minutes.  Spasms continue for 3 to 4 weeks.  Complete recovery may take months.

(2)  Localized tetanus is an uncommon form of the disease in which patients have persistent contraction of muscles in the same anatomic area as the injury.  These contractions may persist for many weeks before gradually subsiding.  Localized tetanus may precede the onset of generalized tetanus, but is generally milder.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(3)  Cephalic tetanus is a rare form of the disease, occasionally occurring with otitis media in which clostridium tetani is present in the flora of the middle ear or following injuries to the head.  There is involvement of the cranial nerves, especially in the facial area.

(4)  Complications of tetanus are common.  Laryngospasm or spasm of the muscles of respiration leads to interference with breathing.  Fractures of the spine or long bones may result from sustained contractions and convulsions.  Hyperactivity of the autonomic nervous system may lead to hypertension or an abnormal heart rhythm.  Nosocomial infections are common because of prolonged hospitalization.  Secondary infections may include sepsis from indwelling catheters, hospital-acquired pneumonias, and decubitus ulcers.  Pulmonary embolism is particularly a problem in persons who use drugs and elderly patients.  Aspiration pneumonia is a common late complication of tetanus, found in 50% to 70% of autopsied cases.  In recent years, tetanus has been fatal in approximately 11% of reported cases.

c.  Treatment required and level of medical treatment facility capable of delivering that treatment.  Tetanus cases must be treated in a tertiary care facility with capability to provide long term ICU care and mechanical ventilation.  Tetanus immune globulin (TIG) is recommended for persons with tetanus.  Intravenous immune globulin (IVIG) contains tetanus antitoxin and may be used if TIG is not available.  Because of the extreme potency of the toxin, tetanus disease does not result in tetanus immunity.  Active immunization with tetanus toxoid should begin or continue as soon as the person's condition has stabilized.

d.  Efficacy of available vaccine(s).  Efficacy of the tetanus toxoid has never been studied in a vaccine trial.  It can be inferred from protective antitoxin levels that a complete tetanus toxoid series has an efficacy of almost 100%.  In the series of 233 cases from 2001–2008, only 7 cases (3%) had received a complete tetanus toxoid series with the last dose within the last 10 years.

e.  Periodicity of vaccine boosters.  Every 10 years.

f.  Likelihood of infection if unvaccinated.  While tetanus is rare in the US (averaging 31 cases per year for 2000-2007), nearly all of those cases were in unvaccinated or under-vaccinated individuals.  Tetanus is much more common outside the US; in 2015 there were approximately 209,000 infections and about 59,000 deaths globally.  As noted above, vaccine efficacy is high, with over 32 times the risk for unvaccinated persons compared to vaccinated.

g.  Other methods of prevention.  Usual safety measures can help prevent injuries resulting in cuts or puncture wounds from contaminated objects.

h.  Efficacy of non-pharmaceutical interventions.  At the individual level, such accidents are common and have proven difficult to prevent.

i.  Medical opinion on whether other methods of prevention, alone or in concert, will be successful in meeting the compelling government interest.  Safety measures alone will not likely be successful in preventing tetanus-prone wounds.

5.  Diphtheria

6

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
         STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

    a.  <u>Means of infection</u>.  Transmission of diphtheria is most often person-to-person through respiratory droplets.  Transmission may also occur from exposure to infected skin lesions or articles soiled with discharges from these lesions.  The basic reproduction number is about 2.6.

    b.  <u>Disease's specific harm to health</u>.  This may be a spectrum, but should include worst case scenarios and likelihood of worst case scenarios.  Understand that co-morbidities play a significant role in these calculations, and our population tends to lack co-morbidities.  The most common form of diphtheria results in a membranous pharyngitis and tonsillitis, with symptoms of fever, sore throat, malaise, and anorexia.  While some patients may recover at this point without treatment, others may develop severe disease.  The patient may appear quite toxic, but the fever is usually not high.  Patients with severe disease may develop marked edema of the submandibular areas and the anterior neck along with lymphadenopathy, giving a characteristic "bull neck" appearance.  If enough toxin is absorbed, the patient can develop severe prostration, pallor, rapid pulse, stupor, and coma.  Death can occur within 6 to 10 days.  Death occurs in 5-10% of diphtheria cases.

    c.  <u>Treatment required and level of medical treatment facility capable of delivering that treatment</u>.  In addition to supportive care, as described for influenza and COVID-19, specific treatments include antitoxin and antibiotics.  Diphtheria antitoxin, produced in horses, has been used for treatment of respiratory diphtheria in the United States since the 1890s.  Diphtheria antitoxin is available only from CDC, through an Investigational New Drug (IND) protocol.  Diphtheria antitoxin does not neutralize toxin that is already fixed to tissues, but it will neutralize circulating toxin and prevent progression of disease.

    (1)  After a provisional clinical diagnosis of respiratory diphtheria is made, appropriate specimens should be obtained for culture and the patient placed in isolation.  Persons with suspected diphtheria should be promptly given diphtheria antitoxin and antibiotics in adequate dosage, without waiting for laboratory confirmation.  Respiratory support and airway maintenance should also be provided as needed.  Consultation on the use of and access to diphtheria antitoxin is available through the duty officer at CDC's Emergency Operations Center at 770-488-7100.

    (2)  In addition to diphtheria antitoxin, patients with respiratory diphtheria should also be treated with antibiotics.  The disease is usually no longer contagious 48 hours after antibiotics have been given.  Elimination of the organism should be documented by two consecutive negative cultures taken 24 hours apart, with the first specimen collected 24 hours after therapy is completed.

    d.  <u>Efficacy of available vaccine(s)</u>.  Diphtheria toxoid-containing vaccine has been estimated to have an efficacy of 97%.

    e.  <u>Periodicity of vaccine boosters</u>.  Every 10 years in adults.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
           STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

   f.  Likelihood of infection if unvaccinated.  Diphtheria is rare in the U.S. (14 cases were reported between 1996 and 2018), but it is much more common outside the U.S. where vaccination coverage is suboptimal (4,500 cases worldwide in 2015).

   g.  Other methods of prevention.  For diseases transmitted by respiratory droplets such as diphtheria, the CDC recommends non-pharmaceutical interventions (NPI) in addition to vaccination, although widespread vaccination has all but eliminated disease incidence in the U.S. (ex. no cases in 2017 and 2018 according to World Health Organization, which largely eliminated the subsequent need for diphtheria-related NPI in practice).  NPIs recommended by the CDC to avoid contracting or spreading respiratory infections have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of masks may be appropriate in certain situations such as during periods of high community transmission and when an individual or contact is immunocompromised.

   h.  Efficacy of non-pharmaceutical interventions.  While we are not aware of any studies evaluating the efficacy of NPI specifically for diphtheria, it is likely the effectiveness of most NPI would be similar to that for other infections transmitted by respiratory droplets.

      (1)  Despite the potential for NPIs to prevent respiratory disease transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates (where NPI impacts both source control and personal protection) would not be applicable at the individual level.

      (2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

   i.  Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing diphtheria outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as diphtheria, especially when only implemented at the individual level and not by the entire community.

6.  Pertussis.  Note:  there is no pertussis vaccine preparation that does not contain tetanus and diphtheria toxoids.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
         STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

a. <u>Means of infection</u>.  Transmission most commonly occurs person-to-person through contact with respiratory droplets, or by contact with airborne droplets of respiratory secretions. Transmission occurs less frequently by contact with an infected person's freshly contaminated articles.  The basic reproduction number is about 5.5.

b. <u>Disease's specific harm to health</u>.  The clinical course of pertussis is divided into three stages: catarrhal (with symptoms similar to the common cold lasting 1-2 weeks), paroxysmal (with more severe cough and paroxysms of numerous rapid coughs lasting 1-6 weeks), and convalescent (with gradual recovery over weeks to months).  The most common complication and cause of death is secondary bacterial pneumonia, occurring in 13.2% of cases.  Between 2000 and 2017, 307 deaths from pertussis were reported to CDC, mostly in children.  Adults may also develop complications of pertussis, such as difficulty sleeping, urinary incontinence, pneumonia, rib fracture, syncope, and weight loss

c. <u>Treatment required and level of medical treatment facility capable of delivering that treatment</u>.  Varying levels of supportive management are required, depending on severity of disease, as with influenza and COVID-19.  Antibiotics are of some value if administered early (i.e., during the first 1 to 2 weeks of cough before coughing paroxysms begin).

d. <u>Efficacy of available vaccine(s)</u>.  Diphtheria, Tetanus, and Pertussis (DTaP) vaccine efficacy ranged from 80% to 85%, with overlapping confidence intervals.

e. <u>Periodicity of vaccine boosters</u>.  Every 10 years.

f. <u>Likelihood of infection if unvaccinated</u>.  Reported pertussis incidence has been gradually increasing in the U.S. since the late 1980s and early 1990s, and large epidemic peaks in disease have been observed since the mid-2000s.  A total of 48,277 pertussis cases were reported in 2012, the largest number reported since the mid-1950s.  Recent outbreaks of pertussis in the U.S. were due to low vaccination rates with large numbers of vaccine refusals (over 75% in one cluster) based on nonmedical reasons.  The disease is more common outside the U.S.; an estimated 16.3 million people worldwide were infected in 2015, with 58,700 deaths.

g. <u>Other methods of prevention, such as non-pharmaceutical interventions</u>.  For diseases transmitted by respiratory droplets such as pertussis, the CDC recommends non-pharmaceutical interventions (NPI) in addition to vaccination.  NPIs recommended by the CDC to avoid contracting or spreading respiratory infections have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of masks may be appropriate in certain situations such as during periods of high community transmission and when an individual or contact is immunocompromised.

Pls.' Mot. for Classwide Prelim. Inj. App. 0066

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

    h.  <u>Efficacy of non-pharmaceutical interventions</u>.  While we are not aware of any studies evaluating the efficacy of NPI specifically for pertussis, it is likely the effectiveness of most NPI would be similar to that for other infections transmitted by respiratory droplets.

    (1)  Despite the potential for NPIs to prevent respiratory disease transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates (where NPI impacts both source control and personal protection) would not be applicable at the individual level.

    (2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

    i.  <u>Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest</u>.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing pertussis outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as pertussis, especially when only implemented at the individual level and not by the entire community.

7.  My point of contact is CDR (b) (6)              , MC, USN, Preventive Medicine, who can be reached at (b) (6)            or (b) (6)            @mail.mil.







## COVID-19

# Science Brief: COVID-19 Vaccines and Vaccination

Updated Sept. 15, 2021

## Summary of Recent Changes

Last updated September 15, 2021                                                   

- Data were added indicating that COVID-19 vaccination remains highly effective against COVID-19 hospitalization and death caused by the Delta variant of SARS-CoV-2.
- Data were added from studies published since the last update that further characterize reduced COVID-19 vaccine effectiveness against asymptomatic and mild symptomatic infections with the Delta variant of SARS-CoV-2.
- Data were added from studies published since the last update that suggest decreased vaccine effectiveness against SARS-CoV-2 infection, symptomatic disease, and hospitalization in several groups of immunocompromised persons and potential benefit of a third dose of COVID-19 vaccine in immunocompromised populations.
- Data were added summarizing several small studies of heterologous COVID-19 vaccination series (i.e., mixed schedules), which found that a dose of adenovirus vector vaccine followed by a dose of mRNA vaccine elicits antibody responses at least as high as two doses of mRNA vaccine.
- Data were added from recent studies examining the duration of protection conferred by COVID-19 vaccination.
- Data were added from recent studies describing clinical outcomes and transmissibility of SARS-CoV-2 infections in fully vaccinated persons.

View Previous Updates

## Key Points

- All COVID-19 vaccines currently approved or authorized in the United States (Pfizer-BioNTech/Comirnaty, Moderna, and Janssen [Johnson & Johnson]) are effective against COVID-19, including against severe disease, hospitalization, and death.
- Available evidence suggests the currently approved or authorized COVID-19 vaccines are highly effective against hospitalization and death for a variety of strains, including Alpha (B.1.1.7), Beta (B.1.351), Gamma (P.1), and Delta (B.1.617.2); data suggest lower effectiveness against confirmed infection and symptomatic disease caused by the Beta, Gamma, and Delta variants compared with the ancestral strain and Alpha variant. Ongoing monitoring of vaccine effectiveness against variants is needed.
- Limited available data suggest lower vaccine effectiveness against COVID-19 illness and hospitalization among immunocompromised people. In addition, numerous studies have shown reduced immunologic response to COVID-19 vaccination among people with various immunocompromising conditions.
- The risk for SARS-CoV-2 infection in fully vaccinated people cannot be completely eliminated as long as there is continued community transmission of the virus. Early data suggest infections in fully vaccinated persons are more commonly observed with the Delta variant than with other SARS-CoV-2 variants. However, data show fully vaccinated persons are less likely than unvaccinated persons to acquire SARS-CoV-2 or transmit it to others.

vaccinated persons are associated with less severe clinical outcomes. Infections with the Delta variant in vaccinated persons potentially have reduced transmissibility than infections in unvaccinated persons, although additional studies are needed.

- This updated science brief synthesizes the scientific evidence supporting CDC's guidance for fully vaccinated people and will continue to be updated as more information becomes available.

# Background

COVID-19 vaccination is a critical prevention measure to help end the COVID-19 pandemic. COVID-19 vaccines are now widely available in the United States, and CDC recommends all people 12 years and older be vaccinated against COVID-19.

On August 23, 2021, the U.S. Food and Drug Administration (FDA) approved an mRNA vaccine (Pfizer-BioNTech/Comirnaty) as a 2-dose series for prevention of symptomatic COVID-19 in persons aged ≥16 years. This vaccine is also authorized under an Emergency Use Authorization (EUA) to be administered to prevent COVID-19 in persons aged 12-15 years. A second mRNA vaccine (Moderna), as well as a recombinant, replication-incompetent adenovirus serotype 26 (Ad26) vector vaccine (Janssen vaccine [Johnson & Johnson]) are authorized under an EUA for use in persons aged ≥18 years. Both mRNA vaccines are also authorized for administration of an additional dose to certain immunocompromised persons.

People are considered fully vaccinated if they are ≥2 weeks following receipt of the second dose in a 2-dose series (mRNA vaccines), or ≥2 weeks following receipt of a single-dose vaccine (Janssen vaccine).*

Public health recommendations for people fully vaccinated with FDA-approved or FDA-authorized COVID-19 vaccines consider evidence of vaccine effectiveness against symptomatic COVID-19 with and without severe outcomes, as well as vaccine impact on SARS-CoV-2 transmission. Other individual and societal factors are also important when evaluating the benefits and potential harms of additional prevention measures (e.g., masking, physical distancing) among vaccinated individuals. The Advisory Committee on Immunization Practices and CDC routinely consider individual health benefits and risks along with factors such as population values, acceptability, and feasibility of implementation when making vaccine recommendations.(1) These factors were also considered when developing CDC's interim public health recommendations for fully vaccinated people.

In this scientific brief, we summarize evidence available through August 24, 2021, for the currently approved or authorized COVID-19 vaccines (administered according to the recommended schedules) and additional considerations used to inform public health recommendations for fully vaccinated people, including:

- Vaccine efficacy and effectiveness against SARS-CoV-2 infection in the general population as well as among immunocompromised persons
- Vaccine effectiveness of heterologous (mixed) vaccination series
- Vaccine performance (i.e., immunogenicity and effectiveness) against emerging SARS-CoV-2 variant viruses, with a particular focus on the Delta (B.1.617.2) variant

Current evidence indicates that fully vaccinated people without immunocompromising conditions are able to engage in most activities with low risk of acquiring or transmitting SARS-CoV-2, with additional prevention measures (e.g. masking) where transmission is substantial or high.

# Emerging SARS-CoV-2 viral variants

As of August 28, 2021, the Delta variant of concern (B.1.617.2) is the predominant variant in the United States, with 99% of sequenced specimens being identified as Delta; current data on variant prevalence can be found on CDC's website. The Delta variant, first detected in India, has been shown to have increased transmissibility, potential reduction in neutralization by some monoclonal antibody treatments, and reduction in neutralization by post-vaccination sera.(2)

Other variants that are either no longer detected or are circulating at very low levels in the United States include: Alpha (B.1.1.7), first detected in the United Kingdom; Beta (B.1.351), first detected in South Africa; Gamma (P.1), first detected in Japan/Brazil; Iota (B.1.526), first detected in the United States-New York; Eta (B.1.525), first detected in the United Kingdom/Nigeria; Kappa (B.1.617.1) and B.1.617.3, first detected in India; Mu, first detected in Colombia; and Zeta (P.2), first detected

receptor binding domain of the spike protein and have variable impact on vaccine effectiveness (notably the E484K/Q mutation in Beta, Gamma, Eta, Iota, Kappa, and B.1.617.3; the N501Y mutation occurring in Alpha, Beta, and Gamma; the E417T/N mutations in Beta and Gamma; and the L452R mutation in Delta, Kappa and B.1.617.3).(2) Vaccine performance against emerging SARS-CoV-2 variants is an important consideration when evaluating the need for prevention measures in vaccinated people and will require continued monitoring.

# COVID–19 vaccine efficacy, effectiveness, and immunogenicity

Immunogenicity is the generation of effective protective immunity against a vaccine antigen as measured by laboratory tests. Vaccine efficacy refers to how well a vaccine performs in a carefully controlled clinical trial, and effectiveness describes its performance in real-world observational studies. Evidence demonstrates that the approved or authorized COVID-19 vaccines are both efficacious and effective against symptomatic, laboratory-confirmed COVID-19, including severe forms of the disease. In addition, as shown below, a growing body of evidence suggests that COVID-19 vaccines also reduce asymptomatic infection and transmission. Substantial reductions in SARS-CoV-2 infections (both symptomatic and asymptomatic) will reduce overall levels of disease, and therefore, SARS-CoV-2 virus transmission in the United States. Investigations are ongoing to further assess the risk of transmission from fully vaccinated persons with SARS-CoV-2 infections to other vaccinated and unvaccinated people. Early evidence suggests infections in fully vaccinated persons caused by the Delta variant of SARS-CoV-2 may be transmissible to others; however, SARS-CoV-2 transmission between unvaccinated persons is the primary cause of continued spread.

## Animal challenge studies

Rhesus macaque challenge studies provided the first evidence of the potential protective effects of Pfizer-BioNTech, Moderna, and Janssen COVID-19 vaccines against SARS-CoV-2 infection, including both symptomatic and asymptomatic infection. Vaccinated macaques developed neutralizing antibodies that exceeded those in human convalescent sera and showed no or minimal signs of clinical disease after SARS-CoV-2 challenge.(3-5) In addition, COVID-19 vaccination prevented or limited viral replication in the upper and lower respiratory tracts, which may have implications for transmission of the virus among humans.(3-5)

## Vaccine efficacy from human clinical trials

Clinical trials subsequently demonstrated the FDA-approved or authorized COVID-19 vaccines to be efficacious against laboratory-confirmed, symptomatic COVID-19 in adults, including severe forms of the disease, with evidence for protection against both symptomatic and asymptomatic SARS-CoV-2 infection (6-12) (Box). Trial data demonstrated 100% efficacy of the Pfizer-BioNTech vaccine against laboratory-confirmed, symptomatic COVID-19 in adolescents 12–15 years old; this estimate was based on small numbers of cases and prior to emergence of the Delta variant.(13)

Clinical trial data suggest that the Janssen COVID-19 vaccine may have reduced overall efficacy against disease caused by the Beta variant, compared to the other COVID-19 vaccines. Although sero-response rates were similar between U.S. clinical trial participants and those from Brazil and South Africa, vaccine efficacy against moderate to severe-critical COVID-19 after ≥14 days was 74% in the United States (where ~96% of infections were due to the ancestral strain with the D614G mutation), 66% in Brazil (where ~69% of infections were due to Zeta [P.2]), and 52% in South Africa (where ~95% of infections were due to Beta).(14) Notably, Janssen vaccine showed good efficacy against severe or critical disease (73%–82%) across all sites.

---

Box. Summary of vaccine efficacy estimates for approved or authorized COVID-19 vaccines

All approved or authorized COVID-19 vaccines demonstrated efficacy (range 65% to 95%) against symptomatic, laboratory-confirmed COVID-19 in adults ≥18 years.

- For each approved or authorized COVID-19 vaccine, efficacy was demonstrated across different populations, including elderly and younger adults, in people with and without underlying health conditions, and in people representing different races and ethnicities.
- The Pfizer-BioNTech COVID-19 vaccine also demonstrated high efficacy against symptomatic, laboratory-confirmed COVID-19 in adolescents aged 12-17 years.

All approved or authorized COVID-19 vaccines demonstrated high efficacy (≥89%) against COVID-19 severe enough to require hospitalization.

All approved or authorized COVID-19 vaccines demonstrated high efficacy against COVID-19-associated death.

- In the clinical trials, no participants who received a COVID-19 vaccine died from COVID-19; the Moderna and Janssen vaccine trials among adults ≥18 years each had COVID-19 deaths in the unvaccinated placebo arm.

Data from the clinical trials among adults ≥18 years old suggest COVID-19 vaccination protects against symptomatic infection and may also protect against asymptomatic infection.

- In the Moderna trial, among people who had received a first dose, the number of asymptomatic people who tested positive for SARS-CoV-2 at their second-dose appointment was approximately 67% lower among vaccines than among placebo recipients (0.1% [n=15] and 0.3% [n=39], respectively)
- Efficacy of Janssen COVID-19 vaccine against asymptomatic infection was 74% in a subset of trial participants.

No trials have compared efficacy between any of the approved or authorized vaccines in the same study population at the same time, making comparisons of efficacy difficult.

- All Phase 3 trials differed by calendar time and geography.
- Vaccines were tested in settings with different background COVID-19 incidence and circulating variants.

## Vaccine effectiveness from real-world studies

Multiple studies from the United States and other countries have demonstrated that a two-dose COVID-19 mRNA vaccination series is effective against SARS-CoV-2 infection (including both symptomatic and asymptomatic infection) caused by ancestral and variant strains and sequelae including severe disease, hospitalization, and death. Early evidence for the Janssen vaccine also demonstrates effectiveness against COVID-19 in real-world conditions. There is now a substantial volume of scientific literature examining the effectiveness of COVID-19 vaccination against SARS-CoV-2 infection, symptomatic disease, and other clinical outcomes; detailed summaries of these studies are available in the International Vaccine Access Center's VIEW-Hub resource library ⧉ .

Several systematic reviews and meta-analyses of vaccine effectiveness have recently been published (15-17); meta-analyses indicate an average effectiveness of full vaccination against SARS-CoV-2 infection of 85%–95% shortly after completion of vaccination. (16, 17) However, many of the studies in these reviews were conducted prior to the emergence of the variants of concern. Studies in Israel, Europe, and the United Kingdom have demonstrated high real-world effectiveness (>85%) of two doses of Pfizer-BioNTech COVID-19 vaccine while the Alpha variant was prevalent.(18-26) Studies from Qatar have demonstrated high effectiveness against documented infection with Alpha and Beta ≥14 days after receiving the Pfizer-BioNTech vaccine (90% and 75%, respectively) and the Moderna vaccine (100% and 96%, respectively); importantly, both vaccines were 96%–100% effective against severe, critical, or fatal disease, regardless of strain.(27, 28) In three studies from Canada, one demonstrated 79% effectiveness for mRNA vaccines against confirmed infection during a time when Alpha and Gamma represented most infections, while another two demonstrated 84% and 88% effectiveness, respectively, against symptomatic infection caused by Gamma/Beta.(29-31)

Individual studies specifically examining vaccine effectiveness against the Delta variant or conducted in the context of substantial circulation of Delta are summarized in Table 1a and as follows. Studies from the United Kingdom have noted effectiveness of the Pfizer-BioNTech vaccine against confirmed infection (79%) and symptomatic infection (88%), compared with the Alpha variant (92% and 93%, respectively).(23, 25) A study from Canada demonstrated 87% effectiveness against symptomatic illness caused by the Delta variant ≥7 days after receipt of the second dose of Pfizer-BioNTech vaccine, compared with 89% for the Alpha variant.(32)Data from Qatar demonstrated 54% effectiveness against symptomatic illness for the Pfizer-BioNTech vaccine compared with 85% for the Moderna vaccine.(33). Preliminary data from South Africa ⬛ ⧉ on the effectiveness of the Janssen vaccine showed 71% effectiveness against hospitalization when Delta variant was predominant, compared to 67% when Beta was predominant. Data from Israel ⬛ also suggest decreased effectiveness of vaccines against infection and illness caused by Delta. The variability in vaccine effectiveness estimates between countries may in part reflect differences in study methodology, intervals used between vaccine doses, and timing of vaccine effectiveness assessments. Of note, the United Kingdom and Canada used prolonged intervals of 12–16 weeks between vaccine doses, which have been observed to induce higher immunogenicity and effectiveness (including in ages ≥80 years) (34-37). The most recent estimates from Israel and Qatar represent time points >6 months after initiating respective national vaccination campaigns and 2–5 months after prior assessments of vaccine effectiveness against the Alpha variant, with

potential for waning immunity. Notably, in the United Kingdom, Canada, Qatar, South Africa, and Israel, vaccine effectiveness against hospitalization related to Delta was >90% and comparable to that observed with Alpha for all vaccines currently approved or authorized in the United States.(26, 32, 33)

Table 1a. *Effectiveness of COVID-19 Vaccination Against SARS-CoV-2 Infection and Symptomatic Disease (Including Severe Disease and Hospitalization) Caused by the Delta Variant*

| Country | Population | Vaccine | Outcome | Vaccine Effectiveness* |
|---|---|---|---|---|
| UK[38] | General population ≥16 years | Pfizer-BioNTech | Symptomatic disease | 88%[1](85-90) |
| Canada[32] | General population ≥16 years | Pfizer-BioNTech | Symptomatic disease | 85%[1](59-94) |
| UK (Scotland)[25] | General population | Pfizer-BioNTech | SARS-CoV-2 infection | 79%[1](75-82) |
| UK[23] | General population | Pfizer-BioNTech | SARS-CoV-2 infection | 80%[1](77-83) |
| United States[39] | Healthcare workers, first responders, and other essential and frontline workers | Pfizer-BioNTech, Moderna, or Janssen | SARS-CoV-2 infection | 66%[1](26-84) |
| United States[40] | Health system members ≥12 years | Pfizer-BioNTech | SARS-CoV-2 infection | 75%[2](71-78) |
| | | | Hospitalization | 93%[2](84-96) |
| Qatar[33] | General population ≥12 years | Moderna | SARS-CoV-2 infection | 85%[1](76-91) |
| | | Pfizer-BioNTech | SARS-CoV-2 infection | 54%[1](44-61) |
| | | Moderna | Symptomatic disease | 86%[1](71-94) |
| | | Pfizer-BioNTech | Symptomatic disease | 56%[1](41-67) |
| | | Moderna | Severe, critical, or fatal disease | 100%[1](41-100) |
| | | Pfizer-BioNTech | Severe, critical, or fatal disease | 90%[1](61-98) |
| UK[26] | Patients hospitalized following ED visit | Pfizer-BioNTech | Hospitalization | 96%[1](86-99) |

*Only studies including estimates of vaccine effectiveness ≥7 days following a completed vaccination series of a COVID-19 vaccine currently approved or authorized for use in the United States are included here. For studies that examined variant-specific vaccine effectiveness against multiple variants of SARS-CoV-2, only estimates for effectiveness against the Delta variant are shown. The 95% confidence interval for each estimate of vaccine effectiveness is displayed in parentheses following the estimate.

[1]≥14 days after second dose

[2] ≥7 days after second dose

In addition to preventing morbidity and mortality associated with COVID-19, currently approved or authorized vaccines also demonstrate effectiveness against asymptomatic SARS-CoV-2 infection. However, most studies of asymptomatic infection prevention were conducted in the context of circulation of different variants and the effectiveness of COVID-19 vaccines in preventing asymptomatic infection differs by variant and vaccine. In addition, infections identified in such studies as asymptomatic may simply have been identified prior to the infected person developing symptoms, i.e., these infections are presymptomatic rather than asymptomatic. Asymptomatic people are also less likely to be tested for SARS-CoV-2 infection in most settings and thus less likely to be captured in "real world" effectiveness studies.

Table 1b. *Effectiveness of COVID-19 Vaccination Against Asymptomatic SARS-CoV-2 Infection When Different Variants Predominated*

| Country | Population | Vaccine | Dominant Variant(s) | Vaccine Effectiveness* |
|---|---|---|---|---|
| Israel [24] | Healthcare workers | Pfizer-BioNTech | Alpha | 65%[1](45-79) |
| United States (California) [41] | General population ≥18 years | Pfizer-BioNTech or Moderna | Epsilon, Alpha | 68%[2](29-86) |
| United States[42] | Preprocedural adult patients | Pfizer-BioNTech or Moderna | Ancestral strain | 80%[3](56-91) |
| Qatar[33] | General population ≥12 years | Moderna | Delta | 80%[4](54-93) |
|  |  | Pfizer-BioNTech | Delta | 36%[4](11-54) |
| Israel[43] | Healthcare workers | Pfizer-BioNTech | Alpha | 86%[5](69-93) |
| Israel[21] | General population ≥16 years | Pfizer-BioNTech | Alpha | 92%[5](91-92) |
| Israel[19] | General population ≥16 years | Pfizer-BioNTech | Ancestral strain, Alpha | 90%[5](83-94) |

*The 95% confidence interval for each estimate of vaccine effectiveness is displayed in parentheses following the estimate.

[1] ≥11 days after second dose
[2] ≥15 days after second dose
[3] ≥0 days after second dose
[4] ≥14 days after second dose
[5] ≥7 days after second dose

### Vaccine immunogenicity and effectiveness in immunocompromised people

Vaccination is particularly important for people with immunocompromising conditions, who are at increased risk of severe COVID-19 illness. However, current evidence suggests reduced protection from COVID-19 vaccines for many immunocompromised persons. Recent studies in several countries found significantly lower vaccine effectiveness among immunocompromised adults compared to those without immunocompromising conditions (44-46) (Table 2), although each study defined the immunocompromised population differently. Studies in the United States and Israel have also found that immunocompromised persons account for a high proportion (≥40%) of infections among fully vaccinated hospitalized persons. (46, 47)

Compared with those who are not immunocompromised, reduced antibody response to a two-dose primary series of mRNA COVID-19 vaccines has also been observed in specific groups of immunocompromised adults, including people receiving solid organ transplants (48-54); some people with cancer, particularly hematologic cancers, and some people receiving

hemodialysis for kidney disease (57, 58); and people taking certain immunosuppressive medications (51, 53, 54, 59).  While antibody measurement and threshold levels varied by study, a large proportion of immunocompromised persons overall had a measurable immune response after a two-dose series of mRNA vaccine, although some remained seronegative. The distribution of antibody response by immunocompromising condition in several recent studies 🔎 is summarized in Figure 1.

Emerging data suggest an additional COVID-19 vaccine dose in immunocompromised people, typically administered at least 28 days after completion of the primary series, increases antibody response. In small observational studies of solid organ transplant recipients (60-63) or hemodialysis patients (64-66), 33%-54% of persons who had no detectable antibody response to an initial two-dose mRNA vaccine series developed an antibody response to an additional dose of a COVID-19 vaccine. A recently published randomized controlled trial demonstrated substantial increases in serologic immune response to a third dose of Moderna's mRNA vaccine compared with placebo among solid organ transplant recipients who previously received a two-dose series of that vaccine.(67) While these studies evaluated serologic immune response to an additional vaccine dose, the clinical impact of an additional dose on acquisition, severity, and infectiousness of infections in fully vaccinated immunocompromised persons is not yet known.

Table 2. *Effectiveness of COVID-19 Primary Series Vaccination Against SARS-CoV-2 Infection and Symptomatic Disease <u>among Immunocompromised Persons</u>*

| Country | Population | Vaccine | Outcome | Dominant Variant(s) | Vaccine Effectiveness in IC Population | Vaccine Effectiveness in Comparison Population* |
|---|---|---|---|---|---|---|
| United States[45] | Veterans ≥18 years taking immunosuppressive medications for inflammatory bowel disease | Pfizer-BioNTech or Moderna | SARS-CoV-2 infection | Unknown | 69%[1](44-83) | No comparison |
| United States[68] | Solid organ transplant recipients | Pfizer-BioNTech, Moderna, or Janssen | SARS-CoV-2 infection | Ancestral strain, Alpha | 81%[2](50-95) | No comparison |
| Israel[44] | General population ≥16 years | Pfizer-BioNTech | SARS-CoV-2 infection | Ancestral strain, Alpha | 71%[1](37-87) | 90%(79-95) |
| | | | Symptomatic disease | | 75%[1](44-88) | 94%(88-97) |
| Qatar[69] | Kidney transplant recipients | Pfizer-BioNTech or Moderna | SARS CoV-2 infection | Alpha, Beta | 47%[2](0-74) | No comparison |
| | | | Severe, critical, or fatal COVID-19 disease | | 72%[2](0-91) | |
| United States[46] | Hospitalized patients ≥18 years | Pfizer-BioNTech or Moderna | Hospitalization | Ancestral strain, Alpha | 59%[2](12-81) | 91%(86-95) |

IC: Immunocompromised

* In the Israeli study, the comparison is with overall vaccine effectiveness (i.e., vaccine effectiveness in the entire study population, including those with immunocompromising conditions). In the U.S. study, the comparison is with vaccine effectiveness among members of the study population without immunocompromising conditions.

The 95% confidence interval for each estimate of vaccine effectiveness is displayed in parentheses following the estimate.

[1]≥7 days after second dose
[2]≥14 days after second dose

Figure 1:





*The studies displayed in Figure 1 represent the results of a literature review conducted by the Advisory Committee on Immunization Practices' COVID-19 Vaccines Work Group and are current as of July 21, 2021. Numerous additional studies of antibody response to COVID-19 vaccination in various immunocompromised populations have been published since that date and are not captured here.

Vaccine immunogenicity and effectiveness of heterologous (mixed) dosing regimens

Multiple small studies from Europe have examined the immunogenicity of a heterologous or 'mixed' series of COVID-19 vaccines. These studies found that receipt of a dose of AstraZeneca's adenovirus vector vaccine followed by a dose of an mRNA vaccine (most frequently Pfizer-BioNTech) induced a robust immune response (70-72) and was at least as immunogenic as two doses of mRNA vaccines by most measures of immune response.(73-79) One study examined vaccine effectiveness of this heterologous series and estimated an effectiveness of 88% against any SARS-CoV-2 infection two weeks following the mRNA (second) dose.(80) Only one study examined a heterologous series in which the mRNA vaccine was the priming (first) dose; this study found that a dose of Pfizer-BioNTech vaccine followed by a dose of AstraZeneca vaccine did not achieve non-inferiority of immune response when compared with two doses of Pfizer-BioNTech.(81) A single study to date examined heterologous dosing with a primary mRNA vaccine series followed by a dose of the Janssen adenovirus vector COVID-19 vaccine in four subjects and noted substantially increased immune response against SARS-CoV-2 after the third dose.(82)

Vaccine-induced neutralizing antibody activity

Sera from mRNA COVID-19 vaccine (both Pfizer-BioNTech and Moderna) recipients have demonstrated minimal to large reductions in antibody neutralization activity against a variety of mutations, as reviewed in VIEW-Hub ⧉ . Two related systematic reviews and meta-analyses have also been published (83, 84); however, these reviews do not include all available neutralization studies of the Delta variant with sera from people who received mRNA vaccines or the Janssen vaccine.(85-96) Across studies of VOCs, the greatest reductions were observed for Beta, followed by Gamma and Delta; reductions for Alpha were minimal. The E484K/Q and L452R mutations alone or in combination with other mutations in the receptor binding domain have been shown to account for the majority of the reduction in vaccine-induced neutralizing antibody activity for the Beta, Gamma, and Delta variants.(97-103) Alpha and Iota variants with E484K mutations, which have been detected in the United Kingdom, United States, and other countries, have shown further reductions in neutralization above Alpha and Iota alone, respectively.(87, 97, 104-109) For two-dose COVID-19 vaccines, multiple studies have shown greater neutralization against variants after the second dose (i.e. among fully vaccinated people) compared with after the first dose alone.(88, 91, 97,

Robust correlation has been demonstrated between vaccine efficacy and neutralizing antibody levels induced by different vaccines.(119, 120) Based on evidence from clinical trials, the correlate of protection, or antibody threshold providing protection against severe disease, has been estimated to be much lower than that required for protection against confirmed infection.(120) However, in the absence of an accepted antibody threshold that correlates with protection, it is difficult to fully predict how reduced neutralizing activity may affect COVID-19 vaccine effectiveness. Some variants may reduce neutralizing antibody levels to near or below the protective threshold, resulting in lowered vaccine efficacy, increased infections in vaccinated persons, and shortened duration of immunity, and others may not be significant.

### Vaccine-induced cellular immunity

Several studies have assessed CD4+ and CD8+ T cell responses from Moderna or Pfizer-BioNTech vaccine recipients to the ancestral SARS-CoV-2 strain compared with the Alpha, Beta, Gamma, and Epsilon variants; these studies observed modest or no defects in cellular immune recognition of the variants.(112, 116, 121-126) Thus, cellular immunity may help limit disease severity in infections caused by variants that partially escape neutralizing antibodies. Variations in the genes encoding human leukocyte antigens have been observed to result in variation of the T cell response to specific SARS-CoV-2 variants, which may impact different subpopulations differently based on genetic prevalence of these variations.(127-132) There are currently no studies of vaccine-induced cellular immunity against the Delta variant.

### Older adults and long-term care facility residents

Multiple studies have noted reduced vaccine effectiveness in older adults (≥60 years) (38, 133-135) or residents of long-term care facilities, compared with general population estimates.(136-138) Compared with younger individuals, persons aged >80 years have been noted to have reduced T-cell responses, lower neutralizing antibody levels, and less potential antibody diversity (somatic hypermutation), potentially giving this group increased risk for susceptibility to SARS-CoV-2 infection in vaccinated people. (139) Two studies have observed poor antibody response to the Pfizer-BioNTech vaccine among nursing home residents compared with staff (140, 141); one study noted 38% of nursing home residents had undetectable antibodies to the Beta variant at 2–4 weeks after the second dose of Pfizer-BioNTech vaccine, compared with 12% with Moderna vaccine. (140) Another study showed declining antibody levels among nursing home residents, with 72% of residents having undetectable neutralizing antibody levels at 6 months post-vaccination with Pfizer-BioNTech.(142)

### Duration of protection

Immunogenicity of COVID-19 vaccines has been demonstrated out to 6–8 months after vaccination.(86, 143) At 2–3 months post vaccination, two studies have shown lower neutralizing titers, including against the Beta and Delta variants, for Janssen (an adenovirus vector vaccine) compared with the mRNA vaccines.(144, 145) Two studies have shown a combined impact of waning antibody levels and reduced neutralization of variants; six months after receiving the Moderna vaccine, neutralizing antibody levels were reduced but sufficient to protect against the ancestral strain, while about 50% of people had undetectable neutralization activity against Beta and Gamma compared with the ancestral strain.(146, 147) However, a small study of people 8 months after receiving the Janssen vaccine had minimal decline in neutralizing titers against Beta, Gamma, and Delta and there was evidence of expanded breadth of neutralizing antibody response against variants over this time period, likely through B cell maturation.(86) More evidence is still needed in this area, including understanding potential differences in the kinetics of immune response related to different vaccine platforms. One recent modeling study based on immunogenicity data predicted that vaccine effectiveness against symptomatic infection caused by the Delta variant may drop below 50% within the first year after vaccination for most current vaccines in use globally, while the majority are protected from severe illness.(148)

Six-month clinical efficacy for the Pfizer-BioNTech vaccine shows an overall efficacy against infection of 91% and 97% efficacy against severe illness.(149) However, a non-significant decrease of six percentage points was observed for every two months ≥7 days post-vaccination, from 96% at ≥7 days to <2 months, 90% at 2 to <4 months, and 84% at 4 to <6 months. Similar results for the Moderna vaccine have not yet been published, but data from the manufacturer ■ cite 93% overall efficacy up to 6 months.

Several recent studies have noted decreases over time in the effectiveness of COVID-19 vaccines against SARS-CoV-2 infection. A study of U.S. long-term care residents, who were among the first groups in the United States to be vaccinated, found effectiveness of mRNA vaccination against infection declined from 75% in March–May 2021 to 53% in June–July 2021. (150) A study of adults in one U.S. state found a decline in vaccine effectiveness against SARS-CoV-2 infection from 92% the week of May 3, 2021 to 80% the week of July 19, 2021.(151) Two studies in large U.S. health systems examined mRNA vaccine effectiveness longitudinally from December 2020 and January 2021 through July 2021 and August 2021 and noted marked declines over this period (40, 152); similarly, a large population-based study found declines in effectiveness of mRNA vaccines

Pfizer-BioNTech vaccination over 4-5 months following the second dose.(153) Observed changes in vaccine effectiveness against infection with SARS-CoV-2 may reflect reduced vaccine performance against the Delta variant, waning immunity from primary vaccination, or other unmeasured confounders. In addition, as people at the highest risk of SARS-CoV-2 infection were generally vaccinated first, observational studies of duration of immunity may be subject to confounding by risk status. Importantly, data as of July 2021 confirm sustained high effectiveness of full mRNA vaccination against COVID-19 hospitalization, even up to 6 months post-vaccination.(151, 154)

A retrospective cohort study in a large healthcare system in Israel noted a 2.3-fold increased risk for infection among fully vaccinated persons who were vaccinated with Pfizer-BioNTech in January vs. April 2021.(155) A similar study observed a higher rate (2.4% v. 1.1%, OR=2.2) of infection in fully vaccinated persons who received the second Pfizer-BioNTech dose ≥5 months ago compared with those who received it <5 months ago, with higher magnitude of difference with increasing age. (156)

Infections in fully vaccinated persons: clinical implications and transmission

As expected, because no vaccines is 100% effective, infections in fully vaccinated persons (e.g. breakthrough infections) have been observed, albeit at much lower rates than infections among unvaccinated persons; vaccine effectiveness against severe disease remains high.  From January through June 2021, COVID-NET data from laboratory-confirmed COVID-19-associated hospitalizations in adults ≥18 years of age for whom vaccination status is known showed 3% of hospitalizations occurred in fully vaccinated persons. In general, symptoms and duration of illness in infections among fully vaccinated persons have been attenuated compared with cases among unvaccinated people.(157) CDC conducts nationwide monitoring of infections in fully vaccinated persons resulting in hospitalization or death. Among hospitalized or fatal cases reported to CDC as of August 30, 2021, 70% of hospitalized cases and 87% of fatal cases of COVID-19 in fully vaccinated persons were in persons aged 65 years or older.  Infections in fully vaccinated persons may be associated with lower antibody levels compared with those who maintain protection, as shown in a study of fully vaccinated healthcare workers in Israel with infections caused by the Delta variant.(158) However, infection in a fully vaccinated person may boost immunity; four weeks after an outbreak in a long-term care facility, fully vaccinated residents who experienced SARS-CoV-2 infections were found to have significantly higher antibody levels than vaccinated individuals who did not experience SARS-CoV-2 infections.(159)

The proportions of VOCs observed among cases in fully vaccinated persons has been similar to that observed in CDC's national genomic surveillance,(160) but interpretation of these data are challenging because of local variation and changes in variant proportions over time. An Israeli study of VOC infections in adults fully vaccinated with Pfizer-BioNTech vaccine compared with unvaccinated matched controls, during a time when Alpha was the dominant strain and Beta was detected in <1% of all specimens, found a higher proportion of Beta in fully vaccinated cases (matched odds ratio = 8.0) and a higher proportion of Alpha in partially vaccinated cases (matched odds ratio = 2.6), though small sample sizes, especially for Beta, were noted as a limitation.(161) Results of a study from Maryland showed that variants with E484K substitutions (e.g., Beta, Gamma) were associated with increased odds of SARS-CoV-2 infection (OR=2.0) in fully vaccinated persons and infection in fully vaccinated persons associated with hospitalization (OR=2.6), while L452R substitutions (e.g., Delta) were not.(162) However, a study from Houston, Texas observed that Delta caused a significantly higher rate of infections in fully vaccinated people compared with infections from other variants, but noted that only 6.5% of all COVID-19 cases occurred in fully vaccinated individuals(163); similar findings were noted in India.(96)

In studies conducted before the emergence of the Delta variant, data from multiple studies in different countries suggested that people vaccinated with mRNA COVID-19 vaccines who develop COVID-19 generally have a lower viral load than unvaccinated people.(157, 165-169) This observation may indicate reduced transmissibility, as viral load has been identified as a key driver of transmission.(170) Studies from multiple countries found significantly reduced likelihood of transmission to household contacts from people infected with SARS-CoV-2 who were previously vaccinated for COVID-19.(171-176) For the Delta variant, early data indicate vaccinated and unvaccinated persons infected with Delta have similar levels of viral RNA and culturable virus detected, indicating that some vaccinated people infected with the Delta variant of SARS-CoV-2 may be able to transmit the virus to others.(163, 164, 177-180) However, other studies have shown a more rapid decline in viral RNA and culturable virus in fully vaccinated people (96, 177, 180-182). One study observed that Delta infection in fully vaccinated persons was associated with significantly less transmission to contacts than persons who were unvaccinated or partially vaccinated.(181)

Together, these studies suggest that vaccinated people who become infected with Delta have potential to be less infectious than infected unvaccinated people. However, more data are needed to understand how viral shedding and transmission from fully vaccinated persons are affected by SARS-CoV-2 variants, time since vaccination, and other factors, particularly as

transmission dynamics may vary based on the extent of exposure to the infected vaccinated person and the setting in which the exposure occurs. Additional data collection and studies are underway to understand the extent and duration of transmissibility of Delta variant SARS-CoV-2 in the United States and other countries.

## Conclusions

COVID-19 vaccines currently approved or authorized in the United States have been shown to provide considerable protection against severe disease and death caused by COVID-19. These findings, along with the early evidence for reduced levels of viral mRNA and culturable virus in vaccinated people who acquire SARS-CoV-2 infection, suggest that any associated transmission risk is substantially reduced in vaccinated people: even for Delta, evidence suggests fully vaccinated people who become infected are infectious for shorter periods of time than unvaccinated people infected with Delta. While vaccine effectiveness against emerging and other SARS-CoV-2 variants will continue to be assessed, available evidence suggests that the COVID-19 vaccines approved or authorized in the United States offer substantial protection against hospitalization and death from emerging variants, including the Delta variant. Data suggest lower vaccine effectiveness against laboratory-confirmed illness and symptomatic disease caused by the Beta, Gamma, and Delta variants compared with the ancestral strain and Alpha variant. Early data also find some decline in vaccine effectiveness against SARS-CoV-2 infection over time, although in fall 2021, 9 months after the start of the U.S. COVID-19 vaccination program, vaccination remains highly protective against hospitalization with COVID-19**.**

Evidence suggests the U.S. COVID-19 vaccination program has substantially reduced the burden of disease in the United States by preventing serious illness in fully vaccinated people and interrupting chains of transmission. Vaccinated people can still become infected and have the potential to spread the virus to others, although at much lower rates than unvaccinated people. The risks of SARS-CoV-2 infection in fully vaccinated people are higher where community transmission of the virus is widespread. Current efforts to maximize the proportion of the U.S. population that is fully vaccinated against COVID-19 remain critical to ending the COVID-19 pandemic.

*Note: This brief summarizes evidence related to vaccines approved or authorized for emergency use in the United States. In specific circumstances, CDC guidance for fully vaccinated people can also be applied to COVID-19 vaccines that have been listed for emergency use by the World Health Organization (e.g. AstraZeneca/Oxford) and to some vaccines used for U.S. participants in COVID-19 vaccine trials.

# Previous Updates

## Updates from Previous Content ⌄

### As of July 27, 2021

- Data were added from studies published since the last update that demonstrate currently authorized mRNA vaccines provide protection against variants of concern, including the Delta strain that is now predominant in the United States. Vaccine effectiveness against hospitalization and death is high for all current SARS-CoV-2 variants; emerging data suggest lower effectiveness against confirmed infection and symptomatic disease caused by the Beta, Gamma, and Delta variants compared with the ancestral strain and the Alpha variant.

## References

Note: Preprints have not been peer-reviewed. They should not be regarded as conclusive, guide clinical practice/health-related behavior, or be reported in news media as established information.

1. Lee G, Carr W, ACIP Evidence Based Recommendations Work Group. Updated Framework for Development of Evidence-Based Recommendations by the Advisory Committee on Immunization Practices. MMWR Morb Mortal Wkly Rep. 2018;67(45):1271-2.
2. Centers for Disease Control and Prevention. SARS-CoV-2 Variant Classifications and Definitions. Available from 078

3. Corbett KS, Flynn B, Foulds KE, Francica JR, Boyoglu-Barnum S, Werner AP, et al. Evaluation of the mRNA-1273 Vaccine against SARS-CoV-2 in Nonhuman Primates. N Engl J Med. 2020;383(16):1544-55.

4. Mercado NB, Zahn R, Wegmann F, Loos C, Chandrashekar A, Yu J, et al. Single-shot Ad26 vaccine protects against SARS-CoV-2 in rhesus macaques. Nature. 2020;586(7830):583-8.

5. Vogel AB, Kanevsky I, Che Y, Swanson KA, Muik A, Vormehr M, et al. BNT162b vaccines protect rhesus macaques from SARS-CoV-2. Nature. 2021.

6. Baden LR, El Sahly HM, Essink B, Kotloff K, Frey S, Novak R, et al. Efficacy and Safety of the mRNA-1273 SARS-CoV-2 Vaccine. N Engl J Med. 2021;384(5):403-16.

7. Food and Drug Administration. Pfizer-BioNTech COVID-19 Vaccine. Vaccines and Related Biological Products Advisory Committee Briefing Document – Sponsor. https://www.fda.gov/media/144246/download ⧉ .

8. Food and Drug Administration. Moderna COVID-19 Vaccine. Vaccines and Related Biological Products Advisory Committee December 17, 2020 Meeting Briefing Document- Sponsor. https://www.fda.gov/media/144452/download ⧉ .

9. Food and Drug Administration. Moderna COVID-19 Vaccine. Vaccines and Related Biological Products Advisory Committee December 17, 2020 Meeting Briefing Document Addendum- Sponsor. https://www.fda.gov/media/144453/download ⧉ .

10. Food and Drug Administration. Janssen COVID-19 Vaccine. Vaccines and Related Biological Products Advisory Committee February 26, 2021 Meeting Briefing Document – Sponsor. https://www.fda.gov/media/146219/download ⧉ .

11. Food and Drug Administration. Janssen COVID-19 Vaccine. Vaccines and Related Biological Products Advisory Committee February 26, 2021 Meeting Briefing Document Addendum – Sponsor. https://www.fda.gov/media/146218/download ⧉ .

12. Polack FP, Thomas SJ, Kitchin N, Absalon J, Gurtman A, Lockhart S, et al. Safety and Efficacy of the BNT162b2 mRNA Covid-19 Vaccine. N Engl J Med. 2020;383(27):2603-15.

13. Food and Drug Administration. Emergency Use Authorization (EUA) Amendment for an Unapproved Product Review Memorandum. https://www.fda.gov/media/148542/download ⧉ .

14. Sadoff J, Gray G, Vandebosch A, Cardenas V, Shukarev G, Grinsztejn B, et al. Safety and Efficacy of Single-Dose Ad26.COV2.S Vaccine against Covid-19. N Engl J Med. 2021;384(23):2187-201.

15. Harder T, Koch J, Vygen-Bonnet S, Kulper-Schiek W, Pilic A, Reda S, et al. Efficacy and effectiveness of COVID-19 vaccines against SARS-CoV-2 infection: interim results of a living systematic review, 1 January to 14 May 2021. Euro Surveill. 2021;26(28).

16. Kow CS, Hasan SS. Real-world effectiveness of BNT162b2 mRNA vaccine: a meta-analysis of large observational studies. Inflammopharmacology. 2021;29(4):1075-90.

17. Shapiro J, Dean NE, Madewell ZJ, Yang Y, Halloran ME, Longini I. Efficacy Estimates for Various COVID-19 Vaccines: What we Know from the Literature and Reports. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.20.21257461v2 ⧉ .

18. Björk J, Inghammar M, Moghaddassi M, et al. Effectiveness of the BNT162b2 vaccine in preventing COVID-19 in the working age population – first results from a cohort study in Southern Sweden. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.04.20.21254636v1 ⧉ .

19. Dagan N, Barda N, Kepten E, Miron O, Perchik S, Katz MA, et al. BNT162b2 mRNA Covid-19 Vaccine in a Nationwide Mass Vaccination Setting. N Engl J Med. 2021.

20. Goldberg Y, Mandel M, Woodbridge Y, et al. Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three-month nationwide experience from Israel. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 ⧉ .

21. Haas EJ, Angulo FJ, McLaughlin JM, Anis E, Singer SR, Khan F, et al. Impact and effectiveness of mRNA BNT162b2 vaccine against SARS-CoV-2 infections and COVID-19 cases, hospitalisations, and deaths following a nationwide vaccination campaign in Israel: an observational study using national surveillance data. Lancet. 2021.

22. Hall VJ, Foulkes S, Saei A, Andrews N, Oguti B, Charlett A, et al. COVID-19 vaccine coverage in health-care workers in England and effectiveness of BNT162b2 mRNA vaccine against infection (SIREN): a prospective, multicentre, cohort study. Lancet. 2021;397(10286):1725-35.

23. Lopez Bernal J, Andrews N, Gower C, Gallagher E, Simmons R, Thelwall S, et al. Effectiveness of Covid-19 Vaccines against the B.1.617.2 (Delta) Variant. N Engl J Med. 2021.

against the B.1.1/.2 (Delta) variant. N Engl J Med. 2021.

24. Regev-Yochay G, Amit S, Bergwerk M, et al. Decreased Infectivity Following BNT162b2 Vaccination: A prospective cohort study in Israel. The Lancet Regional Health – Europe. 2021;7(100150).

25. Sheikh A, McMenamin J, Taylor B, Robertson C, Public Health S, the EIIC. SARS-CoV-2 Delta VOC in Scotland: demographics, risk of hospital admission, and vaccine effectiveness. Lancet. 2021;397(10293):2461-2.

26. Stowe J, Andrews N, Gower C, et al. Effectiveness of COVID-19 vaccines against hospital admission with the Delta (B.1.617.2) variant. khubnet. 2021;https://khub.net/web/phe-national/public-library/-/document_library/v2WsRK3ZlEig/view/479607266 ⧉.

27. Chemaitelly H, Yassine HM, Benslimane FM, Al Khatib HA, Tang P, Hasan MR, et al. mRNA-1273 COVID-19 vaccine effectiveness against the B.1.1.7 and B.1.351 variants and severe COVID-19 disease in Qatar. Nat Med. 2021.

28. Abu-Raddad LJ, Chemaitelly H, Butt AA, National Study Group for C-V. Effectiveness of the BNT162b2 Covid-19 Vaccine against the B.1.1.7 and B.1.351 Variants. N Engl J Med. 2021.

29. Chung H, He S, Nasreen S, et al. Effectiveness of BNT162b2 and mRNA-1273 COVID-19 vaccines against symptomatic SARS-CoV-2 infection and severe COVID-19 outcomes in Ontario, Canada. BMJ. 2021;Aug 20; 374:n1943.

30. Nasreen S, Chung H, He S, et al. Effectiveness of COVID-19 vaccines against variants of concern in Ontario, Canada. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.06.28.21259420v2 ⧉ .

31. Yassi A, Grant JM, Lockhart K, et al. Infection control, occupational and public health measures including mRNA-based vaccination against SARS-CoV-2 infections to protect healthcare workers from variants of concern: a 14-month observational study using surveillance data. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.21.21257600v1 ⧉ .

32. Nasreen S CH, He S, et al. Effectiveness of COVID-19 vaccines against variants of concern in Ontario, Canada. medRxiv. 2021;https://doi.org/10.1101/2021.06.28.21259420 ⧉ .

33. Tang P, Hasan MR, Chemaitelly H, et al. BNT162b2 and mRNA-1273 COVID-19 vaccine effectiveness against the Delta (B.1.617.2) variant in Qatar. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.11.21261885v1 ⧉ .

34. Amirthalingam G, Lopez Bernal J, Andrews NJ, et al. Higher serological responses and increased vaccine effectiveness demonstrate the value of extended vaccine schedules in combatting COVID-19 in England. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.26.21261140v1 ⧉ .

35. Carazo S, Talbot D, Boulianne N, et al. Single-dose mRNA vaccine effectiveness against SARS-CoV-2 in healthcare workers extending 16 weeks post-vaccination: a test-negative design from Quebec, Canada. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.19.21260445v1 ⧉ .

36. Flaxman A, Marchevsky N, Jenkin D, et al. Tolerability and Immunogenicity After a Late Second Dose or a Third Dose of ChAdOx1 nCoV-19 (AZD1222). Preprints with The Lancet. 2021;https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3873839 ⧉ .

37. Parry H, Bruton R, Stephens C, Amirthalingam G, Hallis B, Otter A, et al. Extended interval BNT162b2 vaccination enhances peak antibody generation in older people. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.15.21257017v1 ⧉ .

38. Lopez Bernal J, Andrews N, Gower C, Robertson C, Stowe J, Tessier E, et al. Effectiveness of the Pfizer-BioNTech and Oxford-AstraZeneca vaccines on covid-19 related symptoms, hospital admissions, and mortality in older adults in England: test negative case-control study. BMJ. 2021;373:n1088.

39. Fowlkes A, Gaglani M, Groover K, et al. Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance — Eight U.S. Locations, December 2020–August 2021. MMWR Morb Mortal Wkly Rep. 2021;ePub: 24 August 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7034e4http://dx.doi.org/10.15585/mmwr.mm7034e4 ⧉ .

40. Tartof SY, Slezak JM, Fischer H, et al. Six-Month Effectiveness of BNT162B2 mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohort Study. Preprints with The Lancet. 2021;https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3909743 ⧉ .

41. Andrejko K, Pry J, Myers JF, et al. Early evidence of COVID-19 vaccine effectiveness within the general population of California. MedRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.04.08.21255135v2 ⧉ .

42. Tande AJ, Pollock BD, Shah ND, Farrugia G, Virk A, Swift M, et al. Impact of the COVID-19 Vaccine on Asymptomatic Infection Among Patients Undergoing Pre-Procedural COVID-19 Molecular Screening. Clin Infect Dis. 2021.

43. Angel Y, Spitzer A, Henig O, et al. Association Between Vaccination with BNT162b2 and Incidence of Symptomatic

44. Chodick G, Tene L, Rotem RS, Patalon T, Gazit S, Ben-Tov A, et al. The effectiveness of the two-dose BNT162b2 vaccine: analysis of real-world data. Clin Infect Dis. 2021.

45. Khan N, Mahmud N. Effectiveness of SARS-CoV-2 Vaccination in a Veterans Affairs Cohort of Patients With Inflammatory Bowel Disease With Diverse Exposure to Immunosuppressive Medications. Gastroenterology. 2021;161(3):827-36.

46. Tenforde MW, Patel MM, Ginde AA, et al. Effectiveness of SARS-CoV-2 mRNA Vaccines for Preventing Covid-19 Hospitalizations in the United States. medRxiv. 2021;https://doi.org/10.1101/2021.07.08.21259776 ⧉

47. Brosh-Nissimov T, Orenbuch-Harroch E, Chowers M, Elbaz M, Nesher L, Stein M, et al. BNT162b2 vaccine breakthrough: clinical characteristics of 152 fully vaccinated hospitalized COVID-19 patients in Israel. Clin Microbiol Infect. 2021.

48. Boyarsky BJ, Chiang TP, Ou MT, Werbel WA, Massie AB, Segev DL, et al. Antibody Response to the Janssen COVID-19 Vaccine in Solid Organ Transplant Recipients. Transplantation. 2021;105(8):e82-e3.

49. Boyarsky BJ, Werbel WA, Avery RK, Tobian AAR, Massie AB, Segev DL, et al. Antibody Response to 2-Dose SARS-CoV-2 mRNA Vaccine Series in Solid Organ Transplant Recipients. JAMA. 2021.

50. Chavarot N, Ouedrani A, Olivier M, et al. Poor Anti-SARS-CoV-2 Humoral and T-cell Responses After 2 Injections of mRNA Vaccine in Kidney Transplant Recipients Treated with Belatacept. Transplantation. 2021;105(9):e94-e5.

51. Grupper A, Rabinowich L, Schwartz D, Schwartz IF, Ben-Yehoyada M, Shashar M, et al. Reduced humoral response to mRNA SARS-CoV-2 BNT162b2 vaccine in kidney transplant recipients without prior exposure to the virus. Am J Transplant. 2021.

52. Itzhaki Ben Zadok O, Shaul AA, Ben-Avraham B, Yaari V, Ben Zvi H, Shostak Y, et al. Immunogenicity of the BNT162b2 mRNA vaccine in heart transplant recipients – a prospective cohort study. Eur J Heart Fail. 2021.

53. Rabinowich L, Grupper A, Baruch R, et al. Low immunogenicity to SARS-CoV-2 vaccination among liver transplant recipients. J Hepatol. 2021;75:435-8.

54. Rozen-Zvi B, Yahav D, Agur T, Zingerman B, Ben-Zvi H, Atamna A, et al. Antibody response to mRNA SARS-CoV-2 vaccine among kidney transplant recipients – Prospective cohort study. Clin Microbiol Infect. 2021.

55. Herishanu Y, Avivi I, Aharon A, Shefer G, Levi S, Bronstein Y, et al. Efficacy of the BNT162b2 mRNA COVID-19 Vaccine in Patients with Chronic Lymphocytic Leukemia. Blood. 2021.

56. Monin L, Laing AG, Munoz-Ruiz M, McKenzie DR, Del Molino Del Barrio I, Alaguthurai T, et al. Safety and immunogenicity of one versus two doses of the COVID-19 vaccine BNT162b2 for patients with cancer: interim analysis of a prospective observational study. Lancet Oncol. 2021.

57. Broseta JJ, Rodriguez-Espinosa D, Rodriguez N, Mosquera MDM, Marcos MA, Egri N, et al. Humoral and Cellular Responses to mRNA-1273 and BNT162b2 SARS-CoV-2 Vaccines Administered to Hemodialysis Patients. Am J Kidney Dis. 2021.

58. Simon B, Rubey H, Treipl A, et al. Hemodialysis Patients Show a Highly Diminished Antibody Response after COVID-19 mRNA Vaccination Compared to Healthy Controls. Nephrol Dial Transplant. 2021:1-8.

59. Boyarsky BJ, Ruddy JA, Connolly CM, Ou MT, Werbel WA, Garonzik-Wang JM, et al. Antibody response to a single dose of SARS-CoV-2 mRNA vaccine in patients with rheumatic and musculoskeletal diseases. Ann Rheum Dis. 2021.

60. Charmetant X, Espi M, Benotmane I, et al. Comparison of infected and vaccinated transplant recipients highlights the role of Tfh and neutralizing IgG in COVID-19 protection. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.22.21260852v1 ⧉ .

61. Kamar N, Abravanel F, Marion O, Couat C, Izopet J, Del Bello A. Three Doses of an mRNA Covid-19 Vaccine in Solid-Organ Transplant Recipients. N Engl J Med. 2021;385(7):661-2.

62. Schrezenmeier E, Rincon-Arevalo H, Stefanski AL, et al. B and T cell responses after a third dose of SARS-CoV-2 vaccine in Kidney Transplant Recipients. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.12.21261966v2.full ⧉ .

63. Werbel WA, Boyarsky BJ, Ou MT, Massie AB, Tobian AAR, Garonzik-Wang JM, et al. Safety and Immunogenicity of a Third Dose of SARS-CoV-2 Vaccine in Solid Organ Transplant Recipients: A Case Series. Ann Intern Med. 2021.

64. Ducloux D, Colladant M, Chabannes M, Yannaraki M, Courivaud C. Humoral response after 3 doses of the BNT162b2 mRNA COVID-19 vaccine in patients on hemodialysis. Kidney Int. 2021;100(3):702-4.

65. Espi M, Charmetant X, Barba T, et al. Justification, safety, and efficacy of a third dose of mRNA vaccine in

maintenance hemodialysis patients: a prospective observation study. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.02.21259913v1 .

66. Longlune N, Nogier MB, Miedouge M, Gabilan C, Cartou C, Seigneuric B, et al. High immunogenicity of a messenger RNA based vaccine against SARS-CoV-2 in chronic dialysis patients. Nephrol Dial Transplant. 2021.

67. Hall VG, Ferreira VH, Ku T, Ierullo M, Majchrzak-Kita B, Chaparro C, et al. Randomized Trial of a Third Dose of mRNA-1273 Vaccine in Transplant Recipients. N Engl J Med. 2021.

68. Aslam S, Adler E, Mekeel K, Little SJ. Clinical effectiveness of COVID-19 vaccination in solid organ transplant recipients. Transpl Infect Dis. 2021:e13705.

69. Chemaitelly H, AlMukdad S, Joy JP, et al. SARS-CoV-2 vaccine effectiveness in immunosuppressed kidney transplant recipients. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.07.21261578v1.full .

70. Behrens GM, Cossmann A, Stankov MV, Nehlmeier I, Kempf A, Hoffmann M, et al. SARS-CoV-2 delta variant neutralisation after heterologous ChAdOx1-S/BNT162b2 vaccination. Lancet. 2021.

71. Borobia AM, Carcas AJ, Perez-Olmeda M, Castano L, Bertran MJ, Garcia-Perez J, et al. Immunogenicity and reactogenicity of BNT162b2 booster in ChAdOx1-S-primed participants (CombiVacS): a multicentre, open-label, randomised, controlled, phase 2 trial. Lancet. 2021;398(10295):121-30.

72. Normark J, Vikstrom L, Gwon YD, Persson IL, Edin A, Bjorsell T, et al. Heterologous ChAdOx1 nCoV-19 and mRNA-1273 Vaccination. N Engl J Med. 2021.

73. Rose R, Neumann, F., Grobe, O., et al. Heterologous immunisation with vector vaccine as prime followed by mRNA vaccine as boost leads to humoral immune response against SARS-CoV-2, which is comparable to that according to a homologous mRNA vaccination scheme. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.09.21260251v1 .

74. Groß R, Zanoni M, Seidel A, et al. Heterologous ChAdOx1 nCoV-19 and BNT162b2 prime-boost vaccination elicits potent neutralizing antibody responses and T cell reactivity. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.30.21257971v2 .

75. Schmidt T, Klemis V, Schub D, Mihm J, Hielscher F, Marx S, et al. Immunogenicity and reactogenicity of heterologous ChAdOx1 nCoV-19/mRNA vaccination. Nat Med. 2021.

76. Hillus D, Schwarz T, Tober-Lau P, Vanshylla K, Hastor H, Thibeault C, et al. Safety, reactogenicity, and immunogenicity of homologous and heterologous prime-boost immunisation with ChAdOx1 nCoV-19 and BNT162b2: a prospective cohort study. Lancet Respir Med. 2021.

77. Tenbusch M, Schumacher S, Vogel E, Priller A, Held J, Steininger P, et al. Heterologous prime-boost vaccination with ChAdOx1 nCoV-19 and BNT162b2. Lancet Infect Dis. 2021.

78. Barros-Martins J, Hammerschmidt SI, Cossmann A, Odak I, Stankov MV, Morillas Ramos G, et al. Immune responses against SARS-CoV-2 variants after heterologous and homologous ChAdOx1 nCoV-19/BNT162b2 vaccination. Nat Med. 2021.

79. Brehm TT, Thompson M, Ullrich F, et al. Low SARS-CoV-2 infection rate and high vaccine-induced immunity among German healthcare workers at the end of the third wave of the COVID-19 pandemic. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.02.21260667v1 .

80. Gram MA, Nielsen J, Schelde AB, et al. Vaccine effectiveness when combining the ChAdOx1 vaccine as the first dose with an mRNA COVID-19 vaccine as the second dose. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.26.21261130v1 .

81. Liu X, Shaw RH, Stuart ASV, Greenland M, Aley PK, Andrews NJ, et al. Safety and immunogenicity of heterologous versus homologous prime-boost schedules with an adenoviral vectored and mRNA COVID-19 vaccine (Com-COV): a single-blind, randomised, non-inferiority trial. Lancet. 2021.

82. Iketani S, Liu L, Nair MS, et al. A third COVID-19 vaccine shot markedly boosts neutralizing antibody potency and breadth. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.11.21261670v1 .

83. Chen X, Chen Z, Azman AS, et al. Comprehensive mapping of neutralizing antibodies against SARS-CoV-2 variants induced by natural infection or vaccination. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.03.21256506v1 .

84. Noori M, Nejadghaderi SA, Arshi S, Carson-Chahhoud K, Ansarin K, Kolahi AA, et al. Potency of BNT162b2 and mRNA-1273 vaccine-induced neutralizing antibodies against severe acute respiratory syndrome-CoV-2 variants of concern: A systematic review of in vitro studies. Rev Med Virol. 2021:e2277.

85. Arora P, Kempf A, Nehlmier I, et al. Increased lung cell entry of B.1.617.2 and evasion of antibodies induced by infection and BNT162b2 vaccination. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.06.23.449568v1 .

86. Barouch DH, Stephenson KE, Sadoff J, et al. Durable Humoral and Cellular Immune Responses Following Ad26.COV2.S Vaccination for COVID-19. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.05.21259918v1 [↗] .

87. Choi A, Koch M, Wu K, et al. Serum Neutralizing Activity of mRNA-1273 against SARS-CoV-2 Variants. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.06.28.449914v1 [↗] .

88. Davis C, Logan N, Tyson G, et al. Reduced neutralisation of the Delta (B.1.617.2) SARS-CoV-2 variant of concern following vaccination. MedRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.06.23.21259327v1 [↗] .

89. Edara VV, Pinsky BA, Suthar MS, Lai L, Davis-Gardner ME, Floyd K, et al. Infection and Vaccine-Induced Neutralizing-Antibody Responses to the SARS-CoV-2 B.1.617 Variants. N Engl J Med. 2021.

90. Jongeneelen M, Kaszas K, Veldman D, et al. Ad26.COV2.S elicited neutralizing activity against Delta and other SARS-CoV-2 variants of concern. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.07.01.450707v1 [↗] .

91. Liu C, Ginn HM, Dejnirattisai W, Supasa P, Wang B, Tuekprakhon A, et al. Reduced neutralization of SARS-CoV-2 B.1.617 by vaccine and convalescent serum. Cell. 2021.

92. Liu J, Liu Y, Xia H, Zou J, Weaver SC, Swanson KA, et al. BNT162b2-elicited neutralization of B.1.617 and other SARS-CoV-2 variants. Nature. 2021.

93. Lustig Y, Zuckerman N, Nemet I, Atari N, Kliker L, Regev-Yochay G, et al. Neutralising capacity against Delta (B.1.617.2) and other variants of concern following Comirnaty (BNT162b2, BioNTech/Pfizer) vaccination in health care workers, Israel. Euro Surveill. 2021;26(26).

94. Planas D, Veyer D, Baidaliuk A, Staropoli I, Guivel-Benhassine F, Rajah MM, et al. Reduced sensitivity of SARS-CoV-2 variant Delta to antibody neutralization. Nature. 2021;596(7871):276-80.

95. Wall EC, Wu M, Harvey R, Kelly G, Warchal S, Sawyer C, et al. Neutralising antibody activity against SARS-CoV-2 VOCs B.1.617.2 and B.1.351 by BNT162b2 vaccination. Lancet. 2021;397(10292):2331-3.

96. Mlcochova P KS, Dhar MS, et al. . SARS-CoV-2 B.1.617.2 Delta variant emergence and vaccine breakthrough. Research Square. 2021 https://www.researchsquare.com/article/rs-637724/v1 [↗] .

97. Collier DA, De Marco A, Ferreira I, Meng B, Datir R, Walls AC, et al. Sensitivity of SARS-CoV-2 B.1.1.7 to mRNA vaccine-elicited antibodies. Nature. 2021.

98. Garcia-Beltran WF, Lam EC, St Denis K, Nitido AD, Garcia ZH, Hauser BM, et al. Multiple SARS-CoV-2 variants escape neutralization by vaccine-induced humoral immunity. Cell. 2021.

99. Jangra S, Ye C, Rathnasinghe R, Stadlbauer D, Personalized Virology Initiative study g, Krammer F, et al. SARS-CoV-2 spike E484K mutation reduces antibody neutralisation. Lancet Microbe. 2021.

100. Lucas C, Vogels CBF, Yildirim I, et al. Impact of circulating SARS-CoV-2 variants on mRNA vaccine-induced immunity in uninfected and previously infected individuals. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.14.21260307v1 [↗] .

101. Tada T, Dcosta BM, Samanovic MI, Herati RS, Cornelius A, Zhou H, et al. Convalescent-Phase Sera and Vaccine-Elicited Antibodies Largely Maintain Neutralizing Titer against Global SARS-CoV-2 Variant Spikes. mBio. 2021;12(3):e0069621.

102. Tada T, Zhou H, Dcosta BM, et al. SARS-CoV-2 Lambda Variant Remains Susceptible to Neutralization by mRNA Vaccine-elicited Antibodies and Convalescent Serum. BioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.07.02.450959v1 [↗] .

103. Wang P, Nair MS, Liu L, Iketani S, Luo Y, Guo Y, et al. Antibody Resistance of SARS-CoV-2 Variants B.1.351 and B.1.1.7. Nature. 2021.

104. Annavajhala MK, Mohri H, Zucker JE, Sheng Z, Wang P, Gomez-Simmonds A, et al. A Novel SARS-CoV-2 Variant of Concern, B.1.526, Identified in New York. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.02.23.21252259v4 [↗] .

105. Carreno JM, Alshammary H, Singh G, et al. Reduced neutralizing activity of post-SARS-CoV-2 vaccination serum against variants B.1.617.2, B.1.351, B.1.1.7+E484K and a sub-variant of C.37. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.21.21260961v1 [↗] .

106. Liu Y, Liu J, Xia H, Zhang X, Zou J, Fontes-Garfias CR, et al. BNT162b2-Elicited Neutralization against New SARS-CoV-2 Spike Variants. N Engl J Med. 2021.

107. West AP WJ, Wang JC, et al. Detection and characterization of the SARS-CoV-2 lineage B.1.526 in New York. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.02.14.431043v3 [↗] .

108. Wu K, Werner AP, Koch M, Choi A, Narayanan E, Stewart-Jones GBE, et al. Serum Neutralizing Activity Elicited by mRNA-1273 Vaccine. N Engl J Med. 2021.

109. Wang Z, Schmidt F, Weisblum Y, Muecksch F, Barnes CO, Finkin S, et al. mRNA vaccine-elicited antibodies to SARS-CoV-2 and circulating variants. bioRxiv. 2021. These results were identified in New York City are neutralized by vaccine-elicited and therapeutic monoclonal antibodies. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.03.24.436620v1.full.pdf 📄 ↗ .

110. Alenquer M, Ferreira F, Lousa D, et al. Amino acids 484 and 494 of SARS-CoV-2 spike are hotspots of immune evasion affecting antibody but not ACE2 binding. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.04.22.441007v2 ↗ .

111. Becker M, Dulovic A, Junker D, Ruetalo N, Kaiser PD, Pinilla YT, et al. Immune response to SARS-CoV-2 variants of concern in vaccinated individuals. Nat Commun. 2021;12(1):3109.

112. Geers D, Shamier MC, Bogers S, den Hartog G, Gommers L, Nieuwkoop NN, et al. SARS-CoV-2 variants of concern partially escape humoral but not T-cell responses in COVID-19 convalescent donors and vaccinees. Sci Immunol. 2021;6(59).

113. Marot S, Malet I, Leducq V, Abdi B, Teyssou E, Soulie C, et al. Neutralization heterogeneity of United Kingdom and South-African SARS-CoV-2 variants in BNT162b2-vaccinated or convalescent COVID-19 healthcare workers. Clin Infect Dis. 2021.

114. Planas D, Bruel T, Grzelak L, Guivel-Benhassine F, Staropoli I, Porrot F, et al. Sensitivity of infectious SARS-CoV-2 B.1.1.7 and B.1.351 variants to neutralizing antibodies. Nat Med. 2021;27(5):917-24.

115. Shen X, Tang H, McDanal C, Wagh K, Fischer W, Theiler J, et al. SARS-CoV-2 variant B.1.1.7 is susceptible to neutralizing antibodies elicited by ancestral spike vaccines. Cell Host Microbe. 2021.

116. Skelly D, Harding A, Gilbert-Jaramillo J, et al. Two doses of SARS-CoV-2 vaccination induce robust immune responses to emerging SARS-CoV-2 variants of concern. Nature Communications. 2021;12(5061):1-12.

117. Stamatatos L, Czartoski J, Wan YH, Homad LJ, Rubin V, Glantz H, et al. mRNA vaccination boosts cross-variant neutralizing antibodies elicited by SARS-CoV-2 infection. Science. 2021.

118. Supasa P, Zhou D, Dejnirattisai W, Liu C, Mentzer AJ, Ginn HM, et al. Reduced neutralization of SARS-CoV-2 B.1.1.7 variant by convalescent and vaccine sera. Cell. 2021.

119. Earle KA, Ambrosino DM, Fiore-Gartland A, Goldblatt D, Gilbert PB, Siber GR, et al. Evidence for antibody as a protective correlate for COVID-19 vaccines. Vaccine. 2021;39(32):4423-8.

120. Khoury DS, Cromer D, Reynaldi A, Schlub TE, Wheatley AK, Juno JA, et al. Neutralizing antibody levels are highly predictive of immune protection from symptomatic SARS-CoV-2 infection. Nat Med. 2021;27(7):1205-11.

121. Gallagher KME, Leick MB, Larson RC, Berger TR, Katsis K, Yam JY, et al. SARS -CoV-2 T-cell immunity to variants of concern following vaccination. bioRxiv. 2021.

122. Lilleri D, Vassaniti I, Bergami F, et al. SARS-CoV-2 mRNA vaccine BNT162b2 elicited a robust humoral and cellular response against SARS-CoV-2 variants. Research Square. 2021;https://www.researchsquare.com/article/rs-396284/v1 ↗ .

123. Neidleman J, Luo X, McGregor M, et al. mRNA vaccine-induced SARS-CoV-2-specific T cells recognize B.1.1.7 and B.1.351 variants but differ in longevity and homing properties depending on prior infection status. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.05.12.443888v2 ↗ .

124. Stankov MV, Cossmann A, Bonifacius A, Dopfer-Jablonka A, Ramos GM, Godecke N, et al. Humoral and cellular immune responses against SARS-CoV-2 variants and human coronaviruses after single BNT162b2 vaccination. Clin Infect Dis. 2021:1-9.

125. Tarke A, Sidney J, Methot N, et al. Impact of SARS-CoV-2 variants on the total CD4+ and CD8+ T cell reactivity in infected or vaccinated individuals. Cell Reports Medicine. 2021;2(7):1-12.

126. Woldemeskel BA, Garliss CC, Blankson JN. SARS-CoV-2 mRNA vaccines induce broad CD4+ T cell responses that recognize SARS-CoV-2 variants and HCoV-NL63. J Clin Invest. 2021;131(10).

127. Motozono C, Toyoda M, Zahradnik J, et al. An emerging SARS-CoV-2 mutant evading cellular immunity and increasing viral infectivity. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.04.02.438288v1 ↗ .

128. Pretti MAM, Galvani RG, Farias AS, et al. New SARS-CoV-2 lineages could evade CD8+ T-cells response. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.03.09.434584v2 ↗ .

129. Reynolds CJ, Pade C, Gibbons JM, Butler DK, Otter AD, Menacho K, et al. Prior SARS-CoV-2 infection rescues B and T cell responses to variants after first vaccine dose. Science. 2021.

130. Dolton G, Rius C, Hasan MS, et al. Emergence of immune escape at dominant SARS-CoV-2 killer T-cell epitope. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.06.21.21259010v2 ↗ .

131. Agerer B, Koblischke M, Gudipati V, Montano-Gutierrez LF, Smyth M, Popa A, et al. SARS-CoV-2 mutations in MHC-I-restricted epitopes evade CD8(+) T cell responses. Sci Immunol. 2021;6(57).

132. Becker M, Dulovic A, Junker D, et al. Immune response to SARS-CoV-2 variants of concern in vaccinated individuals. Nat Commun. 2021; Pre-print shared with human coronaviruses. bioRxiv. 2021;https://www.biorxiv.org/content/10.1101/2021.07.17.452778v1 🔗 .

133. Aran D. Estimating real-world COVID-19 vaccine effectiveness in Israel using aggregated counts. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.02.05.21251139v3 🔗 .

134. Gomes D, Beyerlein A, Katz K, et al. Is the BioNTech-Pfizer COVID-19 vaccination effective in elderly populations? Results from population data from Bavaria, Germany. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.19.21262266v1 🔗 .

135. Mason T, Whitston M, Hodgson J, et al. Effects of BNT162b2 mRNA vaccine on Covid-19 infection and hospitalisation among older people: matched case control study for England. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.04.19.21255461v1 🔗 .

136. Cavanaugh AM, Fortier S, Lewis P, Arora V, Johnson M, George K, et al. COVID-19 Outbreak Associated with a SARS-CoV-2 R.1 Lineage Variant in a Skilled Nursing Facility After Vaccination Program – Kentucky, March 2021. MMWR Morb Mortal Wkly Rep. 2021;70(17):639-43.

137. Emborg H, Valentiner-Branth P, Schelde AB, et al. Vaccine effectiveness of the BNT162b2 mRNA COVID-19 vaccine against RT-PCR confirmed SARS-CoV-2 infections, hospitalisations and mortality in prioritised risk groups. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.27.21257583v1 🔗 .

138. Moustsen-Helms I, Emborg HD, Nielsen J, et al. Vaccine effectiveness after 1st and 2nd dose of the BNT162b2 mRNA Covid-19 Vaccine in long-term care facility residents and healthcare workers – a Danish cohort study medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.03.08.21252200v1(March 🔗 24, 2021).

139. Collier DA, Ferreira I, Kotagiri P, Datir RP, Lim EY, Touizer E, et al. Age-related immune response heterogeneity to SARS-CoV-2 vaccine BNT162b2. Nature. 2021;596(7872):417-22.

140. Abe KT, Hu Q, Mozafarihashjin M, et al. Neutralizing antibody responses to SARS-CoV-2 variants in vaccinated Ontario long-term care home residents and workers. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.06.21261721v1.full.pdf 📄 🔗 .

141. Pannus P, Neven, K.Y., De Craeye, S., et al. Poor antibody response to BioNTech/Pfizer COVID-19 vaccination in SARS-CoV-2 naïve residents of nursing homes. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.06.08.21258366v1 🔗 .

142. Canaday DH, Oyebanji OA, Keresztesy D, et al. Significant reduction in humoral immunity among healthcare workers and nursing home residents 6 months after COVID-19 BNT162b2 mRNA vaccination. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.15.21262067v1.full.pdf 📄 🔗 .

143. Doria-Rose N, Suthar MS, Makowski M, O'Connell S, McDermott AB, Flach B, et al. Antibody Persistence through 6 Months after the Second Dose of mRNA-1273 Vaccine for Covid-19. N Engl J Med. 2021;384(23):2259-61.

144. Tada T, Zhou H, Samanovic M, et al. Comparison of Neutralizing Antibody Titers Elicited by mRNA and Adenoviral Vector Vaccine against SARS-CoV-2 Variants. bioRxiv. 2021;https://doi.org/10.1101/2021.07.19.452771 🔗

145. Naranbhai V, Garcia-Beltran, W.F., Berrios Mairena, C., et al. . Immunogenicity of mRNA-1273, BNT162b2 and Ad26.COV2.S COVID-19 vaccines. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.18.21260732v1 🔗 .

146. Pegu A, O'Connell S, Schmidt SD, O'Dell S, Talana CA, Lai L, et al. Durability of mRNA-1273 vaccine-induced antibodies against SARS-CoV-2 variants. Science. 2021.

147. Wu K, Choi A, Koch M, et al. Preliminary Analysis of Safety and Immunogenicity of a SARS-CoV-2 Variant Vaccine Booster. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.05.21256716v1 🔗 .

148. Cromer D, Steain M, Reynaldi A, et al. SARS-CoV-2 variants: levels of neutralisation required for protective immunity. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.11.21261876v1 🔗 .

149. Thomas SJ, Moreira ED, Kitchin N, et al. Six Month Safety and Efficacy of the BNT162b2 mRNA COVID-19 Vaccine. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.28.21261159v1 🔗 .

150. Nanduri S, Pilishvili T, Derado G, et al. Effectiveness of Pfizer-BioNTech and Moderna Vaccines in Preventing SARS-CoV-2 Infection Among Nursing Home Residents Before and During Widespread Circulation of the SARS-CoV-2 B.1.617.2 (Delta) Variant — National Healthcare Safety Network, March 1–August 1, 2021. MMWR Morb Mortal Wkly Rep. 2021;ePub: 18 August 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7034e3 🔗 .

151. Rosenberg ES, Holtgrave DR, Dorabawila V, et al. New COVID-19 Cases and Hospitalizations Among Adults, by Vaccination Status — New York, May 3–July 25, 2021. MMWR Morb Mortal Wkly Rep. 2021;ePub: 18 August 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7034e1 🔗 .

152. Puranik A, Lenehan PJ, Silvert E, et al. Comparison of two highly-effective mRNA vaccines for COVID-19 during periods of Alpha and Delta variant prevalence. medRxiv.

153. Pouwels KB, Pritchard E, Matthews PC, et al. Impact of Delta on viral burden and vaccine effectiveness against new SARS-CoV-2 infections in the UK. 2021;https://www.ndm.ox.ac.uk/files/coronavirus/covid-19-infection-survey/finalfinalcombinedve20210816.pdf 🔗 .

154. Tendforde MW, Self WH, Naioti EA, et al. Sustained Effectiveness of Pfizer-BioNTech and Moderna Vaccines Against COVID-19 Associated Hospitalizations Among Adults — United States, March–July 2021. MMWR Morb Mortal Wkly Rep. 2021;ePub: 18 August 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7034e2 🔗 .

155. Mizrahi B, Lotan R, Kalkstein N, et al. Correlation of SARS-CoV-2 Breakthrough Infections to Time-from-vaccine; Preliminary Study. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.29.21261317v1.full 🔗 .

156. Israel A, Merzon E, Schäffer AA, et al. Elapsed time since BNT162b2 vaccine and risk of SARS-CoV-2 infection in a large cohort. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.03.21261496v1 🔗 .

157. Thompson MG, Burgess JL, Naleway AL, Tyner H, Yoon SK, Meece J, et al. Prevention and Attenuation of Covid-19 with the BNT162b2 and mRNA-1273 Vaccines. N Engl J Med. 2021;385(4):320-9.

158. Bergwerk M, Gonen T, Lustig Y, Amit S, Lipsitch M, Cohen C, et al. Covid-19 Breakthrough Infections in Vaccinated Health Care Workers. N Engl J Med. 2021.

159. Muller L, Andree M, Ostermann PN, et al. SARS-CoV-2 infection in fully vaccinated individuals of old age strongly boosters the humoral immune response. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.19.21260563v1 🔗 .

160. Centers for Disease Control and Prevention. COVID-19 Vaccine Breakthrough Infections Reported to CDC — United States, January 1–April 30, 2021 [Available from: https://www.cdc.gov/mmwr/volumes/70/wr/mm7021e3.htm?s_cid=mm7021e3_w.

161. Kustin T, Harel N, Finkel U, Perchik S, Harari S, Tahor M, et al. Evidence for increased breakthrough rates of SARS-CoV-2 variants of concern in BNT162b2-mRNA-vaccinated individuals. Nat Med. 2021.

162. Feder KA, Patel A, Vepachedu VR, et al. Association of E484K and L452R spike protein mutations with SARS-CoV-2 infection in vaccinated persons—Maryland, January – May 2021. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.29.21261006v2 🔗 .

163. Musser JM, Christensen PA, Olsen RJ, et al. Delta variants of SARS-CoV-2 cause significantly increased vaccine breakthrough COVID-19 cases in Houston, Texas. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.19.21260808v2 🔗 .

164. Brown CM, Vostok J, Johnson H, Burns M, Gharpure R, Sami S, et al. Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings – Barnstable County, Massachusetts, July 2021. MMWR Morb Mortal Wkly Rep. 2021;70(31):1059-62.

165. Jones NK, Rivett L, Seaman S, Samworth RJ, Warne B, Workman C, et al. Single-dose BNT162b2 vaccine protects against asymptomatic SARS-CoV-2 infection. Elife. 2021;10.

166. Levine-Tiefenbrun M, Yelin I, Katz R, Herzel E, Golan Z, Schreiber L, et al. Initial report of decreased SARS-CoV-2 viral load after inoculation with the BNT162b2 vaccine. Nat Med. 2021;27(5):790-2.

167. McEllistrem MC, Clancy CJ, Buehrle DJ, Lucas A, Decker BK. Single dose of a mRNA SARS-CoV-2 vaccine is associated with lower nasopharyngeal viral load among nursing home residents with asymptomatic COVID-19. Clin Infect Dis. 2021.

168. Petter E, Mor O, Zuckerman N, et al. Initial real world evidence for lower viral load of individuals who have been vaccinated by BNT162b2. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.02.08.21251329v1 🔗 .

169. Abu-Raddad LJ, Chemaitelly H., Ayoub H.H., et al. Effect of vaccination and of prior infection on infectiousness of vaccine breakthrough infections and reinfections. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.28.21261086v1 🔗 .

170. Marks M, Millat-Martinez P, Ouchi D, Roberts CH, Alemany A, Corbacho-Monne M, et al. Transmission of COVID-19 in 282 clusters in Catalonia, Spain: a cohort study. Lancet Infect Dis. 2021.

171. de Gier B, Andeweg S, Joosten R, Ter Schegget R, Smorenburg N, van de Kassteele J, et al. Vaccine effectiveness against SARS-CoV-2 transmission and infections among household and other close contacts of confirmed cases, the Netherlands, February to May 2021. Euro Surveill. 2021;26(31).

172. Harris RJ, Hall JA, Zaidi A, Andrews NJ, Dunbar JK, Dabrera G. Effect of Vaccination on Household Transmission of SARS-CoV-2 in England. N Engl J Med. 2021;385(8):759-60.

173. Layan M, Gilboa M, Gonen T. Impact of BNT162b2 vaccination and isolation on SARS-CoV-2 transmission in Israeli households: an observational study. medRxiv.

households: an observational study. medRxiv.
2021;https://www.medrxiv.org/content/10.1101/2021.07.12.21260577v1 ☐ .

174. Prunas O, Warren JL, Crawford FW, et al. Vaccination with BNT162b2 reduces transmission of SARS-CoV-2 to household contacts in Israel. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.13.21260393v1 ☐ .

175. Salo J, Hagg M, Kortelainen M, et al. The indirect effect of mRNA-based Covid-19 vaccination on unvaccinated household members. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.05.27.21257896v2 ☐ .

176. Shah A, Gribben C, Bishop J, et al. Effect of vaccination on transmission of COVID-19: an observational study in healthcare workers and their households. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.03.11.21253275v1 ☐ .

177. Chia PY, Ong SWX, Chiew C, et al. Virological and serological kinetics of SARS-CoV-2 Delta variant vaccine-breakthrough infections: a multi-center cohort study. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.28.21261295v1 ☐ .

178. Griffin JB, Haddix M, Danza P, et al. SARS-CoV-2 Infections and Hospitalizations Among Persons Aged ≥16 Years, by Vaccination Status — Los Angeles County, California, May 1–July 25, 2021. MMWR Morb Mortal Wkly Rep. 2021;ePub: 24 August 2021. DOI: http://dx.doi.org/10.15585/mmwr.mm7034e5 ☐ .

179. Riemersma KK, Grogan BE, Kita-Yarbro A, et al. Shedding of Infectious SARS-CoV-2 Despite Vaccination when the Delta Variant is Prevalent – Wisconsin, July 2021. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.07.31.21261387v4 ☐ .

180. Shamier MC, Tostmann A, Bogers S. Virological characteristics of SARS-CoV-2 vaccine breakthrough infections in health care workers. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.20.21262158v1 ☐ .

181. Kang M, Xin H, Yuan J. Transmission dynamics and epidemiological characteristics of Delta variant infections in China. medRxiv. 2021;https://www.medrxiv.org/content/10.1101/2021.08.12.21261991v1 ☐ .

182. Ong SWX, Chiew CJ, Ang LW, et al. Clinical and Virological Features of SARS-CoV-2 Variants of Concern: A Retrospective Cohort Study Comparing B.1.1.7 (Alpha), B.1.315 (Beta), and B.1.617.2 (Delta). Preprints with The Lancet. 2021;https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3861566 ☐ .

## Previous Updates ⌄

As of May 27, 2021

- Data were added from studies published since the last update that further demonstrate currently authorized COVID-19 vaccines are effective against SARS-CoV-2 infection, symptomatic and severe disease, and hospitalization with COVID-19.
- Data were added suggesting that currently authorized mRNA vaccines provide protection against variants of concern, including the B.1.1.7 strain that is predominant in the United States.
- Data were added from studies published since the last update that further demonstrate people who are fully vaccinated with a currently authorized mRNA vaccine are protected against asymptomatic infection and, if infected, have a lower viral load than unvaccinated people.

Last Updated Sept. 15, 2021

**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
7700 ARLINGTON BOULEVARD
FALLS CHURCH VA 22042

IN REPLY REFER TO

6320
Ser M44/21UM401
22 Sep 21

From:   Chief, Bureau of Medicine and Surgery
To:       Deputy Chief of Naval Operations, Manpower, Personnel, Training, and Education (N1)

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

1.  Subject matter experts at the Bureau of Medicine and Surgery have compiled the below facts on certain mandatory vaccines for United States (U.S.) Navy Active Duty and Reserve personnel.  The information below provides some of the scientific and medical rationale for the vaccine requirements for vaccine-preventable diseases that would otherwise create risk to the readiness of the Force.

2.  Coronavirus Disease 2019 (COVID-19)

     a.  Means of infection and infectivity.  Person-to-person transmission via respiratory fluids, composed mainly of respiratory droplets and aerosol particles.  Basic reproduction numbers (i.e., the number of people who become ill due to exposure to a single case) are estimated to be 2.8 for the original strain, 4-5 for the Alpha variant, and 5-8 for the Delta variant.  In other words, every case of Delta variant COVID-19 can infect 5-8 people if effective countermeasures are not employed.

     b.  Disease's specific harm to health.  COVID-19 symptoms are extremely unpredictable, and range from non-existent (asymptomatic) to death.  The most common symptoms are: fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, loss of taste or smell, sore throat, congestion, nausea or vomiting, and diarrhea.  These more minor symptoms result in clinic visits, time off work, reduced productivity, possible temporary incapacitation (requiring bed rest).  Most serious cases may require hospitalization, the need for oxygen support, and mechanical ventilation.  Between 17 December 2020 and 31 August 2021, six Sailors and one Marine have died due to COVID-19; none of them were fully immunized.

          (1)  The risk of complications from COVID-19 illness is significant.  A recent Center for Disease Control and Prevention (CDC) report showed COVID-19 patients had nearly 16 times the risk for myocarditis compared with patients who did not have COVID-19, and this risk was higher in younger age groups.

          (2)  In addition, there is a significant risk of persistent COVID symptoms after recovery from acute illness, or "long COVID."  A recent study found that in patients who had recovered from COVID-19, 87.4% reported persistence of at least one symptom, particularly fatigue and

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

dyspnea at an average of 60 days after symptoms onset.  Another found that nearly 2/3 of people
hospitalized with COVID-19 still had symptoms 6 months later.

    c.  <u>Treatment required and level of medical treatment facility capable of delivering that
treatment</u>.  While mild cases may only require isolation and routine symptomatic care, severe
cases may rapidly require intensive resources (Role 3 hospital with Intensive Care Unit (ICU)
level care and mechanical ventilation) that are not routinely available in a deployed setting.  A
recent study of over 43,000 COVID-positive patients in England showed the rate of
hospitalization within 14 days of testing was 2.2% for the Alpha variant and 2.3% for the Delta
variant (74% were unvaccinated).

    d.  <u>Efficacy/effectiveness of available vaccine(s)</u>.  In large phase III trials, the Food and Drug
Administration (FDA) approved COVID-19 vaccine was shown to have over 94% efficacy at
preventing symptomatic COVID-19.  For the same vaccine, against the Delta variant in a real
world setting, studies show 88% effectiveness against symptomatic disease, to include
hospitalization and death.  Nationally in the United States, per the CDC, from January through
August 2021, the unvaccinated comprised over 99% of all hospitalized COVID patients (over 1.6
million) as well as over 99% of all COVID-19 deaths (over 264,000).  There have been zero
COVID-19 deaths of Sailors or Marines among those fully immunized, and zero deaths of
Sailors or Marines due to vaccination administration.

    e.  <u>Likelihood of infection if unvaccinated</u>.  In a recent (24 Aug 2021) CDC report of over
43,000 SARS-CoV-2 infections in Los Angeles County, California (population approx. 9.6M),
over 71% of the infections were unvaccinated and over 85% of hospitalizations were
unvaccinated.  The same study reported infection and hospitalization rates among unvaccinated
persons were 4.9 times and 29.2 times the rates of those for fully vaccinated people, respectively.
According to current surveillance data, nearly 87% of hospitalized Department of the Navy
(DON) Active Duty COVID-19 cases since 17 December 2020 are among unvaccinated service
members.  For DON Service members who had COVID-19 since December 2020, surveillance
data indicates that hospitalization rates are approximately 500 per 100,000 cases, which is
substantially higher than for influenza (see paragraph 2b).

    f.  <u>Other methods of prevention</u>.  For diseases transmitted by respiratory droplets and aerosol
particles such as COVID-19, the CDC recommends non-pharmaceutical interventions (NPI) in
addition to vaccination.  NPIs recommended by the CDC to avoid contracting or spreading
COVID-19 have been categorized as either personal or community based.  Personal interventions
comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing),
avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and
surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person
feels unwell.  Community-based actions include public education through a variety of
communication strategies, social distancing (6 feet), wearing facemasks, ensuring adequate
ventilation of indoor spaces, and restrictions on public gatherings.

    g.  <u>Efficacy of non-pharmaceutical interventions</u>.  Despite the ability of NPIs to prevent
respiratory virus transmission, there are very limited data available on their effectiveness at the
individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(where NPI impacts both source control and personal protection) would not be applicable at the individual level.

    (1)  Recent studies have shown efficacy of mask wearing to prevent COVID-19.  During a COVID-19 outbreak on the *USS THEODORE ROOSEVELT*, persons who wore masks experienced a 70% lower risk of testing positive for SARS-CoV-2 infection.  Similar reductions have been reported in case contact investigations when contacts were masked and in household clusters in which household members were masked.

    (2)  However, in order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

    (3)  Similarly, NPI such as masks provide measures of community protection, as described above, only while they are in use.  Because the scientific and medical communities predict that SARS-CoV-2 will remain in global circulation as an endemic virus, the risk to the Force associated with COVID-19 in unvaccinated personnel may exist in perpetuity.

    h.  <u>Scientific and Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest</u>.  Any combination of NPI, in the absence of vaccination, are not likely to be effective at preventing COVID-19 outbreaks and their resulting impacts on the Navy's mission, especially in the setting of the highly contagious Delta variant.  Unlike NPI, vaccination provides its full measure of protection in an enduring capacity, subject to potential boosters as recommended by the FDA.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, vaccination is significantly superior to NPI, and mask wearing, for preventing respiratory infections such as COVID-19, especially when only implemented at the individual level and not by the entire community.

3.  <u>Influenza</u>

    a.  <u>Means of infection</u>.  Person-to-person transmission via respiratory droplets.  Basic reproduction numbers are estimated to be 0.9-2.1, which means, on average, a person infected with influenza will spread the virus to 1-2 other people, if no additional protective measures are in place.

    b.  <u>Disease's specific harm to health</u>.  Typical symptoms include: fever, cough, sore throat, runny nose, muscle aches, headaches, fatigue, and vomiting / diarrhea (more common in children than adults).  This results in clinic visits, time off work, reduced productivity, possible temporary incapacitation (requiring bed rest), and viral shedding, potentially infecting those who come in contact with the person.  Hospitalization is rare among young adults with influenza, 3-7 per 100,000 age 18-49.  The most common complications of influenza include secondary bacterial

3

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

pneumonia, exacerbations of underlying respiratory conditions, otitis media, laryngotracheobronchitis, and bronchitis.  Other complications may include primary pneumonia, encephalitis, aseptic meningitis, transverse myelitis, myocarditis, pericarditis, and Guillain-Barré syndrome.

c.  <u>Treatment required and level of medical treatment facility capable of delivering that treatment</u>.  For mild cases, rest at home /in quarters (in isolation), oral rehydration, antipyretics, and medications to target symptoms.  For severe cases or those with complications, hospitalization (role 3 hospital, minimum) and ICU-level care with mechanical ventilation may be required.

d.  <u>Efficacy of available vaccine(s)</u>.  Although influenza vaccine effectiveness is variable from season to season, since 2003, on average it has been 40% (range 10-60%).  In addition, influenza vaccination has been shown in several studies to reduce severity of illness in people who get vaccinated but still get influenza illness.  Influenza vaccination can also reduce transmission of the virus, thus protecting family members, co-workers, and other contacts from getting sick.  Some of these contacts may be more vulnerable to serious influenza illness, like babies and young children, the elderly, and those with certain chronic health conditions.

e.  <u>Periodicity of vaccine boosters</u>.  Annual vaccination is required due to changes in the circulating viruses.

f.  <u>Likelihood of infection if unvaccinated</u>.  If unvaccinated for influenza, a Sailor will have a higher risk of contracting the disease and transmitting it to co-workers.  According to the Centers for Disease Control and Prevention, the estimated annual incidence of influenza infection is approximately 8% (varying from 3% to 11%); approximately half of these cases would be symptomatic.  However, outbreaks can be explosive, with attack rates exceeding 60% over periods as short as 10 days.

g.  <u>Other methods of prevention</u>.  For diseases transmitted by respiratory droplets such as influenza, the CDC recommends NPI in addition to vaccination.  NPIs recommended by the CDC to avoid contracting or spreading respiratory infections have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of masks may be appropriate in certain situations such as during periods of high community transmission and when an individual or contact is immunocompromised.

h.  <u>Efficacy of other methods of prevention</u>.  Despite the potential for NPIs to prevent respiratory virus transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates (where NPI impacts both source control and personal protection) would not be applicable at the individual level.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
         STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(1)  One published observational study out of Japan regarding influenza transmission showed the overall effectiveness of mask wearing was 8.6%, while handwashing showed a negative association (i.e., not protective).  A meta-analysis of NPIs to prevent 2009 pandemic influenza infection showed a statistically significant protective effect for regular hand hygiene (38%) and a statistically non-significant protective effect for facemask use.

(2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

i.  Medical opinion on whether other methods of prevention, alone or in concert, will be successful in meeting the compelling government interest.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing influenza outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as influenza, especially when only implemented at the individual level and not by the entire community.

4.  Tetanus

a.  Means of infection.  The bacteria that causes tetanus, *C. tetani*, usually enters the body through a wound.  In the presence of anaerobic conditions, the spores germinate.  Toxins are produced and disseminated via blood and lymphatics.

b.  Disease's specific harm to health.  On the basis of clinical findings, three different forms of tetanus have been described.

(1)  The most common type (more than 80% of reported cases) is generalized tetanus.  The disease usually presents with a descending pattern.  The first sign is trismus, or lockjaw, followed by stiffness of the neck, difficulty in swallowing, and rigidity of abdominal muscles. Other symptoms include elevated temperature, sweating, elevated blood pressure, and episodic rapid heart rate.  Spasms may occur frequently and last for several minutes.  Spasms continue for 3 to 4 weeks.  Complete recovery may take months.

(2)  Localized tetanus is an uncommon form of the disease in which patients have persistent contraction of muscles in the same anatomic area as the injury.  These contractions may persist for many weeks before gradually subsiding.  Localized tetanus may precede the onset of generalized tetanus, but is generally milder.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

(3)  Cephalic tetanus is a rare form of the disease, occasionally occurring with otitis media in which clostridium tetani is present in the flora of the middle ear or following injuries to the head.  There is involvement of the cranial nerves, especially in the facial area.

(4)  Complications of tetanus are common.  Laryngospasm or spasm of the muscles of respiration leads to interference with breathing.  Fractures of the spine or long bones may result from sustained contractions and convulsions.  Hyperactivity of the autonomic nervous system may lead to hypertension or an abnormal heart rhythm.  Nosocomial infections are common because of prolonged hospitalization.  Secondary infections may include sepsis from indwelling catheters, hospital-acquired pneumonias, and decubitus ulcers.  Pulmonary embolism is particularly a problem in persons who use drugs and elderly patients.  Aspiration pneumonia is a common late complication of tetanus, found in 50% to 70% of autopsied cases.  In recent years, tetanus has been fatal in approximately 11% of reported cases.

c.  <u>Treatment required and level of medical treatment facility capable of delivering that treatment</u>.  Tetanus cases must be treated in a tertiary care facility with capability to provide long term ICU care and mechanical ventilation.  Tetanus immune globulin (TIG) is recommended for persons with tetanus.  Intravenous immune globulin (IVIG) contains tetanus antitoxin and may be used if TIG is not available.  Because of the extreme potency of the toxin, tetanus disease does not result in tetanus immunity.  Active immunization with tetanus toxoid should begin or continue as soon as the person's condition has stabilized.

d.  <u>Efficacy of available vaccine(s)</u>.  Efficacy of the tetanus toxoid has never been studied in a vaccine trial.  It can be inferred from protective antitoxin levels that a complete tetanus toxoid series has an efficacy of almost 100%.  In the series of 233 cases from 2001–2008, only 7 cases (3%) had received a complete tetanus toxoid series with the last dose within the last 10 years.

e.  <u>Periodicity of vaccine boosters</u>.  Every 10 years.

f.  <u>Likelihood of infection if unvaccinated</u>.  While tetanus is rare in the US (averaging 31 cases per year for 2000-2007), nearly all of those cases were in unvaccinated or under-vaccinated individuals.  Tetanus is much more common outside the US; in 2015 there were approximately 209,000 infections and about 59,000 deaths globally.  As noted above, vaccine efficacy is high, with over 32 times the risk for unvaccinated persons compared to vaccinated.

g.  <u>Other methods of prevention</u>.  Usual safety measures can help prevent injuries resulting in cuts or puncture wounds from contaminated objects.

h.  <u>Efficacy of non-pharmaceutical interventions</u>.  At the individual level, such accidents are common and have proven difficult to prevent.

i.  <u>Medical opinion on whether other methods of prevention, alone or in concert, will be successful in meeting the compelling government interest</u>.  Safety measures alone will not likely be successful in preventing tetanus-prone wounds.

5.  <u>Diphtheria</u>

6

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
        STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

a. Means of infection.  Transmission of diphtheria is most often person-to-person through respiratory droplets.  Transmission may also occur from exposure to infected skin lesions or articles soiled with discharges from these lesions.  The basic reproduction number is about 2.6.

b. Disease's specific harm to health.  This may be a spectrum, but should include worst case scenarios and likelihood of worst case scenarios.  Understand that co-morbidities play a significant role in these calculations, and our population tends to lack co-morbidities.  The most common form of diphtheria results in a membranous pharyngitis and tonsillitis, with symptoms of fever, sore throat, malaise, and anorexia.  While some patients may recover at this point without treatment, others may develop severe disease.  The patient may appear quite toxic, but the fever is usually not high.  Patients with severe disease may develop marked edema of the submandibular areas and the anterior neck along with lymphadenopathy, giving a characteristic "bull neck" appearance.  If enough toxin is absorbed, the patient can develop severe prostration, pallor, rapid pulse, stupor, and coma.  Death can occur within 6 to 10 days.  Death occurs in 5-10% of diphtheria cases.

c. Treatment required and level of medical treatment facility capable of delivering that treatment.  In addition to supportive care, as described for influenza and COVID-19, specific treatments include antitoxin and antibiotics.  Diphtheria antitoxin, produced in horses, has been used for treatment of respiratory diphtheria in the United States since the 1890s.  Diphtheria antitoxin is available only from CDC, through an Investigational New Drug (IND) protocol.  Diphtheria antitoxin does not neutralize toxin that is already fixed to tissues, but it will neutralize circulating toxin and prevent progression of disease.

(1) After a provisional clinical diagnosis of respiratory diphtheria is made, appropriate specimens should be obtained for culture and the patient placed in isolation.  Persons with suspected diphtheria should be promptly given diphtheria antitoxin and antibiotics in adequate dosage, without waiting for laboratory confirmation.  Respiratory support and airway maintenance should also be provided as needed.  Consultation on the use of and access to diphtheria antitoxin is available through the duty officer at CDC's Emergency Operations Center at 770-488-7100.

(2) In addition to diphtheria antitoxin, patients with respiratory diphtheria should also be treated with antibiotics.  The disease is usually no longer contagious 48 hours after antibiotics have been given.  Elimination of the organism should be documented by two consecutive negative cultures taken 24 hours apart, with the first specimen collected 24 hours after therapy is completed.

d. Efficacy of available vaccine(s).  Diphtheria toxoid-containing vaccine has been estimated to have an efficacy of 97%.

e. Periodicity of vaccine boosters.  Every 10 years in adults.

7

Subj:  DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

f.  Likelihood of infection if unvaccinated.  Diphtheria is rare in the U.S. (14 cases were reported between 1996 and 2018), but it is much more common outside the U.S. where vaccination coverage is suboptimal (4,500 cases worldwide in 2015).

g.  Other methods of prevention.  For diseases transmitted by respiratory droplets such as diphtheria, the CDC recommends non-pharmaceutical interventions (NPI) in addition to vaccination, although widespread vaccination has all but eliminated disease incidence in the U.S. (ex. no cases in 2017 and 2018 according to World Health Organization, which largely eliminated the subsequent need for diphtheria-related NPI in practice).  NPIs recommended by the CDC to avoid contracting or spreading respiratory infections have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of masks may be appropriate in certain situations such as during periods of high community transmission and when an individual or contact is immunocompromised.

h.  Efficacy of non-pharmaceutical interventions.  While we are not aware of any studies evaluating the efficacy of NPI specifically for diphtheria, it is likely the effectiveness of most NPI would be similar to that for other infections transmitted by respiratory droplets.

(1)  Despite the potential for NPIs to prevent respiratory disease transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates (where NPI impacts both source control and personal protection) would not be applicable at the individual level.

(2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

i.  Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing diphtheria outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as diphtheria, especially when only implemented at the individual level and not by the entire community.

6.  Pertussis.  Note:  there is no pertussis vaccine preparation that does not contain tetanus and diphtheria toxoids.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
          STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

    a.  <u>Means of infection</u>.  Transmission most commonly occurs person-to-person through contact with respiratory droplets, or by contact with airborne droplets of respiratory secretions. Transmission occurs less frequently by contact with an infected person's freshly contaminated articles.  The basic reproduction number is about 5.5.

    b.  <u>Disease's specific harm to health</u>.  The clinical course of pertussis is divided into three stages: catarrhal (with symptoms similar to the common cold lasting 1-2 weeks), paroxysmal (with more severe cough and paroxysms of numerous rapid coughs lasting 1-6 weeks), and convalescent (with gradual recovery over weeks to months).  The most common complication and cause of death is secondary bacterial pneumonia, occurring in 13.2% of cases.  Between 2000 and 2017, 307 deaths from pertussis were reported to CDC, mostly in children.  Adults may also develop complications of pertussis, such as difficulty sleeping, urinary incontinence, pneumonia, rib fracture, syncope, and weight loss

    c.  <u>Treatment required and level of medical treatment facility capable of delivering that treatment</u>.  Varying levels of supportive management are required, depending on severity of disease, as with influenza and COVID-19.  Antibiotics are of some value if administered early (i.e., during the first 1 to 2 weeks of cough before coughing paroxysms begin).

    d.  <u>Efficacy of available vaccine(s)</u>.  Diphtheria, Tetanus, and Pertussis (DTaP) vaccine efficacy ranged from 80% to 85%, with overlapping confidence intervals.

    e.  <u>Periodicity of vaccine boosters</u>.  Every 10 years.

    f.  <u>Likelihood of infection if unvaccinated</u>.  Reported pertussis incidence has been gradually increasing in the U.S. since the late 1980s and early 1990s, and large epidemic peaks in disease have been observed since the mid-2000s.  A total of 48,277 pertussis cases were reported in 2012, the largest number reported since the mid-1950s.  Recent outbreaks of pertussis in the U.S. were due to low vaccination rates with large numbers of vaccine refusals (over 75% in one cluster) based on nonmedical reasons.  The disease is more common outside the U.S.; an estimated 16.3 million people worldwide were infected in 2015, with 58,700 deaths.

    g.  <u>Other methods of prevention, such as non-pharmaceutical interventions</u>.  For diseases transmitted by respiratory droplets such as pertussis, the CDC recommends non-pharmaceutical interventions (NPI) in addition to vaccination.  NPIs recommended by the CDC to avoid contracting or spreading respiratory infections have been categorized as either personal or community based.  Personal interventions comprise respiratory hygiene (covering the mouth and nose during coughing and sneezing), avoiding touching the face, frequent hand washing, cleaning and disinfecting objects and surfaces that are frequently touched, avoiding sick people, and self-quarantine when a person feels unwell.  Community-based actions include public education through a variety of communication strategies, social distancing (6 feet), ensuring adequate ventilation of indoor spaces, and restrictions on public gatherings.  The use of masks may be appropriate in certain situations such as during periods of high community transmission and when an individual or contact is immunocompromised.

Subj:   DISEASES TARGETED WITH MANDATORY VACCINATIONS FOR UNITED
         STATES NAVY ACTIVE DUTY AND RESERVE PERSONNEL

   h.  Efficacy of non-pharmaceutical interventions.  While we are not aware of any studies evaluating the efficacy of NPI specifically for pertussis, it is likely the effectiveness of most NPI would be similar to that for other infections transmitted by respiratory droplets.

   (1)  Despite the potential for NPIs to prevent respiratory disease transmission, there are very limited data available on their effectiveness at the individual level.  Data on the effectiveness of NPIs implemented as community-wide mandates (where NPI impacts both source control and personal protection) would not be applicable at the individual level.

   (2)  In order to be effective, NPI must be implemented rigorously and continuously, and breaches in implementation are common.  This is particularly true in communal environments such as aboard ships, in barracks, or in field situations; high rates of transmission have been documented in schools and household settings.  One study during a recent mask mandate found that 90% of 5,893 individuals were observed not wearing a mask or not wearing it correctly, despite 75.9% of those individuals self-reporting always wearing a mask in public.

   i.  Medical opinion on whether non-pharmaceutical interventions, alone or in concert, will be successful in meeting the compelling government interest.  Any combination of NPI in the absence of vaccination are not likely to be effective at preventing pertussis outbreaks and their resulting impact on the Navy's mission.  Vaccination is not subject to reductions in efficacy due to incomplete implementation as with NPI.  For this reason, and given the limited data available, it appears vaccination is significantly superior to NPI and mask wearing in particular, for preventing respiratory infections such as pertussis, especially when only implemented at the individual level and not by the entire community.

7.  My point of contact is                                        Preventive Medicine, who can be reached at                                        .

B. L. GILLINGHAM

10

# EXHIBIT D

**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC  20350-2000

5720
Ser DNS-36GC/21U103110
December 23, 2021

Mr. Branden M Vriens

████████████████

Dear Mr. Vriens:

   This is in reference to your Freedom of Information Act (FOIA)/Privacy Act (PA) request dated December 6, 2021. Your request was received in our office on the same day and assigned case number DON-NAVY-2022-002169.

   In the course of processing your FOIA request, this office contacted OPNAV OfficeN1, to conduct a search for applicable records. Accordingly, N1 has searched their database for records relating to "All responsive records reviewed by the Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1) in adjudicating the Request for Religious Accommodation Through Waiver of Immunization Requirements for EOD1 Branden M. Vriens, USN. (For ease of reference notification of the denial was sent on 29 Nov 21 under ltr 1730 Ser N1/116214.)" Upon review of the responsive records, it has been determined that they are releasable in their entirety.

   You have the right to an appeal within 90 calendar days from the date of this letter.  There are two ways to file an appeal:  through FOIAonline or by mail.

      (1) Through FOIAonline.  This will work only if you set up an account on FOIAonline before you make the request that you would like to appeal.  To set up an account, go to FOIAonline (this is a website that will appear as the top hit if you search the internet for "FOIAonline"), click "Create Account" (a link located within the blue banner at the top in the upper right corner), enter your data into the field that subsequently appears, and click "Save" (at the bottom left of the screen). With your account thereby created, you will have the power to file an appeal on FOIAonline to any request you file on FOIAonline thereafter.  To do so, locate your request (enter a keyword or the request tracking number in the "Search for" field on the "Search" tab), click on it, then the "Create Appeal" tab in the left-hand column.  Complete the subsequent field, click "Save," and FOIAonline will submit your appeal.

(2) <u>By mail</u>.  Address your appeal to:

> The Judge Advocate General (Code 14)
> 1322 Patterson Avenue SE, Suite 3000
> Washington Navy Yard, DC 20374-5066

If filing an appeal by mail please provide a letter that explains what you are appealing with any supporting arguments or reasons you think may be worthy of consideration;

b.  A copy of your initial request;

c.  A copy of the letter of denial.

Also, please provide me a copy of your appeal letter at:

> DONFOIA-PA@NAVY. MIL

In this instance, the fees associated with the processing of your request are waived, but this action is not indicative of how future requests will be handled.

For this determination, you have the right to seek dispute resolution services from either the DoD Navy Component FOIA Public Liaison, Mr. Chris Julka, at: Christopher.a.julka@navy.mil, via phone: (703) 697-0031; or by contacting the Office of Government Information Services at:(https://ogis.archives.gov/), (202) 741-5770, ogis@nara.gov.

Questions regarding the action this office has taken during the processing of your request may be directed to our FOIA service center at (202) 685-0412 or via email at DONFOIA-PA@navy.mil, and reference the FOIA tracking numbers cited above.

> Sincerely,
>
> *Gregory Cason*
>
> G. Cason
> Deputy Director,
> DON FOIA/PA Program Office

# EXHIBIT E

| No. | Name | Rate | Rank | DESIG | Tasker # | Religion | Specifics | Duty Type | Requesting Command | Homeport | AC RC | Compelling Government Interest | Least Restrictive Means Analysis | Synopsis: Full Range of the facts | Synopsis: Full Range of the facts | Synopsis: Full Range of the facts | Synopsis: Full Range of the facts | Synopsis: Full Range of the facts | N13 Recommendation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | Vriens, Brandon | EOD1 | E6 | N/A | N131-3248 | Christian | Immunizations | CONUS SEA | EODMU 11 | ✚ | AC | Health/Safety of the Force | All alternative measures for preventing spread of disease are insufficient due to unique circumstances inherent in naval service. Vaccination is the only viable option for achieving the compelling interest. | EOD1 Vriens' request is based on his religious beliefs against abortion and the use of fetal stem cells in the development of vaccines. Member is LIMDU, pending a medical board. Member is currently assigned to EOD Mobile Unit 11 for sea duty. | CO's endorsements make no recommendation. ISIC endorsements recommends approval. | Chaplain states their beliefs are sincere. | BUMED recommends disapproval based on significant medical risks associated with granting such a waiver. | Legal states it is not legally objectionable to disapprove the request. | Recommend disapproval of the request due to the negative impact to military readiness and health of the force. |

# Exhibit 3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **U.S. NAVY SEALs 1-3**, on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**, | |
| Plaintiffs, | Case No. 4:21-cv-01236-O |
| v. | |
| **LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy, | |
| Defendants. | |

## DECLARATION OF LIEUTENANT COMMANDER ERIK V. DE SOUSA, USN

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury as follows:

1.      I am over the age of eighteen and am competent to make this declaration.

2.      I have served in the United States Navy for 10 years. I have the rank of Lieutenant Commander (O-4). I received a BS in Naval Architecture from the U.S. Naval Academy in 2011 and a MS in Naval/Mechanical & Total Ship Systems Engineering from the Naval Postgraduate School in 2018. I am currently the Program Manager's Representative (PMR) for the Expeditionary Fast Transport (T-EPF) shipbuilding program, an Acquisition Category (ACAT) 1 program under the purview of Supervisor of Shipbuilding, Conversion & Repair Gulf Coast, a

1

Naval Sea Systems Command (NAVSEA) field activity. We provide on-site, hands-on contract oversight for new construction ships in order to ensure on-time delivery of ships to the fleet. We operate out of the Navy Administration Building at the Austal USA shipyard in Mobile, AL, and we also get underway for various sea trial events. I have 5 government civilians reporting to me as well as several dozen government civilians and government contractors providing matrixed support for testing, quality assurance, engineering, and contract management, and finance.

3.      I have a sincere religious objection to receiving the COVID-19 vaccination as mandated by the Navy and submitted a religious accommodation request on 30 August 2021. This accommodation request was disapproved by the Chief of Naval Personnel (CNO N1) on 17 November 2021. On 01 December 2021, I appealed the disapproval by CNP to the Chief of Naval Operations. On 14 February 2022, I received the denial of my appeal from the Chief of Naval Operations.

4.      On 22 February 2022 I submitted a renewed religious accommodation request. According to BUPERSINST 1730.11A ¶ 5f(2), "When a religious accommodation request is denied, the requestor may renew the request upon change in physical, operational or geographical environment, or at any time in which there is a change to pertinent policy." In my accommodation request, I explained that my operational environment had changed since August because I have since contracted and recovered from a mild case of COVID-19 in January 2022 and noted widespread COVID infection among vaccinated co-workers and other military officials despite vaccination. The BUMED letter relied on to deny my religious accommodation request was dated in September 2021, making it outdated in light of more recent COVID-19 developments. My religious accommodation request is attached to this declaration as Exhibit A.

2

5.      On 24 February 2022, the Chief of Naval Personnel John B. Nowell denied my request, claiming that my operational circumstances had not changed despite this. A copy of the denial is attached to this declaration as Exhibit B.

6.      As a result, on 25 February 2022, CDR Diane Cua stated that my previously adjudicated religious accommodation from CNO remains in effect. My commanding officer informed me the same day that the administrative separation process would begin next week unless I elect to resign by 1 June 2022. A copy of this email chain is attached to this declaration as Exhibit C.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on February 27, 2022.

ERIK V. DE SOUSA

3

# EXHIBIT A

22 Feb 22

From:  LCDR DeSousa, Erik V., USN
To:    Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education)
       (N1)
Via:   Commanding Officer, Supervisor of Shipbuilding Conversion and Repair Gulf Coast

Subj:  REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

Ref:   (a) DOD Instruction 1300.17
       (b) SECNAVINST 1730.8
       (c) BUPERSINST 1730.11A

Encl:  (1) BUMED ltr 6320 Ser M44/21UM40232 of 28 Sep 21
       (2) List of abortion-tainted vaccines compiled by the non-profit group Children of God for
Life (https://cogforlife.org/)
       (3) Letter discussing ethical vaccine practices by Bishop Joseph Strickland, Diocese of
Tyler, TX
       (4) Endorsement of sincerely held religious beliefs by Fr. Gabriel Mills, Christ the King
Catholic Church, Daphne, AL
       (5) NAVPERS 1070/613 signed by member
       (6) Chaplain memorandum for the record completed by LCDR D.E. Clark, LCDR, CHC,
USN
       (7) Chaplain checklist completed by LCDR D.E. Clark, LCDR, CHC, USN

1.  Per references (a) and (b), the Department of the Navy (DON) recognizes that religion can be as
integral to a person's identity as one's race or sex. To that extent, DON promotes a culture of
diversity, tolerance, and excellence by making every effort to accommodate religious practices
absent a compelling operational reason to the contrary. Religious medical practices include
traditional objections to receiving immunizations. It is DON policy to accommodate the traditional
observances of the religious faith practiced by individual members when these doctrines or
observances will not have an adverse impact on military readiness, individual or unit readiness, unit
cohesion, health, safety, discipline, or mission accomplishment. Immunization requirements may be
waived when requested by the member based on religious objection.

2.  I am submitting a new RA request per BUPERSINST 1730.11A which states as follows:
                *5f(2) When a religious accommodation request is denied, the requestor may renew
                the request upon change in physical, operational or geographical environment, or at
                any time in which there is a change to pertinent policy.*

Since my original request for RA submitted 30AUG21, my physical and operational environments
have changed significantly in the last 4.5 months as follows:
    a.  I contracted the COVID-19 virus on 25JAN22 (date of positive test) with mild throat and
        sinus symptoms associated with the Omicron variant and now have natural immunity that I
        did not have previously.

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

b.   As of 18FEB22, at least 197 of 553 members in my command (combined CIVPERs and active duty military) have contracted the COVID-19 virus despite a ~92% vaccination rate.

c.   The HON Lloyd Austin (SECDEF), Gen Mark Milley (Chairman, Joint Chiefs of Staff), The HON Carlos Del Toro (SECNAV), and many other military leaders have contracted COVID-19 despite receiving a complete vaccination series including boosters.  World-wide reports clearly indicate current COVID-19 vaccinations do not prevent contraction or spread of the COVID-19 virus.

d.   The Omicron variant (as opposed to the original virus and subsequent variants), though more transmissible, has significantly lower instances leading to hospitalization and almost non-existent instances of death directly relating to COVID-19 infection.

3.  Upon reading the BUMED letter dated 28SEP21 (Encl 1), but first received by me on 17FEB22, in opposition to my previous request for RA, I would like to proactively address some of the information that is contained therein as follows:

a.   Per para 3, vaccines required for individual medical readiness have met the safety requirements of the FDA. Of note, vaccines that are required for individual medical readiness have been approved by the FDA. The only COVID-19 vaccines that are currently approved by the FDA are "COMIRNATY" by BioNTech Manufacturing GmbH (Mainz, Germany) and "SPIKEVAX" by Moderna, neither of which are available in the United States presently as stated in the 31 Jan 2022 letter to ModernaTX, Inc. which states:

> *"Although SPIKEVAX (COVID-19 Vaccine, mRNA) and Comirnaty (COVID-19 Vaccine, mRNA) are approved to prevent COVID-19 in certain individuals, within the scope of the Moderna COVID-19 Vaccine authorization, there is **not sufficient approved vaccine** available for distribution to this population in its entirety at the time of reissuance of this **EUA**."*

b.   Currently, all other COVID-19 vaccinations that are available to service members are authorized by the FDA for Emergency Use Authorization (EUA) only. Per 21 USC Sec. 360bbb-3, vaccinations under EUA are voluntary, unless waived by POTUS per 10 USC Sec. 1107a, DoDI 1300.17, DoDI 6200.02 and DoDI 6205.02.

c.   The BUMED letter states that vaccinations have demonstrated effectiveness in disease prevention. That statement may apply to other vaccinations; however, it does not apply to any of the current COVID-19 vaccines available. The efficacy of the current COVID-19 vaccinations is based on reducing symptoms if exposed and preventing severe illness or death. None of the COVID-19 vaccinations prevent contracting the predominant Omicron variant virus, or transmission of the virus as evidenced by worldwide reports and current Navy COVID-19 virus positivity tracking data.

d.   Per para 4, the letter states that active duty personnel will be up to date on routine vaccinations. COVID-19 is not a routine vaccination.

e.   Per para 5, the BUMED letter states that a waiver of immunization requirements would have a **detrimental** effect on readiness of myself and my fellow service members. The letter does

2

not explain **how** this is detrimental. The letter continues to state that primary prevention of disease is through immunization. It is still common knowledge that COVID-19 vaccination does not prevent the contraction or spread of COVID-19. Studies have shown natural immunity is an effective guard against contraction, spread and symptoms that would cause hospitalization or death.

     f.  The BUMED letter further cites the case of USS THEODORE ROOSEVELT (CVN 71) that had a COVID outbreak in March 2021 as an example of how an outbreak of COVID can degrade unit readiness.  This case is used by BUMED to "highlight the importance of vaccination to both individual and unit force health protection.  A similar outbreak happened to the USS MILWAUKEE (LCS 5) in December 2021 with a crew that was 100% vaccinated. One-third of the crew tested positive for COVID.  This ship was isolated in-port, removing the unit from executing its mission capabilities for several days. A similar COVID-19 outbreak occurred on USS HALSEY (DDG 97) with one-third of the crew testing positive for COVID-19. Both of the latter two outbreaks (among a list of others) clearly demonstrate that unit and mission readiness could be negatively impacted regardless of COVID vaccination status of its sailors.

     g.  Per para 6, the BUMED letter states that unvaccinated individuals remain at risk for developing COVID-19 and propagating new variants that impact the force. This statement is inaccurate in that both vaccinated and unvaccinated individuals can develop COVID-19.  Also, studies show that vaccinated individuals are just as likely to transmit COVID and propagate variants. Specifically, researchers using data from Israel's Maccabi Healthcare Services found that "those who were fully vaccinated with the Pfizer-BioNTech COVID-19 vaccine had a 13.06-fold increased risk of developing COVID-19 from the delta variant than those who had previously contracted and recovered from a COVID-19. The study also found that those who previously contracted and recovered from COVID-19 had increased protection against reinfection from a single dose of Pfizer's COVID-19 vaccine compared to those who had had a prior infection and remained unvaccinated. Researchers calculated the 13-fold increased risk of infection based on just 238 infections among about 16,000 vaccinated people—accounting for less than 1.5% of that group—versus 19 reinfections among roughly 16,000 study participants who had been previously infected." Similarly, CDC Director Rochelle Walensky said in a statement, "High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus.…This finding is concerning and was a pivotal discovery leading to CDC's updated mask recommendation. The masking recommendation was updated to ensure the vaccinated public would not unknowingly transmit virus to others, including their unvaccinated or immunocompromised loved ones." The BUMED letter is not up to date with the CDC comments on vaccinated individuals being susceptible to transmitting COVID. Therefore, it should not be used against unvaccinated personnel who are no different.

     h.  Per para 7, the BUMED letter states that vaccination remains the most effective means to prevent COVID-19. However, studies show that vaccination does not prevent one from contracting or spreading COVID.  The letter does state that efficacy was tied to preventing symptomatic COVID.  It should be restated that the efficacy is not tied to preventing the contraction or transmission of COVID. Additionally, the BUMED letter refers to the FDA-approved vaccine.  The FDA has only approved two of the five COVID-19 vaccine products, COMIRNATY on 23 Aug 2021 and SPIKEVAX on 31 Jan 2022.  Of note, the other three COVID vaccine products (Pfizer-BioNTech, Moderna, and Johnson&Johnson) remain under EUA. This statement by BUMED implies that the FDA approved vaccine is and has been available to servicemembers. Based upon

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

the most recent FDA letter to Moderna on 31 Jan 2022, no FDA licensed vaccine is currently available in the U.S.

     i.  Per para 8, the BUMED letter states that my religious objections must be balanced against the medical risk to me and my unit. All personnel (vaccinated or unvaccinated) are susceptible to COVID transmission; vaccination status does not affect this fact. It has already been shown that mission accomplishment can still be achieved despite vaccination status. Additionally, even commands with 100% vaccination status can still be impacted by COVID, which could affect unit readiness. Not receiving the vaccine has no measurable effect to the facts which BUMED states in their letter. Consequently, these facts should not be held against service members that have a sincerely held belief or religious objection.

4.  The Religious Freedom Restoration Act of 1993 (RFRA) states the Government may substantially burden an individual's exercise of religion only if it demonstrates that the application of the burden to the person is: (1) in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that interest.  The burden rests with the government to demonstrate both factors in their entirety, not the individual requesting the exemption per DoDI 1300.17, September 1, 2020.  All requests for accommodation of religious practices are to be assessed on a case-by-case basis.  My original RA request, subsequent appeal, and this new RA request demonstrate facts that the government's vaccination mandate is not the least restrictive means to further the interest of mission accomplishment and unit readiness.  The original disapproval from CNP and subsequent appeal disapproval from CNO do not explain how vaccination outweighs my sincerely held beliefs to accomplish the mission and promote good order and discipline, nor do they explain how this would detrimentally affect me and my unit's readiness. Using the information provided, I have demonstrated how the COVID-19 vaccination is not the least restrictive means available to preserve military readiness, mission accomplishment and the health and safety of military service members. The government must show it cannot accommodate the religious adherent while achieving its interest through a viable alternative, which is available.

5.  On 3 Jan 2022, Judge Reed O'Connor issued a preliminary injunction for plaintiffs in U.S. NAVY SEALS 1-26, et al, v. JOSEPH R. BIDEN, JR., et al.  Plaintiffs had submitted RA requests but were not provided the legal review required in evaluating their submissions. The Court noted that the Navy utilized a "six-phase, fifty step process" wherein at Phase 1 the administrator is instructed to update a prepared disapproval template with the requestor's name and rank. Based upon the boilerplate rejection template, it appears the RA review process is pre-determined and sidesteps an individualized review process as required by law. The Judge called the Navy RA review process "theater" stating it "merely rubber stamps each denial." Based upon the documents presented to the Court and the Judge's acknowledgement of the blanket denial process of all RA requests, I am submitting a new RA request for an individualized case-by-case review as required under the law.

6.  Pursuant to references (a) through (c), I hereby request religious accommodation from Navy vaccination policy in order to not be injected with any abortion-tainted vaccines as listed in Encl. (1),
including but not limited to the Johnson & Johnson, Pfizer, and Moderna COVID-19 vaccines, due to
my religious belief that members should not be compelled to receive vaccinations which use or

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

contain aborted fetal cell lines in any stage of vaccine production or testing.

7.  My request is based on my religious belief that innocent life is sacred from the time of conception. By allowing ourselves to be injected with or consume any by-product of an aborted fetus, we are complicit, regardless of how remotely, in the continued practice of abortions, as summarized by Bishop J. Strickland in Encl (3). This sincerely held belief is corroborated in Encl. (4) by Fr. Gabriel Mills of the Catholic Parish my family and I attend weekly as well as in Encl. (6) by Chaplain Clark from NAS Pensacola. This request is based on additional growth in religious practices that have greatly evolved in our family since the birth of our first child in 2017. Despite having had several of the aforementioned vaccines administered in the past, I can no longer in good conscience accept these vaccines or any boosters of same.

8.  Additionally, based on a recent COVID-19 infection (positive test date 25JAN22), it would be both scientifically irresponsible to take a COVID-19 vaccine at this point (lack of studies focusing on vaccine interaction with natural antibodies) as well as morally prohibitive based on the likelihood of causing myself harm (see 1 Corinthians 3:16-17).

9.  I certify that I understand that any approved or partially approved waiver may not be appropriate for future duty to which I may be assigned, including operational, non-operational or training command(s), and may be suspended or withdrawn in accordance with reference (c).

10.  Based upon the above arguments and enclosures in support, I respectfully request review of my religious accommodation request.  As stated by Judge O'Connor:

*"The COVID-19 pandemic provides the government no license to abrogate those [religious] freedoms. There is no COVID-19 exception to the First Amendment.  There is no military exclusion from our Constitution."*

Very respectfully,

DESOUSA.ERI
K.VINCENT.1
299139375

Digitally signed by
DESOUSA.ERIK.VIN
CENT.1299139375
Date: 2022.02.22
21:29:21 -06'00'

Erik V. De Sousa
LCDR        USN

Pls.' Mot. for Classwide Prelim. Inj. App. 0112

**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
7700 ARLINGTON BOULEVARD
FALLS CHURCH VA 22042

IN REPLY REFER TO

6320
Ser M44/21UM40232
28 Sep 21

From: Chief, Bureau of Medicine and Surgery
To:      Deputy Chief of Naval Operations (Manpower, Personnel, Training, and Education) (N1)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
        IMMUNIZATION REQUIREMENTS ICO LT ERIK V. DeSOUSA, USN

Ref:    (a) LT DeSousa's Waiver Request of 30 Aug 21
        (b) BUMED Memo, Diseases Targeted with Mandatory Vaccinations for U.S.
            Navy Active Duty and Reserve Personnel of 22 Sep 21
        (c) BUMED INST 6230.15B, Immunizations and Chemoprophylaxis for the Prevention
            of Infectious Diseases, 7 Oct 2013
        (d) SECNAVINST 1730.8B CH-1

1.  Subject matter experts at the Bureau of Medicine and Surgery have reviewed reference (a).
Per reference (a), LT DeSousa objects to receiving all immunizations developed or tested using
fetal cells based on his religious beliefs.

2.  Fetal embryo fibroblast cells are used to grow viruses for multiple vaccines, including
adenovirus, varicella (chickenpox), rubella (the "R" in the MMR vaccine), hepatitis A, one
preparation of rabies vaccine, two combination vaccines containing the polio vaccine virus, and
two formulations of zoster (shingles) vaccine. The FDA-approved Coronavirus Disease 2019
(COVID-19) vaccine did not require the use of any fetal cell cultures in order to manufacture the
vaccine, however, early in the development of mRNA vaccine technology, fetal cells were used
for "proof of concept" or to characterize the SARS-CoV-2 spike protein. All other vaccines,
including tetanus, diphtheria, pertussis, influenza, etc., are not derived from fetal cells. No
alternative formulations grown without fetal cells are currently available for COVID-19,
adenovirus, varicella, rubella, and hepatitis A vaccines.

3.  All vaccines required for maintenance of individual medical readiness and vaccines required
for specific overseas deployments meet the safety requirements of the U.S. Food and Drug
Administration (FDA), and have demonstrated effectiveness in disease prevention.

4.  Per reference (c), Active Duty and Reserve Component personnel will receive or be up-to-
date on adult routine vaccinations. Details of required vaccinations are outlined in this
instruction and are available at www.health.mil/vaccines.

5.  A waiver of immunization requirements would have detrimental effects on the readiness of
both LT DeSousa and Service members who serve alongside LT DeSousa.  Primary prevention
of disease through immunizations is a key enabler for maintaining force health protection and
avoiding disease-related non-battle injury, and has been the cornerstone of these efforts for
decades.  Recent outbreaks of contagious viral diseases aboard Navy ships highlight the

Encl. 1

Subj:   RELIGIOUS ACCOMMODATION REQUEST THROUGH WAIVER OF
IMMUNIZATION REQUIREMENTS ICO LT ERIK V. DeSOUSA, USN

operational impact of low levels of immunity. Diseases such as COVID-19 are highly
contagious and can rapidly degrade individual and unit readiness. In the current COVID-19
pandemic, the outbreak aboard the *USS THEODORE ROOSEVELT* in March 2020, resulted in
71 days of unavailability for a forward deployed aircraft carrier. There was an infection rate of
more than 26% of the crew as confirmed by laboratory testing within 5 weeks of the initial
positive case (including four hospitalizations and one death, according to data published in
Journal of The American Medical Association 11 November 2020). This outbreak resulted in
crew-wide quarantine, isolation, and repeated testing, and highlights the importance of
vaccination to both individual and unit force health protection. Additional information on the
potential impacts of vaccine-preventable diseases is provided in reference (b).

6.  The scientific and medical communities believe that SARS-CoV-2 will likely remain in
global circulation as an endemic virus and a threat to the Force. The emergence of the SARS-
CoV-2 Delta variant shows that while some vaccinated personnel may transmit the virus, they
are largely protected against severe illness and death.  Unvaccinated individuals remain at risk
for developing COVID-19 and propagating new variants that may adversely impact the readiness
of the Force.

7.  Vaccination remains the most effective means to prevent COVID-19 (as well as influenza,
pertussis, diphtheria, tetanus, and other diseases). Optimally, vaccination should be coupled with
other countermeasures to minimize risk of infections to the Sailor's health, co-workers' health,
and to Navy's mission. In large phase III trials, the FDA-approved COVID-19 vaccine
demonstrated over 94% efficacy in preventing symptomatic COVID-19. For the same vaccine,
against the Delta variant in a real world setting, studies show 88% effectiveness against
symptomatic disease, to include hospitalization and death.  Additional information on the
efficacy of other vaccines is provided in reference (b).

8.  Per reference (d), the religious objection of the Service member must be balanced against the
medical risk to the Service member and their military unit. The Department of Defense has a
compelling interest in mission accomplishment and safeguarding the health of military Service
members. In this case, the medical risks of not receiving required vaccines outweigh the
religious objection that LT DeSousa has stated in reference (a).

9.  A waiver of required immunizations is not recommended due to the aforementioned reasons.

10.  My point of contact is ****************, MC, USN, Preventive Medicine, who can be
reached at ****************

****************
Deputy Chief
Business Operations

2

Encl. 1



**CHILDREN OF GOD FOR LIFE**

Children of God for Life is the pro-life worldwide leader in the campaign for ethical biomedical research and commerce that preserves the dignity of human life.

# Abortion-Tainted Vaccines for US and Canada and Ethical Alternatives

| DISEASE | PRODUCT NAME | MANUFACTURER | FETAL CELL LINE | ETHICAL VERSION | MANUFACTURER | CELL |
|---|---|---|---|---|---|---|
| ACUTE RESPIRATORY | Adenovirus 4, 7 Oral | Barr Labs | WI-38, HEK-293 | None | NA | NA |
| CHICKENPOX | All Varivax, Varilrix | Merck, GSK | WI-38, MRC-5 | None | NA | NA |
| COVID-19 | See here. | Moderna, Pfizer, J&J, AstraZeneca | HEK-293, PER.C6 HEK-293, | None | NA | NA |
| EBOLA | Advac, VSV-EBOV | J&J/Cruc, BioProt | PER.C6 | Ervebo (rVSV-ZEBOV) 2-2020 | Merck | Vero |
| HEPATITIS A | Vaqta, Havrix, Avaxim, Epaxal | Merck, GSK, Sanofi, Berna | MRC-5 | Aimmugen (None in US or Canada) | Kaketsuken (Japan Only) | Vero |
| HEPATITIS A&B, HEPATITIS A&TYPHOID | Twinrix, Vivaxim | GSK, Sanofi | MRC-5 | Engerix Hep-B Only, Recombivax Hep-B, TyphimVi | GSK, Merck, Sanofi | Yeast |
| INFECTION PREVENTION | G-CSF | Octapharma | HEK-293 | Neupogen, Zarxio | Amgen, Sandoz | E-coli |
| MEASLES, MUMPS, RUBELLA | MMR, Priorix | Merck, GSK | RA273, WI-38, MRC-5 | MR+M (Japan Only) | Mitsubishi, Kitasato | Egg, Rabbit |
| MEASLES-RUBELLA | NR Vax, Eolarix | Merck, GSK | RA273, WI-38, MRC-5 | Attenuvax (Measles Only)* AIK-C+R, Tanabe (Japan) | Merck, Kitasato, Mitsubishi | Egg, Rabbit |
| MUMPS-RUBELLA | Biavax II | Merck | RA273, WI-38 | Mumpsvax (Mumps Only)* | Merck | Egg |
| RUBELLA | Meruvax II | Merck | RA273, WI-38 | Matsuura, Takahashi (Japan) | Mitsubishi, Kitasato | Egg, Rabbit |
| MMR+CHICKENPOX | ProQuad/MMR-V, Priorix Tetra | Merck, GSK | RA273, WI-38, MRC-5 | None | NA | NA |
| RABIES | Imovax | Sanofi | MRC-5 | RabAvert | GSK | Egg |
| SHINGLES | Zostavax | Merck | WI-38, MRC-5 | Shingrix | GSK | Hamster |
| SMALLPOX | Acambis 1000 | Acambis | MRC-5 | ACAM2000, MVA3000 | Acambix, Baxter | Vero |

Note: ImmuneGlobulin shots will provide temporary immunity (4-6 months) for Hepatitis-A and Rubella (3-4 months).

**\*Ethically produced separate doses of measles and mumps vaccines are unavailable. Merck stopped providing them.**

If the vaccine you are questioning is not listed, then to our knowledge it is not abortion-tainted.

Encl. 2



DIOCESE
of
TYLER

OFFICE OF THE BISHOP

Dear Flock of East Texas,

"*To know that God is not distant but close, not indifferent but compassionate, not aloof but a merciful Father who follows us lovingly with respect for our freedom: all this is a cause of deep joy which the alternating ups and downs of daily life cannot touch*."
Pope John Paul II, Angelus, Third Sunday of Advent, 2003

As the Bishop of the Roman Catholic Diocese of Tyler, I wish you peace as we approach the end of a challenging 2020 and unwavering faith as we enter 2021. We have walked together through these difficult times. Soon we will face the availability of vaccines which we hope will alleviate the painful consequences of COVID-19 and its spread. Along with other Christian leaders, I have stressed the importance of ensuring that vaccines respect the dignity of human life and do *not* use the remains of electively aborted children in any part of the process.

We have the responsibility to make an informed and moral choice as to the use of a particular vaccine. The Church teaches: "Conscience must be informed and moral judgment enlightened. A well-formed conscience is upright and truthful. It formulates its judgments according to reason, in conformity with the true good willed by the wisdom of the Creator" (*Catechism of the Catholic Church* 1783). Christians are called to form their consciences in accordance with what is true as revealed in natural law and divine revelation and to act accordingly when deciding about the use of a COVID-19 vaccine.

Every procured abortion murders an innocent human person. For university, government, or industrial scientists to use materials obtained from the remains of an electively aborted child in the research, development, testing, or production of any vaccine is immoral and constitutes formal cooperation in evil. We must never cease to protest this practice with maximum determination to defend the dignity and sacredness of children in the womb. They are not objects to be used but persons to be received as gifts, our brothers and sisters. As your shepherd, I cannot in good conscience receive a vaccine that has been produced using an aborted child. There are ethical vaccines in development which are worth waiting for.

The instructions, which were promulgated in *Dignitas Personae* in 2008, say we have a duty to ask healthcare systems to do better. In this time of Covid-19, Catholic leaders have not asked for better. Too many have accepted the exploitation of aborted children. I urge you to reject any vaccine that uses the remains of aborted children in research, testing, development, or production. Testify to the truth that abortion must be rejected and make a choice that is consistent with the dignity of every human life from conception to natural death and is rooted in a mature faith and trust in eternal life, not fear of suffering in this life.

Encl. 3



DIOCESE
*of*
TYLER

OFFICE OF THE BISHOP

As bishop, I affirm the call from the American Association of Pro-Life Obstetricians and Gynecologists, American College of Pediatricians, Catholic Medical Association, and Christian Medical and Dental Associations that we should all "expect and demand vaccines that are safe, effective, and ethically sound" (Joint Statement, December 2, 2020). Until that day, I urge all of us to exercise patience and to educate our conscience by studying the teaching of the Church. Then remain faithful to the truth concerning the dignity of every human life. We must prayerfully consider how we might best conform our will to Jesus Christ and seek the good in all things for ourselves, for our families, and for our communities. To echo *Dignitas Personae*, may we here in East Texas "*mobilize our consciences in favour of life*."

**Most Reverend Joseph E. Strickland**
Bishop of Tyler

*Christ The King Church*

711 COLLEGE AVE.   •   DAPHNE, ALABAMA 36526

251-626-2343   •   251-626-3740

August 2, 2021

To Whom It May Concern:

I testify to the fact that I exercise both pastoral and spiritual care over LT Erik DeSousa both as a Roman Catholic Priest as well as their spiritual advisor. After having spoken to Erik at length regarding the moral circumstances and obligations concerning the COVID-19 vaccinations, I hereby confirm that they maintain insurmountable obstacles of conscience both in respect to prudence and to justice, and that these obstacles are reasonable and are consistent with traditional Catholic moral teaching as pertaining to the natural law. As taking the vaccinations would constitute a violation of conscience, I hereby request that they please be excused from the mandatory vaccination policy of the U.S. Navy and Department of Defense. LT DeSousa, in choosing this decision to abstain from receiving the COVID-19 vaccination, will do all in his power to protect the common good of the people he comes into contact with during the course of his duties by using every other means at his disposal to guard against contracting and spreading COVID-19. These basic human rights and responsibilities that people have who freely choose to refuse to take the COVID-19 vaccination are taught and reiterated by the Congregation of the Doctrine of the Faith in paragraph no. 5 of their recent document from December 21, 2020, entitled Note on the Morality of using some anti-COVID-19 Vaccines.

Respectfully Yours,

Rev. Gabriel V. Mills

Reverend Gabriel Mills
Parochial Vicar
Christ the King Catholic Church
Daphne, Alabama

Encl. 4

Pls.' Mot. for Classwide Prelim. Inj. App. 0118

**ADMINISTRATIVE REMARKS**
NAVPERS 1070/613 (REV. 08-2012) PREVIOUS EDITIONS ARE OBSOLETE        SUPPORTING DIRECTIVE MILPERSMAN 1070-320

SHIP OR STATION:
Supervisor of Shipbuilding Conversion and Repair Gulf Coast

| SUBJECT: | |
|---|---|
| IMMUNIZATION EXEMPTIONS FOR RELIGIOUS BELIEFS ICO LT ERIK V. DESOUSA | ☒ PERMANENT         ☐ TEMPORARY |
| | AUTHORITY (IF PERMANENT): CHIEF OF NAVAL PERSONNEL |

I request a waiver of any immunization containing aborted fetal cell lines (as outlined in Encl. (1) of the religious accommodation request dated 27AUG21). I hereby state that my request is based upon religious objection to receiving immunizations tainted with aborted fetal cell lines in development, production, or testing, regardless of how remote. I acknowledge having received the following counseling:

1. Failure to obtain immunization poses additional risk to my health upon exposure to disease.

2. In the event of foreign travel, I may be detained during travel across foreign borders due to international health regulations.

3. If granted, a waiver may be revoked by my commanding officer if I am at imminent risk of disease or due to international health regulations.

4. If my job duties change, I may need to route a new request.

5. If I am at my permanent change of station while my waiver is in effect, I may need to route a new request if my job duties change, my geographic region exposes me to the aforementioned disease, or other factors exist that could put me at imminent risk of disease.

DESOUSA.ERIK.VN Digitally signed by
CENT.1299139375 DESOUSA.ERIK.VNCENT.1299139375
Date 2021.06.27 09:46:09 -05'00'

Erik V. De Sousa
LT         USN

Witnessed:
Daniel E. Clark
LCDR, CHC, USN

ENTERED AND VERIFIED IN ELECTRONIC SERVICE RECORD:

| VERIFYING OFFICIAL RANK OR GRADE/TITLE: | DATE: | SIGNATURE OF VERIFYING OFFICIAL: |
|---|---|---|
| | | |

| NAME (LAST, FIRST, MIDDLE): | SOCIAL SECURITY NUMBER: | BRANCH AND CLASS: |
|---|---|---|
| DeSousa, Erik, V. | | USN |

FOR OFFICIAL USE ONLY
PRIVACY SENSITIVE

[Reset Form]  [Print Form]        [Submit by E-mail]

1730
27 Aug 21

MEMORANDUM FOR THE RECORD

From:  Daniel E. Clark, LCDR, CHC, USN

To: Chief of Naval Operations N1
Via: Commanding Officer, Supervisor of Shipbuilding Conversion and Repair Gulf Coast

Subj:   RECOMMENDATION FOR IMMUNIZATION WAIVER ICO LT ERIK DESOUSA

Ref:   (a) MILPERSMAN 1730-020
       (b) SECNAVINST 1730.8C
       (c) SECNAVINST 1730.9A

1. LT Erik DeSousa has submitted a request to accommodate a religious belief based on a
sincerely held moral or ethical principle.  I interview him as required by reference (b) on August
17th, 2021. I explained to LT DeSousa the difference between confidential communications to a
chaplain, as defined in reference (c), and the interview process to support this memorandum.  LT
DeSousa was given the opportunity to confidentially discuss his request with a chaplain other
than myself.  I reviewed the content of this memorandum with him and provided LT DeSousa a
copy of the memorandum.

2. LT DeSousa is seeking a religious accommodation to be exempt from taking the currently
offered COVID vaccines. Through the development of his sincerely held beliefs he and his
family have come to the conclusion that taking these vaccines would irrefutably damage his
moral conscience. He has not previously had a related request approval.

3. LT DeSousa openly shared his Christian faith and religious convictions that he has regarding
the currently offered COVID vaccinations.  The request is based on his Catholic view on the
sanctity of life as it pertains to abortion, his body and the greater community. LT DeSousa's
beliefs and their connection to these vaccinations are sincerely held and morally grounded. He
consistently demonstrates a sincerity of faith and conviction of conscience.  His service record
indicates his Christian faith. He has not previously requested this kind of exemption due to the
fact that most required vaccinations for military service have been around for many years of
testing and have alternatives that do not use fetal cell lines.

4. There are currently no alternate means of meeting the request.

5. LT DeSousa has provided more than adequate means to prove his sincerity in this matter.
Though he is currently 100% physically mission ready his mental readiness continues to decline
due to the prospect of being forced to take a vaccine that undermines his personal religious
convictions. This is negatively impacting his morale and mission readiness. Though no one can
say for certain that forcing him to receive the vaccination will prevent him from getting COVID
and therefore increase mission readiness and the safety of all, I can 100% confirm that it will
decrease his mission readiness if forced to receive it.

Encl. 6

Pls.' Mot. for Classwide Prelim. Inj. App. 0120

6.  Therefore, considering the Public Law 112-239, Section 533 from the Defense Authorization Act of 2013, the "Armed Forces shall accommodate the beliefs of a member of the armed forces reflecting the conscience, moral principles, or religious beliefs of the member", and balancing the religious accommodation request with military readiness and mission accomplishment, I recommend favorable consideration of LT DeSousa's immunization waiver for the foreseeable future. My contact information is ████████████ and daniel.clark7@navy.mil

D. E. CLARK

Encl. 6

Pls.' Mot. for Classwide Prelim. Inj. App. 0121

## Religious Accommodation Interview Checklist

| Applicant: ERIK DESOUSA | Date of Interview(s): August 17th, 2021 |
|---|---|
| Rate/Rank: LT | Chaplain Interviewer: LCDR Daniel Clark |
| Phone: ▮▮▮▮▮ | Phone: ▮▮▮▮▮ |
| Email: erik.v.desousa@navy.mil | Email: daniel.clark7@navy.mil |
| Command: Supervisor of Shipbuilding Conversion | Chaplain's Command: NAS Pensacola |

### Interview Preliminaries:

| Yes | No | N/A | |
|---|---|---|---|
| x | | | Review DoDI 1300.17on religious accommodation. |
| X | | | Notify Applicant that the interview is not confidential or privileged, and will be used in an official report to advise the command on the Applicant's request. |
| x | | | Obtain Applicant's signed waiver (see attached). |
| X | | | Explain to the Applicant that confidential support can be obtained through either 1) another chaplain or 2) a separate counseling session. |
| | x | | Has the Applicant been granted a policy waiver for this practice previously? |
| X | | | Does the Applicant's Page 2 (NAVPERS 1070/602) reflect the belief cited in the application? |

### The application is for a waiver from the following:

| Yes | No | N/A | |
|---|---|---|---|
| | | x | Uniform standards |
| | | x | Grooming standards |
| x | | | Immunization requirements |
| | | x | DNA sampling |
| | | x | Other |

### Interview Results:

| Yes | No | N/A | |
|---|---|---|---|
| X | | | Applicant communicated his/her beliefs (conscience, moral principles, or religious beliefs) in an honest and sincere manner. |
| x | | | Applicant was credible (consistently keeps tenets, practices, etc.). |
| x | | | Applicant's demeanor and pattern of conduct are consistent with the request. |
| x | | | Applicant participates in activities associated with the belief(s). |
| x | | | Persons supporting the claim are credible. |
| X | | | Applicant's request is supported by letter(s) of verification or endorsement from an organization espousing the beliefs which are the basis for the claim. |
| x | | | Alternate means of accommodating the practice were explored in the interview. |

### Process Checklist:

| Yes | No | N/A | |
|---|---|---|---|
| X | | | Chaplain has prepared a memorandum memorializing the interview, following the guidance, specifically identifying the religious importance of the accommodation to the Applicant. |
| x | | | Chaplain reviewed memorandum with Applicant and provided a copy. |
| X | | | Chaplain submitted the memorandum and this document to the commanding officer via chain of command. |
| x | | | Chaplain referred Applicant to command to process request. |

Encl. 7

WARNING ADVISEMENT ABOUT STATEMENTS MADE DURING A RELIGIOUS
ACCOMODATION INTERVIEW


I, LT ERIK DESOUSA                              , have been advised
that statements that are made during the course of my religious
accommodation interview are not confidential and may be
disclosed by Chaplain DANIEL CLARK             to further my
religious accommodation request.


17AUG21                                        _____

Date                                           Counselee


17AUG21                                        _____

Date                                           Chaplain


Encl. 7

EXHIBIT B



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/118244
24 Feb 22

From:   Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To:     LCDR Erik V. DeSousa, USN
Via:    Commanding Officer, Supervisor of Shipbuilding Conversion and Repair Gulf Coast

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

Ref:    (a) LCDR Erik V. DeSousa, USN ltr of 22 Feb 22 w/ends
        (b) BUPERSINST 1730.11A
        (c) DCNO/N1 RA Response ltr of 17 Nov 21
        (d) CNO Appeal RA Response ltr of 10 Feb 22

1.  Your request in reference (a) is denied.  Contrary to your assertion, there have been no substantive changes to the physical environment since your original request and appeal.  The compelling government interest in ensuring mission accomplishment, to include military readiness, unit cohesion, good order and discipline, health and safety, on both individual and unit levels remains the same.

2.  As provided in reference (b), members are afforded the opportunity to renew requests when the physical, operational, or geographical environment in which they work or operate has changed.  In your case, the environment has not materially changed.  Specifically, and as already noted in references (c) and (d), you remain an Engineering Duty Officer and continue to fill a vital billet at your command, interacting on the waterfront with essential Navy personnel.  Further, a waiver of the COVID-19 immunization would continue to have a predictable and detrimental effect on your readiness and the readiness of the Sailors who serve alongside you in both operational and non-operational environments.  Granting your request would still have a direct and foreseeable negative impact on the compelling government interests of military readiness and health of the force.  Finally, while no vaccine is completely effective, vaccines reduce disease incidence and disease severity.

NOWELL.JOHN.BL   Digitally signed by
ACKWELDER.JR.1   NOWELL.JOHN.BLACKWELDER
057611835        .JR.1057611835
                 Date: 2022.02.24 20:42:10 -05'00'

    JOHN B. NOWELL, JR

Copy to:
OPNAV (N131, N0975)
BUMED

EXHIBIT C

**From:** Schneider, Nathan A CAPT USN SUPSHIP GULFCOAST MS (USA)
<nathan.a.schneider.mil@us.navy.mil>
**Sent:** Friday, February 25, 2022 4:18 PM
**To:** DeSousa, Erik Vincent LCDR USN SUPSHIP GULFCOAST MS (USA) <erik.v.desousa.mil@us.navy.mil>
**Cc:** Suarez, S M (Sal) CAPT USN SUPSHIP GULFCOAST MS (USA) <salvador.m.suarez2.mil@us.navy.mil>;
Massey, Mark A Jr CPO USN (USA) <mark.a.massey22.mil@us.navy.mil>
**Subject:** FW: CNO Religious Accommodation Appeal Response ICO LT Erik DeSousa

Erik,
   The DCNO has responded to your RA stating that the conditions described do not constitute valid
"change[s] in physical, operational or geographical environment" – see attached.

Please note that IAW guidance, we need to start the administrative separation process possibly as early
as next week unless you elect to request resignation by 1 June 2022 (14 days from the disapproval of the
appeal - will be following up w/ PERS-834 to determine how to address this given the additional RA
request).  With that in mind, please let me know how you would like to proceed once you've had a
chance to review.

V/R,

CAPT Nate Schneider
SSGC CO
W: (228) 935-0275
████████████
nathan.a.schneider.mil@us.navy.mil

**From:** Cua, Diane S CDR USN DCNO N1 (USA) <diane.s.cua.mil@us.navy.mil>
**Sent:** Friday, February 25, 2022 3:26 PM
**To:** Schneider, Nathan A CAPT USN SUPSHIP GULFCOAST MS (USA)
<nathan.a.schneider.mil@us.navy.mil>; Navy Religious Accommodations
<ALTN_Navy_Religious_Accommodations@navy.mil>
**Cc:** Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) <mery.a.katson.mil@us.navy.mil>; Cua,
Diane S CDR USN DCNO N1 (USA) <diane.s.cua1@navy.mil>; richard.a.neuer@navy.mil; Johnson, Katelyn
A PO2 USN (USA) <katelyn.a.johnson2@navy.mil>; Suarez, S M (Sal) CAPT USN SUPSHIP GULFCOAST MS
(USA) <salvador.m.suarez2.mil@us.navy.mil>; Massey, Mark A Jr CPO USN (USA)
<mark.a.massey22.mil@us.navy.mil>
**Subject:** RE: CNO Religious Accommodation Appeal Response ICO LT Erik DeSousa

CAPT Schneider,

Good afternoon.  Please find attached DCNO N1's response to LCDR DeSousa's request for waiver of
policy in support of religious practice. The conditions described do *not* constitute valid "change[s] in
physical, operational or geographical environment." Therefore, the previously adjudicated Religious
Accommodation from CNO remains in effect. Request you (or your designee):

   (1)  acknowledge receipt of DCNO N1's letter by responding to this email (kindly reply to all above).
   (2)  provide DCNO N1's response to LCDR DeSousa.

(3) update the CCDA database with the appropriate entry. Specifically, change the entry from "unvaccinated, pending religious accommodation" to (NAVADMIN 249/21):
    a. 'unvaccinated, **vaccination series started but not complete**' if the service member initiated the *two series vaccination* (Pfizer or Moderna), OR
    b. '**vaccination series complete**', previously reported as unvaccinated' if the service member received the *one shot vaccination* (Johnson & Johnson), OR
    c. '**unvaccinated, refuser**' if the service member decided to not comply with CNO's direction.

Note:  These updates can be made via the My Navy Portal Site:  https://www.mnp.navy.mil/group/navy-covid-19-reporting (NAVADMIN 249/21 pertains).


V/r
Diane

CDR Diane Cua
OPNAV N131B
Deputy Branch Head, Officer Plans and Policy
diane.s.cua.mil@us.navy.mil
Office: (703) 604-5023


**From:** Schneider, Nathan A CAPT USN SUPSHIP GULFCOAST MS (USA) <nathan.a.schneider.mil@us.navy.mil>
**Sent:** Wednesday, February 23, 2022 11:43 AM
**To:** Navy Religious Accommodations <ALTN_Navy_Religious_Accommodations@navy.mil>
**Cc:** Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) <mery.a.katson.mil@us.navy.mil>; Cua, Diane S CDR USN DCNO N1 (USA) <diane.s.cua1@navy.mil>; richard.a.neuer@navy.mil; Johnson, Katelyn A PO2 USN (USA) <katelyn.a.johnson2@navy.mil>; Suarez, S M (Sal) CAPT USN SUPSHIP GULFCOAST MS (USA) <salvador.m.suarez2.mil@us.navy.mil>; DeSousa, Erik Vincent LCDR USN SUPSHIP GULFCOAST MS (USA) <erik.v.desousa.mil@us.navy.mil>; Massey, Mark A Jr CPO USN (USA) <mark.a.massey22.mil@us.navy.mil>
**Subject:** RE: CNO Religious Accommodation Appeal Response ICO LT Erik DeSousa

Good morning.  LCDR DeSousa is requesting a new reasonable accommodation be considered due to a change in operational environment - please see attached.


V/R,

CAPT Nate Schneider
SSGC CO
W: (228) 935-0275
███████████████████
nathan.a.schneider.mil@us.navy.mil


**From:** Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) <mery.a.katson.mil@us.navy.mil>
**Sent:** Monday, February 14, 2022 5:47 AM
**To:** Suarez, S M (Sal) CAPT USN SUPSHIP GULFCOAST MS (USA) <salvador.suarez@navy.mil>; Schneider, Nathan A CAPT USN SUPSHIP GULFCOAST MS (USA) <nathan.a.schneider3@navy.mil>

**Cc:** Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) <mery.a.katson.mil@us.navy.mil>; Cua, Diane S CDR USN DCNO N1 (USA) <diane.s.cua1@navy.mil>; richard.a.neuer@navy.mil; Johnson, Katelyn A PO2 USN (USA) <katelyn.a.johnson2@navy.mil>
**Subject:** CNO Religious Accommodation Appeal Response ICO LT Erik DeSousa

CAPT Suarez,

Good morning.  Please find attached LT DeSousa's fully adjudicated Religious Accommodation Appeal from CNO Gilday.  This is the final step in the Religious Accommodation process.  Request you (or your designee):

(1) acknowledge receipt of the CNO's letter by responding to this email (kindly reply to all above).
(2) provide the CNO's response to LT DeSousa and remind him of the ***requirement to initiate vaccination against COVID-19 within five (5) calendar days upon receipt of this letter and become fully vaccinated by following the required vaccine series protocol.***
(3) update the CCDA database with the appropriate entry after the five (5) calendar days has passed. Specifically, change the entry from "unvaccinated, pending religious accommodation" to (NAVADMIN 249/21):
   a. 'unvaccinated, **vaccination series started but not complete**' if the service member initiated the *two series vaccination* (Pfizer or Moderna), OR
   b. '**vaccination series complete**, previously reported as unvaccinated' if the service member received the *one shot vaccination* (Johnson & Johnson), OR
   c. '**unvaccinated, refuser**' if the service member decided to not comply with CNO's direction by the fifth calendar day.
   Note:  These updates can be made via the MyNavy Portal Site:  https://www.mnp.navy.mil/group/navy-covid-19-reporting (NAVADMIN 249/21 pertains).

Thank you,
V/r CAPT Mery-Angela S. Katson
COVID-19 Religious Accommodation Appeals Team Lead
701 South Courthouse Road, Bldg 12, Suite 301
Arlington, VA 22204

# Exhibit 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **U.S. NAVY SEALs 1-3**, on behalf of themselves and all others similarly situated; **U.S. NAVY EXPLOSIVE ORDNANCE DISPOSAL TECHNICIAN 1**, on behalf of himself and all others similarly situated; **U.S. NAVY SEALS 4-26**; **U.S. NAVY SPECIAL WARFARE COMBATANT CRAFT CREWMEN 1-5**; and **U.S. NAVY DIVERS 1-3**,<br><br>                Plaintiffs,<br><br>    v.<br><br>**LLOYD J. AUSTIN, III**, in his official capacity as United States Secretary of Defense; **UNITED STATES DEPARTMENT OF DEFENSE**; **CARLOS DEL TORO**, in his official capacity as United States Secretary of the Navy,<br><br>                Defendants. | Case No. 4:21-cv-01236-O |

## DECLARATION OF LIEUTENANT DANIEL FRANKLIN, USN

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury as follows:

1.    I am over the age of eighteen and am competent to make this declaration.

2.    I have served in the United States Navy for 16 years. I have the rank of Lieutenant (O-3). I am an Explosive Ordnance Disposal (EOD) Officer and prior command Division Officer. My command is a training command with ten training divisions. As a Division Officer my overall responsibility was the proper management of my division which composed of around 25 personnel, mostly instructors. Command instruction dictates 18 specific responsibilities for Division Officers including but not limited to: ensuring staff proficiency, planning, budgeting, maintaining curricula

1

and records, enforcing safety regulations and command instructions, counseling students, accounting for controlled items such as training aids and publications, submitting reports, scheduling, coordinating with other divisions and supervising and training assigned staff. The majority of my time as a Division Officer was spent in my private office fulfilling these administrative responsibilities. I am a qualified instructor and did assist in training students a limited number of times due to the administrative responsibilities. The division I was assigned to is considered a "high-risk" division due to the nature of the training. The majority of student training in my division occurs outside, either in physical training, underwater diving or in outdoor practice areas.

3.      I have a sincere religious objection to receiving the COVID-19 vaccination as mandated by the Navy and submitted a religious accommodation request on 20 September 2021. After it was denied I submitted an appeal to Chief of Naval Operations on 08 December 2021. In January 2022 a new EOD officer arrived at the command and I was instructed to begin training him as my replacement in preparation of my separation from the Navy for not receiving the COVID-19 vaccination, so I can "get my personal things in order". Around 27 January 2022 I was fully replaced as the Division Officer. I still assist in training students as a qualified instructor but am no longer performing duties that correlate with my rank or that are meaningful to professional development and advancement of my career as an EOD Officer. My original and current orders have me working at my command until July 2022.

4.      On 18 February 2022, I received the denial of my appeal from the Chief of Naval Operations. On 23 February 2022 I submitted a renewed religious accommodation request. According to BUPERSINST 1730.11A ¶ 5f(2), "When a religious accommodation request is denied, the requestor may renew the request upon change in physical, operational or geographical

2

environment, or at any time in which there is a change to pertinent policy." In my accommodation request, I explained that my physical and operational environment had changed since first requesting accommodation in September. I have since contracted and recovered from a mild case of COVID-19 in December 2022 and have tested positive for COVID-19 T-cells. I had witnessed widespread COVID infection among vaccinated co-workers and other military officials despite vaccination. I have also since been removed from my position as a command Division Officer. The BUMED letter relied upon to deny my religious accommodation request was dated September 2021, making it outdated in light of more recent COVID-19 developments. I updated my accommodation request to now include all routine and non-routine vaccinations in addition to COVID-19 vaccines for religious reasons detailed in my renewed accommodation request. My renewed religious accommodation request is attached to this declaration as Exhibit A.

5.      On 24 February 2022, the Chief of Naval Personnel John B. Nowell denied my request, claiming that my physical environment had not changed despite this. A copy of the denial is attached to this declaration as Exhibit B.

6.      As a result, on 25 February 2022, CDR Diane Cua stated that my previously adjudicated religious accommodation from CNO remains in effect. A copy of this email chain is attached to this declaration as Exhibit C.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on February 26, 2022.

DANIEL FRANKLIN

3

EXHIBIT A

23 Feb 22

From:  LT Daniel Franklin, USN
To:    Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education)
       (N1)
Via:   CAPT Steven Beall, Commanding Officer, Naval School Explosive Ordnance Disposal

Subj:  REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

Ref:   (a) DOD Instruction 1300.17
       (b) SECNAVINST 1730.8
       (c) BUPERSINST 1730.11A

Encl:  (1) CNO disapproval 15 Feb 22
       (2) OPNAV N13 ltr 1730 Ser N13/306 of 17 Nov 21
       (3) BUMED ltr 6320 Ser M44/21UM401 of 22 Sep 21
       (4) Positive Serological test for Covid-19 T-cells
       (5) Naval Medical Intel report of 11 February 2022
       (6) Study Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity, Gazit
       (7) CDC FOIA Response, 05 Nov 21
       (8) Defense Medical Epidemiology Database (DMED) data, 26 Jan 22

1.  Per references (a) and (b), the Department of the Navy (DoN) recognizes that religion can be as integral to a person's identity as one's race or sex.  To that extent, DoN promotes a culture of diversity, tolerance, and excellence by making every effort to accommodate religious practices absent a compelling operational reason to the contrary.  Religious medical practices include traditional objections to receiving immunizations.  It is DoN policy to accommodate the traditional observances of the religious faith practiced by individual members when these doctrines or observances will not have an adverse impact on military readiness, individual or unit readiness, unit cohesion, health, safety, discipline, or mission accomplishment.  Immunizations requirements may be waived when requested by the member based on religious objection.

2.  Per enclosure (1) [CNO Denial Letter], I received denial of my Religious Accommodation (RA) appeal request from the CNO dated 15 February 2022.  I am submitting a new RA request per BUPERSINST 1730.11A which states as follows:

> *5f(2) When a religious accommodation request is denied, the requestor may renew the request upon change in <u>physical, operational or geographical environment</u>, or at any time in which there is a change to pertinent policy.*

Since my original request for RA dated 20 September 2021, my physical and operational environment has changed significantly in the last 5 months as follows:

a.  I contracted the COVID-19 virus on 24 December 2021, with mild throat, fever, chills and headache symptoms associated with the Omicron variant and have natural immunity that I did not have previously.  See enclosure (4), Positive Serological test for Covid-19 T-cells;

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

b.   I received a positional change and am no longer a command division officer;

c.   100% of active duty staff at my command are now vaccinated and/or went through natural infection and recovery from the COVID-19 virus.  Mr. Lloyd Austin (SECDEF), Gen Mark Milley (Chairman, Joint Chiefs of Staff), Mr. Vivek Murthy (U.S. Surgeon General), Navy Secretary Carlos Del Toro (SECNAV) and other military leaders have contracted COVID-19 despite receiving a complete vaccination series including boosters.  World-wide reports clearly indicate current COVID-19 vaccinations do not prevent contraction or spread of the COVID-19 virus;

d.   The Omicron variant emerged and swept across the Nation and my geographical area, drastically shifting the nature of the COVID-19 pandemic and providing proven natural immunity;

e.   Evidence of widespread harm from the COVID-19 vaccines are now known, including but not limited to data from the CDC/FDA database VAERS and Defense Medical Epidemiology Database (DMED);

f.   Federal vaccine mandates were stopped in courts, including the OSHA requirement.  The five DoD contractors I work with in my division are now not required to be vaccinated.

g.   Ongoing Federal court cases continue to reveal discrepancies in DoD following Federal and Constitutional law in the implementation of its COVID-19 Vaccine mandate among DoD personnel;

3.  Upon reading the OPNAV N13 letter I received with my appeal denial, enclosure (2), in opposition to my previous request for RA, I would like to proactively address some of the information that is contained therein as follows:

a.   Per paragraph 1, the OPNAV N13 letter states it is the Navy's compelling government interest to prevent the spread of vaccine-preventable communicable diseases among sailors.  However, this does not apply to any of the current COVID-19 vaccines available.  The efficacy of the current COVID-19 vaccinations is based on reducing symptoms if exposed and preventing severe illness or death.  None of the COVID-19 vaccinations prevent contracting the predominant Omicron variant virus, or transmission of the virus as evidenced by world-wide reports and current Navy COVID-19 virus positivity tracking data.

b.   The OPNAV N13 letter states only 1.7% of sailors who were fully vaccinated contracted a breakthrough case and 23.3% of unvaccinated became infected up to October 2021.  This is misleading and outdated.  Force vaccination rates were changing throughout 2021 and were not a fixed number.  According to Naval Medical Intel report of 11 February 2022, enclosure (5), from December 2020 to February 2022 a total of 15,855 non-vaccinated sailors became infected.  In the same time frame 28,966 fully vaccinated sailors became infected.  There is an 82% increase in vaccinated sailors contracting COVID-19 over unvaccinated sailors contracting COVID-19.  Not only is vaccination failing to prevent disease, it appears vaccination increases the risk of contracting

2

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

COVID-19, and does not serve the alleged compelling government interest of preventing the spread of disease.

    c.   The OPNAV letter states "even one unvaccinated Sailor, after contracting COVID-19 affects mission accomplishment" then two paragraphs later mentions, "The small group of Sailors who have temporary medical exemptions and the very small group with permanent medical exemptions are at higher risk".  It is not congruent with the protections of the Constitution to state the Navy's compelling government interest is achieved through approving unvaccinated medical and administrative exemptions while simultaneously disapproving every single Religious Accommodation request.

4.  Upon reading the BUMED letter I received with my appeal denial, enclosure (3), in opposition to my previous request for RA, I would like to proactively address some of the information that is contained therein as follows:

    a.   Per para 7, the BUMED letter refers to phase III trials of the FDA approved COVID-19 vaccine.  Of note, the only COVID-19 vaccines that are currently approved by the FDA are "COMIRNATY" by BioNTech Manufacturing GmbH (Mainz, Germany) and "SPIKEVAX" by Moderna, neither of which are available in the United States presently as stated in the 31 Jan 2022 letter to Moderna, Inc. which states:

> *"Although SPIKEVAX (COVID-19 Vaccine, mRNA) and Comirnaty (COVID-19 Vaccine, mRNA) are approved to prevent COVID-19 in certain individuals, within the scope of the Moderna COVID-19 Vaccine authorization, there is __**not sufficient approved vaccine**__ available for distribution to this population in its entirety at the time of reissuance of this __**EUA**__."*

    b.   Currently, all COVID-19 vaccinations available to service members are only authorized by the FDA for Emergency Use Authorization (EUA) only.  Per 21 USC Sec. 360bbb-3, vaccinations under EUA are voluntary, unless waived by POTUS per 10 USC Sec. 1107a, DoDI 1300.17, DoDI 6200.02 and DoDI 6205.02.

    c.   The BUMED letter cites the COVID-19 outbreak on the USS THEODORE ROOSEVELT that occurred in March 2021, prior to wide-spread vaccinations.  A similar outbreak later happened to the USS MILWAUKEE (LCS 5) in December 2021 with a crew that was 100% vaccinated.  One third of the crew tested positive for COVID-19.  This ship was isolated in port, removing the unit from executing its mission capabilities for several days.  A similar COVID-19 outbreak occurred on USS HALSEY (DDG 97) with one-third of the crew testing positive for COVID-19.  Both outbreaks (among others) clearly demonstrate that vaccination status does not preserve mission accomplishment.

5.  Both the OPNAV and BUMED letters I received applied the threat of COVID-19 while working and living on-board a ship referring to situations such as narrow passage-ways, community berthing and messing areas.  Shipboard comparisons are inapplicable to my current assignment and for future assignments as I follow the narrow EOD LDO career path for the duration of my career.  BUPERSINST 1730.11A, reference (c) states, "Each request for religious accommodation must be reviewed on a case-by-case basis, giving consideration to the full range of facts and circumstances

3

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

relevant to the specific request".  Also, "It is essential that commanders articulate the factual basis underlying any compelling government interest and that they articulate why a recommended denial or partial denial is the least restrictive means available to the commander to protect the compelling government interest over the individual request".  By making a denial based upon ship-board operations that do not apply to my case-by-case bases, this requirement was not met.  The Religious Freedom Restoration Act of 1993 (RFRA) states the Government may substantially burden an individual's exercise of religion only if it demonstrates that the application of the burden to the person is: (1) in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that interest.  The burden rests with the government to demonstrate both factors in their entirety, not the individual requesting the exemption per DoDI 1300.17, September 1, 2020.  My original RA request, subsequent appeal, and this renewed RA request demonstrate facts that the DOD's vaccination mandate is not the least restrictive means to further the interest of mission accomplishment and unit readiness.  The original disapproval from CNP and subsequent Appeal disapproval from CNO fail to explain how vaccination outweighs my sincerely held beliefs to accomplish the mission and promote good order and discipline, nor do they explain how this would detrimentally affect me and my unit's readiness.  Using the information throughout this RA, despite not bearing the burden, I demonstrate how the COVID-19 vaccination is not the least restrictive means available to preserve military readiness, mission accomplishment and the health and safety of military service members.  The government must show it cannot accommodate the religious adherent while achieving its interest through a viable alternative. The government cannot meet this burden.

6.  The arrival of the Omicron variant occurred after my originally submitted RA and Omicron was not mentioned at all in the supporting OPNAV or BUMED letters I received.  Omicron was first identified in South Africa on 11 November 2021 and quickly spread around the globe entirely changing the nature of the COVID-19 pandemic.  Though more transmissible than prior variants, it had significantly lower instances leading to hospitalization and almost non-existent instances of death directly relating to COVID-19 infection.  On 10 January 2022, the European Medicines Agency (EMA) based in Amsterdam reported that the spread of Omicron was pushing COVID-19 towards an endemic disease that humanity can live with.  Numerous regulatory agencies and medical governance authorities have also denied repeated boosters as a sustainable strategy.  Marco Cavaleri, head of vaccine strategy at EMA reported "With the increase of immunity in population – and with Omicron, there will be a lot of natural immunity taking place on top of vaccination – we will be fast moving towards a scenario that will be closer to endemicity".  Additionally, Spain released a study of Omicron on 20 January 2022 stating "once infected, index vaccinated cases seem to have the same transmission capacity as non-vaccinated people."  A study by the Africa Health Research Institute found the antibody response of people infected with Omicron increased protection against the Delta variant more than fourfold. "These results are consistent with Omicron displacing the Delta variant, since it can elicit immunity which neutralizes Delta making re-infection with Delta less likely" reported the team of scientists led by Khadija Khan.  Any evaluation on the COVID-19 disease and vaccines is not complete or current without considering the altering impact Omicron had around the globe.

7.  Natural immunity was not mentioned at all in the OPNAV or BUMED letters I received although many countries, scientists and doctors are discussing it with many studies supporting the effectiveness of natural immunity.  https://brownstone.org/articles/79-research-studies-affirm-naturally-acquired-immunity-to-covid-19-documented-linked-and-quoted/ provides 150 studies,

Pls.' Mot. for Classwide Prelim. Inj. App. 0138

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

reports and papers supporting the evidence of natural immunity vs vaccine induced immunity.  In on such study, enclosure (6), Gazit et al. conducted "a retrospective observational study comparing three groups: (1) SARS-CoV-2-naïve individuals who received a two-dose regimen of the BioNTech/Pfizer mRNA BNT162b2 vaccine, (2) previously infected individuals who have not been vaccinated, and (3) previously infected and single dose vaccinated individuals".  In Model 1, findings revealed a 13-fold increased risk of breakthrough Delta infections in double vaccinated persons, and a 27-fold increased risk for symptomatic breakthrough infection in double vaccinated relative to the natural immunity recovered persons.  Additionally, the risk of hospitalization was 8 times higher in the double vaccinated.  In conclusion, "this analysis demonstrated that natural immunity affords longer lasting and stronger protection against infection, symptomatic disease and hospitalization due to the Delta variant of SARS-CoV-2, compared to the BNT162b2 two-dose vaccine induced immunity."  I have fully recovered from a prior COVID-19 infection and still carry naturally protective T-cell immunity as shown in my positive, serological T-cell test, enclosure (4).  In their response to a FOIA request, the CDC reinforced natural immunity on 05 Nov 2021 when they failed to provide even one document evidencing a single case where an individual infected with SARS-Cov-2, recovered and then later became re-infected or infected others, enclosure (7).

8.   The COVID-19 vaccines are now known to have caused physical bodily harm in numbers far surpassing standard vaccine adverse events.  This is seen in data from the Defense Medical Epidemiology Database (DMED).  On January 24th attorney Thomas Renz representing three military doctors testified to Senator Ron Johnson about the highly concerning trends found in the DMED database.  Enclosure (8) details the information and actual screen shots taken directly from DMED.  Comparing data from a 5-year average 2016-2020 to the data during 2021 when vaccines were implemented is alarming.  To list some of the examples, unspecified chest pain increased by 1,529%, Acute Myocarditis increased by 285%, Pulmonary Embolism increased by 467%, HIV increased by 590%, Spontaneous Abortion increased by 306%.  This is clear harm done to DoD service members.  Within days of this whistleblower release, DMED was taken off-line.  When it was put back online the numbers were "fixed" to show no large discrepancies through 2016-2021.  The damaging effects of these vaccines are being actively hidden.

9.   In addition to hiding how unsafe the vaccines are, concerted efforts have been taken to actively hide how ineffective they are.  For example, prior to 26 August 2021 the definition of vaccine on the CDC website was "A product that stimulates a person's immune system to produce immunity to a specific disease, protecting the person from that disease."  Since September 2021, the CDC changed the definition of vaccine to "A preparation that is used to stimulate the body's immune response against diseases."  Which is now the new definition of vaccine as found on Merriam Webster dictionary website.  Further, on 20 February 2022, the New York times reported "the CDC has been routinely collecting information since the Covid vaccines were first rolled out last year, according to a federal official familiar with the effort.  The agency has been reluctant to make those figures public, the official said, because they might be misinterpreted as the vaccines being ineffective."  Data regarding the effectiveness of the vaccines is actively being hidden.

10.   Federal court cases continue to reveal discrepancies in DoD following Federal and Constitutional law in the implementation of its COVID-19 Vaccine mandate among DoD personnel.  Below are three recent examples:

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

a.  On 3 Jan 2022, Judge Reed O'Connor issued a preliminary injunction for plaintiffs in U.S. NAVY SEALS 1-26, et al, v. JOSEPH R. BIDEN, JR., et al.  Plaintiffs had submitted RA requests but were not provided the legal review required in evaluating their submissions.  The Court noted that the Navy utilized a "six-phase, fifty step process" wherein at Phase 1 the administrator is instructed to update a prepared disapproval template with the requestor's name and rank.  Based upon the boilerplate rejection template, it appears the RA review process is pre-determined and sidesteps an individualized review process as required by law.  The Judge called the Navy RA review process "theater" stating it "merely rubber stamps each denial."  The Judge further states, *The COVID-19 pandemic provides the government no license to abrogate those [religious] freedoms. There is no COVID-19 exception to the First Amendment.  There is no military exclusion from our Constitution."*  Based upon the documents presented to the Court and the Judge's acknowledgement of the blanket denial process of all RA requests, I am submitting a new RA request for an individualized case-by-case review as required under the law.

b.  On 15 February 2022, Judge Tillman Self issued a preliminary injunction for the plaintiff in AIR FORCE OFFICER, v. LLOYD J. AUSTIN, III et al.  The Judge states, *"Plaintiff's claim that she has been "forced to choose between her sincerely held religious beliefs and her livelihood" undoubtedly checks the box for an allegation of a deprivation of a constitutional right or violation of an applicable federal statute.".*  In conclusion, the Judge also states, *"Given "the Nation's essential commitment to religious freedom[,]" Plaintiff's harm—a constitutional injury involving her right to freely exercise her religion—is not a mere trivial grievance. Church of Lukumi, 508 U.S. at 524. And, what real interest can our military leaders have in furthering a requirement that violates the very document they swore to support and defend? The Court is unquestionably confident that the Air Force will remain healthy enough to carry out its critical national defense mission even if Plaintiff remains unvaccinated and is not forced to retire."*

c.  On 18 February 2022, Judge Steven Merryday issued a preliminary injunctive relief for two plaintiffs in NAVY SEAL 1, et al v. LLOYD J. AUSTIN, et al.  Within the order, the Judge states, *"Requiring a service member either to follow a direct order contrary to a sincerely held religious belief or to face immediate processing for separation or other punishment undoubtedly causes irreparable harm."*

11.  This Religious Accommodation request is for waiver from COVID-19 immunizations and routine and non-routine vaccines.  As a believer in Christ, I am called to test and look into all prophecies and claims (1 Thess 5:21) and to search for understanding as if it were a treasure (Prov 2:3-4).  As such, I diligently researched the COVID-19 disease and the related vaccines in search of understanding.  Though my situation and the dynamic nature of the Covid-19 pandemic has changed and further information has become available, my religious beliefs and convictions have stayed the same.  Following is the basis of my convictions in how I am to live in the reality of this disease and vaccines as governed by my faith rooted in God's Holy Word.

Subj:    REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

As of this writing, the Navy reports eight out of 346,000 active duty sailors have passed away from COVID-19 since December 2020, enclosure (5).  This equates to a .002% chance of death to sailors such as myself.  The chance of myself or any sailor dying in a car crash driving to work is 8 times more likely at .016% per National Safety Council.  The heightened level of fear for COVID-19 does not match the threat of the disease to service members.  As a believer, I have been commanded not to be overcome by fear or live my life in a constant state of fear (Joshua 1:9, 2 Tim 1:7).  If I partake in the vaccine, I would be bearing a false witness to my spiritual beliefs and will be complicit in the effects of this hysterical fear upon my life.

The immense national and global pressure to take the COVID-19 vaccine is unlike any other vaccine in history.  It is being pushed by governments, employers and big tech companies on the news, on the radio, on the internet, on social media, on billboards, in newspapers, essentially anywhere one turns.  Taking the COVID-19 vaccine has clearly been ascribed supreme importance, absolute and worthy of special reverence.  These qualities are what make a religion.  To receive these vaccines, I would be guilty of subjecting myself to the demands of those who have idolized COVID-19 vaccination as the only way to live a happy life.  However, I am a follower of Christ and I am commanded not to follow or have affection for any other gods (Exodus 20:3-5).

Observing history, the evil actions of the drug and vaccine industry are clearly evident.  Simply look into AZT for AIDs, the Polio Cutter Incident and Polio SV40, Swine Flu vaccine and the Stanley Plotkin deposition.  From vaccines contaminated with viruses to experimentation on babies whose mothers were imprisoned.  These historical examples show how greed, rushed FDA approvals and conflicts of interest resulted in a multitude of innocent humans killed or permanently maimed over decades.  These same actions, especially rushed FDA approval, took place for COVID-19 vaccines.  There is not a single medical professional or expert in the world who can describe or state with particularity the long-term effects of the current COVID-19 vaccines.  However, we now know what the near-term affects are.  As of this writing, there are 23,990 reported deaths and 43,476 permanently disabled individuals by COVID-19 vaccines as shown in the VAERS public database managed by the CDC and FDA.  Comparably, only 605 deaths were reported as adverse events to all vaccines combined in the calendar year 2019 (prior to COVID-19 vaccines).  During the Swine Flu vaccine debacle in 1976, the vaccination campaign was shut down forever when adverse events reached 94 cases of paralysis.  Yet today, the vaccine campaign continues for DoD personnel despite high adverse events and such a low threat from the COVID-19 disease.  Continuing to authorize and mandate the use of COVID-19 vaccines with such high adverse events that cause suffering and death, is evil.  As a Christian, I have been commanded by God to turn away from the path of evildoers (Prov 4:14-15).  By following the Lord's command in turning from this evil and not taking the COVID-19 vaccines, I will be protecting my physical health and spiritual health, as God cares for both.

The governing officials who have the responsibility to protect Americans from harmful drugs and vaccines are failing.  God's word states, "you can identify people by their actions" (Matt 7:20).  As such, through the actions of these governing officials throughout the COVID-19 pandemic, I have identified them as untrustworthy.  If these current governing entities cannot or will not protect Americans in managing the safety of the COVID-19 vaccines, how can they be trusted to govern the safety of other vaccines?  The mis-management of the COVID-19 vaccine in regard to

7

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

safety directly correlates to the continued safety management of routine and non-routine vaccinations.  In 1 Corinthians 3:16-17, God's word declares that His Holy Spirit dwells within me and that I am His temple.  It goes on to say if anyone destroys God's temple, He will destroy that person.  I am to care for this body as it is the dwelling place of God's Holy Spirit, if I do not, I will face the wrath of God.  As such, I cannot in good faith allow the injection of any routine, non-routine or COVID-19 vaccines into my healthy body knowing the great harm they may do to this temple of God.

12.  There are no effects upon command mission accomplishment for grounds to disapprove this accommodation.  Since the beginning of the COVID-19 pandemic a large number of personnel became infected with COVID-19.  Both vaccinated and un-vaccinated alike.  The average recovery time was two weeks or less before returning to work.  The divisions I worked in and the command itself still accomplished its mission in training the same amount of EOD ascension students as years prior.  Not one of our 327 command staff members have been permanently removed from performing their duty due to getting COVID-19.  As detailed prior in this RA, natural immunity has proven to be superior to vaccine induced immunity.  A large number of our command staff have now had and recovered from COVID-19, including myself.  My accommodation from being vaccinated will have zero effect on the command meeting its mission.

    Approving this accommodation, will not produce a negative effect on health or safety as both vaccinated and un-vaccinated at the command have been infected with COVID-19.  Additionally, less restrictive means than denial of this accommodation exist.  Alternate means of mitigating the transmission of COVID-19 or any disease include: Masks, distancing, performing activities or training outdoors, weekly COVID-19 testing and staying home when symptomatic.  I claim I have utilized a combination of these alternate means since checking into the command July 2020 to present day all while performing the responsibilities of my occupation in the same period.  No studies or proof have been provided showing these alternate means are not available or not effective.  No proof or studies have been provided showing natural immunity does not mitigate COVID-19.

    When not at my private desk, my instructor duties take place in open air outdoors.  Although billeted as an instructor, "hands-on" training does not mean hands-on the students.  It means students are getting their hands on tools and equipment while performing training.  The training objectives are met without me putting hands on the students.  With me following our proven mitigation protocols and the large majority of staff being vaccinated or naturally immune, there will be no negative effect on health or safety in approving this accommodation.

    Unit cohesion and good order will not be negatively affected by approving this accommodation.  My convictions on vaccines are mine and in Romans 14:1-6 I am instructed not to attack others' convictions or cause divisions.  I will continue to abide by this as a believer and Naval Officer and continue to promote good order and discipline to those I am assigned over.  The submission of this Religious Accommodation for vaccination is not counter to a display of good order and discipline.  To the contrary, it is an example of good order and discipline as I strive to abide by the rules and regulations as provided for Religious Accommodations.

Pls.' Mot. for Classwide Prelim. Inj. App. 0142

Subj:   REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

13. These COVID-19 vaccinations were created, approved and mandated under a hyped worldwide fear. The vaccines have been idolized as the only hope of having a normal life. They have been created and approved by an industry marred by evil effects whose actions are being repeated. The governing entities in charge of vaccine safety continue to allow known suffering and death. In all these ways, accepting any routine, non-routine or COVID-19 vaccines into my body would violate God's instructions as directed to me through His Holy Word. My faith is not new and it has played a large role in my life and the life of my family. An example of how my faith has directed our health and wellness in past years is through the births of our three younger children. My wife successfully birthed each of our three children at home with a midwife, naturally and without medicine or a doctor. The births were VBACs (vaginal birth after caesarean) due to our first child being born by caesarean. VBACs are considered high-risk births, by many medical professionals, even in a hospital setting. Through careful research, consideration and prayer, it was ultimately our faith in God and His provisions for us that navigated us through all three safe and successful home births resulting in three wonderful and healthy children. Approval of this Religious Accommodation waiver from the COVID-19 vaccines allows me to serve my Nation in the United States Navy as I continue standing upon my long-held religious convictions.

14. Based upon the above arguments and enclosures in support, I respectfully request review of my religious accommodation request.

D. J. Franklin

9

**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/115723
23 Nov 21

From:  Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To:    LT Daniel J. Franklin, USN
Via:   Commanding Officer, Naval School Explosive Ordnance Disposal

Subj:  REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
       IMMUNIZATION REQUIREMENTS

Ref:   (a) 42 U.S.C. §2000bb-1
       (b) DoD Instruction 1300.17 of 1 September 2020
       (c) SECNAVINST 1730.8B
       (d) ASN (M&RA) memo of 6 Jun 13
       (e) MILPERSMAN 1730-020
       (f) United States Attorney General memo of 6 Oc 17
       (g) Your ltr of 20 Sep 21 w/ends
       (h) BUMED ltr 6320 Ser M44/21UM40931 of 19 Oct 21

1.  Pursuant to references (a) through (h), your request for religious accommodation through
waiver of immunization requirements is disapproved.  You must receive all required vaccines.
However, you are free to request from your healthcare provider alternative vaccines that are
available and meet the Navy's immunization requirements, as determined by a credentialed
military healthcare provider.  You are free to choose which COVID-19 vaccine to take.  If you
choose a COVID-19 vaccine that requires two doses, you must receive your first dose within five
calendar (5) days upon receipt of this letter and complete the series as prescribed.  If you choose
a one-dose vaccine you must receive the vaccine within five calendar (5) days upon receipt of
this letter.

2.  In line with references (b) through (d), I am designated as the approval authority for requests
for religious accommodation.

3.  Reference (a), the Religious Freedom Restoration Act (RFRA), states that the Government
may substantially burden an individual's exercise of religion only if it demonstrates that
application of the burden to the person is in furtherance of a compelling governmental interest
and is the least restrictive means of furthering that interest.  Reference (b) incorporates the RFRA
and notes that the Government has a compelling interest in mission accomplishment, to include
military readiness, unit cohesion, good order and discipline, health and safety, on both individual
and unit levels.  Additionally, unless it will have an adverse impact on mission accomplishment,
including military readiness, unit cohesion and good order and discipline, the Navy will
accommodate individual expressions of sincerely held beliefs of Sailors.  Reference (f)

Subj:   REQUEST FOR RELIGIOUS ACCOMMODATION THROUGH WAIVER OF
        IMMUNIZATION REQUIREMENTS

emphasizes that only those interests of the highest order can overbalance legitimate claims to the free exercise of religion.

4.   All requests for accommodation of religious practices are assessed on a case-by-case basis. In line with references (b) and (c), determination of a request for religious accommodation requires consideration of the following factors:

   a.   Impact on military readiness, unit cohesion, good order and discipline, health and safety

   b.   Religious importance of the request

   c.   Cumulative impact of repeatedly granting similar requests

   d.   Whether there are alternatives available to meet the requested accommodation and

   e.   How other such requests have been treated

5.   In making this decision, I reviewed reference (g), including the endorsements from your chain of command, the local chaplain and the advice of Chief, Bureau of Medicine and Surgery in reference (h).

   a.   A waiver of immunizations would have a predictable and detrimental effect on your readiness and the readiness of the Sailors who serve alongside you in both operational and non-operational (including training) environments.  Primary prevention of disease through immunizations has been a key enabler for maintaining force health and avoiding disease-related non-battle injury.  Granting your request will have a direct and foreseeable negative impact on the compelling Government interests of military readiness and health of the force.

   b.   While serving in the U.S. Navy, you will inevitably be expected to live and work in close proximity with your shipmates.  I find that disapproval of your request for a waiver of immunization requirements is the least restrictive means available to preserve the Department of Defense's compelling interest in military readiness, mission accomplishment and the health and safety of military Service Members.

6.   The Navy is a specialized community governed by a discipline separate from that of the rest of society.  While every Sailor is welcome to express a religion of choice or none at all, our greater mission sometimes requires reasonable restrictions.  You have my sincere best wishes for your continued success in your Navy career.


                                        JOHN B. NOWELL, JR


Copy to:
OPNAV (N131, N0975)
BUMED

EXHIBIT B



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

1730
Ser N1/118245
24 Feb 22

From:  Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)
To:    LT Daniel J. Franklin, USN
Via:   Commanding Officer, Naval School Explosive Ordnance Disposal

Subj:  REQUEST FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS PRACTICE

Ref:   (a) LT Daniel J. Franklin, USN ltr of 23 Feb 22 w/ends
       (b) BUPERSINST 1730.11A
       (c) DCNO/N1 RA Response ltr of 23 Nov 21
       (d) CNO Appeal RA Response ltr of 15 Feb 22

1.   Your request in reference (a) is denied.  Contrary to your assertion, there have been no substantive changes to the physical environment since your original request and appeal.  The compelling government interest in ensuring mission accomplishment, to include military readiness, unit cohesion, good order and discipline, health and safety, on both individual and unit levels remains the same.

2.   As provided in reference (b), members are afforded the opportunity to renew requests when the physical, operational, or geographical environment in which they work or operate has changed.  In your case, the environment has not materially changed.  Specifically, and as already noted in references (c) and (d), you remain an Explosive Ordnance Disposal officer and an instructor interacting with Sailors.  Further, a waiver of the COVID-19 immunization would continue to have a predictable and detrimental effect on your readiness and the readiness of the Sailors who serve alongside you in both operational and non-operational environments.  Granting your request would still have a direct and foreseeable negative impact on the compelling government interests of military readiness and health of the force.  Finally, while no vaccine is completely effective, vaccines reduce disease incidence and disease severity.

NOWELL.JOHN.BL
ACKWELDER.JR.1
057611835
Digitally signed by
NOWELL.JOHN.BLACKWELDER
JR.1057611835
Date: 2022.02.24 20:43:15 -05'00'

JOHN B. NOWELL, JR

Copy to:
OPNAV (N131, N0975)
BUMED

# EXHIBIT C

From: Rogers, Casey L LCDR USN NAVSCOLEOD EGLIN FL (USA) <casey.l.rogers.mil@us.navy.mil>
Sent: Friday, February 25, 2022 3:41 PM
To: Franklin, Daniel J LT USN (USA) <daniel.j.franklin@navy.mil>
Cc: Beall, Steven Gene CAPT USN NAVSCOLEOD EGLIN FL (USA) <steven.g.beall.mil@us.navy.mil>
Subject: Fw: RELIGIOUS ACCOMMODATION (RA) PACKAGE WITH ENDORSEMENT ICO LT DANIEL J. FRANKLIN

Dan,

Email from the DCNO's office as requested.

V/R,

XO

_____

From: Cua, Diane S CDR USN DCNO N1 (USA) <diane.s.cua.mil@us.navy.mil>
Sent: Friday, February 25, 2022 3:14 PM
To: Stewart, Charles M CIV USN NAVSCOLEOD EGLIN FL (USA) <charles.m.stewart.civ@us.navy.mil>; Katson, Mery Angela Sanabria CAPT USN DCNO N1 (USA) <mery.a.katson.mil@us.navy.mil>
Cc: Rogers, Casey L LCDR USN NAVSCOLEOD EGLIN FL (USA) <casey.l.rogers.mil@us.navy.mil>; Beall, Steven Gene CAPT USN NAVSCOLEOD EGLIN FL (USA) <steven.beall@navy.mil>; 'ALTN_Navy_Religious_Accommodations@navy.mil' <ALTN_Navy_Religious_Accommodations@navy.mil>
Subject: RE: RELIGIOUS ACCOMMODATION (RA) PACKAGE WITH ENDORSEMENT ICO LT DANIEL J. FRANKLIN

Mr. Stewart,

Good afternoon.  Please find attached DCNO N1's response to LT Franklin's request for waiver of policy in support of religious practice. The conditions described do not constitute valid "change[s] in physical, operational or geographical environment." Therefore, the previously adjudicated Religious Accommodation from CNO remains in effect. Request you (or your designee):

(1)    acknowledge receipt of DCNO N1's letter by responding to this email (kindly reply to all above).

(2)    provide DCNO N1's response to LT Franklin.

(3)    update the CCDA database with the appropriate entry. Specifically, change the entry from "unvaccinated, pending religious accommodation" to (NAVADMIN 249/21):

a.    'unvaccinated, vaccination series started but not complete' if the service member initiated the two series vaccination (Pfizer or Moderna), OR

b.    'vaccination series complete, previously reported as unvaccinated' if the service member received

the one shot vaccination (Johnson & Johnson), OR

c.    'unvaccinated, refuser' if the service member decided to not comply with CNO's direction.

Note:  These updates can be made via the My Navy Portal Site:  https://www.mnp.navy.mil/group/navy-covid-19-reporting<https://usg01.safelinks.protection.office365.us/?url=https%3A%2F%2Fwww.mnp.navy.mil%2Fgroup%2Fnavy-covid-19-reporting&data=04%7C01%7Cdaniel.j.franklin5.mil%40us.navy.mil%7Cffcade56e5624e6eb6a308d9f8a77bcf%7Ce3333e00c8774b87b6ad45e942de1750%7C0%7C0%7C637814220483271758%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000&sdata=tUhEgalhoCm5cDayMSBuAH92Su06rroXI1hPnTvPTDM%3D&reserved=0> (NAVADMIN 249/21 pertains).

V/r

Diane

CDR Diane Cua

OPNAV N131B

Deputy Branch Head, Officer Plans and Policy

diane.s.cua.mil@us.navy.mil<mailto:diane.s.cua.mil@us.navy.mil>

Office: (703) 604-5023

# Exhibit 5

JAMES LANKFORD
OKLAHOMA

COMMITTEES:
FINANCE
ENERGY AND NATURAL RESOURCES
INDIAN AFFAIRS
ETHICS
HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS

WASHINGTON OFFICE:
316 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5754

OKLAHOMA CITY OFFICE:
1015 NORTH BROADWAY AVENUE, SUITE 310
OKLAHOMA CITY, OK 73102
(405) 231-4941

TULSA OFFICE:
401 SOUTH BOSTON AVENUE, SUITE 2150
TULSA, OK 74103
(918) 581-7651

## United States Senate

January 25, 2022

The Honorable Lloyd J. Austin
Secretary of Defense
United States Department of Defense
1000 Defense Pentagon
Washington, DC 20301

Dear Secretary Austin:

On behalf of all Americans who are bravely serving in our nation's Armed Forces, I demand an explanation for why the Department of Defense has refused to grant nearly all requests for a religious accommodation for the COVID-19 vaccine, despite having received 19,979 exemption requests across all branches.[1]

My office has repeatedly requested updated data on COVID-19 vaccination rates among our service members from each branch for months, despite facing significant delays, inadequate data, and recycled responses. Although some branches have approved medical and administrative accommodation requests, as of early January, zero religious accommodation requests have been granted in all branches – zero, that is, except for two requests reportedly granted by the U.S. Marine Corps out of 3,367 requests, just days after a federal district court ruled in favor of a Marine seeking a religious exemption, calling the Navy's system for processing accommodations "theater" because not a single exemption had been granted in seven years.[2] More specifically from the information we were able to obtain, despite receiving 2,128 religious exemption requests in its active component, the U.S. Army has approved zero requests. Similarly, the U.S. Navy has received 3,791 and the Air Force has received 10,693 total religious exemption requests, but neither service has approved a single one.

Furthermore, in denial letters that have been shared with my office, the Department often uses discriminatory, boilerplate form letters that misapply the law and discredit the sincerity of religious beliefs. For example, a Marine shared his denial of a religious exemption with me in which the Commanding Officer said that requiring the COVID-19 vaccine "does not substantially burden your sincerely held religious belief." It is inappropriate and legally unnecessary for a Commanding Officer with no legal or spiritual training to adjudicate what substantially burdens the service member's sincerely held religious belief.

It is alarming that the Department is so blatantly disregarding the free exercise of religion that is guaranteed to our military service members, both through the First Amendment and through the Religious Freedom Restoration Act (RFRA) (42 U.S.C. Sec 2000bb-1). Congress chose to apply RFRA to the military, and the military remains accountable to Congress for adhering to this law.

As Judge Reed O'Connor stated in his injunction of the mandate for 26 Navy SEALS who have religious objections to the vaccine in *Navy Seal v. Biden*, our nation "asks the men and women in our military to serve, suffer, and sacrifice. But we do not ask them to lay aside their citizenry and give up the very rights they have

---

[1] This number was provided by the services as of January 21, 2022. The Army would only provide data for Active Duty, and not for the National Guard and Reserve; therefore, these numbers are not represented in the total.

[2] Philip Athey, "2 Marines Receive Religious Exemption to Covid-19 Vaccine," Marine Corps Times (Marine Corps Times, January 13, 2022), https://www.marinecorpstimes.com/news/your-marine-corps/2022/01/13/2-marines-receive-religious-exemption-to-covid-19-vaccine/#:~:text=The%20Marine%20Corps%20has%20granted,to%20receive%20by%20Nov.%2028..e

Pls.' Mot. for Classwide Prelim. Inj. App. 0152

sworn to protect."[3]  He went on to say that "there is no COVID-19 exception to the First Amendment. There is no military exclusion from our Constitution."[4] I would ask that you take swift action to ensure religious liberty is protected and upheld at the Department of Defense.

As you will recall, I first wrote to you about this issue on September 20, 2021 – shortly after the vaccine requirement for military service members was implemented and after evidence surfaced that service members were being discouraged from seeking religious accommodations by their superiors. In that letter, I underscored the urgency and importance of the Department respecting the sincerely-held religious beliefs of service members, and that it was paramount that DOD leadership and each branch work to uphold the constitutional rights of our men and women in uniform.  I also intentionally emphasized the importance of relying on the RFRA, as well as the policy outlined in DOD Instruction (DODI) 1300.17, *Religious Liberty in the Military Services*, which provides specific guidance to clarify that service members may seek religious accommodations from vaccines should they substantially burden their sincerely-held religious beliefs.

After 37 days, I received a response that explicitly stated that the Department will ensure that "religion-based vaccine exemption requests and appeals are respectfully considered."

It has been 90 days since that response, yet the U.S. Army, Navy, Air Force, and Space Force, Active, Guard, and Reserve have still not granted a single religious exemption for the COVID-19 vaccine, while the Marine Corps has granted only two accommodation for individuals who were already in the process to retire. Clearly, religion-based vaccine exemption requests and appeals are not being respectfully considered.

Congress recently spoke to this concern directly in the National Defense Authorization Act for Fiscal Year 2022 (P.L. 117-81), which explicitly called for the establishment of "uniform standards under which covered members may be exempted from receiving an otherwise mandated COVID-19 vaccine for administrative, medical, or religious reasons."

The Department has a constitutional and statutory responsibility to accommodate religious exercise - even exercise it may disagree with or see as negligible. It does not have the legal authority to second-guess the reasonableness of a religious belief or the service member's assessment of the religious connection between the mandate and his or her underlying belief. Further, the Department is required to evaluate all accommodation requests individually to determine whether or not the vaccine mandate is the least restrictive means of burdening that one individual service member's religious belief.

There are currently 2.3 million Active Duty, National Guard, and Reserve service members in the US military, from which less than 20,000 accommodation requests have reportedly been submitted. Correctly applying RFRA and DODI 1300.17 would not mandate that all religious accommodation requests are approved. But to grant a mere two accommodations demonstrates at best a lack of preparedness to properly evaluate requests in accordance with current DOD policies and law. At worst, it betrays an intentional hostility toward religious freedom (one of the core Constitutional protections our military actively serves to protect) that results in the violation of the law.

On January 7, 2022, President Biden, the Commander-in-Chief, stated that religious freedom is a universal and inalienable right."  While I appreciate the claim that the Department will respect religious exercise, those words are meaningless if they are not followed by actions.  These outcomes demonstrate a remarkable disregard for religious freedom and glaring legal deficiencies with the current review process.

---

[3] Navy Seal v. Biden, 4:21-cv-01236-O (N.D. Tex. 2022).
[4] Navy Seal v. Biden, 4:21-cv-01236-O (N.D. Tex. 2022).

In light of this, please fully respond to the following questions and requests:

1. What actions are you taking to ensure all military leaders charged with evaluating accommodation requests are basing such determinations in accordance with RFRA and DODI 1300.17, rather than whether leaders personally affirm the basis for the request?

2. Please provide an assessment of the Department's compliance with RFRA and DODI 1300.17, including an analysis of the compelling government interest and the least restrictive means for carrying that out in light of the denial of religious accommodation requests to date.

3. Has the Department established "uniform standards under which covered members may be exempted from receiving an otherwise mandated COVID-19 vaccine for administrative, medical, or religious reasons," as required by the FY22 NDAA?

It is imperative that you act to protect the constitutional right of religious freedom for all those serving in the armed services. I, along with the men and women serving our nation, eagerly await your reply by February 1, 2022.

In God We Trust,

James Lankford
United States Senator

# Exhibit 6

JAMES LANKFORD
OKLAHOMA

316 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5754

COMMITTEES:
FINANCE
ENERGY AND NATURAL RESOURCES
INDIAN AFFAIRS
ETHICS
HOMELAND SECURITY AND
GOVERNMENTAL AFFAIRS

OKLAHOMA CITY OFFICE:
1015 NORTH BROADWAY AVENUE, SUITE 310
OKLAHOMA CITY, OK 73102
(405) 231-4941

TULSA OFFICE:
401 SOUTH BOSTON AVENUE, SUITE 2150
TULSA, OK 74103
(918) 581-7651

**United States Senate**

February 17, 2022

Mr. Sean O'Donnell
Acting Inspector General
Department of Defense
4800 Mark Center Drive
Alexandria, VA. 22350-1500

Dear Acting Inspector General O'Donnell:

I am writing to request that you conduct an audit into the process for reviewing religious accommodation requests for the Department of Defense (DOD) COVID-19 vaccine mandate.

Congress has a vested interest in ensuring that DOD is upholding the constitutional rights of our men and women in uniform. Such an audit would aid the oversight responsibilities my colleagues and I have to ensure the Pentagon is working to protect the religious liberty of each of our service members.

From the data points on religious accommodations for the COVID-19 vaccine that I have received, it is clear that DOD leaders are ignoring the sincerely-held religious beliefs of service members. Until a few weeks ago, the U.S. military had not approved a single religious accommodation request across all branches. Since then, the Department has informed me they have approved twelve requests—all granted to service members who are already planning to separate from their service—out of thousands of requests. The U.S. Army still has not granted a single permanent religious accommodation despite thousands of requests. Given DOD's track record, it is not unreasonable to presume these adjudications were made in an attempt to establish an outward perception of a just process in response to public outrage, rather than the result of credible analysis.

DOD's religious accommodation approval rate remains below 0.04 percent, which is shocking enough. But the Department has made matters worse by using discriminatory, boilerplate responses in denial letters. Examples shared with my office misapply U.S. law and discredit the sincerity of religious beliefs. In one denial reply shared by a Marine, the Commanding Officer stated that requiring the COVID-19 vaccine "does not substantially burden your sincerely held religious belief."

Commanding Officers with no legal or spiritual training have no right to dictate what substantially burdens a service member's sincerely held religious belief. The Department has a constitutional and statutory responsibility to accommodate religious exercise, even exercise with which it disagrees or views as negligible. DOD does not have the legal authority to second-guess the reasonableness of a religious belief or the service member's assessment of the religious connection between the mandate and his or her underlying belief. Further, the Department is required to evaluate all accommodation requests individually to determine whether or not the vaccine is the least restrictive way of burdening a service member's religious belief.

DOD's evasive replies, incomplete data, and continued delays have sparked considerable outrage on Capitol Hill. With this track record of obfuscation and unclear guidance on religious accommodations,

81) calling for the establishment of "uniform standards under which covered members may be exempted from receiving an otherwise mandated COVID-19 vaccine for administrative, medical, or religious reasons." That directive from Congress should impress upon DOD the seriousness of its behavior, yet no significant improvements have been made.

In light of this troubling fact pattern, I ask that you consider and provide answers to the following questions in an audit:

- What actions is DOD taking to ensure that military leaders who are evaluating religious accommodation requests base such determinations on the Religious Freedom Restoration Act (RFRA) and DOD Instruction (DODI) 1300.17, rather than the personal views of DOD leaders?
- Is the DOD evaluating each accommodation request individually? Please evaluate and provide an analysis on the use of boilerplate responses to accommodation requests.
- Please include an analysis of the medical and administrative accommodation request approvals and denials compared to accommodation requests that are religious.
- Has the Department established "uniform standards under which covered members may be exempted from receiving an otherwise mandated COVID-19 vaccine for administrative, medical, or religious reasons," as required by the FY22 NDAA?
- How does DOD's religious accommodation adjudication process for service members who anticipate remaining in the military for a number of years differ from those who are nearing retirement?
- Were any service members who were discharged following a denied religious accommodation request subjected to a less than honorable discharge?
- Were chaplains who requested a religious accommodation denied? If so, how many and for what reason were they denied?

As the Acting Inspector General, you are uniquely positioned to examine this issue without fear of reprisal, which continues to silence many concerned service members. I urge you to use your authority to investigate DOD's clear disregard for the religious liberties of our men and women in uniform. A full examination of the Department's adjudication process for religious accommodations will only grow more important as the services commence separation.

Thank you for your attention to this matter and I look forward to hearing from you.

In God We Trust,

James Lankford
United States Senator