# Exhibit 1

# HACKER STEPHENS LLP

HEATHER GEBELIN HACKER                                    (512) 399-3022
Partner                                          Heather@HackerStephens.com

December 5, 2022

Lyle W. Cayce, Clerk
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

**Via ECF**

Re: *U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 consolidated with 22-10534

Dear Mr. Cayce,

Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiffs-Appellees submit newly discovered facts and additional authority. As explained in Plaintiffs' briefing, the appeals for numerous class members are still being processed by the Navy. As part of this process, commanding officers have the option to submit endorsements in favor of an appeal.  Attached is an endorsement from a Navy Commander urging the Navy to approve SWCC 3's religious accommodation request, which was received by SWCC 3 on November 16, 2022. In analyzing the Navy's asserted compelling interests, the Commander concludes no such compelling interest exists when SWCC 3's age, fitness, and medical history is considered alongside the marginal benefit of the vaccine to protect individuals against the Omicron variant of the virus, which now accounts for most COVID-19 infections. The Commander also concludes that the mandate is not the least restrictive means of accomplishing the Navy's interest because natural immunity, masking, and good hygiene are less restrictive alternatives. Indeed, according to the Commander, enforcing the mandate will result in the loss of personnel necessary for accomplishing the Commander's mission. This endorsement further illustrates that the Navy has failed to satisfy RFRA's rigorous standard.

Counsel also points the Court to the recent decision in *Doster v. Kendall*, No. 22-3497/3702, 2022 WL 17261374 (6th Cir. Nov. 29, 2022). In *Doster,* a unanimous panel of the Sixth Circuit upheld preliminary injunctions for both individual Air Force servicemembers and a class of Air Force servicemembers. The court determined that abstention is inappropriate, the action is ripe for judicial review, the

*U.S. Navy SEALs 1-26 v. Biden*, No. 22-10077 consolidated with 22-10534
Page 2

servicemembers are likely to succeed on the merits of their RFRA claims, and that the other requirements for injunctive relief are met. The Sixth Circuit noted that the Air Force (like the Navy here) asked it "to read RFRA as if it simply codified the 'great deference' that the Supreme Court had previously given to the military under the Free Exercise Clause. . . . We see no textual path to that result." *Id.* at *19 (citations omitted).

Sincerely,

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
Counsel for Plaintiffs-Appellees

Encl: Endorsement

cc: All counsel of record via ECF

DEPARTMENT OF THE NAVY
NAVAL SPECIAL WARFARE GROUP ELEVEN
3322 GUADALCANAL ROAD BUILDING 309
SAN DIEGO CA 92155-5094

1732
Ser N00/105
5 Oct 22

SECOND ENDORSEMENT on SWCC 3

From:  Commander, Naval Special Warfare Group ELEVEN
To:    Chief of Naval Operations
Via:   Deputy Chief of Naval Operations (Manpower, Personnel, Training and Education) (N1)

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

Ref:   (a) 42 U.S.C 2000bb-1
       (b) ALNAV 062/21
       (c) "Summary of Guidance for Minimizing the Impact of COVID-19 on Individual
           Persons, Communities, and Health Care Systems," Centers for Disease Control and
           Prevention, 11 August 2022
       (d) Bardosh, Kevin, et al, "COVID-19 Vaccine Boosters for Young Adults: A Risk
           Benefit Assessment and Five Ethical Arguments against Mandates at Universities,"
           SSRN, 12 September 2022
       (e) Stein, Rob, "Scientists debate how lethal COVID is. Some say it's now less risk than
           flu," National Public Radio, 16 September 2022
       (f) LCDR Ruth Link-Gelles, "Updates on COVID-19 Vaccine Effectiveness during
           Omicron," Centers for Disease Control and Prevention, 1 September 2022
       (g) BUMED ltr 6320 Ser M44/21UM401 of 22 Sep 21
       (h) BUMED ltr 6320 Ser M44/21UM42355 of 10 Nov 21
       (i) BUMED ltr 6320 Ser M44/22UM401 of 15 Jun 22
       (j) "COVID-19 Situation Update: COVID-19 Vaccine Breakthrough Data," Minnesota
           Department of Health
       (k) "Weekly Epidemiology and Surveillance Report," Oklahoma State Department of
           Health, 26 June – 2 July 2022
       (l) "Rhode Island COVID-19 Breakthrough Data," Rhode Island Department of Health
       (m) "COVID-19 Data" dashboard, Utah Department of Health & Human Services
       (n) "Quarterly COVID-19 Update: Hospitalizations, Deaths, Repeat, and Vaccine
           Breakthrough Infections," The Section of Epidemiology, Alaska Division of Public
           Health, March 2022
       (o) "South Dakota COVID-19 Dashboard," South Dakota Department of Health, June
           2022.
       (p) "Estimated COVID-19 Burden," Centers for Disease Control and Prevention, 12
           August 2022
       (q) Sharff, Katie A., et al, "Risk of myopericarditis following COVID-19 mRNA
           vaccination in a large integrated health system: A comparison of completeness and

3

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

   timeliness of two methods," *Pharmacoepidemiology and Drug Safety*, 16 April 2022
(r) Buchan, Sarah A., et al, "Epidemiology of Myocarditis and Pericarditis Following
    mRNA Vaccination by Vaccine Product, Schedule, and Interdose Interval Among
    Adolescents and Adults in Ontario, Canada," *JAMA Network Open*, 24 June 2022
(s) Dr. Guy Witberg, et al., "Myocarditis after Covid-19 Vaccination in a Large Health
    Care Organization," *New England Journal of Medicine*, 21 December 2021
(t) Patone, Martina, et al, "Risk of Myocarditis After Sequential Doses of COVID-19
    Vaccine and SARS-CoV-2 Infection by Age and Sex," *Circulation*, 22 August 2022
(u) Dr. Dror Mevorach, et al, "Myocarditis after BNT162b2 mRNA Vaccine against
    Covid-19 in Israel," *New England Journal of Medicine*, 2 December 2021
(v) "COVID-19 infection poses higher risk for myocarditis than vaccines," *American
    Heart Association News*, 22 August 2022
(w) Diaz, George A., et al, "Myocarditis and Pericarditis After Vaccination for COVID
    19," *JAMA Network*, 4 August 2021
(x) Fraiman, Joseph, et al, "Serious adverse events of special interest following mRNA
    COVID-19 vaccination in randomized trials in adults," *Science Direct*, 22 September
    22
(y) Under Secretary of Defense for Personnel and Readiness (USD(PR)) Memo,
    Consolidated Department of Defense Coronavirus Disease 2019 Force Health
    Protection Guidance
(z) NAVADMIN 130/22
(aa) Leon, Tomas M., et al, "COVID-19 Cases and Hospitalizations by COVID-19
    Vaccination Status and Previous COVID-19 Diagnosis – California and New York,
    May – November 2021," *Morbidity and Mortality Weekly Report*, Centers for
    Disease Control and Prevention, 28 January 2022
(bb) Dr. Kristie E. Clarke, et al, "Seroprevalence of Infection-Induced SARS-CoV-2
    Antibodies – United States, September 2021-February 2022," *Morbidity and
    Mortality Weekly Report*, Centers for Disease Control and Prevention, 26 April 2022
(cc) Pilz, Stefan, et al, "SARS-CoV-2 reinfections: Overview of efficacy and duration of
    natural and hybrid immunity," *Environmental Research*, June 2022
(dd) Wei, Jia, et al, "Antibody responses and correlates of protection in the general
    population after two doses of the ChAdOx1 or BNT162b2 vaccines," *Nature
    Medicine*, 14 February 2022
(ee) Nordström, Peter, et al, "Risk of SARS-CoV-2 reinfection and COVID-19
    hospitalisation in individuals with natural and hybrid immunity: a retrospective, total
    population cohort study in Sweden," *The Lancet: Infectious Diseases*, 31 March
    2022
(ff) Dr. Paul A. Offit, "Covid-19 Boosters – Where from Here?", *New England Journal
    of Medicine*, 28 April 2022
(gg) Dr. Heba N. Altarawneh, et al, "Effects of Previous Infection and Vaccination on
    Symptomatic Omicron Infections," *New England Journal of Medicine*, 7 July 2022
(hh) Al-Aly, Zihad, et al, "Long COVID after breakthrough SARS-CoV-2 infection,"
    *Nature  Medicine*, 25 May 2022.


Encl:  (1) Religious Accommodations Step-by-Step Instructions
       (2) NSWG-11 COVID-19 Infection Tracker
       (3) Israel:  Coronavirus Pandemic Country Profile

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

  (4) Iceland:  Coronavirus Pandemic Country Profile
  (5) Nyberg, Tommy, et al, "Comparative analysis of the risks of hospitalization and death
      associated with SARS-CoV-2 omicron (B.1.1.529) and delta (B.1.617.2) variants in
      England: (a cohort study)," *The Lancet*, 16 Mar 2022
  (6) Appendices to Enclosure (5)
  (7) Adjei, Stacey, et al, "Mortality Risk Among Patients Hospitalized Primarily for
      COVID-19 During the Omicron and Delta Variant Pandemic Periods – United States,
      April 2020 – June 2022," Centers for Disease Control and Prevention, 16 September
      2022
  (8) "Risk for COVID-19 Infection, Hospitalization, and Death by Age Group," Centers
      For Disease Control and Prevention, 16 September 2022.
  (9) Email from Matthew J. Wallock, dtd 2 August 2022
  (10) Idaho COVID-19 Events by Vaccination Schedule
  (11) Kentucky COVID-19 Data by Vaccination Schedule
  (12) Vermont COVID-19 Breakthrough Data
  (13) Mississippi Vaccination Report
  (14) Louisiana COVID-19 Dashboard Snapshot
  (15) NSW RC Retention Survey Results, August 2022
  (16) Dr. Sivan Gazit, et al, "Comparing SARS-CoV-2 Natural Immunity to Vaccine
      Induced Immunity: Reinfections Versus Breakthrough Infections"
  (17) Kulldorff, Martin, "A Review and Autopsy of Two COVID Immunity Studies," 2
      November 2021
  (18) Centers for Disease Control and Prevention (CDC) Letter dtd 05 Nov 2021

1.  **Executive Summary:**  I acknowledge up front the length of this endorsement.  This is owed
to several reasons:

    a.  This is SWCC 3 's final administrative opportunity for accommodation of his religious
beliefs, and I believe it is my responsibility to comprehensively and accurately address this
matter.

    b.  The law requires a good faith, case-by-case review.

    c.  My force, the Naval Special Warfare Reserve Component, is grappling with retention
challenges due in part to the manner in which religious accommodation requests like that from
SWCC 3 have thus far been processed and adjudicated by the Navy.  For mission-related
reasons subsequently discussed, I cannot afford to lose more quality Sailors.

I take no comfort in my role in this process, which effectively places me between well-
intentioned Navy and DoD policies addressing unvaccinated Sailors and the duly enacted law of
the land that outlines a standard which, when applied in SWCC 3 's *specific* case, dictates an
outcome contrary to that contemplated by the Navy's more generalized policies.  I believe my
role in this process is twofold: 1) to carry out Navy policy and the orders of those above me; and,
2) to honestly apply the law – the Religious Freedom Restoration Act (RFRA) – to the specific
facts on the ground and, as the NSW commander closest to this Sailor, his unit, and the
operational requirements he is needed to fill, to candidly communicate my ground-level
observations.  I do not take this role – nor my charge of command and oath – lightly, and I hope

5

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

this lengthy, cumbersome document – which has been staffed, re-staffed, and then staffed some
more – evidences the seriousness with which I approach this matter. Further, I sincerely hope
the forthcoming analysis and ground-level detail on **SWCC 3**, his unit, my force, and my
manning challenges illuminates a path to reconcile our considerable efforts to foster a diverse
and inclusive force with our interests to protect the health and safety of that force.

2.  **Standard of Review:** I initially reviewed and endorsed **SWCC 3** 's request for religious
accommodation on 15 December 2021.  I carefully applied the guidance in the Religious
Freedom Restoration Act (RFRA) and implementing DOD, SECNAV, and BUPERS
instructions, which led to the conclusion that approval of his request was justified by both fact
and law.  Now, reviewing **SWCC 3** 's appeal with nine months' worth of additional data and
observations to inform my decision-making and recommendations, the grounds justifying
approval of his religious exemption request are even stronger.  To be clear, I have personally
recommended that all my teammates, including **SWCC 3**, get one of the COVID shots.  Alas,
my personal preferences must subordinate to the Constitution – to which I have repeatedly sworn
an oath – and must acquiesce to the duly-enacted laws of the nation, passed by Congress and
signed by the President.  In **SWCC 3** 's case, the governing law is RFRA, passed with bipartisan
support in the House and then by a 97-3 vote in the Senate before being signed into law by
President Clinton in November 1993.  Drafted and passed with the express purpose of bolstering
the Constitution's protections of the Free Exercise of religion against government intrusions[1],
this unambiguous and purposefully-crafted statute places the burden of proof *on the government*
– defined to encompass every "branch, department, agency, instrumentality, and official (or other
person acting under color of law) of the United States" – when government action or mandate
substantially burdens a citizen's First Amendment rights to free religious exercise.  RFRA
forbids any substantial government burden on an individual's Free Exercise unless *the
government* "demonstrates" the substantial burden it's imposing (1) "is in furtherance of a
compelling government interest" and (2) "is the least restrictive means of furthering that
compelling government interest."  Underscoring that the burden of proof rests on the
government, not the individual, RFRA defines "demonstrates" as "meets the burdens of going
forward with the evidence and of persuasion."

3.  Case law further underscores that the government's charge under RFRA is considerable, and
the bar it must clear to substantially burden an individual's free exercise rights is high.  As the
Supreme Court has reiterated, RFRA affords even "greater protection for religious exercise than
is available under the First Amendment" and provides that the "Government may substantially
burden a person's exercise of religion only if it demonstrates that application of the burden to the
person—(1) is in furtherance of a compelling governmental interest; and (2) is the least
restrictive means of furthering that compelling governmental interest."  *Holt v. Hobbs*, 574 U.S.
352, 357 (2015).  Once an individual entitled to the protections of RFRA – as **SWCC 3**
unquestionably is – demonstrates a substantial burden on his exercise of religion – as he
unquestionably has – "RFRA requires the Government to demonstrate that the compelling
interest test is satisfied through application of the challenged law 'to the person' – the particular
claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O*

---

[1] Expressly-stated in the statute, reference (a), RFRA is intended "(1) to restore the compelling interest test…in all
cases where free exercise of religion is substantially burdened[] and (2) to provide a claim or defense to persons
whose religious exercise is substantially burdened by government."

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

*Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-431 (2006). By focusing on
"the burden to the person," RFRA's burden of proof requires the government justify its action or
policies burdening Free Exercise not with generalizations and conclusory statements about its
compelling interests or about, broadly, the absence of less restrictive means to further those
interests. "RFRA demands a 'more focused' inquiry and requires scrutiny of the ''marginal
interest in enforcing' the challenged government action in that particular context. *Colonel
Financial Management Officer v. Austin*, 8:22-CV-1275-SDM-TGW (M.D. Fla. Aug. 18, 2022)
(citing *Holt*, 574 U.S. at 363 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694-95
(2014))). Applying the court's admonition from an ongoing case concerning the Marine Corp's
discharge of its RFRA obligations to the present matter, "RFRA requires in practice that the
[Navy] articulate – that is, display for informed review – the [Navy's] calculation of the extent of
the adverse effect on the health and readiness of the force that results from allowing a *particular*
[Sailor] to faithfully observe the [Sailor]'s sincere religious belief while serving any reasonable
health and safety practice the [Navy] might prescribe and explain why incurring that marginal
adverse effect unacceptably impairs some compelling governmental interest." *Colonel Financial
Management Officer v. Austin*, 8:22-CV-1275-SDM-TGW (M.D. Fla. Aug. 18, 2022) (emphasis
mine).



4.  While I *personally* disagree with **SWCC 3**'s calculus on the SARS-CoV-2 shots and while I
do not fully understand all of his religious beliefs, I respect them and their constitutional
protection. Furthermore, I have no reason to question the veracity and deep-seated nature of **SWCC 3**
            's religious convictions nor the religious grounding of his objection to compelled
inoculation, noting simply that a respected military chaplain supporting
            has assessed and confirmed the religious sincerity of his objection. As such, the
ensuing question is whether the Navy's requirement that **SWCC 3** receive an approved
COVID-19 pharmaceutical intervention *substantially burdens* his First Amendment rights to free
exercise of his Christian faith. The government burdens the free exercise of religion when it
"put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."
*Thomas v. Rev. Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981). Indeed, substantial
burden is "inescapable [where the] law affirmatively compels [an individual], under threat of
criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious
beliefs," *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972), where the government forced an
individual to choose between their job and their religious beliefs, *see Sherbert v. Verner*, 374
U.S. 398, 404 (1963), and, where an individual is "coerced to act contrary to their religious
beliefs by threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d
1058, 1069-70 (9th Cir. 2008). "Of course, the injection into the body of a substance against
which **SWCC 3** harbors a sincere religious objection…burdens Free Exercise. And the
burden is substantial…because the order to accept injection of the vaccine forces [him] to choose
between betraying a sincere religious conviction and suffering court martial or separation from
the military" along with an array of collateral consequences including, but not limited to,
severance of his and his family's entitlement to valuable medical benefits and of the opportunity
to realize a retirement pension. *Colonel Financial Management Officer* at 33-34.

5.  Because the choice forced upon **SWCC 3** – to violate his sincerely held religious
convictions or surrender his career as a Navy Reservist along with its accompanying entitlements
– substantially burdens his religious exercise, the government must demonstrate that placing this
burden on **SWCC 3** both furthers a compelling government interest and does so by the least

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

restrictive means. Before addressing whether these tests are satisfied "to the person" of ███
███ specifically, I would be remiss to not address the manner in which the Navy, generally,
has processed not just **SWCC 3** 's religious accommodation request but, by all indications,
those of the over 40 service members supporting my claimancy who similarly sought the
protection of RFRA and petitioned for accommodation of their Free Exercise rights. Whereas an
"individualized assessment" of each religious accommodation applicant is required in
discharging the compelling interest and least-restrictive means tests, the Chief of Naval
Personnel (CNP) has, per public reports, denied every one of the thousands of religiously-based
exemption requests of Navy service members, apparently while utilizing a SOP (enclosure (1))
that directed creation of a *disapproval* letter draft before a servicemember's request was even
read. I recognize the difficulty of the task faced by the Chief of Naval Personnel (CNP) and
subordinate Religious Accommodations staff, which I have to assume was not staffed as
necessary to process *thousands* of requests, such as **SWCC 3** 's. I understand the time-intensity
and nuance required to afford each and every request the individualized examination and good
faith analysis required by RFRA – and to make an individualized, fact-based assessment of "not
whether [the Navy has] a compelling interest in enforcing its [vaccination] policies generally, but
whether it has such an interest in denying an exception to [each individual Sailor, like ███
███ who made an actionable request]." *Fulton*, 141 S. Ct. at 1881. But, that is what the law –
and our own implementing instructions – requires. As recently as 2020, Justice Alito
emphasized that the government has a "high bar" to clear in RFRA cases. The Supreme Court
and federal appellate courts have repeatedly emphasized that the bar is raised even higher
"[w]here a regulation already provides an exception from the law for a particular group[.]"
*McAllen Grace Brethern Church v. Salazar*, 764 F.3d 465, 472 (5th Cir. 2014) (citations
omitted); *see also Fulton v. City of Phila.*, 141 S. Ct. 1868, 1878-83. I fear that is precisely the
situation at play here, where the Navy has granted hundreds of temporary or permanent medical
exemptions – and exempted, at least temporarily, those who participated in clinical trials, even
those in the control group – while summarily denying those petitioners seeking accommodation
under the First Amendment and RFRA.

6.  Having established that the Navy's requirement to receive an FDA-approved SARS-CoV-2
pharmaceutical intervention substantially burdens **SWCC 3** 's First Amendment rights to free
exercise of religion, we must next ask whether enforcing this requirement, *against* **SWCC 3**
*specifically*, furthers a compelling government interest. Although not explicitly defined in this
context, "compelling" has often been described as "essential" or "necessary" rather than a matter
of choice, preference, or discretion. *See Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) ("Such
classifications are subject to the most exacting scrutiny; to pass constitutional muster, they must
be justified by a compelling governmental interest and must be 'necessary…to the
accomplishment' of their legitimate purpose," *citing McLaughlin v. Florida*, 379 U.S. 184, 196
(1964).) (In the context of the Free Exercise of religion, the Court in *Wisconsin v. Yoder* allowed
Amish parents to withdraw their children from school at age fourteen, despite the state requiring
school attendance until sixteen, finding that the state's interest in an additional two years of
education, and the benefits therefrom, was not compelling enough to burden the free practice of
religion. 406 U.S. 205 (1972).)

7.  Since the emergence of COVID-19 in 2020 and the 2021 mandate (reference (b)) that all
Sailors "be fully vaccinated…with an FDA approved vaccination against COVID-19," Senior
Navy officials have, as justification for mandated inoculation, at various times invoked a number

8

Subj: APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
     PRACTICE

of compelling government interests, often in broad terms, which could generally be categorized
as follows:

    a.  the health and safety of the *force*,

    b.  the health and safety of the individual *Sailor*, and

    c.  organizational readiness, unit cohesion, and mission accomplishment.

As noted in paragraph (3), above, "RFRA, however, contemplates a 'more focused' inquiry: It
'requires the Government to demonstrate that the compelling interest test is satisfied through
application of the challenged law 'to the person'—the particular claimant whose sincere exercise
of religion is being substantially burdened." *Burwell*, 573 U.S., at 694-95, *citing O Centro*, 546
U.S., at 430-431 (quoting [RFRA]). "This requires us to 'loo[k] beyond broadly formulated
interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular
religious claimants]—in other words, to look to the marginal interest in enforcing the
[government] mandate." *Id., citing O Centro*, supra, at 431.

8. **Does the Navy's requirement *that*** SWCC 3 **, *specifically*, receive an injection with one
of the COVID-19 pharmaceuticals further a *compelling* Navy interest in the health and
safety of the force – that is, of** SWCC 3 **'s shipmates?** Is it *necessary* that SWCC 3 receive
one of these drugs – over his sincere religious objection – to protect the health and safety of the
force? While I readily acknowledge the Navy's interest in protecting the "health and safety of
the force," and have previously recommended denial of a number of religious accommodation
requests on these grounds, I must also recognize the evolving factual reality of the virus.
Whereas in the initial weeks of the vaccines' rollout one could argue that mandatory injection of
the Pfizer-Biontech or Moderna pharmaceuticals furthered the Navy's compelling government
interest in health and safety by curtailing infection and spread of SARS-CoV-2, Omicron and the
growing body of data now available has voided that narrative.

CUI // HIPAA

Subj: APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
PRACTICE

9. As the CDC metrics below unambiguously illustrate, Omicron has crowded out Delta and all
other strains of the SARS-CoV-2 virus; it is not only the dominant variant, but effectively, the
sole variant currently active in our country and almost every country on Earth. Any new cases of
non-Omicron variants no longer register in the CDC's national data. And, as Omicron has
asserted dominance, it has become irrefutably clear that the vaccines do little to reduce the
transmission of the disease. In lieu of painstakingly cataloging the wealth of evidence
illustrating the futility of the currently-available vaccinations against Omicron infection, I'll add
a more personal anecdote. Every senior member of this command – including the triad and
every individual on the review chain for this correspondence – has recently caught, and
recovered from, Omicron. We had all received double doses (or more) of the same
pharmaceuticals **SWCC 3** seeks exemption from taking, but all of our interventions –



pharmaceutical and otherwise – were impotent against such a contagious and vaccine-resistant
virus. Enclosure (2) tracks the COVID-19 infections and vaccination status of personnel in our
small Headquarters element – hardly an endorsement for the efficacy of the vaccines in
preventing infection, and impossible to ignore when honestly assessing whether compelled
injection of Sailors like **SWCC 3** is necessary to protect his fellow Sailors.

10. Mirroring the anecdotal conclusions unavoidably drawn from Naval Special Warfare Group
ELEVEN's (NSWG-11) infection data (and that of my subordinate SEAL Teams), reference (c)
emphasizes "it is increasingly clear that current vaccines provide, at most, partial and transient
protection against infection, which decreases precipitously after a few months, with secondary
transmission largely unaffected (in other words: an infected vaccinated person poses similar risks
to others as an infected unvaccinated person). The CDC states: 'anyone with Omicron infection,
regardless of vaccination status or whether or not they have symptoms, can spread the virus to
others.' It is therefore inaccurate to infer a sustained or long-term reduction in transmission from
a short-term reduction in infection." Beyond the numerous studies making this point, a multitude

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

of real world case data has reflected, and public health and pharmaceutical authorities have
admitted, the inefficacy of the COVID-19 vaccines in preventing infection. For instance, despite
being hailed as one of the most vaccinated (and "boosted") nations on Earth, Israel saw its
largest ever case counts as Omicron spread throughout its borders. Despite a supermajority of its
population vaccinated with the same Pfizer-Biontech formula mandated upon SWCC 3 , Israel
nevertheless saw its infection counts surge more than ten-fold the numbers of any prior wave,
including waves before any SARS-CoV-2 shots were available (Enclosure (2)). In Iceland, an
island nation with over 93% of adults vaccinated and 70% "boosted," Omicron ushered in a
32,611% surge in cases since May 2021, when our nation's Director of the National Institution
of Allergy and Infectious Diseases remarked that if 70% of adults receive at least a single
vaccination dose, "the chances of a surge are extraordinarily low." (Enclosure (3)). My intent in
rehashing statements like this is to illustrate just how comprehensively Omicron has changed the
public health landscape and upended guidance and recommendations that were once considered
almost axiomatic. Even vaccine manufacturers have conceded this: "We know that the two
doses of the [Pfizer-Biontech] vaccine offer very limited protection, if any [from disease
*transmission*]." That statement was made in a Yahoo Finance TV interview on 11 January 2022
by Albert Bourla, the CEO of Pfizer. Two days earlier, in an interview on CNN, Rochelle
Wolinsky, Director of the CDC, conceded, "What [the vaccines] can't do anymore is prevent
transmission." Why would the Navy suggest otherwise?

11. To maintain the trust and confidence of my subordinates, it is critical I speak truthfully and
rationally, particularly in matters impacting their personal health and safety and their unalienable
liberties. Bearing this in mind, I note that dozens of Sailors in my claimancy have already
submitted religious exemption requests and received virtually identically worded digitally-signed
letters from the Chief of Naval Personnel disapproving those requests. Suggesting that Sailors
like SWCC 3 disproportionately risk spreading COVID-19 to their shipmates, these
disapproval letters all argue that "a waiver of immunizations would have a predictable and
detrimental effect on your readiness *and the readiness of the Sailors who serve alongside you*"
and that "you will inevitably be expected to live and work in close proximity with your
shipmates." Further, some of my Sailors requested and received copies of the documentation
ostensibly undergirding those disapproval decisions and boilerplate letters[2]. Even as Omicron
continued to spread and grow in dominance, I noticed a static focus on the notion that the Pfizer-
Biontech phamaceutical prevents the spread of SARS-CoV-2 and *conveys immunity*. For
instance, one of my claimancy Sailors, whose religious accommodation request was disapproved
after Omicron had become the dominant strain, received "board notes" containing this paragraph
articulating why compelled injection is, apparently, the only viable tool to prevent the spread of,
or infection with, SARS-CoV-2: "*All alternative measures for preventing spread of disease are
insufficient due to unique circumstances in naval service. Vaccination is the only viable option
for achieving the compelling interest. Immunity is not instantaneous, and Sailors assigned to
shore must be ready to deploy at a moment's notice*." Suggesting the approved vaccines convey
immunity and prevent spread of disease, this assertion is not simply outdated, it's observably
false when applied to Omicron. While one might credibly argue the vaccines offer some
marginal therapeutic benefit in the event a service member subsequently contracts the virus (and

---

[2] SWCC 3 notes in his appeal that he has not received decisional documentation relating to the denial of his
religious accommodation. He argues, "[t]his severely limits my ability to appeal my denial because I do not know
what it is that I am appealing or on what grounds my request was denied."

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

this would need to be an individually-tailored assessment, not one applied broadly to all Sailors, each with their own unique health characteristics and differing levels of immune protection), any such benefit is an *individual* benefit, not a *collective* benefit.[3]

12.  The evidence is manifest and unambiguous that, at present, Omicron *is* COVID. It is, for all intents and purposes, the only variant posing infection risk to my Sailors – *all* my Sailors, regardless of vaccination status. Given the widely acknowledged inefficacy of the vaccines in conveying immunity and stopping the spread of COVID-19, the Navy does not have a compelling interest in forcing SWCC 3 to receive one of these drugs, in violation of his religious beliefs, in the name of protecting the health and safety of his fellow service members.

13.  **Does the Navy's requirement *that* SWCC 3 , *specifically*, receive an injection with one of the COVID-19 pharmaceuticals further a compelling Navy interest in protecting his health and safety?** Stated another way, is it *necessary* that SWCC 3 receive one of these drugs – over his sincere religious objection – to protect *his own* health and safety? In answering this question, RFRA requires an "individualized assessment," an honest analysis – *to the person,* SWCC 3 – of the marginal risk of remaining unvaccinated. Generalized statements that the vaccines are effective at reducing COVID case severity, hospitalization, and death rates have been repeated regularly by DON personnel. Perhaps these statements are accurate in many situations and for many individuals, yet RFRA requires more. Just how much risk to SWCC 3 , a 28 year-old and a member of one of the most elite and healthy communities in the entire Navy, is there from the relatively-mild Omicron variant and its dominant strain, BA.5? Noting that the CDC's 11 August 2022 guidance aligned with the findings of over two hundred medical studies in acknowledging that "persons who have had COVID-19 but are not vaccinated have some degree of protection against severe illness from their previous infection," reference (f), to what degree is this risk (which statistically is very small for a healthy male of SWCC 3 's age) even further mitigated by the protection provided by his prior SARS-CoV-2 infection? When SWCC3 's original request for accommodation was denied, was his level of fitness properly assessed and weighed, as RFRA requires? His personal health? His assignment? His body fat percentage? Was whether his young age, sex, athletic background, and prior infection might render him more vulnerable to certain known complications or adverse events from the vaccines properly assessed and weighed?

14.  Stated another way, for the Navy to have a compelling interest in forcing SWCC 3 's injection at the expense of his Constitutional right to free exercise, RFRA effectively requires a risk-benefit analysis.[4] Just how great is the current risk posed *to* SWCC 3 by COVID re-

---

[3] Additionally, "[t]o be ethically acceptable, such severe restrictions of individual liberty [i.e., mandated vaccination under threat of employment loss] need to be justified not only by an individual benefit but by the expectation that vaccination reduces harm to others. Booster doses of Covid-19 vaccines provide no lasting reduction in the probability of infection or transmission[] and extremely low expected benefits to young healthy individuals, especially those who have already been infected.[] The expected harms to individuals and the harms of coercive mandates themselves are not counterbalanced by a large public health benefit; such harms and restrictions of liberty are therefore disproportionate and ethically unjustifiable…. The arguments presented above are relevant not only to [] booster mandates but also to [] policies that maintain primary two-dose Covid-19 vaccine mandates in 2022 in the face of high rates of previous SARS-CoV-2 infection" (Reference (d)).

[4] In addition to RFRA effectively requiring a risk-benefit analysis, such an analysis also has strong ethical underpinnings. "There is an even stronger rationale for thorough and transparent risk-benefit assessment when interventions are mandated or when (given uncertainty or relevant population differences) some people might face

infection? Just how great is the benefit these injections would provide *to* **SWCC 3** ? Are these risks and benefits considerable enough to justify the irreparable harm that would result from infringing on his religious liberties?[5, 6] I do not believe they are. Whatever possible benefits injection may have on **SWCC 3** , a young, fit, healthy Special Warfare Combatant Crewman who has already contracted and recovered[7] from SARS-CoV-2, these are outweighed by the irreparable injury of betraying his sincerely held religious beliefs.

15. Just how great is the risk to **SWCC 3** currently posed by SARS-CoV-2? With nearly 10 months of Omicron data to inform, there is no question that Omicron poses *much less* risk to those infected compared to the Delta, Alpha, or original viral strains. The body of evidence unambiguously reaching this conclusion is considerable; one such study, published in *The Lancet*, provides valuable insights stratified by age and prior vaccination status (Enclosure (5)[8]). For those in **SWCC 3** 's age range (20-29), the hospital admission rate from Omicron infection was 0.60%, and the death rate 0.002% (Enclosure (6), Table S4). While these numbers do not differentiate between vaccinated and unvaccinated populations, they similarly do not differentiate between those with natural immunity and those without, nor do they account for the underlying health, fitness, and co-morbidities (or lack thereof) of those within this age band. These data limitations notwithstanding, the study offers conclusive findings on the relative lack of severity of Omicron compared to earlier strains, the vaccine resistance of Omicron, and the considerable benefits of natural immunity.

16. The study's authors summarize its findings as follows: "The risk of severe outcomes following SARS-CoV-2 infection is substantially lower for omicron than for delta, with higher reductions for more severe endpoints and significant variation with age. Underlying the observed risks is a large reduction in intrinsic severity (in unvaccinated individuals) counterbalanced by a reduction in vaccine effectiveness. Documented previous SARS-CoV-2 infection offered some protections against hospitalization and high protection against death in unvaccinated individuals…." Regarding the finding estimating larger severity reductions for Omicron compared with Delta, the authors note this "agrees with observations that the proportion of hospitalized COVID-19 patients requiring intensive care or mechanical ventilation (or both) has been substantially lower during the omicron wave… than the preceding delta wave. The 80% overall reduction in the intrinsic risk of death that we estimate for omicron infection

---

harms not outweighed by individual benefits. In such cases, risk-benefit assessments should be stratified by demographic factors and updated as new data become available to reduce uncertainty" (Reference (d)).
[5] "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).
[6] A Sailor objecting to vaccination on Free Exercise grounds suffers harm when the Navy "puts [the objector] to this choice": violate his religious beliefs or "face serious disciplinary action." *Holt*, 574 U.S. at 361
[7] "It is not clear whether vaccination of previously infected individuals provides any meaningful benefits with respect to severe disease, especially for healthy young people…. [W]e maintain that if mandates remain then there is an ethical obligation…to provide evidence that the intervention confers an expected net benefit to individuals younger than 40 years in the context of the prevailing SARS-CoV-2 variants and pre-existing immunity. Without this, it is problematic to simply claim that Covid-19 vaccines are 'safe and effective' without specific risk-benefit analyses for different age categories and with consideration for individual health status, including evidence of prior infection, because risks of both disease and vaccination are highly variable according to these factors" (Reference (d)).
[8] At the time of its publication, this was the "largest national study quantifying the risk of hospitalization or death after infection with omicron compared with delta, based on individual-level data on 1,516,702 COVID-19 cases, of whom 1,067,859 were infected with the omicron variant."

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

compared with that of delta will make the goal of living with COVID-19 in the absence of
socially and economically disruptive public health interventions substantially easier to achieve at
the current time." Further, the study "estimated a larger reduction (comparing omicron with
delta) in the risk of hospitalization and death in unvaccinated cases than for all cases []…. The
relative risk of hospitalization or death in vaccinated cases compared with unvaccinated cases
was lower for delta cases than for omicron cases []. These estimates indicate that the overall
observed reductions in hospitalization and mortality risk understate the intrinsic reduction in the
risk of severe infection outcomes associated with the delta to omicron transition, due to those
reductions being partially counteracted by reductions in vaccine effectiveness." Addressing the
protection provided by natural immunity, the study notes: "In unvaccinated cases, documented
past infection provides moderate protection against hospitalization and higher protection against
death…. An imputation-based sensitivity analysis to examine the effect of under-ascertainment
of past infections gave…estimates indicating a larger protective effect of past infection against
all endpoints for unvaccinated individuals, and against hospital admission and death in
vaccinated individuals."

17. The government's interest was at its most compelling when the risk from the disease was at
its most pronounced. Just this week, the CDC published data underscoring just how much lower
the risk from the weaker current subvariants is compared with the virus we were dealing with at
the time the Navy's vaccine mandate was instituted (Enclosure (7)[9]). "Using [data from 678
hospitals], CDC assessed in-hospital mortality risk overall and by demographic and clinical
characteristics during the Delta (July-October 2021), early Omicron (January-March 2022), and
later Omicron (April-June 2022) variant periods among patients hospitalized primarily for

---

[9] Importantly, this report filtered out deaths from other causes in order to isolate mortality rates for those individuals
hospitalized "primarily for COVID-19." Many reputable immunologists and researchers argue "that the daily death
toll attributed to COVID is exaggerated because many deaths blamed on the disease are actually from other causes.
Some of the people who died for other reasons happened to also test positive for the coronavirus. 'We are now
seeing consistently that more than 70% of our COVID hospitalizations are in that category,' says Dr. Shira Doron,
an infectious disease specialist at the Tufts Medical Center and a professor at the Tufts University School of
Medicine. 'If you're counting them all as hospitalizations, and then those people die and you count them all as
COVID deaths, you are pretty dramatically overcounting.' If deaths were classified more accurately, then the daily
death toll would be closer to the toll the flu takes during a typical season, Doron says. If this is true, the odds of a
person dying if they get a COVID infection – [] the case fatality rate – would be about the same as the flu now,
which is estimated to be around 0.1%, or perhaps even lower" (Reference (e)).

14

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

COVID-19…. Crude mortality risk (cMR) (deaths per 100 patients hospitalized primarily for
COVID-19) was lower during the early Omicron (13.1) and later Omicron (4.9) periods than
during the Delta (15.1) period (p<0.001). Adjusted mortality risk was lower during the Omicron
periods than during the Delta period for patients aged ≥ 18 years, males and females, all racial
and ethnic groups, persons with and without disabilities, and those with one or more underlying
medical conditions…. *During the later Omicron period, 81.9% of in-hospital deaths occurred
among adults aged ≥ 65 years and 73.4% occurred among persons with three or more
underlying medical conditions.*" In short, the CDC's researchers conclude, "[r]isk for severe
COVID-19 increases with age, disability, and underlying medical conditions. The SARS-CoV-2
Omicron variant is more infectious but has been associated with less severe disease." What is
perhaps most notable about Omicron is just how contagious and transmissible it is, a
characteristic unabated by the vaccines, as documented above. While wildly contagious to both
the vaccinated and unvaccinated, the risks of Omicron are disproportionately borne by the
elderly and infirm (certainly not by the young, healthy, and previously-infected/recovered such
as SWCC 3 .) Indeed, recent CDC data documents the death risk posed to those in SWCC 3 's
age group is 60 times less than those aged 65 to 74, 140 times less than those aged 75 to 84, and
330 times less than those over 85 – and this doesn't even take into account the health and fitness
or natural/vaccinated immunity levels of those within SWCC 3 's age group (Enclosure (8)). A
welcome reality of the "later Omicron" landscape is that hospitalizations and deaths from SARS-
CoV-2 in young, healthy individuals, like SWCC 3 , are so rare as to hardly register on the
CDC's own charts (see below)[10]. Although some may point to "long COVID" as a risk
justifying compelled vaccination of even the young and healthy, Dr. Monica Gandhi, an
infectious disease specialist at the University of California, San Francisco, is quick to push back,



COVID-19 Weekly Deaths per 100,000 Population by Age Group, United States
March 01, 2020 - September 17, 2022*

---

[10] Although visually capturing just how low the SARS-CoV-2 death risk is for the young, this chart nevertheless
overstates that risk, for the reasons discussed in the prior footnote, as it counts all deaths *with* a positive COVID test,
even those *from* other causes. Another critical factor suggesting the actual death rate – for all age groups – may be
even lower yet is the underreporting of infections due to the emergent prevalence of at-home testing, which reduces
the documented number of confirmed cases – i.e., the denominator in the number of deaths over confirmed cases
(the fatality rate).

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

noting that "much of the estimated risk for long COVID comes from people who got seriously ill
at the start of the pandemic" and that "if you account for that, the risk of long term health
problems may not be greater from COVID than from other viral infections like the flu…. 'It was
really severe COVID that led to long COVID. And as the disease has become milder, we're
seeing lower rates of long COVID'" (Reference (e)).

18.  Acknowledging that the risk posed by the Omicron variant for those aged 20-29 without
multiple comorbidities is very low, and that both a healthy, active lifestyle and prior SARS-CoV-
2 infection and recovery further reduce this low risk, I nevertheless acknowledge that the risk is
not non-existent.  What, then, would be the expected benefit of injection with the Pfizer or
Moderna vaccines?[11]  Dr. Paul Offit, vaccine developer, pediatrician, and a member of the
FDA's Vaccine Advisory Committee, said the following in a CNN interview on 1 September
2022:  "Who are those people – who are those people who are getting hospitalized?  It really falls
into three groups.  One is the elderly, meaning people over 65.  Two is the kind of people who
have serious health problems – say, chronic lung disease – which, when they get a mild or
moderate infection lands them in the hospital.  And, there is people who are immune
compromised.  When you're asking people to get a vaccine, I think there has to be clear evidence
of benefit….  You'd like to have at least human data where you see a clear and dramatic increase
[of protection]….  If you don't have that, if there's not clear evidence of benefit, then it's not fair
to ask people to take it no matter how small the benefit – the benefit should be *clear*."  Stated
differently, "A thorough *ethical* evaluation of risks and benefits requires relevant *empirical* data,
especially where risks and benefits can be quantified to a reasonable degree of certainty.
Relevant data include not only those regarding average individual vaccine safety and
effectiveness but also age-stratification of these data as well as the protective effect of prior
infection and the effectiveness of vaccines against transmission" (Reference (d)).

19.  Critically, any benefits of the mandated vaccines should only be discussed in relation to the
Omicron variant of SARS-CoV-2, the only present variant of concern.  As the aforementioned
*Lancet*-published study exhaustingly documented, vaccine effectiveness across all age groups
has been considerably worse against the Omicron variants, particularly the currently dominant
BA.4 and BA.5 subvariants, compared to Delta and earlier SARS-CoV-2 strains.  According to
CDC data (reference (f)) presented on 1 September, data patterns revealed vaccine effectiveness
was "waning substantially," LCDR Ruth Link-Gelles said while presenting the data to the CDC's
vaccine advisory panel.  In particular, this trend of diminishing vaccine efficacy was even more
pronounced in data drawn from the months during which the dominant BA.4 and BA.5
subvariants displaced prior Omicron subvariants.  For instance, across all age groups, even the
elderly, "immunocompetent" adults – the adult population with the immunocompromised

---

[11] I recognize that "Comirnaty" and "Spikevax" are the brand names for, respectively, Pfizer's and Moderna's
SARS-CoV-2 vaccines and that these branded vaccines have been approved by the FDA.  I also recognize that the
formulations of these branded, FDA-approved pharmaceuticals are ostensibly the same as the formulations for the
non-branded Emergency Use Authorized (EUA) pharmaceuticals the overwhelming majority of Sailors in my
claimancy have received.  Throughout this endorsement, I refer to the vaccines by their manufactures' names simply
because the actual FDA-approved pharmaceuticals – those labeled either "Comirnaty" or "Spikevax" – remain
largely unavailable in the United States.  The professed interchangability of the formulations notwithstanding, the
specific vials my Sailors receive have "been granted an EUA by the FDA, but are still not fully approved [unlike
those specifically labeled "Comirnaty" or "Spikevax"] and, therefore, provide a less "transparent legal route to
adequate compensation" in case of injury (Reference (d)).

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

excluded – realized only 44% protection against emergency room and urgent care visits during
the months of BA.4 and BA.5 subvariant dominance. This protection waned to a mere 26% after
150 days from receipt of the second dose. Similarly, protection against hospitalization declined
during the months of BA.4 and BA.5 subvariant dominance, with immunocompetent adults, such
as **SWCC 3** , realizing a mere 25% protective benefit against hospitalization beyond 150 days
from receipt of the second dose. Invoking Dr. Offit's words in the paragraph above, is this
benefit *clear* enough to justify infringement of constitutionally protected liberties?

20. Similarly, recent data sets from the health departments of many states underscore the
worsening performance of the current shots as increasingly vaccine-evasive Omicron
subvariants, like BA.4 and BA.5, emerge and assert dominance. Like the CDC data discussed in
the paragraph above, this state-level data is mostly recent, accounting for the current dominant
subvariants. This contrasts with much of the data informing references (g), (h), and (i), a great
deal of which references numbers from the Delta wave and earlier waves of variants for which
the vaccines demonstrated higher effectiveness. Further, in 25 states reporting "breakthrough"
data (in either SARS-CoV-2 cases, hospitalizations, or deaths), the vaccinated comprise a
majority of at least one of these breakthrough metrics (and, in some cases, all). In over half of
these 25 states, the percentage of vaccinated residents comprising one of these breakthrough
categories *exceeds* the statewide vaccination[12] percentage. Stated another way, in a majority of
these states, vaccinated individuals now appear *more* likely to either contract SARS-CoV-2, be
hospitalized for SARS-CoV-2, or die of SARS-CoV-2 compared to their unvaccinated
counterparts. Although these raw numbers often (but not always) do not account for factors such
as age, and although not all states conveniently report all three metrics (cases, hospitalizations,
and deaths) by vaccination status, the cumulative impact of the reported data – both the more
recent CDC data and the statewide breakthrough data – does not provide a resounding
endorsement for the efficacy of the vaccines against BA.4 and BA.5.

21. As noted above, in a number of states the percentage of at least one metric – post
vaccination SARS-CoV-2 cases, hospitalizations, or deaths – has exceeded the vaccinated
percentage of the state population in recent months.

   a. In **Minnesota**, from 5 June to 3 July 2022, 71% of SARS-CoV-2 cases (29,660 cases)
and 80% of deaths (107 deaths) were observed in the vaccinated population. 66% of
Minnesotans were vaccinated during this period (Reference (j)).

   b. In **Oklahoma**, from 5 June to 5 July 2022, 64% of SARS-CoV-2 hospitalizations (277)
were observed in the vaccinated population. 51% of Oklahomans were vaccinated during this
period (Reference (k)).

   c. In **Wisconsin**, during June 2022, 65% of new cases (31,702), 64% percent of
hospitalizations (634), and 66% of deaths (69) were observed in the vaccinated population.
61.5% of Wisconsin residents were vaccinated during this period (Enclosure (9)).

[12] For the purposes of this comparison and the data vignettes in the below paragraph, those who are "boosted" are
included in the "vaccinated" category.

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

d.  In **Idaho**, from 5 June to 2 July 2022, 53% of hospitalizations (89) were observed in the
vaccinated population.  52% of Idaho residents were vaccinated during this period (Enclosure
(10)).

e.  In **Rhode Island**, during June 2022, 76% of deaths (22) were observed in the vaccinated
population.  75.6% of Rhode Island residents were vaccinated during this period (Reference (l)).



Source: Minnesota Department of Health
Fully Vaccinated during this period: 66%

f.  In **Utah**, from 5 June to 26 June 2022, 67% of cases (17,856) and 67% of hospitalizations
(623) were observed in the vaccinated population.  62% of Utah residents were vaccinated
during this period (Reference (m)).

g.  In **Kentucky**, during June 2022, 67% of deaths (55) were observed in the fully (53) or
partially (2) vaccinated population.  66% of Kentucky residents were vaccinated during this
period (Enclosure (11)).

h.  In **Vermont**, during June 2022, 84% of hospitalizations (32) and 91% of deaths (10) were
observed in the vaccinated population.  78.6% of Vermont residents were vaccinated during this
period (Enclosure (12)).

i.  In **Alaska**, during March 2022[13], 64.5% of cases (3,995) were observed in the vaccinated
population.  59.1% of Alaska residents were vaccinated during this period (Reference (n)).

j.  In **Mississippi**, from 1 April through 1 August 2022, 54% of deaths were observed in the
vaccinated population.  51.7% of Mississippi residents were vaccinated during this period
(Enclosure (13)).

k.  In **South Dakota**, during June 2022, 74% of hospitalizations (141) and 66.6% of deaths
(8) were observed in the vaccinated population.  58% of South Dakota residents were vaccinated
during this period (Reference (o)).

l.  In **Louisiana**, during the week of 21 July, 61% of deaths were observed in the vaccinated
population.  52% of Louisiana residents were vaccinated during this period (Enclosure (14)).

---

[13] Although Alaska's Department of Health had regularly posted quarterly COVID-19 updates, which included
breakthrough data, this update from March 2022 (available at:
https://health.alaska.gov/dph/Epi/id/siteassets/pages/HumanCoV/COVID_monthly_update.pdf) is the last such
update posted on the Department's webpage.

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

22.  Although the reporting formats and reporting periods differ from state to state (most
nevertheless encompass periods of BA.4 and BA.5 dominance), and although the percentages of
vaccinated personnel accounting for breakthrough metrics does not exceed the statewide
vaccination rate in 11 of 25 states, the statewide breakthrough data – across the board – conveys
an unmistakable shift from the earlier stages of the pandemic, when unvaccinated individuals
comprised the overwhelming majority of state-reported SARS-CoV-2 cases, hospitalizations,
and deaths and when the vaccines apparently performed better against the then-dominant variants
and subvariants of SARS-CoV-2. Accordingly, the weight of recent CDC and statewide data
undermines the argument that the Navy's interest in **SWCC 3** 's health and safety is somehow
compelling enough to justify his injection in violation of his religious beliefs. Might the
vaccines provide him *some* benefit? Indeed. Nevertheless, good faith (and a wealth of data)
requires acknowledgement that the risk he faces from the current subvariants is not all that great.
The protection offered from the current FDA-approved vaccines is not all that good or long-
lasting. And, **SWCC 3** already has some protective benefit from his prior infection and
recovery. Furthermore, this analysis only considers the potential health *benefits* of **SWCC 3**'s
injection, yet the *risks* accompanying injection must also be considered.[14]

23.  As discussed above, in order to properly assess (to the degree RFRA requires) whether the
Navy's requirement that **SWCC 3**, specifically, receive an injection furthers a compelling Navy
interest in protecting health and safety at the individual level – i.e., **SWCC 3** 's own health and
safety – we must assess whether it is *necessary* that **SWCC 3** receive one of these drugs – over
his sincere religious objection – in order to protect *his own* health and safety. In order to
properly make this assessment "to the person," we must weigh the risk the current form of the
virus presents to **SWCC 3** as well as the benefits the currently available FDA-approved
vaccines would reasonably provide *to* **SWCC 3**. Nevertheless, any analysis that fails to
consider and weigh the risks these drugs present to **SWCC 3** would be incomplete. As noted
above, "RFRA requires an 'individualized assessment,' an honest analysis – to the person,
**SWCC 3** – of the marginal risk *of remaining unvaccinated*." An individualized assessment of the
marginal risk *of getting vaccinated* logically follows.

24.  We have been often told that the current FDA-approved vaccines are "safe and effective."
While this may be true generally, the known risks presented by the vaccines continue to mount
and often operate in an age-specific manner. Additionally, it merits acknowledgement that the
current FDA-approved vaccines for SARS-CoV-2, both utilizing Messenger RNA (mRNA)
technology (a novel platform with "unknown unknowns"), are quite different in several respects
from other vaccines, most notably the flu vaccine, my Sailors receive annually. These mRNA
vaccines are certainly more reactogenic, with a higher proportion of Sailors forced to miss work
following injection and a higher number of adverse events compared to, for instance, the flu
vaccine. For example, one of my subordinate commanding officers, a relatively young and
exceedingly fit SEAL who, like **SWCC 3**, had previously contracted and recovered from
SARS-CoV-2, experienced significant adverse reactions to the mRNA injection, falling far more
ill than at any point during his prior SARS-CoV-2 infection. My intent in sharing this anecdote
is not to suggest his experience is universal or that these pharmaceuticals are more harmful than

---

[14] "While harms from Covid-19 vaccines are rare they should be factored into policy recommendations" (Reference
(d)).

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

the virus but, rather, to simply illustrate in a personally-observed manner that these shots can
cause harmful adverse reactions, especially to those who had previously contracted SARS-CoV-
2. "In those with a prior SARS-CoV-2 infection, post-vaccination symptoms causing missed
work or daily activities are reported two- to -three-fold more often than those without a history of
infection, a major concern given that the seroprevalence among adults aged 18-49 is now well
above the February 2022 estimate of 67%" (Reference (d)). Another distinguishing
characteristic of the two mandated SARS-CoV-2 vaccines is the fact they are formulated to
counteract *past* strains of SARS-CoV-2 (hence their waning efficacy). And, perhaps most
significantly, the known risks of these mRNA pharmaceuticals appear greatest in the young,
those who generally face the lowest risk from the virus itself.

25.   Vaccination-associated myo/pericarditis is often referenced as "rare, (typically) 'mild' and
followed by rapid recovery with anti-inflammatory treatment. [However, t]he reviews have not
framed vaccine-associated risks versus infection-associated risks using compatible denominators
based on exposure (vaccination) and infection (seroprevalence), thus the infection-associated
risks have been overstated by at least a factor of four according to CDC estimates of the burden
of Covid-19 illness. [Reference (p)] However, it has been found to occur in as many as 1 in
2652 males aged 12-17 years old and 1 in 1862 males aged 18-24 years old after the second dose
[Reference (q) [15]] (and as high as 1/1300 after the second dose in a Pfizer-Moderna
combination). [Reference (r)] An Israeli study described 1 in 5 cases among 16-29 year-olds to
be of intermediate severity, meaning these cases had persistent new/worsening abnormalities in
left ventricular (LV) function, or persistent ECG anomalies, or frequent non-sustained
ventricular arrhythmias without syncope [Reference (s)].... The potential long-term impact of
scar tissue on heart conduction remains unknown. [] *Post-vaccination myocarditis has been
found to be equivalent to or exceed the risk of post-Covid myocarditis in males less than 40 years
old despite the lack of seroprevalence-based estimates of Covid-associated myocarditis[16]*.
[Reference (t)]" (Reference (d)). (Emphasis mine)

26.   According to the CDC, incidence of myocarditis is significantly elevated for males in ▆▆▆
SWCC ▆'s age group, even with the shortcomings in the VSD's search algorithm discussed in
footnote (15).

---

[15] "We identified additional valid cases of myopericarditis following an mRNA vaccination that would be missed by
the VSD's search algorithm, which depends on select hospital discharge diagnosis codes. *The true incidence of
myopericarditis is markedly higher than the incidence reported to US advisory committees in the fall of 2021.* The
VSD should validate its search algorithm to improve its sensitivity for myopericarditis." (Emphasis mine)
[16] Although I acknowledge statements to the contrary, such as that in reference (v), these overly-broad and
generalized statements that "COVID-19 infection poses higher risk for myocarditis than vaccines" ignore the
difference between, for instance, a 28-year old man and an 88-year old woman. Lumping *everyone* together hides
critical safety signals, such as the emergent reality that, in the age of weaker Omicron subvariant dominance, the
mRNA vaccines now can cause more myocarditis in men under 40 than COVID-19 infection. This conclusion
(which is especially pronounced "after a second dose of the [Moderna] vaccine") is supported by the data in
reference (t), which requires careful parsing (especially Table 2) due to the reporting format. Additionally, by
lumping all men under 40 together, the study obscures the outsized harm of myocarditis posed, for instance, to 16-24
year-old males.

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

**VSD incidence rates of verified myocarditis/pericarditis 0–7 days following mRNA COVID-19 vaccination – December 14, 2020–March 31, 2022**

| (Adults ages 18-39 years) | Pfizer-BioNTech[1] Incidence rate per million doses admin | Moderna[2] Incidence rate per million doses admin | (Children ages 5-17 years provided for reference) | Pfizer-BioNTech[1] Incidence rate per million doses admin |
|---|---|---|---|---|
| **18–29 years** | | | **5–11 years** | |
| Males – Dose 1 | 14.4 | 24.1 | Males – Dose 1 | 0.0 |
| Males – Dose 2 | 81.4 | 97.3 | Males – Dose 2 | 15.7 |
| Males – 1st Booster | 47.6 | 70.3 | Females – Dose 1 | 0.0 |
| Females – Dose 1 | 2.4 | 7.9 | Females – Dose 2 | 0.0 |
| Females – Dose 2 | 5.0 | 4.1 | **12–15 years** | |
| Females - 1st Booster | 4.7 | 7.0 | Males – Dose 1 | 9.5 |
| **30–39 years** | | | Males – Dose 2 | 151.4 |
| Males – Dose 1 | 2.8 | 4.5 | Males – 1st Booster | 16.7 |
| Males – Dose 2 | 14.7 | 37.0 | Females – Dose 1 | 0.0 |
| Males – 1st Booster | 16.5 | 7.1 | Females – Dose 2 | 25.0 |
| Females – Dose 1 | 0.0 | 3.8 | Females - 1st Booster | 0.0 |
| Females – Dose 2 | 7.3 | 3.9 | **16–17 years** | |
| Females · 1st Booster | 4.0 | 11.1 | Males – Dose 1 | 9.6 |
| | | | Males – Dose 2 | 139.1 |
| | | | Males – 1st Booster | 198.1 |
| | | | Females – Dose 1 | 9.2 |
| | | | Females – Dose 2 | 9.5 |
| | | | Females - 1st Booster | 43.4 |

[1]Pfizer dose totals, all ages/sexes, dose 1 2,583,000, dose 2 2,464,535, 1st booster 357,217. [2]Moderna dose totals, all ages/sexes, dose 1 350,501, dose 2 974,785, 1st booster 541,824.

27.  Similarly, German hospital data captured significantly elevated myocarditis events in German 16 to 39 year-olds during the summer of 2021, a period of relatively low SARS-CoV-2 infection activity in Germany, compared to the same period during the summer of 2020, when no one had yet received an mRNA vaccine.  If the 2021 spike in myocarditis was caused by SARS-CoV-2 infection, why is no prior infection-induced spike reflected in these numbers?  (In fact,

Myocarditis Cases 16-39y in German Hospitals



Data Source: InEK Datenbrowser [accounting data of all german Hospitals], by Rate of discharge
16-39 year-old patients with any diagnosis of myocarditis (I01.2-I03.0-I40.x-I41-I51.4)

the myocarditis case rates in this age group were consistently at or below the pre-SARS-CoV-2 average until implementation of mass mRNA vaccination of this age group.)
mRNA vaccines now can cause more myocarditis in men under 40 than COVID-19 infection. This conclusion (which is especially pronounced "after a second dose of the [Moderna] vaccine") is supported by the data in reference (t), which requires careful parsing (especially

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

Table 2) due to the reporting format.  Additionally, by lumping all men under 40 together, the
study obscures the outsized harm of myocarditis posed, for instance, to 16-24 year-old males.

28.  Additional research tracked the data of patients who were administered SARS-CoV-2
vaccinations in 40 hospitals in Washington, Oregon, Montana, and Los Angeles County within
the same hospital system, flagging those vaccinated patients "who subsequently had emergency
department or inpatient encounters with diagnoses of myocarditis, myopericarditis, or
pericarditis" (Reference (w)).  This data mirrors that from German hospitals, showing peaks in
myocarditis, particularly in younger males, after mRNA vaccine administration.



Figure. Monthly Number of Inpatient and Emergency Department Cases of Myocarditis and
Pericarditis at 40 Hospitals in the Western US

A   Incident cases of myocarditis

Month and year of first hospital visit

"Two distinct self-limited syndromes, myocarditis and pericarditis, were observed after COVID-
19 vaccination.  Myocarditis developed rapidly in younger patients, mostly after the second
vaccination.... Some vaccines are associated with myocarditis,[] including mRNA vaccines,[]
and the Centers for Disease Control and Prevention recently reported a possible association
between COVID-19 mRNA vaccines and myocarditis, primarily in younger male individuals
within a few days after the second vaccination, at an incidence of about 4.8 cases per 1 million.[]
This study shows a similar pattern, although at higher incidence, suggesting vaccine adverse
event underreporting....  Temporal association does not prove causation, although the short span
between vaccination and myocarditis onset and the elevated incidences of myocarditis... in the
study hospitals lend support to a possible relationship."

29.  Furthermore, data from the Pfizer and Moderna phase III clinical trials, much of which was
not available until relatively recently, also illustrates the excess risk of serious adverse events
resulting from these manufacturers' mRNA vaccines.  A recent study of this data "used a simple

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

harm-benefit framework to place [its] results in context, comparing risks of excess serious AESIs
[(adverse events of special interest)[17]] against reductions in COVID-19 hospitalization"
(Reference (x)). Most notably, "In the Moderna trial, the excess risk of serious AESIs (15.1 per
10,000 participants) was higher than the risk reduction for COVID-19 hospitalization relative to
the placebo group (6.4 per 10,000 participants). In the Pfizer trial, the excess risk of serious
AESIs (10.1 per 10,000) was higher than the risk reduction for COVID-19 hospitalization
relative to the placebo group (2.3 per 10,000 participants)." The study's authors later conclude,
"These results raise concerns that mRNA vaccines are associated with more harm than initially
estimated at the time of emergency authorization…. Rational policy formation should consider
potential harms alongside potential benefits. To illustrate this need in the present context, we
conducted a simple harm-benefit comparison using the trial data comparing excess risk of
serious AESI against reductions in COVID-19 hospitalization. *We found excess risk of serious
AESIs to exceed the reduction in COVID-19 hospitalizations in both Pfizer and Moderna trials.*"
(Emphasis mine.) Of particular relevance to the risk-benefit analysis with respect to SWCC 3,
"harm-benefit ratios would presumably shift towards harm for those with lower risk of serious
COVID-19 outcomes—such as those with natural immunity, younger age or no comorbidities.
Similarly, waning vaccine effectiveness, decreased viral virulence, and increasing degree of
immune escape from vaccines might further shift the harm-benefit ratio toward harm."
(Emphasis in original.)

30. Tying these threads together, the key question is not whether the current FDA-approved
vaccines are 100 percent safe and effective. Multiple states and western countries believe they
are not[18], but many vaccines with lower effectiveness can still reduce disease. The key question,
is whether the Navy's interest in SWCC 3 's individual health and safety is sufficiently
compelling, given the present factual landscape, to justify injecting him with one of these drugs
over his sincere religious objection. It is not.

    a.  SARS-CoV-2 has always operated in a highly age-specific manner. That remains true
with the dominant BA.5 (and less dominant BA.4) Omicron subvariant.

    b.  SWCC 3 is in an age group at one of the lowest risk levels, and with one of the lowest
public health burdens, from SARS-CoV-2 and is at statistically miniscule risk of severe disease
or death from the less-dangerous Omicron variant.

    c.  As natural immunity has repeatedly been documented to provide protection from SARS-
CoV-2 re-infection, hospitalization, and death (as recently acknowledged by the CDC) –
protection that's longer-lasting than that from the quickly-waning mRNA vaccines – SWCC 3,
who has contracted and recovered from SARS-CoV-2, is at even less risk from this relatively
mild virus than the generalized statistics for his age group suggest.

---

[17] "In 2020, prior to COVID-19 vaccine rollout, the Brighton Collaboration created a priority list, endorsed by the
World Health Organization, of potential adverse events relevant to COVID-19 vaccines. We adapted the Brighton
Collaboration list to evaluate serious adverse events of special interest observed in mRNA COVID-19 vaccine
trials" (Reference (x)).
[18] If they were, it's difficult envisioning multiple European countries, the state of Florida, and Kaiser Northwest
restricting or cautioning against the use of Moderna shots in younger populations and Denmark effectively
restricting both vaccines for almost everyone under the age of 50.

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

d.  In addition to his young age and natural immunity, **SWCC 3** 's personal health and
fitness level and absence of comorbidities further reduces the statistically miniscule risk he faces
from SARS-CoV-2 reinfection.

e.  While there may yet be some negligible benefit from the mRNA vaccines in this
omicron-dominant SARS-CoV-2 landscape, there certainly isn't the "clear and dramatic increase
[of protection]" (Dr. Offit's verbiage) to justify these drugs for **SWCC 3** .  While these are the
same vaccines from 2020 and 2021, this is not the same virus.  Today's variants are less lethal
and far better at evading yesterday's vaccines.

f.  As such, the leaky vaccines "provide a low impact on hospitalization and a low impact on
transmission for an age group with a low prospect of benefit" (Reference (d)).

g.  Furthermore, the vaccines carry risks of their own, particularly to young males, like
**SWCC 3**, who have already contracted SARS-CoV-2.

h.  Beyond their documented post-injection reactogenic qualities, causing symptoms and
requiring work absences at significantly heightened rates for those with prior SARS-CoV-2
infection, the risk of adverse events, captured in real world and clinic trial data, is too great to
ignore.

31.  I will not argue the risks of the shots exceed the risk of Omicron to **SWCC 3** .  I will,
however, acknowledge the growing body of scholarly, data-driven research credibly making that
argument.  Returning to the core question posed by RFRA, in light of the aforementioned data,
scholarly studies, and hundreds of observable touchpoints across my claimancy since Omicron
became the dominant variant, I believe that whatever the marginal benefit these shots might
provide **SWCC 3**, they are not *necessary* to protect his personal health and safety.  Broadly
speaking, these shots might advance "military readiness," "health and safety," and "good order
and discipline[19]."  Applied *to the person* of **SWCC 3** against the present factual landscape,
however, these generalized interests do not clear the "high bar" required by RFRA.

32.  **Does the Navy's requirement *that* SWCC 3 , *specifically*, receive an injection with one
of the COVID-19 pharmaceuticals further a compelling Navy interest in organizational
readiness, unit cohesion, and mission accomplishment?**  Stated another way, is it *necessary*
that **SWCC 3** receive one of these drugs – over his sincere religious objection – to avoid a
predictable and detrimental impact to his Navy Reserve Unit (NRU) or to the Navy's military
readiness and ability to execute its missions?  For the reasons discussed below, I do not believe it
is.

---

[19] A federal official "cannot simply utter[] magic words…and as a result receive unlimited deference from those of
us charged with resolving these disputes." *Davila v. Gladden*, 777 F.3d 1198, 1206-07 (11th Cir. 2015) (citing *O
Centro*, 546 U.S. at 438). "Instead, the government must proffer 'specific and reliable evidence' (not formulaic and
generic commands, policies, and conclusions) demonstrating that the marginal benefit flowing from a specific denial
furthers a compelling government interest." *Colonel Financial Management Officer* at 35 (citing *Davila*, 777 F.3d
at 1206).

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

33.  I've observed broad, generalized concerns that accommodation of Sailors like SWCC 3
would possibly "have an adverse impact on mission accomplishment, including military
readiness, unit cohesion and good order and discipline" or "have a predictable and detrimental
effect on the readiness" of accommodated Sailors and their shipmates – but, specifically, how
so?  At this point, nearly three years into the new COVID reality, I remain uncertain as to what
the *specific* concern is with granting SWCC 3 a religious accommodation.  I certainly
appreciate the Navy's "broadly formulated interests", but I cannot ascertain just what,
specifically, is "the *marginal* interest in enforcing the [government] mandate[.]" *Burwell*, 573
U.S., at 694-95, *citing O Centro*, 546 U.S., at 431 (emphasis mine).  Nor can I ascertain what,
specifically, is the marginal risk of SWCC 3 serving his country without these specific
vaccines.

34.  Acknowledging that RFRA requires a "more focused" inquiry, how, specifically, would
accommodating SWCC 3 have a "predictable and detrimental" impact on the "Sailors who
serve alongside" him?  Surely, given the widely-acknowledged and documented inefficacy of the
vaccines in preventing the spread of SARS-CoV-2 (discussed in paragraphs eight through 12,
above), one cannot credibly argue that SWCC 3 's vaccination status somehow places the health
and safety of his mostly-vaccinated shipmates at outsized risk of contracting COVID.
Additionally, given how miniscule the risk posed to SWCC 3 's own health and safety by
SARS-CoV-2 is (discussed in paragraphs 13 through 31), one cannot credibly argue that, in spite
of his young age, exemplary health and fitness, and natural immunity, SWCC 3 's vaccination
status somehow places his own health and safety at outsized risk and that this marginal risk, if
any, would predictably and detrimentally impact his own military readiness or that of his
shipmates.

35.  Given the shortcomings of the above-mentioned "health and safety"-rooted arguments when
posited against the evolving factual backdrop of a much-weakened virus, the statistically
negligible SARS-CoV-2 risk to ▇▇ SWCC3, and the documented deficiencies of the vaccines
relative to BA.4, BA.5, and newer subvariants, I can only conclude that invocations of "broadly
formulated interests" like "military readiness" and "mission accomplishment," are somehow
rooted in SWCC 3 's "deployability," and that of other religiously-objecting Sailors like him.
Although the Chief of Naval Personnel's templated denial of SWCC 3 's religious
accommodation request largely alludes to "health and safety" concerns for SWCC 3 and those
shipmates he "will inevitably be expected to live and work in close proximity with," the denial
letter in response to the religious accommodation *appeal* of another of my Sailors notes that
"[l]ack of worldwide deployability affects organizational readiness" and also that the Sailor's
Selected Reserve (SELRES) status requires that he "be continuously screened for immediate
voluntary or involuntary mobilization availability…. By regulation, you are required to be
prepared to report to your supporting Navy Reserve Center within 24 hours of receiving
mobilization orders."  No doubt, "worldwide deployability affects organizational readiness."
Nevertheless, applying this argument as grounds for depriving SWCC 3 of his free exercise
rights and denying his appeal would be disingenuous, because the proximate and most-
immediate cause of SWCC 3 's present non-deployability is not that he is unfit, unqualified, or
unable to deploy but, quite simply, that the military won't allow him to deploy.  And herein lies
the rub: on one hand is the Navy's COVID travel policies, which I will unequivocally enforce as
directed; on the other is my oath and my charge of command.  I will carry out my orders as
delivered, yet my role in this process – and my obligations under RFRA and implementing

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

instructions, places me well outside my comfort zone, as it's difficult to reconcile my support for
this policy broadly and my intent to live up to my oath and to my charge of command.  On one
hand, I acknowledge this policy (a policy I believe was implemented with noble intentions)
effectively preventing the official travel, much less the mobilization, of SWCC 3 and Sailors
like him so long as he remains unvaccinated – and, *personally*, I want this Sailor to get the
vaccine.  On the other hand, I must also acknowledge the "high bar" of RFRA and the "to the
person" inquiry it imposes and, from my vantage point as SWCC 3 's Commander (and,
essentially, as your sensor at the point of impact), I must concede the COVID travel policy does
not meet the high bar for *this* individual Sailor *in this individual situation*.

36.  As the Commander of Naval Special Warfare's (NSW) Reserve Component (RC), I am
responsible for mobilizing SELRES members to fill validated and vetted NSW and Special
Operations Command (SOCOM) requirements, a task that is growing more difficult for reasons I
will later address.  In the interests of fairness and transparency, NSWG-11 mobilizes SELRES
members to fill requirements in order of dwell status – that is, the qualified SELRES member out
of dwell the longest is the member who is "tagged" for mobilization.  Recognizing that
SWCC 3 will be coming out of dwell later this year, I would like to be able to deploy him and
NSWG-11 claimancy Sailors like him, and I am confident he presents no outsized risk to the
health and safety of my force or that of our partner force personnel.  Similarly, I am confident he
presents no outsized risk to the missions my RC force supports nor to relations with our foreign
partners.  Although I want and need to deploy Sailors like SWCC 3 to mobilization billets for
which they are well suited temperamentally and experientially, current policy – specifically
references (y) and (z) – prevents me from doing so.  The country entry requirements for <u>all the
nations where I might mobilize SWCC 3 draw no significant distinction between vaccinated
and unvaccinated travelers</u>, so his vaccination status doesn't prevent him from entering these
countries, yet our travel policies[20] effectively preclude me[21] from sending him and leveraging his
valuable skillset in service of our nation abroad.[22]  In short, while SWCC 3 's deployability
might currently require vaccination against SARS-CoV-2, that is only because we've chosen to
implement such a requirement.  The military "cannot evade RFRA by defining the conditions of
service to exclude the possibility of an accommodation.  This definitional sleight of hand evades
the inquiry that RFRA demands:  whether the [Navy's] generalized interest in worldwide
deployability is materially impaired by tolerating a few religious objectors and accommodating

---

[20] Reference (z) provides "guidance on mission-critical travel for unvaccinated individuals," in the name of
protect[ing] the health and safety of the force, maintain[ing] mission readiness and comply[ing] with federal,
Department of Defense (DoD), Department of the Navy (DON) and Host Nation (HN) guidelines."  Yet, with a
litany of countries (including all where I'd conceivably send SWCC 3 ) permitting unvaccinated travel (most with
no SARS-CoV-2 testing or quarantine requirements), only our own military guidelines actually preclude his
mobilization and travel.
[21] Although I acknowledge the theoretical possibility that SWCC 3 's mobilization could be authorized, the path
implemented to actually effectuate that course of action is so onerous, and approval authority so highly-elevated, as
to chasten and discourage trying.  "[T]ravel of unvaccinated individuals should be minimized.  Requests for official
travel by unvaccinated personnel outside of the following categories will be routed to the Under Secretary of the
Navy (UNSECNAV) for decision via the Chief of Naval Personnel (CNP), the Chief of Naval Operations (CNO)
and the Assistant Secretary of the Navy for Manpower and Reserve Affairs (ASN MRA)" (Reference (z)).
[22] I likewise am confident SWCC 3 's vaccination status presents no readiness risk in a mass-mobilization (i.e., a
"fight tonight") scenario, which would likely see him recalled CONUS, likely at an NSW Training Detachment
(TRADET), to backfill active component personnel surged forward.

CUI // HIPAA

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

their continued service to the [Navy] despite the generalized policy of worldwide deployability."
*Colonel Financial Management Officer* at 40. To reiterate, I will carry out my orders as
delivered and will continue to enforce the Navy's policy on the travel of unvaccinated Sailors.
As I understand my role under RFRA and implementing instructions, however, I owe it to you to
be the Navy's point man – to explain the facts on the ground, as the Commander closer to this
individual Sailor and to the operational requirements he might reasonably be called to fulfill, to
illuminate the ground-level consequences this policy is having on my force and, hopefully, to
help illuminate a path forward that respects RFRA and mitigates these consequences. Again, I
acknowledge the atypical length and detail of this endorsement; by putting this level of effort
into this at my (and my staff's) level and providing this level of detail, I am trying to serve as
your sensor at the point of impact to convey how this policy impacts this individual and, further,
how it impacts his unit and my Force.

37.   While I am comfortable and confident that **SWCC 3** remaining unvaccinated will not
impair mission accomplishment or readiness, generalized policy – which does not account for
**SWCC 3** 's age, his health, his fitness, his prior infection, specific mission or training
requirements, location of mission, country entry requirements, or any number of other salient
factors – has dictated otherwise, his deployment not deemed "mission critical," per reference (z).
The costs of this policy – and, more broadly, the costs of the growing perception of how
unvaccinated members seeking accommodation for their faith have thus far been treated by the
Navy – cannot be discounted or ignored. Most immediately, these policies – and nothing else –
prevent me from traveling talented, experienced, capable, and healthy operators and support
personnel to training evolutions to maintain their proficiency and from deploying them
downrange to fill validated and vetted requirements[23]. The consequences of these policies have
caused manning shortfalls, which are now compounding[24]. **SWCC 3** is a high-demand, low-
density asset in whom the Navy has invested a considerable amount of time, effort, and money,
and he has operational value in the locations I might send him but for this policy. He is a good
Sailor and I do not want to lose him but, if these policies persist without exceptions for those,
like **SWCC 3** , who merit them, I fear that is what will happen and, as a result, my ability to
support validated DEPORD and other NSW/SOCOM requirements may be jeopardized.

38.   Furthermore, the costs of current policy to my ability to recruit and retain SEAL and SWCC
members in my fenced community are manifest and profound. NSWG-11 closely tracks a
number of data sets and metrics spanning three to 10 years, which we have used to reliably
project inventory for our fenced SELRES force – enlisted Special Operators (SO), enlisted
Special Warfare Combatant Crewmen (SWCC), and SEAL Officers (1135). Leading into fiscal
year 2022, this data projected a net annual gain of 10 personnel in our fenced community. Fiscal
year 2022 ended with a net loss of 28 personnel. This 38-person divergence from our data-

---

[23] For instance, the #1 SEAL Officer on ▮▮▮▮▮▮▮▮ s dwell list and the #1 SEAL enlisted member on
▮▮▮▮▮▮▮▮ s dwell list are both healthy, fit, capable, experienced, and respected special operators
who exercised their right to submit religious accommodation requests and have since caught and recovered from
SARS-CoV-2, with test results evidencing SARS-CoV-2 antibodies.

[24] The prohibition on mobilizing the above-mentioned SEAL Officer to fill an upcoming deployed SOF Task
Element Officer in Charge (OIC) billet left me with no appropriate SELRES SEAL officer outside of dwell. As a
result, an active duty NSW command will be asked to provide a SEAL officer to fill this SELRES role. While this
course of action may buy time, it does not mitigate the growing manning issues or their primary root causes –
policies curtailing unvaccinated travel combined with declining recruiting and retention metrics.

27

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

driven projections prompted me to launch a "Naval Special Warfare Reserve Component
Retention Survey" to better understand the factors driving SELRES members out of the Navy;
this trend, if left unabated, will negatively impact force readiness and the ability to provide
strategic depth and qualified SELRES members to fill NSW mobilization requirements. Over
40% of my total force, comprised of SEALs, SWCCs, and Combat Support/Combat Service
Support (CS/CSS) Sailors, completed the survey, with especially strong support from members
of my fenced community. 79% of SELRES SEALs completed the survey and provided valuable
feedback. Enclosure (15) is a force-facing summary of those results; this document does not
include an additional 67 pages of illuminating, and often constructive, open-ended comments
from the survey respondents. For privacy reasons, I will not include this longer document as an
enclosure but am happy to provide a copy upon request.

39.  In the context of ██SWCC 3██ 's request for accommodation of his religious exercise and
similar requests from other Sailors of faith in my claimancy, two survey questions merit specific
mention. Question 10 asked respondents to what degree their values align with those of today's
Navy, and question 14 asked them to select "up to 5 factors influencing, or that might influence,
you to leave NSW or the Navy." The answers to both – in particular, the often-lengthy
comments my members took the time to provide – are concerning and unambiguously expose the
scar tissue resulting from the manner in which they have seen their religious accommodation
requests, and those of their brothers and sisters in uniform, adjudicated[25] by the Navy. Given the
persistent challenges presented by life in the Selected Reserve, which requires juggling and
balancing a civilian career, a military career, and a personal/family life, I would have expected
"work/life balance issues" to be the most-selected factor influencing SELRES members to leave
the Navy. It wasn't. Of 36 possible answer choices, "Politicization of the military" was the
most-selected factor, chosen by 37.86% of all respondents, and feedback regarding the Navy's
treatment of religious exercise in the context of SARS-CoV-2 permeated the comments. Similar
sentiments were unambiguously conveyed in my DEOCS survey results and correspondent focus
groups. *This* is having a predictable and detrimental effect on the morale and readiness of the
NSW Reserve Force.

40.  Reference (d) argues, "Strong coercion creates significant social harms. Covid-19 vaccine
mandates have often involved a high degree of coercion, effectively ostracizing unvaccinated
individuals from society[26].... When such mandates are not supported by a *compelling* public
health justification and where exemptions are not easily available, the likelihood of reactance and
negative social effects are increased.[]" (Emphasis in original.) I've seen "unit cohesion" raised
as a compelling interest justifying the injection of Sailors over their sincere religious objections,
yet over the past two-plus years I've observed these policies, and the manner in which religious

---

[25] Paragraphs 5 and 11 pertain.

[26] A recurring theme in survey comments. One example, from a SEAL respondent: "DOD and DON's actions on
pushing the COVID vaccines has done undetermined damage to the community and breached my trust plus many of
my teammates, especially those who are religious. I myself took the vaccine and have since regretted it. The long
term health effects of the vaccine are still to be determined. I can only hope that the improperly tested and
researched vaccine will not have long term consequences. Furthermore, I've observed members of my community
who did appropriately research the vaccine and as a result, refused to take the vaccine. Instead of being praised for
their moral courage, these members have been ostracized by the DOD with an undetermined fate in the military and
a mark as 'undeployable'. Furthermore, the amount of mental and emotional stress these members have endured
(not to mention the countless hours they devoted) to request the appropriate religious accommodations is
unjustifiable."

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

accommodations requests have been processed and adjudicated, tear and fray at the fabric of unit
cohesion to a far more detrimental extent than the presence of a few unvaccinated Sailors, like
**SWCC 3** .  Similarly, I've seen "good order and discipline" asserted as a compelling interest
justifying the denial of religious accommodation requests; I shudder at the inescapable inference
that asserting one's rights under RFRA and the constitution threatens good order *and discipline*,
much as would criminal violations of the Uniform Code of Military Justice.  I personally know
the considerable efforts we as a Navy have made to emphasize diversity and inclusion, having
previously spearheaded these efforts for the NSW community – and I know how quickly these
efforts can be diminished and undermined if protected classes, such as Sailors of deep faith
asserting their constitutionally and legislatively-protected Free Exercise rights, are treated with
less deference and respect than other groups of Sailors.  I recognize that change often moves
slowly in bureaucratic organizations as large as ours – but when the constitutionally-protected
rights and liberties of our Sailors are placed in jeopardy by the organization's reliance on
systems and processes that have produced consistently monolithic results *all in the same
direction* – against the individual's Free Exercise rights – and by the organization's failure, or
reluctance, to quickly adapt to changing real-world realities, we risk irreparable harm not only to
Sailors of faith, like **SWCC 3** , but to our reputation – to our organizational credibility – and to
the strides we have taken to foster a genuinely inclusive Naval force.  While acknowledging the
difficulty of the task faced by CNP and staff, I sincerely hope that appeals, like **SWCC 3** 's, will
receive the individualized scrutiny RFRA requires and that the "high bar" the Navy is required to
meet not be lowered.  Anything less risks rendering our efforts to foster true diversity and
inclusion as lip service.

41.  To this point, I've primarily addressed the first prong of the two-prong test proscribed by
RFRA – whether the Navy has a "compelling government interest" in forcing Sailors of deep
faith, such as **SWCC 3** , to receive a pharmaceutical injection in violation of their faith.  For the
reasons discussed above, it is apparent that the Navy can no longer clear that "high bar."
Accordingly, while I see no imperative in exhaustively addressing the second prong of the RFRA
test – that is, whether vaccinating **SWCC 3** over his religious objection is "the **least restrictive
means** of furthering that compelling governmental interest" – I must nevertheless acknowledge
that the "least-restrictive-means standard is exceptionally demanding," *Burwell*, 573 U.S., at
695-96, and also that, to this point, the Navy appears to have made, at best, a generic effort to
address that standard, as the letter denying **SWCC 3** 's religious accommodation request
contains the same wording as the letters my other requesting Sailors received, wording that
asserts broad and general observations rather than addressing the particular context of each
Sailor's request "to the person."

42.  As repeatedly noted throughout this endorsement,   **SWCC 3** has previously contracted and
recovered from SARS-CoV-2.  The overwhelming number of studies examining natural
immunity following symptomatic SARS-CoV-2 infection support the proposition that natural
immunity provides strong and often superior protection against SARS-CoV-2 relative to
vaccinated immunity.  "In February 2022, the CDC estimated that 67% of adults 18-49 had
infection-induced SARS-CoV-2 antibodies, up from 30% in September 2021.  [Reference (bb).]
By now [], the majority of young adults, both vaccinated and unvaccinated, have most likely
already been infected with Covid-19.  Evidence increasingly shows that prior SARS-CoV-2
infection provides at least similar clinical protection to current vaccines [references (cc), (dd),
and (ee)], something that is not acknowledged in current [Navy] policies.  *It is not clear whether*

CUI // HIPAA

Subj:  APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
       PRACTICE

*vaccination of previously infected individuals provides any meaningful benefits with respect to
severe disease, especially for healthy young people.* [Reference (ff)]" (Reference (d)).
(Emphasis mine.)

43.  Enclosure (16), an oft-cited real-world Israeli study that, while not peer-reviewed has
nevertheless been shown to use accurate methodology (Enclosure (17)) and which remains
perhaps the most comprehensive on the topic, establishes that contracting SARS-CoV-2 and
naturally mounting an immune response to it during recovery, as SWCC 3 did, offers greater
protection from future reinfection and severe disease than the MRNA vaccines. Additionally,
most of the studies cited in paragraphs 13 through 29 of this endorsement acknowledge the
protective benefits of natural immunity with Omicron as the dominant SARS-CoV-2 variant, and
the CDC's acknowledgements mirror these findings. Reference (aa), a CDC report, analyzed
SARS-CoV-2 cases in New York and California from 30 May to 20 November 2021, comparing
the risk of infection against several cohorts. The data clearly illustrated that natural immunity
provided more protection against infection during the Delta wave compared to vaccinated
immunity – 35x protection compared to 8.3x protection, respectively, in California. More
recently, the CDC's 11 August 2022 guidance acknowledges the protection provided by prior
infection and recovery, as discussed in paragraph (13). Furthermore, as reflected in Enclosure
(18), the CDC concedes it has no record of anyone with natural immunity transmitting SARS-
CoV-2, which undermines the argument that SWCC 3 would place his shipmates at greater risk
of contracting the virus by remaining unvaccinated.

44.  While Navy Medical officials have argued that "prior infection is not a reliable source of
immunity," discounting the considerable body of evidence and, most recently, the CDC's own
guidance documenting natural immunity's benefits, neither are the approved vaccines.
Furthermore, "[u]sing a national population-wide dataset in Qatar, both previous infection alone
and vaccination alone were found to provide >70% protection against severe, critical or fatal
Omicron (BA.1 or BA.2). [Reference (gg).] *Prior infection alone was 91% effective whereas
protection from two or three doses of vaccine alone was 66% and 83%, respectively.* Covid-19
does cause acute illness, and may have long-term effects for some, particularly those who
develop critical illness, but vaccination appears to confer at best modest protection against
longer-term sequelae [reference (hh)] and the existing data are non-randomized, from variants
that predate Omicron and with unclear relevance for current adults under age 40" (Reference
(d)). (Emphasis mine.) In sum, if the lion's share of evidence, and our own CDC's guidance,
argues that natural immunity offers meaningful protection from contracting or spreading SARS-
CoV-2 (which the vaccines do not) and also from hospitalization and death from the virus, how
can I credibly argue that SWCC 3 's naturally inquired immunity is not sufficient to acquit the
Navy's interests in health, safety, and readiness? It is certainly less restrictive than injecting him
with a pharmaceutical at the expense of his religious convictions and observance.

45.  Non-pharmaceutical measures such as proper wear of N-95 masks and vigilant personal
hygiene also have shown efficacy in slowing the spread of SARS-CoV-2 and helped SWCC 3
and the rest of my NSW RC Sailors complete mission during the height of the pandemic in 2020,
when no SARS-CoV-2 vaccines were available. Although I dislike the optics of requiring *only*
unvaccinated personnel, a large percentage of whom are religious objectors like SWCC 3 , to
wear masks, as this singles-out and ostracizes these Sailors of faith, especially in consideration of
CDC's guidance that no longer differentiates between vaccinated and unvaccinated due to the

Subj:   APPEAL OF DENIAL FOR WAIVER OF POLICY IN SUPPORT OF RELIGIOUS
        PRACTICE

prevalence of breakthrough infections. I nevertheless acknowledge that masking, along with an
array of other safety protocols, helped my claimancy weather the worst of the COVID storm.
There are also CDC-recommended antiviral and other therapeutics that can be taken to help
reduce incidence of hospitalization and death after diagnosis. Although these non-
pharmaceutical measures have obvious shortcomings, implemented in conjunction with ███
swcc3's natural immunity from prior infection they are as, if not more, effective as the vaccines
alone in maintaining military readiness and the health of the force and are unquestionably less
restrictive than compelled injection.

46. In closing, I recognize the length of this endorsement may appear unorthodox.
Nevertheless, my staff and I have invested this time and effort because applying risk-benefit
analyses accounting for **SWCC 3** 's age, health status, mobilization potential, mission
requirements, and prior infection, amongst other variables, is necessary to abide by the governing
law and because, frankly, I have already seen the negative impacts on my manning, the stress on
the force, and the man hours lost due to the one-size-fits-all manner in which religious
accommodation requests have been adjudicated at higher echelons. I cannot afford to
unnecessarily lose more quality Sailors of faith from my ranks.[27] I sincerely hope that you
consider in good faith and with an open mind the positive value proposition of (and legal basis
for) granting this Sailor's religious accommodation request and reach similar conclusions to
mine – that denying **SWCC 3** accommodation does little to further the Navy's compelling
interests nor is injection the least restrictive means of furthering these interests.

47. My point of contact for this matter is CDR Timothy Pasken, who can be reached at
███████████████████████

E. B. ROHRBACH

Copy to:
███████████

---

[27] If not through administrative separation, through resignation, refusal to re-enlist, or loss of trust in their senior
leadership's commitment to upholding RFRA and the Constitution's free exercise protections

CUI // HIPAA